IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-1237-___-___

**ELECTION SYSTEMS & SOFTWARE, LLC,**
      a Delaware limited liability company; and
**HART INTERCIVIC, INC.,**
      a Texas corporation;
          Plaintiffs,

        v.

**WAYNE W. WILLIAMS,**
      in his official capacity as Colorado Secretary of State.
        Defendant.
_____

**MOTION WITH AUTHORITIES FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**
_____

JONES & KELLER, P.C.
      Thomas P. McMahon
      tmcmahon@joneskeller.com
      Aaron D. Goldhamer
      agoldhamer@joneskeller.com
      1999 Broadway, Ste. 3150
      Denver, CO 80202
      Tel. (303) 573-1600
      Fax  (303) 573-8133
      Attorneys for Plaintiffs

Dated:  May 23, 2016

# TABLE OF CONTENTS

D.C. COLO.LCivR 7.1A CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.  TRADITIONAL PRELIMINARY INJUNCTION REQUISITES
    ARE MET HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  ES&S AND HART ARE ALREADY SUFFERING AND WILL
        CONTINUE TO SUFFER IMMEDIATE AND IRREPARABLE INJURY . . . . . . . . . . . . . . . . . 12

        1.  Plaintiffs' Constitutional Rights Are Implicated . . . . . . . . . . . . . . . . . . . . . 12

        2.  Plaintiffs Are Already Losing and Will Continue
            to Lose Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.  Plaintiffs Are Threatened with Being Forced
            Out of Business in Colorado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4.  Plaintiffs Will Suffer Uncertain Damages . . . . . . . . . . . . . . . . . . . . . . . . . 14

        5.  Plaintiffs Will Suffer Loss of Good Will and Reputation . . . . . . . . . . . . . 15

    B.  THE BALANCE OF HARMS FAVORS INITIAL EQUITABLE RELIEF . . . . . . . . . . . . . . . 16

    C.  THE PUBLIC INTEREST FAVORS INITIAL EQUITABLE RELIEF . . . . . . . . . . . . . . . . . 17

        1.  Appropriate Allocation of Voting Systems . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.  Better Pricing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        3.  Increased Innovation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.  Fostering Customer Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    D.  Plaintiffs Have Both a Fair Ground for Litigation and a Reasonable
        Probability and Substantial Likelihood of Success on the Merits . . . . . . . . . . . . . . 19

        1.  The Secretary's Rules Conflict with State Statutes and Are Void . . . . . . . . 20

        2.  The Secretary's Rules Exceed His Statutory Rulemaking Authority . . . . . . 22

II. ALTERNATIVE PRELIMINARY INJUNCTION REQUISITES ARE MET HERE . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Plaintiffs Election Systems & Software, LLC ("ES&S"), and Hart InterCivic, Inc. ("Hart"), file this motion pursuant to Fed.R.Civ.P. 65. Plaintiffs seek to preserve the *status quo ante* and avoid irreparable injury pending resolution of this litigation. ES&S and Hart request this Court issue an order temporarily restraining and preliminarily enjoining the defendant Colorado Secretary of State (the "Secretary") from (i) implementing and applying certain recently-promulgated election rules and (ii) proceeding with his plan to mandate a single uniform voting system for Colorado political subdivisions.

Those rules and that plan would have the effect of denying Colorado political subdivisions their statutorily-guaranteed right to choose which of multiple competing voting systems to acquire for use in conducting elections. Instead, they would be forced to acquire a single, uniform voting system from Colorado-based Dominion Voting Systems, Inc. ("Dominion"). Among other things, that mandate violates the Constitutional rights, privileges and immunities of non-Colorado-based ES&S and Hart to engage in interstate commerce free from unlawful interference.

## D.C. COLO.LCivR 7.1A CERTIFICATION

Plaintiff's undersigned counsel and counsel for the Secretary have conferred regarding the matters addressed in this motion. The parties stand ready to appear in court; no *ex parte* proceeding is contemplated.

## FACTUAL ALLEGATIONS

The facts underlying this lawsuit are set forth in detail in the factual allegations of the Complaint and Jury Demand ("Complaint").[1] In brief, however:

1.    [¶29] Colorado has 64 counties. In general (except for two cities and counties), the

---

[1]    Bracketed references are to numbered paragraphs of the Complaint. The Complaint is not verified because no one witness for each plaintiff can attest to all the factual allegations. Accordingly, this motion is supported by multiple affidavits attesting to various key factual allegations of the Complaint.

governing body of each is the Board of County Commissioners.  The chief election official of each is the Clerk and Recorder.  (*See* Ex. 1 [Hoffman Aff.] ¶4; Ex. 2 [Lichtenheld Aff.] ¶4.)

2.      [¶30]  In Colorado, voting systems are acquired by each individual county.  They are then used by that county – as well as by municipalities, special districts, school boards and the like within the county – in conducting elections.  (Ex. 1 [Hoffman Aff.] ¶5; Ex. 2 [Lichtenheld Aff.] ¶5.)

3.      [¶31]  Over the years since inception of the use of voting equipment in Colorado, many different vendors have at any one time provided voting systems to the counties.  Historically, each county has been free to choose among the competing vendors of voting systems certified and approved by the Secretary in order to select the particular voting system the county deems most appropriate for its individual circumstances.  (Ex. 1 [Hoffman Aff.] ¶6; Ex. 2 [Lichtenheld Aff.] ¶6.)

4.      [¶105] In the preceding regard, ES&S has been openly marketing and/or providing voting systems and/or election support services to Colorado counties since at least 1988, and Hart has been doing the same since at least 2002.  (Ex. 1 [Hoffman Aff.] ¶7; Ex. 2 [Lichtenheld Aff.] ¶7.)

5.      [¶74]  Both ES&S and Hart are vendors of electronic or electromechanical voting systems in Colorado within the meaning of C.R.S. §§1-1-104(13.5), 1-1-104(23.5) and 1-5-601(1).  (Ex. 2 [Lichtenheld Aff.] ¶8; Ex. 3 [Pearson Aff.] ¶3.)

6.      [¶32]  In fall 2013 then-Secretary promulgated a request for proposals relating to a "uniform voting system" for Colorado.  Under that concept, a single vendor would be chosen by the Secretary to provide the same voting system to all 64 of Colorado's counties.  (Ex. 1 [Hoffman Aff.] ¶8; Ex. 2 [Lichtenheld Aff.] ¶9 .)

7.      [¶33]  In response, proposals were received from Clear Ballot Group, Inc. ("Clear Ballot"); Dominion; ES&S; Everyone Counts, Inc.; and Hart.  (Ex. 1 [Hoffman Aff.] ¶9; Ex. 2 [Lichtenheld Aff.] ¶10.)

8.     [¶34]  In 2014 it was determined by the current Secretary that the proposed systems would be "piloted" – i.e., evaluated – in various counties during the November 2015 election.  (Ex. 1 [Hoffman Aff.] ¶10; Ex. 2 [Lichtenheld Aff.] ¶11.)

9.     [¶35]  A Pilot Election Review Committee ("PERC") was appointed by the Secretary to obtain and evaluate feedback concerning the systems to be piloted.  It was intended that the Secretary would carefully review and consider the PERC's recommendations, and that one or more provider(s) of the system(s) ultimately selected would then undergo formal certification so that counties desiring to acquire the new system(s) could do so in time for use in the 2016 primary election.  (Ex. 1 [Hoffman Aff.] ¶11; Ex. 2 [Lichtenheld Aff.] ¶12.)

10.    [¶36]  In the end, four voting systems were temporarily approved by the Secretary for use in the November 2015 election and evaluation by the PERC – those of Clear Ballot, Dominion, ES&S and Hart.  (Ex. 1 [Hoffman Aff.] ¶12; Ex. 2 [Lichtenheld Aff.] ¶13.)

11.    [¶37]  Eight counties participated in the PERC evaluation process utilizing one of the four voting systems in the November 2015 election:  Adams (Clear Ballot), Denver (Dominion), Douglas (Hart), Garfield (Hart), Gilpin (Clear Ballot), Jefferson (ES&S), Mesa (Dominion) and Teller (ES&S).  (Ex. 1 [Hoffman Aff.] ¶13; Ex. 2 [Lichtenheld Aff.] ¶14.)

12.    [¶38]  On December 15, 2015, the Secretary issued a notice of proposed rulemaking for January 14, 2016, to consider revision, in pertinent part, of election rule 11.9.2, 8 CCR 1505-1. The proposal indicated that, except for voting systems certified by the Secretary on or before December 31, 2014, a county would only be able to purchase or lease a uniform voting system certified and selected by the Secretary on or after December 15, 2015, as the State's uniform voting system.  (Ex. 2 [Lichtenheld Aff.] ¶16; Ex. 3 [Pearson Aff.] ¶4; Ex. 4 [Perez Aff.] ¶4; Ex. 5 [Draft Proposed Rule 11.9.2(b)] at p.21 of 28.)

13.     [¶39]  On December 17, 2015, however, after completing its pilot evaluation the PERC voted 5-2 that Colorado counties should have multiple options available to them for the purchase or lease of such voting systems.  (Ex. 1 [Hoffman Aff.] ¶14; Ex. 2 [Lichtenheld Aff.] ¶15; Ex. 6 [PERC Vote Record].)

14.     [¶40]  A week later, on December 22, 2015, the Secretary announced via letter to Colorado's county clerks and recorders his decision to select a *single* uniform voting system, to be provided by Dominion, for acquisition by all Colorado counties for use in conducting elections.  (Ex. 1 [Hoffman Aff.] ¶15; Ex. 2 [Lichtenheld Aff.] ¶17; Ex. 3 [Pearson Aff.] ¶5; Ex. 4 [Perez Aff.] ¶5; Ex. 7 [Secretary letter to County Clerks/Recorders].)

15.     [¶45] Almost a month later, on January 20, 2016, the Secretary announced that he had moved ahead toward completing the testing and certification of Dominion's system and tentatively negotiated pricing with Dominion on the counties' behalf.  (Ex. 4 [Perez Aff.] ¶6.)

16.     [¶50] Indeed, as of January 20, 2016, the Secretary expected to (i) complete the testing of Dominion's voting system by February 15, 2016, and (ii) certify it for acquisition, installation and use by Colorado counties no later than March 1, 2016.  (Ex. 8 [Secretary Power Point presentation to Colorado County Clerks Ass'n] at 22.)

17.     [¶47]  Ultimately, on February 9, 2016, the Secretary gave notice of permanent adoption of election rules under 8 CCR 1505-1 significantly different than the rules initially proposed on December 15, 2015.  (Ex. 9 [Notice of Permanent Election Rules Adoption].)  The adopted rules eliminated any reference to a uniform voting system, instead adding exclusive and restrictive requirements and considerations.

    a.     Rule 11.9 adds significant technical requirements and optional considerations for approval by the Secretary of the acquisition or use of electronic or electromechanical voting

systems by political subdivisions.

   b.  Rule 21.4 adds significant functional requirements for certification by the Secretary of electronic or electromechanical voting systems.

   c.  Rules 11.9 and 21.4, and their technical and functional requirements and optional considerations, are only met by – and appear to have been tailored to the features of – the Dominion system,

     (i)  Which had been selected on December 22, 2015, by the Secretary as the provider of the single, uniform voting system for Colorado, and

     (ii)  Do not have any basis in the requirements of HAVA incorporated into the Colorado election code.

(Ex. 3 [Pearson Aff.] ¶6; Ex. 4 [Perez Aff.] ¶7; *see* Ex. 1 [Hoffman Aff.] ¶16; Ex. 2 [Lichtenheld Aff.] ¶18.)

  18.  [¶48]  The collective effect of the February 9, 2016 rules is – without expressly calling for a uniform voting system – to functionally mandate that all Colorado counties adopt a single uniform voting system whose requirements are only met by Dominion's product.  For example:

   a.  New rule 11.9.2(b) allows only replacement of damaged, defective or inoperable voting systems, components or devices – but neither

     (i)  replacement of undamaged, non-defective or operable existing electronic and electromechanical voting systems, components or devices, nor

     (ii)  upgrades to existing systems, components or devices.

   b.  New rule 11.9.3(c) gives favorable consideration to a voting system that utilizes commercial, off-the-shelf hardware components rather than proprietary, purpose-built

hardware components.  Dominion's system does so across-the-board.  The ES&S system does not and so is disfavored; Hart's system does so in certain places and not in others, causing it to be less favored.

       c.     New rules 11.9.3(d), 11.9.4(c) and 21.4.7(e) effectively require a voting system to enable system users to operate or access all election management systems within a single interface on the same server or workstation.  Dominion's system meets the requirement; the ES&S and Hart systems do not, effectively disqualifying them.  Yet, there is no operational reason for such functions all to reside on the same high-priced server.  In fact there are internal control, and single point of failure, reasons why they should not be on the same server.

       d.     New rules 11.9.3(g)(1), 11.9.4(a) and 21.4.16(a) effectively require a voting system to enable election judges to digitally rather than manually adjudicate, resolve and duplicate ballots.  Dominion's system meets the requirement; the ES&S system does not, effectively disqualifying it.

       e.     New rules 11.9.3(g)(2), 11.9.4(b) and 11.9.5 effectively require a voting system to have ballot scanners equipped with automatic document feeders, enabling election judges to scan multiple ballots rather than a single ballot at a time.  Dominion's system meets the requirement; the ES&S and Hart systems do not, effectively disqualifying them.  Yet, there is no operational benefit to the requirement.

       f.     New rule 21.4.7(e) effectively prohibits a voting system from deploying, separately  from a traditional election management system, any data management applications that do not capture or tabulate votes.  Dominion's system utilizes integrated applications; the ES&S and Hart systems utilize separately-deployed applications.  New rules 21.4.14 (b)-(c) and 21.4.15(b)-(d) impose arbitrary and restrictive formatting requirements in a manner that is highly irregular for

administrative rules, particularly in light of the fact that the formatting requirements appear to be tailored exactly to the manner in which Dominion system operates.

(Ex. 3 [Pearson Aff.] ¶7; Ex. 4 [Perez Aff.] ¶8.)

19.    [¶49]  On February 17, 2016, the Secretary and Dominion entered into a contract for Dominion to be *the* provider of a single uniform voting system to Colorado's counties.  The contract is six years in length (to 2022) and may be extended by the Secretary for an additional two years (to 2024).  (Ex. 1 [Hoffman Aff.] ¶17; Ex. 2 [Lichtenheld Aff.] ¶19; Ex. 4 [Perez Aff.] ¶9; Ex. 10 [Master Voting Systems Agreement] at 1-2, 3)

20.    Plaintiffs ES&S and Hart have each:

a.    [¶63.a, ¶76] In accordance with C.R.S. §1-5-608.5(1), had their voting systems tested by federally-accredited laboratories and found to be in substantial compliance with all applicable federal and Colorado requirements.

b.    [¶75] Because they meet federal election standards, in accordance with C.R.S. §1-5-601.5 the voting systems of Plaintiffs ES&S and Hart may be offered for sale in Colorado.

c.    [¶63.b, ¶77] In accordance with C.R.S. §1-5-617(1)(a), submitted those voting systems to the Secretary for certification.

(Ex. 2 [Lichtenheld Aff.] ¶¶29-31; Ex. 3 [Pearson Aff.] ¶8.a, b, c; Ex. 4 [Perez Aff.] ¶10.a, b, c.)

21.    [¶64, ¶79]  The voting systems of Plaintiffs ES&S and Hart each comply with the statutorily-prescribed requirements of C.R.S. §1-5-615(1) and the rules establishing minimum standards addressing statutorily-prescribed criteria under C.R.S. §1-5-616(1).  (Ex. 2 [Lichtenheld Aff.] ¶¶32; Ex. 3 [Pearson Aff.] ¶10; Ex. 4 [Perez Aff.] ¶11.)

22.    [¶65, ¶78]  Accordingly, under C.R.S. §1-5-617(1)(b) the Secretary is required to examine them and, under C.R.S. §1-5-608.5(3)(a), must certify them and approve their purchase,

installation and use by political subdivisions.  (Ex. 3 [Pearson Aff.] ¶11; Ex. 4 [Perez Aff.] ¶12.)

23.     [¶66, ¶81]  The Secretary has not done so.  (Ex. 3 [Pearson Aff.] ¶12; Ex. 4 [Perez Aff.] ¶13.)

24.     [¶68] Purporting to act under the state rules amendment process, the Secretary has:

a.      Discriminated in favor of Colorado-based Dominion by ensuring that it is the only company which can meet the new requirements for operating as a voting system vendor in Colorado.

b.      Discriminated against non-Colorado-based Plaintiffs ES&S and Hart, by ensuring they cannot meet the new requirements and therefore are unable to continue operating as voting system vendors in Colorado.

Ex. 3 [Pearson Aff.] ¶13; Ex. 4 [Perez Aff.] ¶14.)

25.     [¶69]  In discriminating against non-Colorado-based Plaintiffs ES&S and Hart by effectively barring them from continuing to provide voting systems in Colorado, the Secretary has prevented them from engaging in interstate commerce – to the benefit of Colorado-based Dominion. (Ex. 3 [Pearson Aff.] ¶14; Ex. 4 [Perez Aff.] ¶15.)

26.     [¶70] The Secretary's discriminatory actions have been undertaken without any objectively-valid justification.  (Ex. 3 [Pearson Aff.] ¶15; Ex. 4 [Perez Aff.] ¶16.)

27.     [¶72]  The Secretary's actions have already caused and will continue to cause injury and damages to Plaintiffs ES&S and Hart as follows.

a.      The two currently have voting systems in place or provide election support services in the following Colorado counties:

(i)      ES&S – Adams, Alamosa, Archuleta, El Paso, Huerfano, Jefferson, La Plata, Mineral, Montezuma, Pitkin, Saguache and Teller.  (Ex. 1 [Hoffman Aff.] ¶18.)

(ii)     Hart – Bent, Boulder, Cheyenne, Conejos, Costilla, Crowley, Custer, Delta, Dolores, Douglas, Fremont, Garfield, Grand, Hinsdale, Jackson, Kit Carson, Kiowa, Lake, Las Animas, Lincoln, Moffat, Montrose, Morgan, Otero, Ouray, Phillips, Prowers, Rio Blanco, Rio Grande, Routt, San Juan, San Miguel, Summit and Yuma.  (Ex. 2 [Lichtenheld Aff.] ¶20.)

b.     Mesa County has already terminated its prior relationship with ES&S in order to acquire the Dominion system.

(i)     ES&S understands that Alamosa and La Plata counties will also be moving from the ES&S system to the Dominion system in response to the Secretary's mandate; and

(ii)      ES&S' remaining county customers are likely to do the same when their current maintenance and support or rental agreements expire in 2016.

(iii)     [¶114] All of this has been and will be to the economic detriment of ES&S.

(Ex. 1 [Hoffman Aff.] ¶20.)

c.     Gilpin County has already terminated its prior relationship with ES&S in order to acquire the Dominion system.  (Ex. 2 [Lichtenheld Aff.] ¶24.a.)

(i)     The following additional (*i.e.*, not listed above) counties where Hart currently has voting systems in place are expected to switch to the Dominion system in response to the Secretary's mandate:  Baca, Chaffee, Clear Creek, Eagle, Gunnison, Logan, Park, Sedgwick and Washington.  (Ex. 2 [Lichtenheld Aff.] ¶21.)

(ii)     Further, it is anticipated that Hart's remaining county customers are likely to do the same when their current maintenance and support or rental agreements expire.  (Ex. 2 [Lichtenheld Aff.] ¶24.b.)

(iii)     [¶114] All of this has been and will be to the economic detriment of

Hart.  (Ex. 2 [Lichtenheld Aff.] ¶24.d.)

        d.     ES&S and Hart have been and will continue to be injured and damaged by the Secretary's single, Dominion universal voting system mandate in that:

        (i)     Due to the newly-changed election rule 11.9.2(b), they will be unable to upgrade or enhance the voting systems they currently have in place in the above-listed Colorado counties.

        (ii)     Due to the newly-changed election rule 11.9.2(b), unable to replace the voting systems they currently have in place in the above-listed Colorado counties unless those voting systems are damaged, defective or inoperable. (Ex. 1 [Hoffman Aff.] ¶21; Ex. 2 [Lichtenheld Aff.] ¶25.)

        (iii)     And, because of other newly-changed or -adopted election rules 11.9 and 21.4 and the Secretary's actions in selecting and then contracting with Dominion as the provider of a uniform voting system for Colorado,  ES&S and Hart have been and will continue to be unable to compete with Dominion to sell or lease voting systems to any Colorado county.  (Ex. 1 [Hoffman Aff.] ¶22; Ex. 2 [Lichtenheld Aff.] ¶27.)

        28.     [¶¶108-09] As a result, no Colorado county has purchased or leased from ES&S or Hart upgrades or enhancements to or replacements for ES&S or Hart voting systems currently in place, nor has any Colorado county purchased or leased a new voting system from ES&S or Hart – all to the Plaintiffs' economic detriment.  (Ex. 1 [Hoffman Aff.] ¶23; Ex. 2 [Lichtenheld Aff.] ¶28.)

## **ARGUMENT**

        A temporary restraining order or preliminary injunction is a form of equitable remedy that implicates the sound discretion of the trial court.  *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).  The purpose of such relief is to preserve the relative positions of the parties pending a trial.

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  In other words, it is designed to preserve the status quo[2] in order to enable a court to render a meaningful decision on the merits.  *Tri-State Generation & Trans. Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

Traditionally, such relief lies where:  (1) the Plaintiffs will suffer irreparable injury unless the order or injunction issues; (2) the injuries threatened to the Plaintiffs outweigh whatever harm the order or injunction may cause the defendant; (3) the order or injunction sought would not be contrary to the public interest; and (4) there is a substantial likelihood the Plaintiffs will prevail on the merits.  *See id.* at 355; *Seneca-Cayuga Tribe v. Okla.*, 874 F.2d 709, 716 (10th Cir. 1989); *accord Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992); *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir. 1988); *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981); *Lundgrin v. Claytor*, 619 F.2d at 63 (citing *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir. 1969)).

Alternatively, "[w]hen the evidence shows that the defendant[] [is] engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations[3] ... . 'it is unnecessary for plaintiff[s] to plead and prove the existence of the usual equitable grounds ... .  It is enough if the requirements of the statute are satisfied.' "  *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259-60 (10th Cir. 1981) (citation omitted) (cited in *CSX Transp., Inc. v. Term. State Bd. of Equaliz'n*, 964 F.2d 548, 550-51 (6th Cir. 1992);

---

[2]  The *status quo* is the last peaceable uncontested status between the parties prior to the controversy arising.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001); 11A Charles Alan Wright, et al., Federal Prac. & Proc. §2948, at 136 (2d ed. 1995).  Here, that was prior to the February 9, 2016 adoption of new election rules 11.9 and 21.4.

[3]  Suit for equitable relief is authorized by the Civil Rights Act.  *See* 42 U.S.C. §1983; *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (parties injured by state action violating Commerce Clause may sue for injunctive relief); *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690 (1978) (injunctive relief available under §1983 against implementation or execution of officially adopted and promulgated regulation or decision).

*Burlington N. R.R. Co. v. Dept. of Revenue*, 934 F.2d 1064, 1074-75 (9th Cir. 1991)).  That is because Congress has already determined that such violations should be enjoined.  *See Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 652 (10th Cir. 2004) (quoting *Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 601 (8th Cir. 1992)).  All that is necessary is a reasonable probability the plaintiff will ultimately prevail on the merits.  *Lennen*, 640 F.2d at 261.

Both the traditional and alternative preliminary injunction standards are met here.

## I.   TRADITIONAL PRELIMINARY INJUNCTION REQUISITES ARE MET HERE

### A.   ES&S AND HART ARE ALREADY SUFFERING AND WILL CONTINUE TO SUFFER IMMEDIATE AND IRREPARABLE INJURY

#### 1.   Plaintiffs' Constitutional Rights Are Implicated

The First Claim (¶¶61-72) of the Complaint and Jury Demand (the "Complaint") asserts that Plaintiffs' constitutional rights to engage in interstate commerce free from discrimination are being and will continue to be abridged here.  When a constitutional right is involved no further showing of irreparable injury is necessary.  *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A Charles Alan Wright, et al., Federal Prac. & Proc. §2948.1 (2d ed. 1995)).

In that regard, the Commerce Clause, U.S. Const., art. I, §8, cl.3 ("Congress shall have [p]ower ... [t]o regulate Commerce ... among the several States"), "confers 'rights, privileges, or immunities' within the meaning of [42 U.S.C.] §1983."  *Dennis v. Higgins*, 498 U.S. 439, 446 (1991).  Although its language only addresses Congress' power over commerce, the Clause has long been recognized as "also limit[ing] the power of ... States to erect barriers against interstate trade.'"  *Id.* at 446 (citations omitted).  The Commerce Clause is a "substantive 'restriction on permissible state regulation' of interstate commerce."  It is a "self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."   *Id.* at 447 (citations omitted).

This implicit rule of law has come to be known as the Dormant Commerce Clause. It "'denies ... states the power ... to *discriminate* against ... the interstate flow of articles of commerce.'" *Bioganic Safety Brand, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1183 (D. Colo. 2001) (emphasis added) (citing *Oregon Waste Sys. v. Dept. of Envtl. Quality*, 511 U.S. 93, 98 (1994)). A state regulation may violate the Dormant Commerce Clause by "*discriminat[ing]* against interstate commerce ... on its face or in practical effect," *id.* (emphasis added) (citing *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir. 2000)), such as by "*discriminat[ing]* in favor of in-state economic interests." *Id.* at 1183-84 (emphasis added). "Violation of Commerce Clause rights is itself an irreparable injury." *Id.* at 1185 (citing *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999)).

Here, the collective effect of the new election rules and the Secretary's mandating of a single, uniform voting system provided by Dominion is to discriminate against non-Colorado-based ES&S and Hart in favor of Colorado-based Dominion without objectively-valid justification. *See* Ex. 3 [Pearson Aff.] ¶15; Ex. 4 [Perez Aff.] ¶16.

## 2.    Plaintiffs Are Already Losing and Will Continue to Lose Business

Plaintiffs are already suffering immediate and irreparable harm as the result of the changed election rules and the Secretary's mandating of a single, uniform voting system provided by Dominion. ES&S has lost Mesa County as a customer, and Hart has similarly lost Gilpin County. Further, Plaintiffs are threatened with immediate and irreparable harm in that at least 11 other counties using the ES&S or Hart voting systems intend to replace them with Dominion's system as a result of the changed election rules and the Secretary's mandate. Once they do so, because of the expense involved those counties will be "locked in" to that new system and lost as customers to ES&S or Hart for at least the six to eight-year length of the Secretary's contract with Dominion.

Likewise, other counties not currently using the ES&S or Hart voting systems will acquire

Dominion's system as a result of the changed election rules and the Secretary's mandate.  Once they do so, because of the expense involved (*see* §I.C.2 below)  those counties will be "locked in" to that new system and lost as potential customers to ES&S and Hart for at least the six to eight-year length of the Secretary's contract with Dominion.

Such economic and competitive disadvantages can constitute irreparable harm.  *Bioganic*, 174 F. Supp. 2d at 1185.

### 3.      Plaintiffs Are Threatened with Being Forced Out of Business in Colorado

Absent preliminary equitable relief restraining the Secretary from implementing and applying new election rules 11.9 and 21.4, Plaintiffs will be forced out of business as voting system vendors in Colorado.  Thus, assuming that years from now following trial the Court grants the relief sought by Plaintiffs, it will be too late to do any good.  Current and prospective customer counties will be locked into 6- to 8-year contracts with Dominion, and Plaintiffs will be gone from the commercial landscape in Colorado.

As a matter of law, this threat or possibility of going out of business constitutes irreparable harm or injury.  *Tri-State*, 805 F.2d at 356 (in finding irreparable harm, analogizing to threats facing Plaintiffs in antitrust actions); *Otero*, 665 F.2d at 278; *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980).  In short, damages cannot fully compensate for the loss of years of effort and livelihood. *Roso-Lino Bevg. Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984).

### 4.      Plaintiffs Will Suffer Uncertain Damages

Plaintiffs will incur economic damages in the form of decreased net revenues due to their inability to continue functioning as voting system providers in Colorado.  They necessarily will lose all their customers and business in the state.  Ex. 1 ¶24; Ex. 2 ¶33.  Just the likely loss of business constitutes irreparable harm.  *See Sealy Mattress Co. of Mich., Inc. v. Sealy, Inc.*, 599 F. Supp. 1494,

1503 (N.D. Ill. 1984), *rev'd on other grounds*, 789 F.2d 582 (7th Cir. 1986).

Plus, once customers are induced away or lost, there is an extreme difficulty and uncertainty in regaining their business. Ex. 1 ¶25; Ex. 2 ¶34. That, too, constitutes irreparable harm. *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F.Supp.2d 1102, 1107 (D. Kan. 2000). And, the effect of the Secretary's challenged conduct on the volume of their revenues is inherently difficult to measure because it is uncertain how many additional new customers and associated revenues ES&S and Hart otherwise may have been able to generate if allowed to compete for new business. Ex. 1 ¶26; Ex. 2 ¶35. That constitutes irreparable harm in and of itself. *See Star Fuel Marts*, 362 F.3d at 652.

Accordingly, Plaintiffs' potential economic damages attributable to the loss of actual and potential customers and revenues cannot be accurately ascertained. Ex. 1 ¶27; Ex. 2 ¶36. That constitutes irreparable harm. *Am. T.V. & Commc'ns. Corp. v. W. Techtronics, Inc.*, 529 F. Supp. 617, 621 (D. Colo. 1982). Put another way, the difficulty in evaluating their lost sales – and, so, damages – renders the harm irreparable. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 383, 385 (7th Cir. 1984).

### 5.     Plaintiffs Will Suffer Loss of Good Will and Reputation

Additionally, Plaintiffs' loss of customer good will is not subject to precise calculation. ES&S and Hart will lose the continuity of business which comes from years of establishing and fostering customer relationships. The contacts and good will that they have established are essential to the continued successful operation of their businesses, both in Colorado and elsewhere. The longer they are precluded from providing new voting systems in Colorado, the more good will and customers they will lose here, *Equifax Serv., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990), and their national business reputations will also suffer as a result. Ex. 1 ¶28; Ex. 2 ¶37.

The effect of the Secretary's challenged conduct on the good will Plaintiffs enjoy with their customers is inherently difficult to project, Ex. 1 ¶29; Ex. 2 ¶38, and so comprises irreparable harm. *See Star Fuel Marts*, 362 F.3d at 652.  There is an extreme difficulty and uncertainty in restoring goodwill among customers.  Ex. 1 ¶29; Ex. 2 ¶38.  That constitutes irreparable harm.  *Fireworks*, 86 F.Supp.2nd at 1107.  Although losses such as good will and reputation are identifiable, they are not readily calculable.  Ex. 1 ¶29; Ex. 2 ¶38.  Therefore, they rise to the level of irreparable harm. *See Supermarket Servs., Inc. v. Hartz Mountain Corp.*, 382 F. Supp. 1248, 1256-57 (S.D.N.Y. 1974).

The harm Plaintiffs will suffer from the Secretary's challenged action while this matter proceeds to trial cannot necessarily be measured in dollars, particularly when, as here, his conduct completely changes the entire competitive structure of the marketplace.  Ex. 1 ¶30; Ex. 2 ¶39.  That is irreparable harm.  *City of Chanute v. Kan. Gas & Elec. Co.*, 754 F.2d 310, 313 (10th Cir. 1985).

### B.    THE BALANCE OF HARMS FAVORS INITIAL EQUITABLE RELIEF

No strict test governs the balance of harms analysis; the inquiry is necessarily fact-specific. *See, e.g.*, *Tri-State*, 805 F.2d at 356-57; *S.W. Shattuck Chem. Co. v. City & Cnty. of Denver*, 1 F.Supp.2d 1235, 1239-40 (D. Colo. 1998).  Here,  implementation and application of new election rules 11.9 and 21.4 will have the effect of imposing the single Dominion uniform voting system mandate in Colorado.

As established immediately above, absent temporary or preliminary equitable relief ES&S and Hart will be irreparably harmed by the change in position forced upon them by the action of the Secretary.  Conversely, issuance of the requested relief will essentially leave the Secretary in the same position he occupied prior to adoption of those election rules on February 9, 2016, with regard to multiple competing voting systems.

Stated differently, the Secretary cannot identify any harm to himself attendant upon entry of

initial equitable relief because heretofore he has not had a single, uniform voting system in place. Such a result does not shift the balance against entry of equitable relief.  *See, e.g., S.W. Shattuck*, 1 F.Supp.2d at 1239 (no significant injury attendant to delay).  Further, there is no basis for requiring security because the Secretary will not sustain any costs or damages even if he is later found to have been wrongfully restrained or enjoined.  *Cf.* Fed.R.Civ.P. 65(c).

Compared with the devastating prospect of Plaintiffs losing customers and goodwill that can never be returned to them, the Secretary will suffer no meaningful prejudice from the requested relief.  Accordingly, the injury that ES&S and Hart will suffer without issuance of temporary or preliminary equitable relief outweighs any injury to the Secretary if such an order is entered.

### C.    THE PUBLIC INTEREST FAVORS INITIAL EQUITABLE RELIEF

For decades, Colorado counties have enjoyed all the benefits of competition among providers of voting systems:  more efficient allocation of systems appropriate to each individual county's particular circumstances, better pricing, technological innovation and enhanced customer service. *See* §§I.C.1-4 below.  Continuation of those benefits militate in favor of initial equitable relief here. Moreover, Colorado counties can choose to acquire the Dominion system if they wish.

### 1.    Appropriate Allocation of Voting Systems

Colorado's two largest counties are Denver and El Paso, each with a population in excess of 600,000.  The vast majority of the state's counties, however – 50 out of 64 – have populations of less than 50,000.  Half have populations of less than 15,000.  Three have populations of less than 1,000. A voting system that is best for the state's two largest counties is undoubtedly not the most appropriate choice for its 50 smallest counties.  For example, Gilpin County, with only 4,000 voters, doesn't need Dominion's system that can process all of its ballots in just 20 minutes – at a cost increase of $84,000 per year.  Yet, that is what Gilpin is now stuck with.

### 2. Better Pricing

In the latter vein, the price impact is staggering.

•        Jefferson County would incur an estimated ownership cost for Dominion's system of $1,238,273 for equipment, acquisition, implementation, training and software licenses that is almost 2½ times higher – over $700,000 more – than the $525,978 total cost of its current ES&S system.

•        Douglas County (which participated in the pilot evaluation) would incur an estimated higher initial cost of 87% or $277,000, and an estimated higher 10-year cost of 99% or $673,000, for Dominion's system as compared to Hart's.

•        Garfield County would incur an estimated higher initial cost of 92% or $240,000, and thereafter estimated higher annual costs of 54.5% or $12,000 – $120,000 more over 10 years – for Dominion's system as compared to Hart's.

•        Grand County would incur an estimated $40,000 cost increase for Dominion's system as compared to Hart's.

•        One county with 25,000 residents would incur an estimated annual maintenance price for Dominion's system that is almost quadruple (from $8,500 to $31,0000) what it pays for its current system.

•        Another county with 60,000 residents would incur an estimated purchase price for Dominion's system that is 90% higher – with quoted annual license and related costs an estimated 50% higher – than the alternative, federally-certified system the county piloted in November 2015.

### 3. Increased Innovation

New rule 11.9.2(b) only allows replacement of damaged, defective or inoperable existing voting systems, components or devices.  That prohibits replacement of undamaged, non-defective

or operable existing electronic and electromechanical voting systems, components or devices; and upgrades to existing systems, components or devices – thereby stifling innovation.

### 4.        Fostering Customer Service

With a single, mandated, uniform voting system from a sole provider, counties will no longer be able to vote with their feet and pocketbooks for or against vendors based on perceptions regarding customer service.

In view of the preceding, the public interest is best served by counties continuing to have multiple competing voting systems available pending determination of the propriety of the Secretary's action seeking to impose a monopolistic single, uniform voting system on them.  Simply put, the public interest here is in facilitating competition.

Conversely, there is no public interest to be furthered by the stifling of competition.  To the contrary, courts should be particularly concerned with threats to a movant's business; failing to preserve a competitor disserves the public interest.  _Foremost Int'l Tours, Inc. v. Qantas Airways, Ltd._, 379 F. Supp. 88, 97 (D. Haw. 1974).  If multiple voting system vendors have managed to compete with one another for decades, certainly they can continue to do so for another relatively-much-briefer period of time while the Court completes its legal analysis.

In short, not only will the public suffer no harm, its interests will be directly furthered by preserving the competitive _status quo_ pending a judicial determination.  That is because the public interest is affirmatively harmed by allowing violations of the law to continue.  _See Saint v. Neb. Sch. Activities Ass'n_, 684 F. Supp. 626, 630 (D. Neb. 1988) (Constitutional violation).

### D.        PLAINTIFFS HAVE BOTH A FAIR GROUND FOR LITIGATION AND A REASONABLE PROBABILITY AND SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

As demonstrated above, the first three conditions of the traditional test are met here.  Where

that is so, "the standard for meeting the fourth 'probability of success' prerequisite becomes more lenient." *Resolution Trust Corp. v. Cruce*, 972 F.2d at 1199; *accord Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).  In such circumstances, the Tenth Circuit rule regarding prevailing on the merits is that Plaintiffs need only make a *prima facie* showing, *Lundgrin*, 619 F.2d at 63 (citing *Crowther*, 415 F.2d at 439), that they have a "fair ground for litigation" in order to satisfy the "substantial likelihood" of success prong. *Seneca-Cayuga*, 874 F.2d at 716 (citing *Lundgrin*, 619 F.2d at 63).  In other words, ES&S and Hart need "only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Cruce*, 972 F.2d at 1199 (quoting *Tri-State*, 805 F.2d at 355 (quoting *Otero*, 665 F.2d at 278)); *accord Shattuck*, 1 F.Supp.2d at 1238.  Nevertheless, as demonstrated below, Plaintiffs have not only a reasonable, but a very substantial, likelihood of success on the merits here.

Under the Dormant Commerce Clause, only Congress is empowered to regulate interstate commerce.  *See* U.S. Const., art. I, §8, cl.3.  In the Tenth Circuit, a state statute or rule that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* under the dormant Commerce Clause and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.  *KT & G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008).  Here, there is no such valid factor.  *See* Ex. 3 [Pearson Aff.] ¶15; Ex. 4 [Perez Aff.] ¶16.  That is additionally true because the Secretary's rules conflict with state statutes and exceed his statutory rulemaking authority.[4]

### 1.   The Secretary's Rules Conflict with State Statutes and Are Void

[¶85]   Any rule, or amendment to an existing rule, of a state agency – such as the Secretary

---

[4]  Significantly, Douglas and Jefferson counties have filed judicial review suits in Colorado state court raising analogous claims.

– that conflicts with a statute is void.  C.R.S. §24-4-103(8)(a).

[¶86]   In (i) selecting Dominion as the provider of a single, uniform voting system for Colorado,  (ii) amending election rules 11.9.2(b), 11.9.3(c), (d), (g)(1) and (g)(2), 11.9.4(a), (b) and (c), 11.9.5, 21.4.7(e), 21.4.16(e), 8 CCR 1505-1, such that only Dominion's voting system qualifies for certification and (iii) certifying only the Dominion voting system, the Secretary's actions conflict with Colorado statutes and are therefore void, as follows:

   a.   C.R.S. §§1-5-603, 612(1) and 616(4), which authorize Colorado's political subdivisions – not the Secretary, to select – and then to adopt and use any kind of voting machine, including electronic or electromechanical voting systems.

   b.   C.R.S. §1-5-616(4), requiring that the minimum standards established by election rules addressing criteria statutorily-prescribed in C.R.S. §1-5-616(1) must be adapted to ensure that new technologies which meet the requirements for such systems are certified in a timely manner and are available for selection by political subdivisions.

   c.   C.R.S. §1-5-608.5(3)(a), requiring the Secretary to certify electronic and electromechanical voting systems and approve them for purchase, installation, and use by political subdivisions after examining them pursuant to C.R.S. §1-5-617(1)(b) for compliance with the statutorily-prescribed requirements of C.R.S. §1-5-615 and the rules establishing minimum standards addressing statutorily-prescribed criteria under C.R.S. §1-5-616.

   d.   C.R.S. §§1-5-623(3)(b) and (b)(I), requiring the Secretary – when considering the application of any political subdivision for approval to purchase an electronic voting device, system or related component – to consider the needs of the political subdivision and compare the requested purchase with its average annual capital election expenditures for the preceding four years.

   e.   In sum, conflict with Colorado statutes requiring the Secretary to certify any

and all voting systems meeting the statutory requirements and authorizing Colorado political subdivision to purchase any systems so certified.

[¶87]   Furthermore:

a.      Political subdivisions are authorized to adopt electronic and electromechanical voting systems including hardware, firmware and software upgrades.  C.R.S. §1-5-612(1).

b.      In amending election rule 11.9.2(b) such that only replacement of damaged, defective or inoperable electronic and electromechanical voting systems, components or devices is authorized – but neither (i) replacement of undamaged, non-defective or operable existing electronic and electromechanical voting systems, components or devices, nor (ii) upgrades to existing systems, components or devices – the Secretary's action conflicts with C.R.S. §1-5-612(1) and is void.

## 2.      The Secretary's Rules Exceed His Statutory Rulemaking Authority

[¶90]   A state agency, such as the Secretary, may not issue rules except within its delegated powers as authorized by law.  A rule shall not be deemed within an agency's statutory authority and jurisdiction merely because it is not contrary to a specific statutory provision.   C.R.S. §§24-4-103(8)(a).

[¶91]   The Secretary is authorized to promulgate, publish, and distribute rules necessary for the proper administration and enforcement of the election laws.  C.R.S. §1-1-107(2)(a).

[¶92]   The Secretary is required to:

a.      Adopt uniform rules regarding the purchase and sale of voting equipment. C.R.S. §1-5-613(1).

b.      Adopt rules for electronic voting systems establishing minimum standards addressing the following statutorily-prescribed criteria:  functional requirements; performance levels; physical and design characteristics; documentation requirements; evaluation criteria; audit capacity;

security requirements; telecommunications requirements; and accessibility.  C.R.S. §1-5-616(1).

      c.    Adapt those minimum standards to ensure that new technologies which meet the requirements for electronic or electromechanical voting systems are certified in a timely manner and available for selection by political subdivisions and meet user standards.  C.R.S. §1-5-616(4).

[¶93]   Nothing in Colorado law delegates power to the Secretary authorizing him to:

      a.    Select a single, uniform voting system for Colorado political subdivisions.

      b.    Issue election rules or amendments having the effect of mandating that Colorado political subdivisions acquire for use in conducting elections only a single uniform voting system provided by one vendor.

[¶94]   To the contrary, the Secretary is required to determine whether electronic voting systems comply with the statutorily-prescribed requirements of C.R.S. §1-5-615(1) and the rules establishing minimum standards addressing statutorily-prescribed criteria under C.R.S. §1-5-616(1).  C.R.S. §1-5-617(1)(b).  If the systems do so, the Secretary is required to certify them and approve their purchase, installation, and use by political subdivisions.  C.R.S. §1-5-608.5(3)(a).

[¶95]   In sum, Colorado election statutes do not grant the Secretary discretion to issue election rules or amendments having the effect of refusing to certify and approve electronic voting systems which meet all statutory requirements.

"[I]f the statute [or rule] ... has the effect of discriminating against out-of-state interests to the benefit of in-state economic interests, the statute will generally be struck down as a *per se* constitutional violation."  *S. Waste Sys., LLC v. The City of Coral Springs, Fla.*, 687 F. Supp. 2d 1342, 1353 (S.D. Fla. 2010).  Here, the new election rules discriminate against out-of-state entities ES&S and Hart by excluding them from doing business in Colorado – to the sole economic benefit of in-state Dominion.  That is a *per se* Constitutional violation.

## II.      ALTERNATIVE PRELIMINARY INJUNCTION REQUISITES ARE MET HERE

As set forth above, the evidence here shows that the Secretary is, and is about to be, engaged in conduct proscribed by the federal civil rights laws, which expressly provide for equitable relief to restrain and prevent such violations.  *See* 42 U.S.C. §1983; *Dennis v. Higgins*, 498 U.S. at 447; *Monell v. Dept. of Social Servs.*, 436 U.S. at 690;  *Bioganic*,  174 F. Supp. 2d at 1183-85. Accordingly, in order to obtain initial equitable relief here, there is no need to:

•       Demonstrate irreparable harm.  *See Lennen*, 640 F.2d at 259 (*quoted in Kikumura*, 242 F.3d at 963; *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1035 (10th Cir. 1993)).

•       Balance the equities between the parties, because Congress has already done so.  *See Star Fuel Marts*, 362 F.3d at 652 (quoting *Bair*, 957 F.2d at 601).

•       Determine the public interest, because "Congress has already ... determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in ... any activity which the statute prohibits."  *See id.*

The existence of evidence showing that such violations have occurred or are about to occur is a sufficient basis in and of itself for the entry of initial equitable relief here.  *See Lennen*, 640 F.2d at 259-60 (*quoted in CSX*, 964 F.2d at 551; *Burlington N. R.R. Co. v. Dept. of Rev.*, 934 F.2d at 1074-75).  Consequently, such relief should issue on this alternative basis as well.

## CONCLUSION

Plaintiffs ES&S and Hart are already suffering irreparable harm and will continue to do so absent entry of temporary or preliminary equitable relief.  On the other hand, the Secretary will suffer no prejudice attendant to the requested relief.  The public interest is affirmatively harmed by violations of the law and so favors the *status quo*.  Plaintiffs have raised serious, substantial, and difficult issues presenting a fair ground for litigation and requiring more deliberate investigation.

JK00815261.1 /font=8                                    Page 24

Further, they have shown that the Secretary's action violates the dorman Commerce Clause, for which equitable relief lies under the Civil Rights Act.  Accordingly, ES&S and Hart respectfully request the entry of temporary and/or preliminary equitable relief as set forth above.

Dated:  May 23, 2016.

JONES & KELLER, P.C.

*S/ T.P. McMahon*

Thomas P. McMahon
tmcmahon@joneskeller.com
Aaron D. Goldhamer
agoldhamer@joneskeller.com
1999 Broadway, Ste. 3150
Denver, CO 80202
Tel. (303) 573-1600
Fax  (303) 573-8133
Attorneys for Plaintiffs