IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-1237-JLK

**ELECTION SYSTEMS & SOFTWARE, LLC**, a Delaware limited liability company; and **HART INTERCIVIC, INC**., a Texas corporation,

     Plaintiffs,

v.

**WAYNE W. WILLIAMS**, in his official capacity as Colorado Secretary of State,

     Defendant.

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

---

Defendant Wayne W. Williams, in his official capacity as the Colorado Secretary of State ("the Secretary"), submits this Response in Opposition to Plaintiffs' Motion with Authorities for Temporary Restraining Order and/or Preliminary Injunction [Doc. 2] ("Motion").

## INTRODUCTION

Plaintiffs Election Systems & Software, LLC ("ES&S") and Hart InterCivic, Inc. ("Hart") seek to preliminarily enjoin new election rules promulgated by the Secretary that govern newly acquired electronic and electromechanical voting systems in Colorado. *See* 8 COLO. CODE REGS. § 1501-1 ("Voting Systems Rules"). Plaintiffs attempt to characterize the rules

as "arbitrary" requirements with "no operational reason[s]" behind them, Compl. ¶ 48(c)(i) & (f), and a thinly guised attempt to bolster an allegedly Colorado-based voting systems vendor, *id.*¶ 47(c). Yet the new rules are neutral on their face, neither favoring nor disfavoring interstate or intrastate voting systems vendors. And local election officials from across Colorado—in small, medium, and large counties alike—applaud the new rules for reducing costs and improving the efficiency, accuracy, and transparency of election administration. Because the neutral Voting Systems Rules advance the State's and public's legitimate interest in enhancing the integrity of the election process in Colorado—an interest unrelated to economic protectionism—Plaintiffs are not substantially likely to succeed on the merits of their dormant Commerce Clause claim.

Plaintiffs attempt to satisfy the remaining preliminary injunction prongs fares no better. Plaintiffs allege only economic harm, which has long been held insufficient to constitute irreparable injury. And as the evidence at hearing will show, the risk of harm to the State's efforts to improve accurate election administration outweighs the purported harm to Plaintiffs' bottom line. Plaintiffs' Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   Plaintiffs' experience in the election industry.

ES&S and Hart are both vendors of electronic and electromechanical voting systems. Compl. ¶¶ 1-2 [Doc. 1]. As alleged in their Complaint, ES&S is a Delaware limited liability company and has its principal place of business in Omaha, Nebraska, while Hart is a Texas corporation and has its principal place of business in Austin, Texas. *Id.*

Plaintiffs both have considerable experience and resources in assisting government officials administer elections. ES&S markets itself on its website as "the world's largest elections-only company" and emphasizes that it has "run fair and accurate elections for more than 30 years." *See* Ex. A, p. 2 (July 5, 2016 Declaration of Suzanne Staiert). Hart, too, has considerable experience, stating on its website that it has been "[a]dvancing democracy for over 100 years" and that its mission fuels its "continuous drive for technological innovation," making elections "more transparent, more efficient and easier." *Id.*

Plaintiffs' expertise in administering elections and providing voting systems has led them to be selected as the single provider of voting systems in several states. ES&S is the sole voting systems provider in thirteen states

3

(Alabama, Arkansas, Maine, Maryland, Mississippi, Montana, Nebraska—the state where ES&S maintains its principal place of business—North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, and West Virginia), while Hart is the sole provider in two states (Hawaii and Oklahoma). *See* Ex. A, pp. 2-3. To the best of the Secretary's staff's knowledge, no court decision in any jurisdiction prevents Plaintiffs from entering into agreements with these and other states to serve as their exclusive provider of voting systems. *Id.* at 3.

> **B.  The Secretary adopts the Voting Systems Rules.**

The Secretary's new rules follow the evaluation of competing voting systems by the Pilot Election Review Committee ("PERC") that was convened by the Secretary. Compl. ¶¶ 35-37. The voting systems of four vendors were evaluated by PERC and piloted during the November 2015 election: Plaintiffs, Clear Ballot Group, Inc., and Dominion Voting Systems, Inc. ("Dominion"). *Id.* ¶¶ 36-37. Although the Secretary initially contemplated following the lead of other states by mandating a single uniform voting system provider, *id.* ¶ 38, the Secretary and his staff ultimately crafted the

new rules so that Colorado's 64 counties will be able to select from more than one voting system if additional vendors become certified. *See* Ex. A, p. 3.

Rather than mandate a single voting systems vendor for all counties, the Voting Systems Rules codify heightened technological functions and capabilities based on Colorado's unique election administration needs. *See* 8 COLO. CODE REGS. § 1501-1.[1] The new rules therefore allow any voting systems vendor to become certified by the Secretary, without regard to whether the vendor is an interstate or intrastate company, if the vendor satisfies these heightened technological standards. For example, in addition to certifying Dominion, the Secretary has also preliminarily determined that the voting system of Clear Ballot Group, Inc., a Massachusetts-based vendor, facially complies with all federal and state requirements and the Voting Systems Rules. *See* Ex. A, p. 18. The vendor's state of incorporation, or its principal place of business, do not influence the Secretary's certification decision and are not factors under the Voting Systems Rules. *Id*. at 19.

---

[1] A redlined version of the Voting Systems Rules that were adopted on February 9, 2016, is attached as Exhibit B.

### C. Plaintiffs challenge specific rules that benefit Colorado counties.

Despite touting their expansive resources, experience, and commitment to using advanced technology, Plaintiffs sued the Secretary three-and-a-half months after he adopted the Voting Systems Rules. *See* Compl.; Sec'y's Mot. to Dismiss [Doc. 21], Ex. A ¶ 4 (June 20, 2016 Declaration of Suzanne Staiert). Plaintiffs claim the new Voting Systems Rules will result in the "threat or possibility of [their] going out of business," Motion, p. 14, even though they are amongst the largest and oldest providers of voting systems in the world.

As relevant to Plaintiffs' challenge, the Voting Systems Rules implement five new advancements in voting systems technology:

*1.   Off-the-shelf components*. The Voting Systems Rules give favorable consideration to voting systems that utilize "commercial off-the-shelf hardware components, rather than proprietary, purpose-built hardware components." 8 COLO. CODE REGS. § 1501-1, Rule 11.9.3(c). Off-the-shelf components benefit county governments in three ways. *First*, voting systems that contain off-the-shelf components are scalable, which allows a county to configure its system to fit its particular needs. This scalability reduces costs and saves taxpayer dollars because counties are not forced to purchase or

lease unnecessary equipment. Thus, electronic or electromechanical voting systems that are compatible with off-the-shelf hardware components are generally less expensive than systems utilizing multiple proprietary, purpose-built components. *See* Exs. A, p. 4; C ¶ 4 (June 30, 2016 Declaration of Denver Elections Director, Amber McReynolds). ES&S, for example, offers a central count scanner utilizing proprietary components for approximately $90,000, while Dominion offers a central count scanner utilizing off-the-shelf components for just $18,500. *See* Ex. D ¶ 4 (June 27, 2016 Declaration of Mesa County Clerk and Recorder, Sheila Reiner). While the less expensive Dominion scanner may not have the same scanning capacity as the more expensive ES&S model, it allows Colorado's 64 counties more flexibility to determine their own needs and how many scanners are appropriate for their elections.

*Second*, off-the-shelf hardware components are more readily available than proprietary, purpose-built components, making it easier for counties to quickly replace broken or inoperable voting systems components. *See id.*; Ex. E ¶ 4 (June 29, 2016 Declaration of Pitkin County Clerk and Recorder, Janice Vos Caudill). The ability to quickly and efficiently replace broken or inoperable components is vital to the proper administration of elections. *Id.*

Otherwise, counties risk delay in reporting pivotal election results to the Secretary and the public at large. *See* Ex. F ¶ 4 (July 5, 2016 Declaration of Teller County Clerk and Recorder, Krystal Brown).

*Third*, voting systems that utilize off-the-shelf components offer better financial and operational stability to counties. In the event a county's voting systems vendor suffers financial instability or bankruptcy, the county may still continue to obtain necessary replacement components from other sources. *See* Ex. A, p. 5. That is not the case with voting systems vendors that utilize proprietary, purpose-built components. *Id*.

**2.    *Digital adjudication***. The Voting Systems Rules require that new voting systems possess digital ballot adjudication functionality. 8 COLO. CODE REGS. § 1501-1, Rules 11.9.3(g)(1), 11.9.4(a), & 21.4.16(a). This requirement enhances election administration because it enables elections judges to quickly "resolve, adjudicate, and duplicate ballots with marginal or ambiguous voter markings digitally rather than manually." *Id.*, Rule 21.4.16(a).

As recognized by local election officials and the Secretary's staff, digital adjudication functionality greatly reduces the human error, cost, and delay inherent in manual adjudication. *See* Exs. A, p. 6; C ¶¶ 5-6; D ¶¶ 5-6; E ¶¶ 6-

8

7; F ¶¶ 5-6. Manual adjudication requires election judges to first locate among the dozens of active ballot styles a duplicate paper ballot style matching the voter's original ballot. Some elections involve 50 or more different ballot styles within a single county. *See* Ex. E ¶ 6. Next, the manual process requires election judges to duplicate a voter's paper ballot by hand-copying the voter's markings that appear on the original paper ballot—a time-intensive process that is susceptible to human error and can result in inconsistency between different teams of election judges. *See* Ex. D ¶ 5. Manual logs of the duplication and adjudication process must also be kept by the election judges. *See* Ex. E ¶ 6. Finally, manual adjudication creates unnecessary and voluminous paper records, including duplicate ballots and manual logs, that must be retained by county officials for designated periods, creating space and storage issues. *See id.*

Digital adjudication, by contrast, allows the entire adjudication process to be completed electronically—greatly increasing accuracy, efficiency, transparency, and consistency—while simultaneously reducing staffing costs. *See* Exs. A, p. 7; C ¶ 5; D ¶ 5; F ¶ 6. Adams County, for example, is estimated to have saved approximately $60,000 in labor costs alone in 2015 based on digital adjudication capability versus manual duplication. *See* Ex. E ¶ 6. The

ballot image capture component of digital adjudication is also beneficial when conducting audits, including risk-limiting audits, because the electronically-saved ballot images eliminate the need to re-scan and re-tabulate the ballots selected for audit. *See* Ex. D ¶ 6.

Moreover, digital adjudication is much faster than manual adjudication, reducing delay in reporting election results. *See* Ex. A, p. 8. The process for adjudicating write-in candidates, for example, is much more efficient with digital adjudication. *Id.* Voting systems with digital adjudication capabilities can be programmed so that ballots cast for write-in candidates are electronically tallied and the results are available immediately. *Id.* Without this function, ballots cast for write-in candidates must be manually adjudicated and tallied by hand, increasing the opportunity for human error and delaying timely results. This was an issue in Adams County during the 2014 general election, when the manual duplication and adjudication process for a local write-in contest delayed election results in other races by three days. *Id.*

Digital adjudication is also uniquely beneficial to Colorado, a jurisdiction in which approximately 95% of voters cast their ballots by mail. *See* Ex. A, pp. 8-9. Voting machines at in-person polling places are

10

programmed to reject overvotes, and to notify the voter that he or she has undervoted particular contests. *Id.* This direct interaction between the voter and the voting system minimizes the number of ballots containing inadvertent overvotes and undervotes, thus reducing the number of cast ballots that must go through the adjudication process. *Id.* But in Colorado, where the vast majority of voters cast mail rather than in-person ballots, most voters never directly interact with a voting machine that can alert them to the undervote or overvote. *Id.* This increases the number of ballots requiring adjudication in Colorado. Thus, Colorado's voting model requires a voting system that permits election judges to quickly and accurately adjudicate ballots. *Id.*

   **3.      *Automatic document feeder*.** The Voting Systems Rules require that new voting systems possess ballot scanners equipped with automatic document feeders. This requirement improves election administration because it permits election judges to scan "multiple ballots rather than a single ballot at a time." 8 COLO. CODE REGS. § 1501-1, Rule 11.9.4(b).

   According to local election officials, the automatic document feeder function benefits counties in multiple ways: (1) it increases the pace at which counties tabulate voters' ballots because, absent an automatic document

feeder, election officials must manually hand-feed ballots into scanners one at a time, *see* Exs. C ¶ 7; D ¶ 7; F ¶ 7; (2) it saves taxpayer dollars because fewer election judges and hand-fed scanners are needed to effectively tabulate ballots and report election results, *see* Exs. E ¶ 8; F ¶ 7; and (3) it reduces the time needed to resolve technical issues, such as ballot-scanner jams in hand-fed machines and rescanning specified ballots to reconcile cast ballots with tabulated ballots, *see* Exs. A, pp. 9-10; E ¶¶ 9-10. These benefits are tangible. In Pitkin County, for example, a process that took an hour or more to scan 400 ballots using a hand-fed scanner now takes just ten minutes, decreasing labor costs for election judges to tabulate ballots, and allowing election results to be more quickly reported to the public. *See id.* ¶ 7.

     **4.**     ***Single user interface***. The Voting Systems Rules require that new voting systems integrate data management applications and the election management system ("EMS") so that they are accessible by a single user interface on the same server or workstation. 8 COLO. CODE REGS. § 1501-1, Rules 11.9.3(d), 11.9.4(c), and 21.4.7(e). As stated in the rules, this requirement improves efficiency in election administration because data management applications that collect, convert, manage, or export election definition information are "essential component[s]" that must be accessible by

system users from a single workstation, rather than several workstations. *Id.*, Rule 21.4.7(e).

Local election officials prefer this type of system over bifurcated, disjointed voting systems that spread the functions of election administration across multiple subsystems. *See* Exs. D ¶ 8; E ¶ 11; F ¶ 8. Integrated voting systems streamline the many steps involved in election administration— setting up the election in the EMS, defining the election, building the ballot format and content, proofing, creating test ballots, scanning cast ballots, validating the election results, and reporting the election results—because the different applications involved can easily "talk to each other." *See* Exs. C ¶ 8; D ¶ 8. This permits county users to verify from a single workstation that the various components of the voting system are interacting and integrating correctly. *See* Ex. A, pp. 11-12. Bifurcated and disjointed voting systems, which in some counties have involved five or more computer systems, are cumbersome because data files are difficult to move between different subsystems and errors discovered midway through the set-up process may require the elections staff to start over from the beginning. *See* Ex. D ¶ 8. The election staff's ability to quickly and efficiently complete the election set-up

process is critical to ensure that ballots may be printed in time to satisfy strict statutory deadlines. *See* Exs. A, p. 12; E ¶ 11.

> **5.** ***Comma separated value file formats***. The Voting Systems Rules require new voting systems to capture a ballot-level cast vote record ("CVR"), which is a record for each ballot tabulated showing the manner in which the system interpreted and counted the voter's markings on the ballot.[2] 8 COLO. CODE REGS. § 1501-1, Rule 21.4.14(b)-(c); Ex. D ¶ 9. The new rule requires that the CVRs be exported from the voting system in a comma-separated value ("CSV") text format. *Id*. The CSV file format is a widely-used file format that is compatible with a host of other computer and software programs. *See* Exs. A, p. 13; C ¶ 9; E ¶ 13; F ¶ 10.

In addition to the CVR, the Voting Systems Rules also require new voting systems to export election night reporting data in a CSV file format that contains specified fields. 8 COLO. CODE REGS. § 1501-1, Rule 21.4.15. This data export format makes it easy for county election officials to upload their county results files into the Secretary's Election Night Reporting ("ENR") system. *See* Exs. C ¶ 11; E ¶ 14. Like the CVR rule, this rule mandates the

---

[2] An example of a CVR is included the attached declaration from the Secretary's staff. *See* Ex. A, pp. 13-14.

widely-used CSV file format, thus ensuring that county results are properly and accurately aggregated for statewide and multi-county ballot contests, and quickly and efficiently communicated to the media and public. *See id*. Utilizing the CSV file format also reduces the risk of election data loss or corruption because it eliminates the need to convert election data from a voting system vendor's proprietary format into a more useable format. *See* Exs. A, p. 15; C ¶ 9; D ¶ 9. Any time election data is manipulated a risk exists that the data will be fully or partially lost, altered, or corrupted. *See* Exs. A, p. 15; D ¶ 9.

## ARGUMENT

### I.    Plaintiffs do not meet the high standard for a preliminary injunction.

Preliminary injunctions are "extraordinary remed[ies]," and "the right to relief must be clear and unequivocal." *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006) (internal quotations omitted). To obtain a preliminary injunction, Plaintiffs must establish (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to Plaintiffs outweighs the injury caused by the preliminary injunction, and (4) that an

injunction is not adverse to the public interest. *Id.* at 1115. The plaintiff bears the burden of proof to demonstrate that each factor tips in its favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). Plaintiffs cannot sustain their burden of showing these four factors.

### A.    Plaintiffs are not substantially likely to succeed on the merits.

The Secretary's Motion to Dismiss [Doc. 21] exposed insurmountable procedural and jurisdictional hurdles requiring dismissal of the Complaint in its entirety. The Secretary incorporates those arguments here. For those reasons alone, this Court is unlikely to reach the merits of Plaintiffs' claims, let alone rule in Plaintiffs' favor on them. But even if the Court were to reach the merits, Plaintiffs are not substantially likely to succeed.

### 1.    Plaintiffs are not substantially likely to succeed on the merits of their dormant Commerce Clause claim.

Modern interpretations of the dormant Commerce Clause are "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008). "The point is to effectuate the Framers' purpose to prevent a State from retreating

into economic . . . isolation." *Id.*; *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039 (10th Cir. 2009). The "clearest example" of legislation that would violate the Commerce Clause "is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624 (1978).

The dormant Commerce Clause is not "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 343 (2007). Instead, in the absence of congressional action or economic protectionism, states remain free to develop their own solutions on matters of local concern, even if it "in some measure affect[s] interstate commerce or even, to some extent, regulate[s] it." *Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977). A contrary approach would lead to "unprecedented and unbounded interference by the courts with state and local government." *United Haulers*, 550 U.S. at 343.

Generally speaking, challenges brought under the dormant Commerce Clause are subject to a two-tiered analysis. *Kleinsmith*, 571 F.3d at 1039. First, when a state law "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-

of-state interests, [the Court has] generally struck down the statute without further inquiry." *Id.* (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986)). The burden to show discrimination rests on the party challenging the state law. *Hughes v. Okla.,* 441 U.S. 322, 336 (1979). The statute may be saved, however, if "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992).

Under the second tier, the court evaluates whether the statute has only indirect effects on interstate commerce and regulates evenhandedly. *Kleinsmith*, 571 F.3d at 1039-40. If so, the court proceeds to examine "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (internal quotations omitted). In doing so, it applies what is known as the *Pike* balancing test, which provides that a law will be upheld unless the burdens imposed are clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Plaintiffs here limit their dormant Commerce Clause argument to the first tier, making no argument under the second-tier *Pike* balancing test. *See* Motion, pp. 20, 23. They contend "the new election rules discriminate against

18

out-of-state entities ES&S and Hart by excluding them from doing business in Colorado," creating a "*per se* Constitutional violation." Motion, p. 23. But Plaintiffs misconstrue the first-tier discrimination analysis. The first-tier inquiry turns on whether the challenged law "'affirmatively or clearly discriminates against interstate commerce on its face or in practical effect.'" *Kleinsmith*, 571 F.3d at 1040 (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402 (1994)). Discriminatory laws are those that "mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald,* 544 U.S. 460, 472 (2005).

The Voting Systems Rules are free of unlawful discrimination, for five important reasons.

*First*, the Voting Systems Rules are geographically neutral on their face. They make no distinction between in-state and out-of-state voting systems vendors. All vendors are treated equally and subject to the same requirements. *See United Haulers*, 550 U.S. at 334 (stating laws that "treat every private business, whether in-state or out-of-state, exactly the same[ ] do not discriminate against interstate commerce"); *Direct Mktg Ass'n v. Brohl*, 814 F.3d 1129, 1141 (10th Cir. 2016) (finding no unlawful discrimination in

19

part because "[t]he Colorado Law makes no such geographic distinction" between in-state and out-of-state economic interests). The absence of any geographic barrier against interstate vendors distinguishes this case from those where a state was found to have impermissibly discriminated against interstate commerce. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978) (collecting cases).

*Second*, the Voting Systems Rules do not discriminate in practical effect because they do not "alter[ ] the competitive balance between in-state and out-of-state firms." *Brohl*, 814 F.3d at 1142 (internal quotations omitted; alteration in original). As indicated above, the Secretary has preliminarily determined that the voting system of a Massachusetts-based company, Clear Ballot Group, Inc., facially complies with federal and state law and the Voting Systems Rules. *See* Ex. A, p. 18. Clear Ballot Group, Inc. has verbally confirmed that it will move forward with the formal certification process for its most current voting system. *See id*. This demonstrates that in-state and out-of-state vendors alike may seek and receive certification under the Voting Systems Rules if their systems comply with the new rules. Certification is not tethered to or influenced by the vendor's physical location. *See id*. at 19. Indeed, the Secretary is concerned first and foremost with improving the

20

efficiency, accuracy, and transparency of elections in Colorado, not with bolstering the bottom line of a Colorado-based voting systems vendor.[3] *See id.* at 16.

*Third*, to the extent that Plaintiffs assert the Voting Systems Rules negatively impact *their* specific businesses, that argument finds no support under the dormant Commerce Clause. The Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp.*, 437 U.S. at 127-28. Nor does the Commerce Clause protect Plaintiffs' "particular structure or methods of operation in a retail market." *Id.*; *accord Kleinsmith*, 571 F.3d at 1043.  Put another way, the Commerce Clause guarantees only an open market in which to compete, not the success of any particular competitor.

*Fourth*, Plaintiffs' suggestion that the Secretary is improperly attempting to benefit an allegedly Colorado-based vendor, Dominion, is without merit. *See* Ex. A, p. 16. Dominion is subject to the exact same set of rules as Plaintiffs. And even if the impacts of the Voting Systems Rules fell

---

[3] Colorado law prohibits election officials and their employees from having any direct or indirect financial or proprietary interest in the manufacture, sale, maintenance, servicing, repair, or transportation of voting equipment. *See* § 1-5-606, C.R.S. (2015).

solely on out-of-state vendors (they don't), that alone would not constitute a Commerce Clause violation. *See Exxon Corp.*, 437 U.S. at 125-26 (holding divestiture requirements that fell "solely on interstate companies" did not discriminate against interstate commerce); *accord Churchill Downs, Inc. v. Trout*, 767 F.3d 521, 524 (5th Cir. 2014) (same); *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 943-44 (11th Cir. 2013) (same). Put simply, the Secretary is not obligated to guarantee that Plaintiffs will forever "enjoy their same status in the [Colorado] market ...." *Exxon Corp.*, 437 U.S. at 126.

*Fifth*, even if the Voting Systems Rules did discriminate in favor of in-state economic interests, they would still pass constitutional muster because they are justified by "a valid factor unrelated to economic protectionism." *Wyoming*, 502 U.S. at 454; *see also Davis*, 553 U.S. at 341 ("[A] government function is not susceptible to standard dormant Commerce Clause scrutiny owing its likely motivation by legitimate objectives distinct from simple economic protectionism the Clause abhors."). Local election officials from counties of all sizes in Colorado agree that the Voting Systems Rules both reduce costs and improve the efficiency, accuracy and transparency of election administration in Colorado. *See* Exs. C ¶ 12; D ¶ 10; E ¶ 15; F ¶ 11.

22

These constitute legitimate state interests unrelated to economic protectionism. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 196 (2008) (stating that "effort[s] to improve and modernize election procedures" and the "orderly administration [of elections] and accurate record keeping" are legitimate state interests).

Accordingly, because Plaintiffs are not substantially likely to succeed on the merits of the dormant Commerce Clause claim, their Motion should be denied.

> ### 2. Plaintiffs are not substantially likely to succeed on the merits of their state law claims.

Plaintiffs are not substantially likely to succeed on their remaining state law claims (Claims Two through Five) for the numerous reasons articulated in the Secretary's Motion to Dismiss [Doc. 21]—namely, because the Eleventh Amendment bars the state law claims; the *Pullman* doctrine counsels in favor of federal abstention; and this Court lacks jurisdiction over them. Sec'y's Mot. to Dismiss [Doc. 21], pp. 15-25.

Even if this Court were to consider the merits of Plaintiffs' state law claims, they are not substantially likely to succeed. To be sure, because Plaintiffs seek the extraordinary remedy of enjoining lawfully-promulgated

rules, it remains questionable whether their cursorily-drafted state law claims pass *Twombly*'s heighted pleading standard. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Each of Plaintiffs' state law claims fail because they rely on a faulty, strained interpretation of Colorado's statutes governing the Secretary's rulemaking authority over electronic and electromechanical voting systems. Plaintiffs' second claim, for example, alleges that the Secretary violated his statutory duty when he failed to certify their voting systems upon their approval by a federally-accredited laboratory. Compl. ¶¶ 76-78. Plaintiffs' third claim is similar, alleging that the Voting Systems Rules conflict with Colorado's Uniform Election Code. *Id.* ¶¶ 84-88. But the Code clearly vests the Secretary with broad discretion to adopt certification criteria that go above and beyond federal requirements. *See* § 1-5-616(4), C.R.S. (2015) ("The secretary of state shall adapt the standards for certification of electronic or electromechanical voting systems established by rule pursuant to subsection (1) of this section to ensure that new technologies that meet the requirements for such systems are certified in a timely manner and available for selection by political subdivisions and meet user standards."). The Secretary's certification is not required unless a vendor complies with *both* federal

requirements and the standards adopted by the Secretary. Specifically, Colorado statute provides, "If the . . . voting systems tested pursuant to this section satisfy *the requirements of this part 6*, the secretary of state shall certify such systems and approve the purchase, installation, and use of such systems by political subdivisions *and establish standards for certification*." § 1-5-608.5(3)(a), C.R.S. (2015) (emphasis added). A voting system that cannot meet the requirements of part 6, which includes meeting the standards established by the Secretary by rule, cannot be certified. *See also* § 1-5-608.5(3)(b), C.R.S. (Secretary "may promulgate conditions of use in connection with the use by political subdivisions of . . . voting systems").

Plaintiffs' fourth claim similarly lacks merit. It alleges that the Secretary exceeded his rulemaking authority when adopting the Voting Systems Rules. Compl. ¶¶ 89-96. This claim ignores the wide latitude granted by the General Assembly to the Secretary to promulgate rules governing electronic and electromechanical voting systems. *See* § 1-5-613(1), C.R.S. (2015) ("The secretary . . . shall adopt uniform rules . . . for the purchase of voting equipment in the state."); § 1-5-616(1), C.R.S. (2015) ("The secretary . . . shall adopt rules . . . that establish minimum standards for electronic and electromechanical voting systems regarding [several listed

criteria].”). Nowhere in these statutes has the General Assembly removed the Secretary's broad discretion to promulgate rules governing off-the-shelf components, digital adjudication, automatic document feeders, single user interfaces, or specified file formats.

Finally, Plaintiffs' fifth claim—alleging the new rules create an unfunded state mandate on counties—lacks merit for the reason stated in the Secretary's Motion to Dismiss: Plaintiff have no standing. Sec'y's Mot. to Dismiss [Doc. 21], pp. 24-25. And even if Plaintiffs crossed that hurdle, their claim would fail because the Voting Systems Rules do not "mandate" anything. The rules permit counties to continue using their existing ES&S and Hart voting systems that were certified by the Secretary before January 1, 2016. *See Gessler v. Doty*, 272 P.3d 1131, 1132 (Colo. App. 2012) (holding no unfunded state mandate created by new ballot drop-off requirements and stating a "'state mandate' is a statutory prescription, categorized as either a program or procedural mandate.").

Accordingly, because Plaintiffs are not substantially likely to succeed on the merits of their state law claims, their Motion should be denied.

26

**B.      Plaintiffs will not suffer irreparable harm absent a preliminary injunction.**

Plaintiffs cannot meet their burden of demonstrating that the Voting Systems Rules will cause them irreparable harm. To meet their burden on the irreparable harm prong, Plaintiffs must establish that their injuries are "both certain and great," and not "merely serious or substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004). The burden to demonstrate irreparable harm is "not an easy burden to fulfill." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). The party seeking injunctive relief must show that the injury complained of "is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original; internal quotation omitted).

Delay in seeking preliminary injunctive relief undercuts any presumption that the alleged violation will cause irreparable harm, and therefore may justify denial of preliminary injunction relief. *See GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Such unnecessary delay may be viewed as inconsistent with a plaintiff's claims that there is an urgent need

for immediate relief. *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F.

Supp. 2d 1201, 1221 (D. Utah), *aff'd*, 425 F.3d 1249 (10th Cir. 2005).

## 1.   No imminent irreparable injury exists, as shown by Plaintiffs' delay in seeking a preliminary injunction.

Plaintiffs cannot show any threat of an imminent irreparable injury

because the Voting Systems Rules require no immediate action. The new

rules contain a grandfathering structure that permit counties to continue

using their current voting systems that were certified by the Secretary before

January 1, 2016; counties may even acquire replacement components for

their existing systems under certain circumstances. *See* 8 COLO. CODE REGS.

§ 1501-1, Rule 11.9.2. Only new voting systems acquired on or after January

1, 2016, must comply with the Secretary's new rules. *See id.*, Rule 11.9.4.

Thus, counties that prefer to maintain their current ES&S or Hart voting

systems may continue to do so. Plaintiffs' fear that they will be deprived of

the opportunity to garner *new* business in Colorado does not rise to the level

of an imminent irreparable injury that must be enjoined pending resolution

of this case on the merits. *See Daly v. United States Fencing Ass'n*, No. CV 07-

1167, 2007 U.S. Dist. LEXIS 28092, *11-12 (E.D.N.Y. 2007) (finding no

irreparable harm because "plaintiff's suggestion that his exclusion from

28

future events is depriving him of the opportunity to drum up additional and new business is at best speculative.").[4]

Plaintiffs' delay in seeking preliminary injunctive relief further confirms the absence of any imminent irreparable harm. The Voting Systems Rules were adopted by the Secretary on February 9, 2016. Compl. ¶ 47. Yet despite participating in the rulemaking comment process leading up to the rules' adoption, *see* Ex. A, p. 17, Plaintiffs waited three-and-a-half months before finally seeking preliminary injunctive relief. Motion [Doc. 2], filed May 23, 2016. Plaintiffs' unnecessary delay "knocks the bottom out" of their claim of imminent irreparable injury. *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F. Supp. 2d 335, 383 (D. N.J. 2002).

Courts have denied preliminary injunctive relief in cases where the plaintiff's delay was even shorter than here. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay); *Balsam Brands, Inc. v. Cinmar, LLC,* No. 15-cv-04829, 2015 U.S. Dist. LEXIS 154075, *30 (N.D. Cal. 2015) (ten-week delay); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,* 909 F. Supp. 896, 910 (S.D.N.Y. 1995) (three-month

---

[4] All unreported decisions cited in this Response are attached hereto as Exhibit G.

delay); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312-13 (E.D. Pa. 1993) (50-day delay); *Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 368 (S.D.N.Y. 1990) (over two-month delay); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (three-month delay).

Because Plaintiffs were dilatory in seeking a preliminary injunction, their Motion should be denied.

### 2.  A violation of Commerce Clause rights is not a per se irreparable injury.

Plaintiffs contend that the alleged violation of their Commerce Clause rights, by itself, is sufficient irreparable harm to warrant a preliminary injunction. This Court should reject Plaintiffs' argument.

Although a number of district courts have concluded that the irreparable injury requirement may be automatically satisfied when there is a violation of one's "personal" constitutional rights, that "per se" rule does not apply when the alleged violation is of "structural" constitutional rights, such as under the Commerce Clause. *See, e.g., Prof'l Towing & Recovery Operators v. Box*, No. 08-c-4096, 2008 U.S. Dist. LEXIS 100002, 2008 WL 5211192, at *12-13 (N.D. Ill. 2008); *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*,

545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008); *Alliance of Auto. Mfr. v. Hull*, 137

F. Supp. 2d 1165, 1173 (D. Ariz. 2001) (refusing to find a presumption of

irreparable harm based on an alleged violation of the dormant Commerce

Clause); *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders*,

893 F. Supp. 301, 308-09 (D.N.J. 1995); *Grand Cent. Sanitation, Inc. v. City of*

*Bethlehem*, No. 94-5928, 1994 U.S. Dist. LEXIS 15825, 1994 WL 613674, at

*2 (E.D. Pa. 1994); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431-

32 (N.D.N.Y. 1989); *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 522 (D. Del.

1984).[5]

This Court, too, has held that not all constitutional claims are entitled

to a presumption of irreparable harm. *See S.W. Shattuck Chem. Co. v. City &*

*County of Denver*, 1 F. Supp. 2d 1235, 1238-39 (D. Colo. 1998) (noting that a

presumption arises only when "fundamental" rights are implicated or when a

future injury is demonstrated that cannot be compensated by monetary

damages alone). Thus, because a bare allegation of a dormant Commerce

---

[5] In *ACLU v. Johnson*, the Tenth Circuit suggested that the deprivation of rights guaranteed by the Commerce Clause constitutes irreparable injury. 194 F.3d 1149, 1163 (10th Cir. 1999). But that statement was mere *dicta* because it was unnecessary to the court's holding under the First Amendment. *See id.* at 1160 ("[W]e need not reach this issue [regarding the dormant Commerce Clause]").

31

Clause violation does not rise to the level of a "per se" irreparable injury,

Plaintiffs cannot meet their high burden.

### 3. Economic loss, damage to good will, and the cost of complying with government regulations are not irreparable injuries.

Plaintiffs' primary grievance is that their existing voting systems do

not meet the heightened technology standards under the Voting Systems

Rules, requiring them to either incur costs to improve their systems or lose

profits and good will in Colorado. But the economic loss resulting from, and

cost of complying with, government regulations do not amount to irreparable

harm. The Tenth Circuit has repeatedly held that economic loss, in and of

itself, does not constitute irreparable harm.[6] *Port City Properties v. Union

Pac. Railroad Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008); *Heideman v. S. Salt

Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). And courts across the

country have rejected the notion that the cost of complying with government

regulations constitutes irreparable harm. *See, e.g., Freedom Holdings, Inc. v.*

---

[6] Plaintiffs' cited cases regarding companies that go out of business are inapposite. Motion, p. 14. Plaintiffs' Motion and affidavits allege only that they risk being forced out of the *Colorado* market, not they will go out of business nationwide. Motion, p. 14; *id.*, Ex. A ¶ 24 (Affidavit of Bryan J. Hoffman); *id.*, Ex. 2 ¶ 33 (Affidavit of Peter Lichtenheld); *id.*, Ex. 3 ¶ 14 (Affidavit of Steven M. Pearson); *id.*, Ex. 4 ¶ 15 (Affidavit of Edward Perez).

*Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 432 (D. Vt. 2009); *Penn. Supply, Inc. v. Susquehanna River Basin Comm'n,* No. 1:CV-06-2454, 2007 WL 551573, 2007 U.S. Dist. LEXIS 11844, *7-10 (M.D. Pa. Feb. 20, 2007).

The Third Circuit explained the reason why compliance costs are insufficient:

> [T]he alleged injury was "unrecoverable costs and commitment of diverse business resources." Without intending to disparage the importance of such an injury, we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, "peculiar".

*A.O. Smith Corp. v. FTC,* 530 F.2d 515, 527-28 (3d Cir. 1976) (internal citations and footnote omitted).

Along the same lines, Plaintiffs' purported loss of good will among their easily identifiable county customers does not establish irreparable injury. Unlike the cases cited by Plaintiffs where the loss of customers was "inherently difficult to measure," *Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 652 (10th Cir. 2004), or "unascertainable," *Equifax Services, Inc. v.*

33

*Hitz*, 905 F.2d 1355 (10th Cir. 1990), any loss of Plaintiffs' business is readily measurable. Each of Plaintiffs' customers in this state is one of Colorado's 64 county governments. According to the Complaint, ES&S currently has twelve county customers, while Hart has 34. Compl. ¶ 27.a. Thus, to the extent any of Plaintiffs' Colorado customers choose to terminate their relationship with Plaintiffs due to the Voting Systems Rules, their discrete losses will be easily quantifiable. This renders preliminary injunctive relief unwarranted. *See Herff Jones v. Okla. Graduate Servs.*, 237 Fed. Appx. 384, 388 (10th Cir. 2007) (denying preliminary injunction because "even if Herff Jones has incurred an intangible loss of customer good will that is not readily ascertainable, it nonetheless appears that Herff Jones can easily determine the precise number of its prior customers that have transferred their business").

Other courts similarly recognize that a business' loss of good will or reputation is typically a measureable, reparable monetary injury that does not support a preliminary injunction. *See, e.g., Kafka v. Hagener*, 176 F. Supp. 2d 1037, 1044 (D. Mont. 2001) (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)); *Medika Int'l v. Scanlan Int'l*, 830 F. Supp. 81, 89 (D. P.R. 1993); *Morton*

34

*Bldgs. of Neb., Inc. v. Morton Bldgs, Inc.*, 333 F. Supp. 187, 196 (D. Neb. 1971).

Accordingly, because Plaintiffs cannot establish an irreparable injury, their request for a preliminary injunction should be denied.

### C.   The injury to the State and public caused by a preliminary injunction outweighs the purported harm threatened to Plaintiffs.

Courts frequently find that the risk of harm to the public interest outweighs speculative monetary losses or injuries to private economic interests. *See, e.g.*, *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007); *EMTA Insaat, A.S. v. United States*, 123 Fed. Cl. 330, 340-41 (Fed. Cl. 2015); *Petroplex Int'l v. St. James Parish*, No. 15-140, 2016 U.S. Dist. LEXIS 59881, *14-15 (E.D. La. 2016); *Miller v. Am. Tel. & Tel. Corp.*, 344 F. Supp. 344, 350 (E.D. Pa. 1972). This principle applies forcefully in the context of elections, where state officials seek to protect the integrity of the democratic process by ensuring that each and every vote is properly counted. Courts therefore understandably reluctant to preliminarily enjoin state processes in the election context. *See Libertarian Party v. Buckley*, 938 F. Supp. 687, 693-94 (D. Colo. 1996); *Gonzalez v. Ariz.*, Nos. CV 06-1268, 1362, & 1575, 2006 U.S. Dist. LEXIS 76638, *33-35 (D. Ariz. 2006); *see also Homes v. FEC*, 71 F.

Supp. 3d 178, 181 (D.D.C. 2014) ("[P]ublic interest in the integrity of the election process outweighs [the plaintiffs'] private interest in giving money in a more focused way.").

The specific harm that the Secretary and the State will suffer if enjoined from enforcing the Voting Systems Rules is addressed below in the discussion of the adverse impact on the public interest. *See Jackson v. Leake*, 476 F. Supp. 2d 515 (E.D. N.C. 2006) (combining analysis of final two prongs where defendants were state officials who "represent the public interest").

### D.   Restraining the Voting Systems Rules will adversely affect the public interest.

In assessing the effect of a requested injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (internal quotations omitted). Elections involve a "unique" context that is "different from ordinary injunction cases," and federal courts "'cannot lightly interfere'" with the electoral process. *Gonzalez*, 2006 U.S. Dist. LEXIS 76638, *15 (quoting *S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003)).

Federal courts at every level recognize the critical and significant public interests at stake in the proper regulation of elections. The U.S.

Supreme Court has said that "orderly administration and accurate recordkeeping" in elections is an important and legitimate state interest. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008). It explained that state "effort[s] to improve and modernize election procedures that have been criticized as antiquated and inefficient" are compelling and "valid" state interests. *Id.* at 191. The Tenth Circuit similarly cautions that courts must give "due regard to the state's duty to provide substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Baer v. Meyer*, 728 F.2d 471, 474 (10th Cir. 1984). This Court, too, has said that the states possess important interests in protecting the "integrity and reliability of the electoral process." *Libertarian Party v. Buckley*, 938 F. Supp. 687, 693 (D. Colo. 1996).

Congress, in passing the Help America Vote Act of 2002 ("HAVA"), and the Colorado General Assembly, in enacting the state Election Code, both agree. After all, "HAVA resulted from a national consensus that the nation's electoral system needs improvements to ensure that every eligible voter has the opportunity to vote . . . ." § 1-1.5-101(1)(b), C.R.S. (2015).

Here, the Voting System Rules seek to advance these important, legitimate state interests by updating the integral machinery used to

administer Colorado's elections. As recognized by local election officials from across the State, the new rules utilize the latest innovations in election administration technology to improve the efficiency, accuracy, and transparency of Colorado elections. *See* Exs. C ¶ 12; D ¶ 10; E ¶ 15; F ¶ 11. The tools implemented by the new rules—off-the-shelf components, digital adjudication, automatic document feeders, single user interfaces, and specified file formats—ease the "administrative processing" of elections, a recognized state interest in this circuit. *Hagelin v. Graves*, 804 F. Supp. 1377, 1383 (D. Kan. 1992).

Without the new rules, voting systems that lack the following important technological features that improve effective election administration may be eligible for certification:

- Digital adjudication, thereby creating more opportunities for human error in the manual adjudication process and thereby risking inaccurate results. *See* Exs. C ¶¶ 5-6; D ¶¶ 5-6; E ¶¶ 5-6; F ¶¶ 5-6;

- Automatic document feeder, thereby requiring election judges to manually hand-feed ballots into scanners one at a time and delaying the reporting of pivotal election results to the public. *See* Exs. C ¶ 7; D ¶ 7; E ¶¶ 7-10; F ¶ 7;

- Integrated data management applications and election management systems, thereby causing possible delays in setting up and programming the election in the critical pre-election period when deadlines are compressed. *See* Exs. C ¶ 8; D ¶ 8; E ¶¶ 11-12; F ¶¶ 8-9; and

38

- Production of election results files in a usable CSV format, thereby increasing the risk of data loss or corruption during the conversion and manipulation process. *See* Exs. C ¶¶ 9-11; D ¶ 9; E ¶¶ 13-14.

Enjoining the Secretary's efforts in this area therefore threatens the integrity of the election process in an important general election year, disserving the public interest. *See Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 548, 551 (6th Cir. 2004) (overruling preliminary injunctive relief and stating "there is a strong public interest in smooth and effective administration of the voting laws . . . ."); *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1247 (D. N.M. 2008) (declining to preliminarily enjoin New Mexico's voter registration requirements because doing so would be "adverse" to the public interest). Plaintiffs' purported risk of monetary harm cannot outweigh the State's significant interest in protecting the integrity of the statewide election process. *See Miller*, 344 F. Supp. at 350.

The two district court cases cited by Plaintiffs regarding the public interest are inapposite because neither implicates the legitimate state interest of improving and modernizing accurate election administration. Motion, p. 19 (citing *Foremost In'tl Tours, Inc. v. Qantas Airways, Ltd.*, 379 F. Supp. 88 (D. Haw. 1974); *Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626

39

(D. Neb. 1988)). *Foremost* involved a private antitrust dispute between two businesses. 379 F. Supp. 88. Likewise, *Saint* dealt with a female student's request to wrestle on the boy's wrestling team—a case where "no public interest [was] injured by the issuance" of a preliminary injunction. 684 F. Supp. at 630. Thus, neither case is informative regarding the public's weighty interest in improving effective election administration.

## II. Plaintiffs' alternative basis for a preliminary injunction should be rejected.

Plaintiffs argue in the alternative that the extraordinary remedy of a preliminary injunction should be granted because the Secretary is, or is about to be, "engaged in conduct proscribed by the federal civil rights laws." Motion, p. 24. Plaintiffs appear to argue that they need not establish the final three preliminary injunction prongs because the Secretary is violating, or is about to violate, section 1983 of Title 42. *Id.*

This Court should reject Plaintiffs' argument for the simple reason, explained above, that they are not substantially likely to succeed on the merits of their claims. Moreover, it is far from clear that Plaintiffs' "alternative basis" approach applies to requests for preliminary injunctive relief in section 1983 cases. Numerous courts in this circuit adjudicating such requests in section 1983 cases require that all four preliminary injunction

40

prongs be satisfied. *See Evans v. Fogarty*, 44 Fed. Appx. 924, 926 (10th Cir. 2002); *Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1181-99 (D. N.M. 2011); *Bannister v. Bd. of Cnty. Comm'rs*, 829 F. Supp. 1249, 1525-53 (D. Kan. 1993). Plaintiffs' approach, by contrast, would permit the first "substantial likelihood of success" prong to swallow the remaining prongs in virtually all section 1983 cases.

Accordingly, Plaintiffs' alternative basis theory should be rejected.

## CONCLUSION

Plaintiffs have not satisfied their heavy burden in establishing all four prongs necessary for a preliminary injunction. Their Motion should be denied.

Respectfully submitted this 5th day of July, 2016.

CYNTHIA H. COFFMAN
Colorado Attorney General

*s/ Grant T. Sullivan*
LEEANN MORRILL, No. 38742*
First Assistant Attorney General
GRANT T. SULLIVAN, No. 40151*
Assistant Solicitor General
CHRISTOPHER JACKSON, No. 49202*
Assistant Attorney General
*Counsel of Record
*Counsel for the Secretary*

Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, CO 80203
Phone:  (720) 508-6000
Fax:  (720) 508-6041
Email:   leeann.morrill@coag.gov
           grant.sullivan@coag.gov
           christopher.jackson@coag.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, I served a true and complete copy of the **DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** upon all parties through ECF-file and serve or as indicated below:

Thomas P. McMahon
Aaron D. Goldhamer
JONES & KELLER, P.C.
1999 Broadway, Ste. 3150
Denver, CO 80202
tmcmahon@joneskeller.com
agoldhamer@joneskeller.com
*Attorneys for Plaintiffs*

*s/ Xan Serocki*
Xan Serocki

43