IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-1237-JLK

ELECTION SYSTEMS & SOFTWARE, LLC, a Delaware limited liability company; and HART INTERCIVIC, INC., a Texas corporation,

    Plaintiffs,

v.

WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State, Colorado Department of Revenue,

    Defendant.

## DECLARATION OF SUZANNE STAIERT

I, Suzanne Staiert, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1. I am the Colorado Deputy Secretary of State, a position I have held since March 2012. In that role, I have full authority to act on behalf of the Colorado Secretary of State ("the Secretary"). I am familiar with the election rules adopted by the Secretary, including the rules being challenged by the plaintiffs in this case, as well as the rulemaking process and comment periods leading up to the rules' adoption. *See* 8 COLO. CODE REGS. § 1501-1 ("Voting Systems Rules").

2. I am also familiar with the certification process that voting systems vendors undergo within the Secretary's office under section 1-5-617(1), C.R.S.

**EXHIBIT A**

(2015), and the vendors who have applied for and received certification. I am also familiar with the market for electronic and electromechanical voting systems in Colorado and other states, the various vendors that participate in that market, as well as the vendors who have negotiated agreements with other states to be the exclusive provider of voting systems in those states.

### A.   Plaintiffs' Experience in Voting Systems

3.   Plaintiff Election Systems & Software, LLC ("ES&S") markets itself on its website as "the world's largest elections-only company" and emphasizes that it has "run fair and accurate elections for more than 30 years." Plaintiff Hart Intercivic, Inc. ("Hart") similarly states on its website that it has been "[a]dvancing democracy for over 100 years" and that its mission fuels its "continuous drive for technological innovation," making elections "more transparent, more efficient and easier." True and correct printouts from ES&S and Hart's website containing the above statements are attached as Exhibits A.1 and A.2, respectively.

4.   Plaintiffs have both been selected as the single provider of voting systems in several states. ES&S is the sole voting systems provider in thirteen states (Alabama, Arkansas, Maine, Maryland, Mississippi, Montana, Nebraska – the state in which ES&S maintains its principal place of business – North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, and West

2

Virginia), while Hart is the sole provider in two states (Hawaii and Oklahoma). To my knowledge, and after conferring with the Secretary's counsel, no court decision in any jurisdiction prevents Plaintiffs from entering into agreements with these and other states to serve as their exclusive provider of voting systems.

### B. The Important Public Interests Advanced by the Voting Systems Rules

5. The Voting Systems Rules follow the evaluation of competing voting systems by the Pilot Election Review Committee ("PERC") that was convened by the Secretary. The voting systems of four vendors were evaluated by PERC and piloted during the November 2015 election, including ES&S, Hart, Clear Ballot Group, Inc. ("Clear Ballot"), and Dominion Voting Systems, Inc. ("Dominion"). Although the Secretary initially contemplated following the lead of other states by adopting a single uniform voting system in Colorado, the Secretary and his staff ultimately crafted the new rules so that Colorado's 64 counties will be able to select from more than one voting system, if the Secretary certifies more than one voting system for use in Colorado.

6. The Voting Systems Rules codify heightened technological functions and capabilities based on Colorado's unique election administration needs. *See* 8 COLO. CODE REGS. § 1501-1. The new rules therefore allow any voting systems

vendor to become certified by the Secretary, without regard to whether the vendor is an interstate or intrastate company, if they satisfy the heightened technological standards. The vendor's state of incorporation, or its principal place of business, do not influence the Secretary's certification decision and are not factors under the Voting Systems Rules.

7.  As relevant to Plaintiffs' challenge, the Voting Systems Rules implement five new advancements in voting systems technology:

*a.* ***Off-the-Shelf Components.*** The Voting Systems Rules give favorable consideration to voting systems that utilize "commercial off-the-shelf hardware components, rather than proprietary, purpose-built hardware components." 8 COLO. CODE REGS. § 1501-1, Rule 11.9.3(c). Off-the-self components benefit county governments in three primary ways. *First*, voting systems that contain off-the-shelf components are scalable, which allows a county to configure its system to fit its particular needs. This scalability reduces costs and saves taxpayer dollars because counties are not forced to purchase or lease unnecessary equipment. Thus, electronic or electromechanical voting systems that are compatible with off-the-shelf hardware components are generally less expensive than systems utilizing or requiring multiple proprietary, purpose-built components. *Second*, off-the-shelf

4

hardware components can be obtained from sources other than the voting system provider, making it easier for counties to quickly replace broken or inoperable voting systems components. The ability to quickly and efficiently replace broken or inoperable voting systems components is vitally important when administering elections. Otherwise, counties risk delay in timely certifying and reporting pivotal election results to the Secretary and the public at large. *Third*, voting systems that utilize off-the-shelf components offer better financial and operational stability to counties. In the event a county's voting systems vendor suffers financial instability or bankruptcy, the county may still continue to obtain necessary replacement components from other sources. That is not the case with voting systems vendors that utilize proprietary, purpose-built components.

Importantly, the Voting Systems Rules do not require any county to convert to a new compliant voting system by any certain date. The new rules contain a grandfathering structure that permit counties to continue using their current voting systems that were certified by the Secretary before January 1, 2016; counties may even acquire replacement components for their existing systems to the extent necessary for replacement of existing components that are damaged, defective or inoperable. *See* 8 COLO. CODE REGS. § 1501-1, Rule 11.9.2. Only new voting systems certified on or after

5

January 1, 2016, must comply with the Secretary's new rules. *See id.*, Rule 11.9.4. Thus, counties that prefer to maintain their current ES&S or Hart voting systems may continue to do so.

    *b.*    ***Digital Adjudication.*** The Voting Systems Rules require that new voting systems possess digital ballot adjudication functionality. 8 COLO. CODE REGS. § 1501-1, Rules 11.9.3(g)(1), 11.9.4(a), & 21.4.16(a). This requirement enhances election administration because it enables elections judges to quickly "resolve, adjudicate, and duplicate ballots with marginal or ambiguous voter markings digitally rather than manually." *Id.*, Rule 21.4.16(a).

    Digital adjudication functionality greatly reduces the human error, cost, and delay inherent in manual adjudication. Manual adjudication requires election judges to first locate amongst the dozens of active ballot styles a duplicate paper ballot style matching the voter's original ballot. Next, the manual process requires election judges to duplicate a voter's paper ballot by hand-copying the voter's markings that appear on the original paper ballot—a time-intensive process that is susceptible to human error and can result in inconsistency between different teams of election judges. Following the 2014 general election, for example, the Secretary's staff reviewed ballots that had

been manually duplicated and adjudicated in Pueblo County, Colorado. The Secretary's staff found duplication errors in 4.4% of the manually duplicated ballots, a relatively high error rate. Although this high error rate did not affect the outcome of any particular race, that may not always be the case. Finally, manual logs of the duplication and adjudication process must also be kept by the election judges in case there is a later audit, recount, or contest. This manual logging process is also prone to human error.

Digital adjudication, by contrast, allows the entire adjudication process to be completed electronically—greatly increasing accuracy, efficiency, transparency and consistency—while simultaneously reducing the staffing costs needed to pay election judges. Digital adjudication (a) preserves the original markings on the ballot as submitted by the voter, and (b) creates an electronic audit log showing the names of the resolution board members and the manner in which they resolved each marking on the ballot. Once adjudicated, the resolved ballots are released for tabulation by the voting system. Digital adjudication yields fewer mistakes, greater accuracy, and verifiable auditability of each ballot adjudicated. The ballot image capture component of digital adjudication is also beneficial when conducting audits, including risk-limiting audits, because the electronically-saved ballot images eliminate the need to rescan and re-tabulate the ballots selected for audit.

Digital adjudication is also much faster than manual adjudication, reducing delay in reporting election results. For example, digital adjudication is much more efficient than manual duplication and adjudication when adjudicating ballots that contain write-in candidates. Voting systems with digital adjudication capabilities can be programmed so that ballots cast for write-in candidates are electronically tallied and the results are available immediately. Without this function, ballots cast for write-in candidates must be manually adjudicated and tallied by hand, increasing the opportunity for human error and delaying timely results. This was an issue in Adams County during the 2014 general election, when the manual duplication and adjudication process for a write-in contest for a local surveyor position delayed election results in other races for approximately three days.

Digital adjudication is also uniquely beneficial to Colorado, a jurisdiction in which approximately 95% of voters cast their ballots by mail. Voting machines at in-person polling places are programmed to reject overvotes, and to notify the voter that he or she has undervoted particular contests. This direct interaction between the voter and the voting system minimizes the number of ballots containing inadvertent overvotes and undervotes, thus reducing the number of cast ballots that must go through the adjudication process. But in Colorado, where the vast majority of voters cast mail rather than in-person ballots, most

8

voters never directly interact with a voting machine that can alert them to the undervote or overvote. This increases the number of ballots requiring adjudication in Colorado. Thus, Colorado's voting model requires a voting system that permits election judges to quickly and accurately adjudicate ballots.

      c.      ***Automatic Document Feeder***. The Voting Systems Rules require that new voting systems possess ballot scanners equipped with automatic document feeders. This requirement augments election administration because it permits election judges to scan "multiple ballots rather than a single ballot at a time." 8 COLO. CODE REGS § 1501-1, Rule 11.9.4(b).

      The automatic document feeder function improves election administration in multiple ways: it increases the pace at which counties tabulate voters' ballots because, absent an automatic document feeder, election officials must manually hand-feed ballots into scanners one at a time; and it saves taxpayer dollars because fewer election judges and hand-fed scanners are needed to effectively tabulate ballots and report election results.

      Moreover, automatic document feeders reduce the time needed to resolve technical issues, such as ballot-scanner jams on hand-fed machines. When a jam occurs on a hand-fed scanner, it sometimes causes the tabulator's ballot counter

to inaccurately reflect the total number of ballots scanned and tabulated. If a question arises about the accuracy of the number of ballots counted from that scanner, election judges in turn must "clear" the election results and start scanning anew all ballots that were previously scanned on that device. This problem occurs because it is often impossible to determine whether a jammed ballot has been scanned and tabulated by the device. If a similar problem occurs on a scanner with an automatic document feeder, election judges can delete just the "batch" of ballots in which the discrepancy arises and rescan only the ballots in that batch. They are not required to delete and rescan each and every ballot previously scanned on the device.

Automatic document feeders are also essential in conducting risk-limiting audits. Risk-limiting audits are ballot audits that are based on scientific and statistical models; proportionally more ballots are audited as the margin of victory between competing candidates narrows. Colorado statute requires all Colorado counties to begin conducting risk-limiting audits in 2017. *See* § 1-7-515, C.R.S. (2015). To conduct an efficient risk-limiting audit, the ballots must be stored in numbered "batches" in the same order that they were scanned, thus permitting a ballot selected for audit to be quickly located and reviewed. Hand-fed scanners lacking an automatic document feeder are not conducive to maintaining the scanning order because they operate on top of ballot boxes and,

once a ballot is scanned, the ballot drops into the box and is mixed out of order with other ballots. This problem is alleviated with automatic document feeders.

    *d.*    *Single User Interface*. The Voting Systems Rules require that new voting systems integrate data management applications and the election management system ("EMS") so that they are accessible by a single user interface on the same server or workstation. 8 COLO. CODE REGS. § 1501-1, Rules 11.9.3(d), 11.9.4(c), and 21.4.7(e). This requirement improves efficiency in election administration because data management applications that collect, convert, manage or export election information are "essential component[s]" that must be accessible by system users from a single workstation, rather than several workstations. *Id.*, Rule 21.4.7(e).

Integrated voting systems that comply with this requirement are preferable in Colorado over bifurcated, disjointed voting systems that spread the functions of election administration across multiple subsystems. Integrated voting systems streamline the many steps involved in election administration—setting up the election in the EMS, defining the election, building the ballot format and content, proofing, creating test ballots, scanning cast ballots, validating the election results, and reporting the election results—

because a user of the voting system can confirm on a single workstation that the different applications are accurately "talking to each other."

This streamlined administration process is especially important during the pre-election period when statutory deadlines are tightly compressed. In Colorado, counties have at most only twelve to fifteen days after the ballot content is certified by the Secretary to generate, edit, proofread, finalize, print, and mail ballots. *See* § 1-5-203(1)(a), C.R.S. (requiring Secretary to certify ballot content 60 days before election in even-numbered years, and 57 days before election in odd-numbered years); 52 U.S.C. § 20302(a)(8)(A) (requiring ballots to be sent to military and overseas voters not later than 45 days before election). This timeline is the best case scenario, and assumes there are no candidate challenges to the Secretary's certification decisions. *See* § 1-1-113, C.R.S. (2015). Thus, counties must be able to define, generate, edit and finalize ballot content quickly and accurately. A voting system that bifurcates the EMS between different applications loaded on different servers or workstations makes programming the election database unnecessarily time-consuming and error-prone.

Integrating the data management applications and the EMS also saves taxpayer dollars in many cases. Creating a bifurcated, disjointed voting system permits vendors to maximize the amount of EMS hardware that counties must

12

acquire to build and program their own election databases. This added up-front expense in turn motivates some counties to forego acquiring the full system configuration and instead opt to acquire a minimal configuration that requires the counties to engage the voting system provider to program the database and generate ballot content. Thus, whether it is a one-time up front charge or an ongoing service provider fee, bifurcated voting systems can impose additional expense on county governments.

  e. *Comma-Separated Value File Formats*. The Voting Systems Rules require new voting systems to capture a ballot-level cast vote record ("CVR"), which is a record for each ballot tabulated showing the manner in which the system interpreted and counted the voter's markings on the ballot. 8 COLO. CODE REGS § 1501-1, Rule 21.4.14(b)-(c). The new rule requires that the CVRs be exported from the voting system in a comma-separated value ("CSV") text format. *Id.* The CSV file format is a widely-used file format that is compatible with a host of other computer and software programs. A very simple CVR export might state:

| Batch | Ballot Position | Contest 1 | | Contest 2 | | Contest 3 | | Contest 4 | |
|---|---|---|---|---|---|---|---|---|---|
| | | Choice 1 | Choice 2 | Choice 1 | Choice 2 | Choice 1 | Choice 2 | Choice 1 | Choice 2 |
| *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| 265 | 51 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 265 | 52 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 |

13

| 265 | 53 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 265 | 54 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| 265 | 55 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 |

Here, the CVR export shows the voting system's interpretation of the markings on ballots 51-55 of batch 265. The "1" indicates a vote for a particular choice within a contest, and "0" reflects no vote for a choice in a contest.

Having CVRs in a useable and easily-understood format is crucial when conducting risk-limiting audits. *See* § 1-7-515, C.R.S. (2015). It permits the auditors to quickly and efficiently compare the CVR with the voter's actual paper ballot. In the above example, if ballot # 52 in batch 265 is randomly selected for audit, the election judges conducting the audit must be able to quickly locate ballot 52 in batch 265, so that they can verify that the voter's markings on the paper ballot correspond to the tabulation reflected in the CVR. Since county clerks must conduct risk-limiting audits beginning in 2017, their voting system must be able to export ballot-level CVRs in a format suitable for that purpose. The vast majority of county clerks do not have the technical resources available to convert CVRs in one format to a more suitable format.

In addition to the CVR, the Voting Systems Rules also require new voting systems to export election night reporting data in a CSV file format that contains specified fields. 8 COLO. CODE REGS. § 1501-1, Rule 21.4.15. This data

export format makes it easy for county election officials to upload their county results files into the Secretary's Election Night Reporting ("ENR") system. Like the CVR rule, this rule mandates the widely-used CSV file format, thus ensuring that county results are properly and accurately aggregated for statewide and multi-county ballot contests, and quickly and efficiently communicated to the media and public. Aggregation cannot be performed correctly or accurately unless the results data is in a standardized format.

Utilizing the CSV file format also reduces the risk of election data loss or corruption because it eliminates the need to convert election data from a voting system vendor's proprietary format into a more useable format. Anytime election data is manipulated a risk exists that the data will be fully or partially lost, altered, or corrupted.

Requiring that election night reporting data be in the widely-used CSV file format also increases the speed, transparency and accuracy of reporting election results. For example, it enables media representatives and interested individuals to access a single website and obtain results on statewide and county-by-county bases, without having to obtain separate results reports from all or some of Colorado's 64 counties. It also increases the accuracy and speed with which the Secretary or affected county clerks can decide whether mandatory recounts are required under sections 1-10.5-101, -102, and -103,

15

C.R.S. (2015). Likewise, interested parties can more quickly decide whether to request a non-mandatory recount at their own expense, in accordance with section 1-10.5-106, C.R.S. (2015) Finally, the useable file format increases the accuracy and speed with which the Secretary can compile and certify the statewide abstract of votes cast for all candidates, ballot issues, and ballot questions, as required by section 1-10-105, C.R.S. (2015). Before the ENR system, preparation of the statewide abstract took approximately eight months; now, the process requires about four months, depending on the type of election.

8. The Secretary is concerned first and foremost with improving the efficiency, accuracy and transparency of elections in Colorado, not with bolstering the bottom line of Dominion or any other Colorado-based voting systems vendor. The Secretary did not adopt the Voting Systems Rules for the purpose of improving or protecting Dominion's competitive position in the voting systems market. The Voting Systems Rules were not tailored to the functions or capabilities of Dominion's voting systems; rather, the new technological standards imposed by the Voting Systems Rules were adopted because they reduce costs and improve the efficiency, accuracy and transparency of election administration in Colorado, a state with unique election administration needs.

### C. Litigation Involving the Voting Systems Rules

9. Representatives from ES&S and Hart participated in the rulemaking process and comment periods leading up the Secretary's adoption of the Voting Systems Rules on February 9, 2016.

10. Three-and-a-half months later, on May 23, 2016, Plaintiffs sued the Secretary in this case to challenge the Voting Systems Rules.

11. In addition to this case, two Colorado clerk and recorders and the Board of County Commissioners for Jefferson County are currently challenging the Voting Systems Rules in state district court on the same grounds alleged in this case by Plaintiffs' state law claims, namely the rules conflict with state statute, exceed the Secretary's statutory authority, and create an unfunded state mandate on local governments. *See Bd. of Cnty. Comm'rs of Jefferson Cnty. v. Williams*, Denver Dist. Court No. 16cv31544 (filed Apr. 29, 2016) (consolidated with *Merlin v. Williams*, Denver Dist. Court No. 16cv31603 (filed May 4, 2016)). These cases in state court were brought pursuant to the prescribed state procedures under the state Administrative Procedures Act ("APA") for challenging an agency's rulemaking decision. *See* § 24-4-106(4), C.R.S. (2015). As of the date of this declaration, the state court has not yet ruled on the

17

challengers' state law claims. ES&S and Hart have not sought to intervene in these state court cases.

### D. Current and Pending Applications for Voting System Certification

12. Plaintiffs both applied to the Secretary for certification of their respective voting systems in January 2016. Pursuant to an agreement between counsel for the Secretary and counsel for Plaintiffs, the Secretary has not yet acted on Plaintiffs' pending applications, and will not do so until after the Court in this case resolves Plaintiffs' request for a preliminary injunction.

13. The Secretary granted certification to Dominion's Democracy Suite 4.21 system on March 1, 2016.

14. On June 2, 2016, the Secretary preliminarily determined that Clear Ballot's ClearVote 1.1 voting system facially complies with all applicable federal and state voting system requirements and the Voting Systems Rules. A true and correct copy of the Secretary's letter to Clear Ballot is attached as Exhibit A.3. Clear Ballot has verbally confirmed that it will update its application to request certification of the most current version of its voting system. Clear Ballot is a Delaware corporation and has its principal place of business in Boston, Massachusetts.

15. The voting systems vendor's state of incorporation, or its principal place of business, do not influence the Secretary's certification decision and are not factors that the Secretary considers under the Voting Systems Rules.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of July, 2016.

Suzanne Staiert