

**User Name:** Grant Sullivan
**Date and Time:** 05 Jul 2016   3:51 p.m. EDT
**Job Number:** 34326677

## Documents(7)

1. *Daly v. United States Fencing Ass'n, 2007 U.S. Dist. LEXIS 28092*
   **Client/Matter:** -None-

2. *Balsam Brands Inc. v. Cinmar, LLC, 2015 U.S. Dist. LEXIS 154075*
   **Client/Matter:** -None-

3. *Prof'l Towing & Recovery Operators v. Box, 2008 U.S. Dist. LEXIS 100002*
   **Client/Matter:** -None-

4. *Grand Cent. Sanitation v. City of Bethlehem, 1994 U.S. Dist. LEXIS 15825*
   **Client/Matter:** -None-

5. *Pennsy Supply Inc. v. Susquehanna River Basin Comm'n, 2007 U.S. Dist. LEXIS 11844*
   **Client/Matter:** -None-

6. *Petroplex Int'l v. St. James Parish, 2016 U.S. Dist. LEXIS 59881*
   **Client/Matter:** -None-

7. *Gonzalez v. Arizona, 2006 U.S. Dist. LEXIS 76638*
   **Client/Matter:** -None-

**EXHIBIT G**

⊕ Positive
As of: July 5, 2016 3:51 PM EDT

## *Daly v. United States Fencing Ass'n*

United States District Court for the Eastern District of New York

April 16, 2007, Decided ; April 16, 2007, Filed

CV 07-1167 (LDW)(ARL)

**Reporter**
2007 U.S. Dist. LEXIS 28092; 2007 WL 1120461

PHILIP DALY d/b/a TAR TAR PRINTING AND/OR PROPRINTWEAR, Plaintiff, -against- UNITED STATES FENCING ASSOCIATION, Defendant.

**Counsel:** **[*1]** For Tar Tar Printing Inc., doing business as Proprintwear, Plaintiff: Rick Ostrove, LEAD ATTORNEY, Leeds Morelli & Brown, P.C., Carle Place, NY.

For United States Fencing Association, Defendant: Thomas J. McNamara, LEAD ATTORNEY, Certilman, Balin, Adler & Hyman, LLP, East Meadow, NY.

**Judges:** ARLENE R. LINDSAY, United States Magistrate Judge.

**Opinion by:** ARLENE R. LINDSAY

## Opinion

MEMORANDUM AND ORDER

LINDSAY, Magistrate Judge:

Before the court is the plaintiff's motion for a preliminary injunction referred to the undersigned by District Judge Leonard D. Wexler on April 11, 2007. The parties consented to a binding determination of the motion by the undersigned. During a teleconference on April 10, 2007, the parties also advised the court that, in lieu of an evidentiary hearing, they would rest on their papers and oral argument thereon. Accordingly,

the court scheduled oral argument on the plaintiff's motion and counsel for the parties appeared on April 12, 2007 for that purpose.

Based on the plaintiff's memorandum of law in support of the motion, the amended complaint, the affidavit of Philip Daly in support of the motion, the reply declaration of Philip Daly, with the exhibits annexed **[*2]** thereto, the defendant's memorandum of law in opposition, the affidavit of Michael Massik, together with exhibits annexed thereto, the affidavit of defense counsel Thomas J. McNamara with exhibits annexed thereto, the oral arguments and the applicable law, the motion for injunctive relief is denied.

FACTS

The plaintiff, Philip Daly, d/b/a/ Tar Tar Printing and/or Proprintwear ("Proprintwear"), a resident of Suffolk County, New York, commenced this breach of contract action against the defendant, United States Fencing Association ("USFA") a nonprofit corporation organized under the laws of the state of Colorado with its principal place of business also in Colorado. (Am. Compl. at PP 1-3). The USFA is the National Governing Body for the sport of fencing. (Id. at P 6). This court's subject matter jurisdiction is invoked pursuant to *28 U.S.C. § 1332* given the parties' diversity of citizenship and the plaintiff's allegation that the amount in controversy exceeds $ 75,000. (Id. at P 4).

The parties agree that the plaintiff and defendant entered into a written Trademark and License

Merchandise Agreement ("License Agreement") in July 2001, whereby the [*3] plaintiff was granted the exclusive right to manufacture, distribute and sell products carrying the USFA logo. (Id. at P 10; see also License Agreement annexed to the Daly Reply Decl. as Exhibit 1). The License Agreement, which provided the plaintiff with access to vendor space at events sponsored by the USFA, was a one year contract that renewed annually automatically unless either party provided the other with written notification of termination. (License Agreement at PP 4, 10). The parties dispute centers around whether the defendant provided such notification of termination.

According to the defendant, its Executive Director, Michael Massik, sent the plaintiff a letter dated May 1, 2006 advising that the USFA would not be renewing the License Agreement with the plaintiff. (Massik Aff. at P 2, see also May 1, 2006 letter annexed to the Daly Reply Decl. as Exhibit 2). Although the License Agreement was terminable at will, the letter describes that the contract was terminated for a number of reasons including that plaintiff had failed to submit required royalty payments and because there were many customer complaints concerning his failure to fulfill orders. (Id. [*4] ). The termination letter set forth the possibility that an entirely new agreement could be negotiated and invited plaintiff to discuss the matter further. (Id.). Although plaintiff contends that he never received this letter and that his licensing agreement with the USFA continued beyond May 2006, he acknowledges that between May 2006 and January 2007 he met with and spoke multiple times with the defendant in an effort to negotiate new licensing terms. (Daly Repl. Decl. at PP 6-9). In the middle of these negotiations on October 3, 2006, sensing that he may not have a valid license agreement, the plaintiff applied for a USFA corporate membership. (Id. at PP 16-17). Under the terms of a corporate membership, plaintiff understood that he would not be guaranteed vendor space, as he

would under an exclusive license, but rather would have to apply for such access. (Id.). Plaintiff asserts that he applied for this membership simply as a precautionary measure. (Id.). While negotiations were ongoing, plaintiff was permitted to sell logo merchandise at USFA sponsored events. As stated above, these negotiations ended in January, 2007 when the defendant notified the plaintiff by [*5] e-mail dated January 23<rd> that despite their many meetings and discussions, no agreement could not be reached on a new license. (See Ex. 7, annexed to the Daly Reply Decl.). Plaintiff was also informed that his services would no longer be required at future tournaments. (Id.). Plaintiff replied by e-mail stating:

> [O]ur [b]usiness relationship has changed from that of Official Merchandiser to Corporate Vendor. We forged a secondary agreement to sell tournament t-shirts and provide the USFA with a percentage of that revenue in exchange for vendor space at National Tournaments. On January 26, 2007 the USFA notified us that our agreement had been terminated. This notification was provided twenty-one (21) days after the 2007 Junior Olympic filing deadline of January 5, 2007 effectively eliminating us from filing a timely application. On February 2, 2007 we made application to attend the 2007 Junior Olympics as a Vendor and the USFA denied our application based upon a late filing and/or limited space considerations. . . . It is clear that the USFA has established a unique application process for our business resulting from your numerous contractual violations [*6] under our previous relationship. . . . We appeal to your better judgment and respectfully request that you approve our application for the 2007 Junior Olympics and the 2007 Summer Nationals . . . .

(Ex. 5 annexed to the Daly Reply Decl.) (emphasis added).

2007 U.S. Dist. LEXIS 28092, *6

Recognizing that he could no longer attend events as an exclusive licensee, plaintiff then pursued his options as a corporate member. By letter dated March 2, 2007, plaintiff was advised that vendor spots for the season had already been filled and this lawsuit followed. The next USFA sponsored events are scheduled for April 20-April 23<rd> in Arizona and June 29-July 8<th> in Florida. The plaintiff seeks a preliminary injunction restraining and enjoining, during pendency and determination of this action, the defendant from breaching the contract between the parties and restricting plaintiff's attendance at USFA events or USFA sponsored events. See Order to Show Cause. [1]

## [*7] DISCUSSION

### 1. Preliminary Injunction Standards.

"A party seeking injunction relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction, and (b) either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant's favor." *Tom Doherty Assocs., Inc. v. Saban Ent. Inc., 60 F.3d 27, 33 (2d Cir. 1995)*. Where the requested preliminary injunction will provide a movant with substantially all the relief sought and that relief cannot be undone even if defendant prevails at trial on merits, a heightened standard has been applied. *Id. at 33-34*. Under this higher standard, the party seeking relief must "meet the higher standard of substantial, or clear showing of, likelihood of success to obtain the preliminary injunction," as opposed to a mere likelihood, together with the requisite irreparable injury. *Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir. 1999)*; see also *Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988).*

  [*8]

It has been said that the use of the heightened standard is "justified when the issuance of an injunction will render a trial on the merits largely or partially meaningless, . . . [such as, in] a case involving the live televising of an event scheduled for the day on which preliminary relief is granted." *Doherty, 60 F.3d at 35*. While the relief being sought warrants the application of a higher standard, the court need not determine whether the heightened standard should apply as plaintiff is unable to establish either irreparable harm or meet the less stringent standard of likelihood of success.

### A. Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction" is a demonstration of irreparable harm. *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)* (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 at 431 (1973) (footnote omitted)). To establish irreparable harm, petitioners must demonstrate "'an injury that is neither remote nor speculative, but actual and imminent.'" *Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)* [*9]  (quoting *Consolidated Brands, Inc. v. Mondi, 638 F. Supp. 152, 155 (E.D.N.Y. 1986))*. But not all actual and imminent injuries will suffice - the injury must also be "one requiring a remedy of more than mere money damages." Id. (monetary loss insufficient unless movant proves that damage cannot be rectified by financial compensation). Following this governing principle, courts have found irreparable harm where a party is threatened with the loss of business or the loss of good will and customers. See *Doherty, 60 F.3d at 37*. This is precisely the argument propounded by the plaintiff.

The plaintiff cannot genuinely dispute that the losses resulting from his exclusion from the

---

[1]  The court notes that the defendant has preserved its right to seek dismissal of the complaint for lack of personal jurisdiction following the disposition of the instant application.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 5 of 70

Page 4 of 6
2007 U.S. Dist. LEXIS 28092, *9

February 2007 Junior Olympic Championship and the March 2007 national event in Georgia or his exclusion from the upcoming events in Arizona and Miami can be rectified by money damages. Rather, the crux of the plaintiff's argument is that "[l]osing the right to attend these events and to use the USFA logo will threaten, if not eliminate, the viability of [his] business." Daly Reply Decl. at P 42. Specifically, the plaintiff contends that:

> I have invested substantial **[*10]** time and money in building [m]y business and approximately 95% of my merchandise is fencing-related. The vast majority of my sales occur at these events. If I can no longer use the logo, or attend events, my opportunity to sell to the fencing community will be virtually eliminated.

<u>Id.</u>

Although the plaintiff's business may in fact be lost if he is prevented from selling logo merchandise at upcoming events, it is apparent from this record that there is no realistic probability that plaintiff's business will continue in the future. The essential difficulty with plaintiff's argument is that it disregards the nature of the relationship between the parties. It is undisputed that the defendant has the right to terminate the agreement on written notice thirty days prior to the termination of the Agreement, here, July 9, 2007. <u>See</u> Licence Agreement at P 4. At the oral argument, counsel for the defendant made clear that they believed they had already terminated their relationship with the plaintiff and were prepared, if necessary, to send yet another written notice of non-renewal of the contract. Accordingly, even if the plaintiff prevails on the merits at trial and can show **[*11]** that the Agreement was not properly terminated in May, 2006, his relationship with the defendant will not continue beyond July, 2007. The absence of any prospects for continuing this business militates against a finding that in the absence of injunctive relief plaintiff will suffer

irreparable harm based on the loss of his business. Under these circumstances, it is clear that money damages will adequately compensate plaintiff for any lost sales during this three month period.

The plaintiff's argument based on the loss of good will and business opportunities also falls short. During the oral argument, counsel for the plaintiff asserted that by excluding the plaintiff from the remaining 2007 events, the defendant is depriving the plaintiff of the opportunity to develop future business beyond the fencing logo line. The plaintiff has not, however, provided any evidence to establish that he had any prospective business beyond the logo line. There is nothing in the record to indicate that the logo items were bundled with other products. Indeed the plaintiff acknowledges that 95% of his existing business was the logo merchandise he sold at these events. (Daly Reply Decl. at P 42). Therefore, **[*12]** the plaintiff's suggestion that his exclusion from future events is depriving him of the opportunity to drum up additional and new business is at best speculative.

**B. Likelihood of Success on the Merits.**

Even assuming that the plaintiff had established irreparable harm, the plaintiff has not established a likelihood of success on the merits. As noted above, the License Agreement, which is governed by Colorado law, is terminable at will by either party upon thirty days written notice of non-renewal. (License Agreement at PP 4, 10, 13). According to the defendant, the plaintiff was provided written notice of termination by letter dated May 1, 2006, but the plaintiff claims that he did not receive it.

Notwithstanding the plaintiff's assertion his claim is likely to fail. To begin with, Colorado law creates a rebuttable presumption of receipt when a properly addressed piece of mail is placed in the care of the postal service, <u>*Witt v. Roadway Express, 136 F.3d 1424, 1429-30 (10th Cir.1998)*</u>.

2007 U.S. Dist. LEXIS 28092, *12

Plaintiff does not dispute that the termination letter was properly addressed to him. Second, the court need not rely on the presumption of receipt in order to find that **[*13]** plaintiff received the termination letter. The status of the business relationship between the parties is made clear by their subsequent dealings and e-mail exchange.

The termination letter invited plaintiff to meet with the defendants to negotiate terms for an entirely new licensing agreement. The letter made clear that the defendants intended to ″completely overhaul the existing agreement.″ (Ex. 2 annexed to the Daly Reply Decl.). Plaintiff concedes that sometime after May 2006 until January 2007, he was engaged in negotiations to completely re-configure the license agreement. Clearly, these negotiations were triggered by the termination letter and would not have occurred had the agreement simply been automatically renewed as plaintiff has suggested. Plaintiff urges that the fact that he was permitted to sell logo merchandise while negotiations were ongoing is evidence that the original agreement was still in effect. However by its terms, the termination letter contemplated that notwithstanding the revocation of the agreement, plaintiff would be permitted to sell merchandise during the interim period. (Id.). Indeed, the defendant's e-mail to the plaintiff dated January 23, 2007 also **[*14]** describes that the plaintiff had been permitted to continue selling logo merchandise pursuant to an ″unsigned and ongoing merchandise agreement.″ (Ex. 7 annexed to the Daly Reply Decl.).

The parties e-mail exchange in early 2007 provides further evidence that no licensing agreement was in effect. The defendant's January 23<rd> email indicates that negotiations for a written license agreement had reached an impasse and it instructed plaintiff to discontinue selling logo merchandise. In response plaintiff concedes:

*[O]ur [b]usiness relationship has changed from that of Official Merchandiser to*

*Corporate Vendor.* We forged a secondary agreement to sell tournament t-shirts and provide the USFA with a percentage of that revenue in exchange for vendor space at National Tournaments. On January 26, 2007 the USFA notified us that our agreement had been terminated. This notification was provided twenty-one (21) days after the 2007 Junior Olympic filing deadline of January 5, 2007 effectively eliminating us from filing a timely application. On February 2, 2007 we made application to attend the 2007 Junior Olympics as a Vendor and the USFA denied our application based upon a late **[*15]** filing and/or limited space considerations. . . . It is clear that the USFA has established a unique application process for our business resulting from your numerous contractual violations *under our previous relationship. . . . We appeal to your better judgment* and respectfully request that you approve our application for the 2007 Junior Olympics and the 2007 Summer Nationals . . . .

(Ex. 5, annexed to the Daly Reply Decl.) (emphasis added).

This court cannot, despite plaintiff's invitation that it do so, ignore plaintiff's own admission that his position as the official merchandiser of the defendant had in fact been terminated. There can simply be no doubt, given the available evidence, that the licensing agreement between the parties was revoked in May, 2006.

Plaintiff's breach of contract claim with regard to his alleged rights pursuant to his corporate membership is similarly unavailing. Plaintiff's claim is based on the corporate membership application's language that one of the benefits of membership is ″access to vendor space at US Fencing National Tournaments.″ (Ex. 6, annexed to the Daly Decl.). Thus, plaintiff claims that his exclusion from USFA tournaments **[*16]** violates the terms of his corporate membership. Given

2007 U.S. Dist. LEXIS 28092, *16

plaintiff's acknowledgment that corporate membership only entitled him to apply for vendor space his breach of contract claim on this basis is completely without merit. (Daly Reply Decl. at PP 17-18 and Ex. 12 annexed thereto). Given the above, this court finds that plaintiff has failed to demonstrate a likelihood of success on the merits. For these same reasons, the court also finds that there are no serious questions going to the merits.

**CONCLUSION**

Based on the foregoing, the plaintiff's motion for a preliminary injunction is denied.

Dated: Central Islip, New York

April 16, 2007

SO ORDERED:

ARLENE R. LINDSAY

United States Magistrate Judge

No *Shepard's* Signal™
As of: July 5, 2016 3:51 PM EDT

## *Balsam Brands Inc. v. Cinmar, LLC*

United States District Court for the Northern District of California

November 12, 2015, Decided; November 12, 2015, Filed

Case No. 15-cv-04829-WHO

**Reporter**
2015 U.S. Dist. LEXIS 154075; 2015 WL 7015417

BALSAM BRANDS INC., et al., Plaintiffs, v. CINMAR, LLC, et al., Defendants.

**Counsel:** **[*1]** For Balsam Brands Inc., a Delaware, Plaintiff: Marc N. Bernstein, LEAD ATTORNEY, Will Barnett Fitton, The Business Litigation Group, P.C., San Francisco, CA.

For Cinmar, LLC, a Delaware limited liability company doing business as, Frontgate and Grandin Road, Frontgate Marketing, Inc., a Delaware corporation, Defendants: Kevin W. Kirsch, LEAD ATTORNEY, Baker & Hostetler, LLP, Cincinnati, OH; Patricia L. Peden, LeClairRyan LLP, San Francisco, CA.

**Judges:** WILLIAM H. ORRICK, United States District Judge.

**Opinion by:** WILLIAM H. ORRICK

## Opinion

### ORDER DENYING REQUEST FOR TEMPORARY RESTRAINING ORDER

Re: Dkt. No. 11

### INTRODUCTION

Plaintiffs Balsam Brands Inc. and Balsam International Limited (collectively, "plaintiffs") seek a temporary restraining order to protect their ability to market and sell an invertible artificial Christmas tree, the "Flip Tree," that includes a "pivot joint" in the trunk that separates the trunk into two parts and allows the tree to fold for simplified set up and storage. They allege that they hold rights in two patents on the Flip Tree, and that defendants Cinmar, LLC dba Frontgate / Grandin Road and Frontgate Marketing, Inc. (collectively, "Frontgate") are advertising and selling invertible artificial **[*2]** Christmas trees that infringe those patents. On the basis of these allegations, plaintiffs bring five causes of action against Frontgate — (1) patent infringement in violation of *35 U.S.C. § 271(a)*; (2) false marking in violation of *35 U.S.C. § 292*; (3) false advertising in violation of section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*; (4) violations of California's Unfair Competition Law ("UCL"), *Cal. Bus. & Prof. Code § 17200 et seq.*; and (5) violations of California's False Advertising Law ("FAL"), *Cal. Bus. & Prof. Code § 17500 et seq.* — and now seek to enjoin Frontgate from making, using, offering to sell, selling, importing, or falsely advertising the accused trees.

Plaintiffs are not entitled to a TRO. As of the hearing on November 3, 2015, plaintiffs had clearly failed to establish that they had standing to sue for infringement of the patents-in-suit. Their supplemental filing three days after the hearing makes the standing question less clear, but it still falls short of adequately demonstrating standing at this juncture. In addition, Frontgate has raised a substantial question regarding infringement by the accused trees. Each of these deficiencies precludes plaintiffs from obtaining a TRO on the basis of their patent infringement claims. This leaves their non-patent-infringement causes of action, but the

record [*3] does not come close to establishing a likelihood of irreparable harm flowing from the alleged misconduct underlying those claims. Plaintiffs' request for a TRO is DENIED.

## LEGAL STANDARD

"The standard for issuance of a temporary restraining order is the same as that for issuance of a preliminary injunction." *Burgess v. Forbes, No. 09-cv-00629-JF, 2009 U.S. Dist. LEXIS 16127, 2009 WL 416843, at *2 (N.D. Cal. Feb. 19, 2009)*; *accord XimpleWare Corp. v. Versata Software, Inc., No. 13-cv-05160-SI, 2013 U.S. Dist. LEXIS 172411, 2013 WL 6405979, at *2 (N.D. Cal. Dec. 6, 2013)*. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997)* (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*; *accord Titan Tire Corp. v. Case New Holland Inc., 566 F.3d 1372, 1375-76 (Fed. Cir. 2009)*.

Under Federal Circuit precedent, "the movant must establish at the very least both of the first two factors, i.e., a likelihood of success on the merits and irreparable harm." *Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1348 (Fed. Cir. 2003)*. "If the accused infringer raises a substantial question concerning either infringement or validity, then the patentee [*4] has not established that it is likely to succeed on the merits, and a preliminary injunction is not appropriate." *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC, 734 F.3d 1361, 1366 (Fed. Cir. 2013)* (internal quotation marks omitted).

"Where an issue is not unique to patent law, [the Federal Circuit] appl[ies] the law of the regional circuit from which the case arises." *Allergan Inc. v. Athena Cosmetics Inc., 738 F.3d 1350, 1354 (Fed. Cir. 2013)*. In the Ninth Circuit, if the plaintiff cannot establish that he is likely to succeed on the merits, he may still obtain an injunction if he shows that he has raised "serious questions going to the merits" and that the balance of hardships "tips sharply" in his favor, so long as he also shows that the other two *Winter* factors are satisfied, i.e., that there is a likelihood of irreparable injury and that the injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011)*; *accord Angelotti Chiropractic, Inc. v. Baker, 791 F.3d 1075, 1081 (9th Cir. 2015)*.

## DISCUSSION

## I. PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THEIR PATENT INFRINGEMENT CLAIMS.

### A. Plaintiffs have not adequately demonstrated that they have standing to sue for infringement of the patents-in-suit.

The standing issue in this case is made significantly more complicated by the fact that plaintiffs submitted the bulk of their evidence regarding standing several days *after* the TRO hearing on November 3, 2015. As of the hearing, it was [*5] clear that plaintiffs lacked standing to sue for infringement of the patents-in-suit. The evidence submitted after the hearing muddies the standing issue, but it leaves substantial questions as to whether plaintiffs may in fact pursue their claims for infringement. *See Filmtec Corp. v. Allied-Signal Inc., 939 F.2d 1568, 1571-74 (Fed. Cir. 1991)* (vacating preliminary injunction where the evidence "raises a serious question about the nature of the title [in the patent]," such that "it cannot be said on this record that [the plaintiff] has established a reasonable likelihood of success on the merits").

2015 U.S. Dist. LEXIS 154075, *5

Under Federal Circuit precedent, "only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit." *Spine Solutions Inc. v. Medtronic Sofamor Danek USA Inc., 620 F.3d 1305, 1317 (Fed. Cir. 2010)* (internal quotation marks omitted). To qualify as an exclusive licensee for the purposes of standing to sue for patent infringement,

> a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. If the party has not received an express or implied promise of exclusivity under the patent, i.e., the right to exclude others from making, using, or selling [*6] the patented invention, the party has only a bare license — and a bare license to sell an invention in a specified territory, even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others.

*Id.* (internal quotation marks, alterations and citations omitted). An exclusive licensee may sue for infringement so long as it is joined by the patent owner, while an exclusive licensee that holds "all substantial rights" in the patent may commence an infringement action on its own. *See Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006); Sicom Sys., Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 976 (Fed. Cir. 2005)* ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement."). Courts applying these rules have repeatedly held that the mere fact that "a corporate parent's subsidiary owns a patent is not enough to establish that the [corporate] parent has rights in the subsidiary's paten[t]." *Top Vic-*

*tory Electronics v. Hitachi Ltd., No. 10-cv-01579 -CRB, 2010 U.S. Dist. LEXIS 125003, 2010 WL 4722482, at *3 (N.D. Cal. Nov. 15, 2010); see also Spine Solutions, 620 F.3d at 1317-18* (holding that parent corporation lacked standing to sue for infringement of subsidiary's patent where "nothing in the record indicates that [the parent corporation] is [*7] an owner or exclusive licensee of the . . . patent"); *Digitech Image Techs., LLC v. Newegg Inc., No. 12-cv-01688, 2013 U.S. Dist. LEXIS 63828, 2013 WL 1871513, at *3 (C.D. Cal. May 3, 2013).*

The patents-in-suit are U.S. Patent Nos. 8,062,718 (the '718 patent) and 8,993,077 (the '077 patent), both of which are entitled, "Invertible Christmas Tree." *See* Compl. ¶¶ 20-21, Exs. A-B (Dkt. No. 1). As of the hearing, the only relevant evidence of record indicated that the assignee of the patents was Balsam Hill LLC.[1] *See* Grier Decl. Ex. B (Dkt. No. 27-1); Harman Decl. ¶ 13 (Dkt. No. 14). Balsam Hill LLC is not a party to this case; the plaintiffs in this case are Balsam Brands Inc. and Balsam International Limited. *See, e.g.*, Compl. ¶¶ 15-16. Balsam Hill LLC is a subsidiary of Balsam Brands Inc. *See* Harman Decl. ¶ 13.

As of the hearing, not only was there no evidence in the record indicating that either Balsam Brands Inc. or Balsam International Limited held legal title to either of the patents-in-suit, but there was no evidence indicating that either plaintiff was an exclusive licensee of either patent. Plaintiffs had stated that the Flip Tree practices the patents-in-suit, and that "given the importance of the Flip Tree technology to our [*8] brand, Balsam Hill has never licensed or offered to license the Flip Tree patents outside of the Balsam Hill family, and certainly not to Frontgate or any entity affiliated with it." Harman Decl. ¶ 15. But this is not the same as showing that plaintiffs are exclusive licensees. Standing alone, the facts that Balsam Hill LLC is a subsidiary of Balsam

---

[1]   The materials submitted after the hearing, as they impact the standing issue, are discussed below.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 11 of 70

Page 4 of 12
2015 U.S. Dist. LEXIS 154075, *8

Brands Inc., and that the "Balsam Hill family"[2] is the only group of entities that practices the patented technology, is not enough to establish an exclusive licensing agreement. *See Spine Solutions, 620 F.3d at 1318* ("[T]he fact that [the patent-holding corporation's sister corporation] is currently the only entity practicing the . . . patent does not mean that [the patent-holding corporation] has promised to exclude all others from doing so. Nothing in the record shows that [the patent-holding corporation] would be prohibited from licensing the . . . patent to a third party, should it so desire.").[3]

At the hearing, plaintiffs did not dispute that, based on the record as it stood at that time, they lacked standing to sue for infringement of the patents-in-suit. They claimed instead that they were in possession of other documents not yet in the record that would establish standing.[4] I granted their request to submit the documents, Dkt. Nos. 33, 35, and on Friday, November 6, 2015, three days after the hearing, plaintiffs finally did so. Dkt. No. 37. Frontgate responded the following Monday, [*10] November 9, 2015 by moving to strike the documents from the record and arguing that, in any event, they fail to make a sufficient

showing of standing for the purposes of this TRO request. *See* Dkt. No. 40-3 ("Mot. to Strike").[5]

The documents consist of what plaintiffs identify as (1) an "Asset Purchase Agreement" dated December 31, 2013 between Bruce Schooley (the named inventor of the patents-in-suit) and Balsam Hill LLC; (2) a "Distribution and Assignment Agreement" effective December 30, 2014 between Balsam Hill LLC, Balsam Brands Group LLC, and the Harman Family Revocable Trust; (3) a "Second Asset Purchase Agreement" between the Harman Family Revocable Trust and Balsam International Limited; and (4) a revised version of the "Distribution and Assignment Agreement" dated October 16, 2015. *See* Dkt. No. 37.

The agreements fail to establish standing for either Balsam Brands Inc. or Balsam International Limited for several reasons. First, despite being filed under seal, significant portions of the agreements are redacted, and no unredacted versions have been filed with the Court or served on Frontgate. *See* Peden Decl. ¶ 5 (Dkt. No. 40-3). Plaintiffs do not explain why this is the case. Plaintiffs cannot expect me to rely on these agreements to find that they [*12] have established

---

[2]   Plaintiffs did not provide a definition for this term.

[3]   While the Federal Circuit has been clear that an entity must either own or possess an exclusive license to a patent to seek *legal* remedies for infringement, the court has also held that in some circumstances an entity with "equitable [*9] title" to a patent may have standing to sue for *equitable* remedies. *See, e.g., Arachnid Inc. v. Merit Indus. Inc.*, 939 F.2d 1574, 1579-81 (Fed. Cir. 1991). Plaintiffs have not raised this argument in this case, however, and the Federal Circuit has not held that the equitable title doctrine automatically applies between a parent corporation and its patentholding subsidiary. Meanwhile, several district courts have explicitly rejected this position. *See Top Victory*, 2010 U.S. Dist. LEXIS 125003, 2010 WL 4722482, at *3 ("a parent corporation does not have equitable title in a patent solely by virtue of its ownership of the subsidiary") (internal quotation marks and alterations omitted); *Steelcase Inc. v. Smart Technologies Inc.*, 336 F. Supp. 2d 714, 719 (W.D. Mich. 2004) (same); *see also Beam Laser Sys. Inc. v. Cox Commc'ns Inc.*, 117 F. Supp. 2d 515, 520-21 (E.D. Va. 2000) (holding that patent-holding corporation's sole shareholder, an individual, did not have equitable title in the corporation's patents).

[4]   Plaintiffs also stated at the hearing that earlier that morning they had provided Frontgate with documents showing that the patents-in-suit had been assigned from Balsam Hill LLC to the Harman Family Revocable Trust, and from the Harman Family Revocable Trust to Balsam International Limited. *See* Penden Decl. Exs. A-B (Dkt. No. 40-3). However, both of those documents were executed on November 2, 2015, the day before the TRO hearing. *See id.* Plaintiffs appear to have abandoned any reliance on those documents to establish their standing, and they now focus instead on the documents they submitted on November 6, 2015.

[5]   Frontgate's request to strike the documents is DENIED. By November 13, 2015, plaintiffs shall file with the Court and serve on Frontgate unredacted versions of the documents. If plaintiffs wish to file the unredacted versions under seal, they shall do so pursuant to Civil Local Rule 79-5 and my Standing Order on Administrative Motions to File Under Seal. I will look to [*11] plaintiffs' sealing motion, if any, in deciding whether the redacted versions of the documents they submitted on November 6, 2015 may remain under seal.

2015 U.S. Dist. LEXIS 154075, *12

standing when they have not provided me with complete, unredacted copies. *Cf. Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1344 (Fed. Cir. 2001)* ("The title of the agreement at issue . . . is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination."); *Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001)* (explaining that a party claiming that it has "all substantial rights" in a patent "must produce [a] written instrumen[t] documenting the transfer of proprietary rights," and that determining whether an agreement transfers all substantial rights requires a court to "ascertain the intention of the parties and examine the substance of what was granted by the agreement"). As Frontgate observes, to find otherwise would be to allow plaintiffs to "cherry-pick" those portions of the agreements that serve their standing argument, while withholding those portions that undermine it. *See* Mot. to Strike at 11-12. Moreover, the agreements — which were not shared either with the Court or with Frontgate until after the hearing — are only properly considered at this juncture if Frontgate is given an opportunity to respond. *See El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1040-41 (9th Cir. 2003)*; *Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)*. By serving Frontgate with the agreements more than two days after filing [*13] them with the Court, and then serving it with only redacted versions, plaintiffs have substantially interfered with that opportunity.[6]

Second, plaintiffs offer no explanation or analysis of the agreements. The only accompanying filing is a declaration from Nathaniel Roland, general counsel of "Balsam Brands Inc. and its affiliates," who succinctly identifies each of the agreements and excerpts certain of their provisions. *See* Roland Decl. ¶¶ 1-16 (Dkt. No. 37). Roland does not

explain how these provisions impact the ownership or licensing of the patents-in-suit, or what the ultimate consequences of the agreements are — e.g., which entity now holds title to the patents-in-suit, or which if any entity holds an exclusive license to them. Roland does not even state that the agreements establish standing; he merely states that his declaration "concerns the ownership" of the patents-in-suit. *See id.* ¶ 2. Contrary to plaintiffs' apparent assumption, the agreements are [*14] not self-explanatory, in particular in light of their complex interlocking nature, their significant redactions, and the odd manner in which they have surfaced in this case. It is plaintiffs' burden to establish their standing to sue for infringement of the patents-in-suit. *See MHL TEK, LLC v. Nissan Motor Co., 655 F.3d 1266, 1274 (Fed. Cir. 2011)*. In the circumstances of this case, merely submitting the agreements without any meaningful explanation or analysis does not satisfy that burden.

The third problem with the agreements is specific to Balsam Brands Inc. Plaintiffs do not identify, and I have not found, any aspect of the agreements that reflects a transfer of rights in the patents-in-suit to Balsam Brands Inc. *See* Mot. to Strike at 12 (observing same). In other words, despite plaintiffs' supplemental filing, there remains no evidence in the record indicating that Balsam Brands Inc. has standing. This is significant because, as discussed in more detail below, the only evidence that plaintiffs offer in support of their claim of irreparable harm is the declaration of Thomas Harman, the cofounder and CEO of Balsam Brands Inc. *See* Harman Decl. ¶¶ 17-21. Although the declaration is unclear on which if any of the Balsam entities it applies to apart from [*15] Balsam Brands Inc., there is no indication that the purported irreparable injuries it describes apply to Balsam International Limited. *See id.* A showing that Balsam Brands Inc. is likely to suffer irreparable harm is not equivalent

---

[6]  Plaintiffs did not serve the agreements on Frontgate until Sunday, November 8, 2015 at 7:18 p.m. *See* Peden Decl. ¶ 5. Because the documents were filed under seal, Frontgate did not have access to the agreements until that time.

to a showing that Balsam International Limited is likely to suffer the same. *See Voda v. Cordis Corp., 536 F.3d 1311, 1329 (Fed. Cir. 2008)* (upholding denial of a permanent injunction where the plaintiff "attempted to prove irreparable injury by alleging irreparable harm to his exclusive licensee rather than himself"); *cf. Poly-Am., L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1310-11 (Fed. Cir. 2004)* (holding that patentee corporation could not recover damages based on the lost profits of its sister corporation, even though the two corporations "share[d] interests as two entities collaborating in the manufacture and sale" of a product; reasoning that the entities "may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure"). Accordingly, without more information regarding Balsam International Limited's activities and its relationship with Balsam Brands Inc. — of which there is very little in the record — the evidence regarding Balsam Brands Inc.'s likely irreparable harm cannot be imputed to Balsam International **[*16]** Limited. The upshot is that for plaintiffs to obtain a TRO based on their patent infringement claims and their current showing of irreparable harm, they must at the very least show that Balsam Brands Inc. has standing. *See Anton/Bauer, 329 F.3d at 1348* ("the movant must establish at the very least both of the first two factors, i.e., a likelihood of success on the merits and irreparable harm"). Neither the materials submitted before the hearing nor the supplemental filing comes close to doing so.

## B. Frontgate has raised a substantial question concerning infringement.

An additional reason that plaintiffs have failed to establish a likelihood of success on the merits of their patent infringement claims is that Frontgate has raised a substantial question that the accused trees do not infringe the patents-in-suit.

To demonstrate a likelihood of success on the merits, a patentee must show, in light of the burdens that will inhere at trial, (1) that it will likely prove infringement, and (2) that any challenges to the validity and enforceability of the patent lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350-51 (Fed. Cir. 2001)*; *accord Anton/Bauer, 329 F.3d at 1348*. As at other phases of the case, the "infringement and validity analyses must be performed on a claim-by-claim basis." *Amazon, 239 F.3d at 1351*. Thus, "in **[*17]** cases involving multiple patent claims, to demonstrate a likelihood of success on the merits, the patentee must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer."[7] *Id.*

Determining infringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999)* (internal citations omitted). "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted clai[m]." *Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000)*. "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* In conducting **[*18]** the first step of the infringement analysis and construing the scope of a claim for the purposes of a request for a TRO or preliminary injunction, the court is not required to construe the claim "finally and conclusively." *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996)*. Rather, the court

---

[7]   Frontgate contends that there are substantial questions concerning both the infringement of each asserted claim and the validity of each of the patents-in-suit. Because I find that Frontgate has raised a substantial question concerning the infringement of each asserted claim, I do not address the validity argument.

"may engage in a rolling claim construction, in which [it] revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002)*.

Plaintiffs contend that Frongate infringes claims 1 and 4 of the '718 patent and claims 11 and 14 of the '077 patent. Compl. ¶ 23; TRO App. at 13-14 (Dkt. No. 11). The claims are as follows:

**'718 patent**:

1. A collapsible Christmas tree, comprising in combination:

a first trunk portion;

said first trunk portion having an elongate form extending between an upper end and a lower end, said upper end above said lower end when said first trunk portion is supported upon a floor;

a second trunk portion having an elongate form between a first end and a second end; said second trunk portion including a plurality of limbs extending laterally therefrom;

a pivot joint coupling said first trunk portion to said second trunk portion in a manner allowing pivoting of said second trunk portion relative to said first trunk portion;

said pivot **[*19]** joint interfacing with said first trunk portion at a location closer to said upper end than to said lower end;

and said pivot joint interfacing with said second trunk portion at a location spaced from both said first end and said second end of said second trunk portion.

4. The collapsible Christmas tree of claim 1 wherein said pivot joint allows for at least about 180° of rotation of said second trunk portion relative to said first trunk portion.

**'077 patent**:

11. An artificial tree, comprising:

a fixed trunk portion with an upper end above a lower end;

a rotating trunk with a first end opposite a second end;

said rotating trunk pivotably joined to said fixed trunk at a location between said first end and said second end;

and a plurality of limbs extending laterally from said rotating trunk.

14. The artificial tree of claim 11 wherein said plurality of limbs are pivotably attached to said rotating trunk, such that said limbs can pivot by gravity from a collapsed position to a deployed position with tips of said limbs closer to said rotating trunk when said limbs are in said collapsed position than in said deployed position.

'718 patent at 17:9-28, 39-41; '077 patent at 18:14-20, 30-35.

Frontgate focuses its noninfringement argument **[*20]** on the terms "pivot joint" in claim 1 of the '718 patent and "pivotably joined" in claim 11 of the '077 patent. *See* Opp. at 9-11. Its expert, Irving Rappaport, construes "pivot joint" as "a joint permitting rotation of the first trunk portion relative to the second trunk portion about one or more fixed points of rotation," and "pivotably joined" as "joined to permit rotation of the rotating trunk relative to the fixed trunk about one or more fixed points of rotation." Rappaport Decl. ¶¶ 42, 54 (Dkt. No. 26). Frontgate argues that, in contrast with the technology covered by the asserted claims, the mechanism (which the parties describe as a "slotted hinge") that allows Frontgate's trees to fold does not contain any "fixed points of rotation" and employs "translational, not rotational movement." *Id.* ¶ 69. In other words, rather than relying on a "pivot joint" or being "pivotably joined," the slotted hinge mechanism that allows Frontgate's trees to fold is a "track mechanism"

2015 U.S. Dist. LEXIS 154075, *20

that "rel[ies] on combinations of translational movement" and "physically moves the location of the trunk, causing a flipping of the trunk."[8] Opp. at 10.

Frontgate purchases the accused trees from UCP International Co. Ltd., which has filed a patent application on the slotted hinge used in the trees. Grier Decl. Ex. A (Dkt. No. 27). The patent application includes the following diagrams:



FIG. 1c



FIG. 2b

*Id.* As used in the accused trees, the slotted hinge appears as follows:



Loomis Decl. ¶ 37 (Dkt. No. 12).

Plaintiffs contend that the asserted claims still cover the accused trees, despite their use of the slotted hinge. Their expert, Jason Loomis, broadly construes "pivot joint" as "a joint permitting rotation of one of the connected parts with respect to the other," and "pivotably joined" as "mechanically connected to permit rotation." *Id.* ¶¶ 23, 25.

I agree with Frontgate that these constructions are not supported by either the intrinsic or the extrinsic evidence in this case. The appropriate starting point of claim construction "is always with the language of the asserted claim itself." *Comark Commc'ns Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998)*. A claim term is "generally given [its] ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," who "read[s] the claim term not only in the context of the particular [*22] claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)* (internal quotation marks omitted). "In light of the statutory directive that the inventor provide a 'full' and 'exact'

---

8   The parties do not dispute that all of the accused trees are materially identical for the purposes of this infringement [*21] analysis.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 16 of 70

Page 9 of 12
2015 U.S. Dist. LEXIS 154075, *22

description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Id.* (quoting *35 U.S.C. § 112*).

Plaintiffs fail to identify any aspect of the asserted claims, the specifications, or any other portion of the patents-in-suit that supports their broad constructions of "pivot joint" and "pivotably joined." Frontgate, on the other hand, observes that every instance of a "pivot joint," "pivot," and "joint" in the specifications for both patents-in-suit conforms to its constructions of the disputed terms.[9] *See* Rappaport Decl. ¶¶ 43, 55. Plaintiffs offer nothing that calls into question this observation. They highlight the following figure, which appears in both specifications and is described as an alternative embodiment of the claimed pivot joint:



Fig. 18

'718 patent at Fig. 18, 7:49-62; '077 patent at Fig. 18, 7:49-62. But even this figure depicts a pivot joint that "permit[s] rotation . . . about one or more fixed points of rotation" and thus conforms to Frontgate's **[*23]** constructions.

Of course, while the specification "may shed contextual light on the plain and ordinary meaning[,] [it] cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharm. Inc. v. Amino Chemicals Ltd., 715 F.3d 1363, 1373 (Fed.*

*Cir. 2013).* But there is no indication here that the plain and ordinary meanings of "pivot joint" and "pivotably joined" extend, as plaintiffs urge, to literally *all* mechanical connections that permit rotation between connected parts. *See* Loomis Decl. ¶¶ 23, 25. The intrinsic evidence does not support this position, and the only extrinsic evidence on record is two dictionary definitions submitted by Frontgate. *See* Rappaport Decl. ¶¶ 48-50, Exs. B-C. While I do not find that either of those dictionary definitions is particularly useful in construing the disputed terms, I note that **[*24]** neither provides meaningful support for plaintiffs' constructions.

Accordingly, of the claim constructions offered by the parties, I am persuaded at this juncture that Frontgate's are the superior ones. Under those constructions, there is clearly a substantial question as to whether the accused trees literally infringe, and plaintiffs' expert offers no opinions on infringement under the doctrine of equivalents. *See* Loomis Decl. ¶ 50. Plaintiffs have not established a likelihood of success on their patent infringement claims.

## II. PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM BASED ON THEIR OTHER CAUSES OF ACTION.

This leaves plaintiffs non-patent-infringement causes of action for (1) false marking in violation of *35 U.S.C. § 292*, (2) false advertising in violation of section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, (3) violations of the *UCL, Cal. Bus. & Prof. Code § 17200 et seq.*, and (4) violations of the FAL, *Cal. Bus. & Prof. Code § 17500 et seq.*

Each of these four causes of action is predicated on one or both of the following allegations: (1)

---

9   The term "pivotably joined" does not appear in the specification for either patent. The terms "pivotably attached," "pivotably coupled," and "pivotably connected" do appear in the specifications, but plaintiffs do not point this out, much less explain how the way in which the terms are used supports their position.

Frontgate has marketed the accused trees as "featuring patented inversion technology," but Frontgate lacks patent rights in the inversion technology featured in the trees; and (2) Frontgate has marketed the accused trees as featuring "exclusive inversion technology," [*25] but the inversion technology featured in the trees is not exclusive to it, because plaintiffs also use the same technology. *See, e.g.*, TRO App. at 14-18.

Irrespective of the merits of these claims, plaintiffs are not entitled to a TRO based on them because plaintiffs have not established that they are likely to be irreparably harmed by the alleged misconduct underlying them. *See XimpleWare, 2013 U.S. Dist. LEXIS 172411, 2013 WL 6405979, at *3* (denying application for TRO based only on movant's failure to show likelihood of irreparable harm); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv., No. 13-cv-03717-NC, 109 F. Supp. 3d 1238, 2015 U.S. Dist. LEXIS 70622, 2015 WL 3466314, at *8-9 (N.D. Cal. May 29, 2015)* (same, with respect to motion for preliminary injunction); *see also Becker v. Wells Fargo Bank, NA, Inc., No. 10-cv-02799, 2012 U.S. Dist. LEXIS 152369, 2012 WL 5289326, at *5 n.5 (E.D. Cal. Oct. 23, 2012)*.

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014)*. The mere "possibility" of irreparable harm is not enough to justify a preliminary injunction. As the Supreme Court made clear in *Winter*, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled [*26] to such relief." *555 U.S. at 22*; *see also Cottrell, 632 F.3d at 1131* ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.")

(emphasis omitted). The threat of irreparable harm must also be "immediate" to warrant preliminary injunctive relief. *Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)*.

As noted above, the only evidence that plaintiffs offer in support of their claim to irreparable harm is the declaration from Thomas Harman, the cofounder and CEO of Balsam Brands Inc. The declaration states in relevant part:

17. Based on Frontgate's holiday marketing promotions in past years, Balsam expects Frontgate to advertise a variety of price promotions and discounts throughout the Christmas selling season. For example, over the October 24 weekend, Frontgate is offering $50 back for every $200 spent, resulting in a 25% discount. Balsam will soon need to decide whether to lower its own prices to compete with Frontgate's infringing products.

18. Frontgate's sale of infringing invertible trees, and its false advertising claiming it's the exclusive provider of such trees and that it even owns the patent on them, erodes Balsam Hill's identity as an innovation leader. Frontgate's actions also discredit [*27] our marketing campaign promoting our exclusive right to the Flip Trees.

19. Frontgate's actions are also costing us sales and market share. Catalog and ecommerce businesses depend on acquiring new customers and then benefiting from the lifetime value of those customers. Typical ecommerce or catalog retailers like Frontgate may break even or even lose money on initial sales to new customers. Their strategy is to acquire customers and then build lifetime relationships that lead to downstream sales. Former Frontgate employees have told me that Frontgate in particular uses trees as its acquisition tool, and then later sells décor and many other products to those customers.

20. Each lifetime customer relationship Frontgate builds using infringing trees and

2015 U.S. Dist. LEXIS 154075, *27

false advertising is a lifetime relationship potentially lost to Balsam Hill. And because our brand and not just our Flip Tree is under fire, we also stand to lose downstream customers and sales across our whole product line. This includes conventional Christmas trees, wreaths, garlands, ornaments, stockings, tree skirts, and other products. These losses may last a lifetime.

21. Christmas trees are highly seasonal. Our business grows tremendously [*28] each week in October and November and hits a fever pitch by the Thanksgiving holiday weekend. Based on 2013 and 2014 sales data, we forecast that the revenues we have received through October 20, 2015 will constitute approximately 10% of our annual revenues this year. However, in the thirty days of November alone, Balsam Hill typically receives a staggering 50% of our annual revenues. Our sales are thus concentrated almost entirely around the Christmas season. A single poor Christmas season could be devastating to the company.

Harman Decl. ¶¶ 17-21.

The declaration does not establish a likelihood of irreparable harm as a result of Frontgate's alleged false marking, Lanham Act, UCL, and FAL violations. The bulk of the statements describe harms threatened by Frontgate's alleged infringing sales, not its alleged illegal advertising. Harman does state that Frontgate's advertising "erodes Balsam Hill's identity as an innovation leader," that Frontgate's actions "discredit our marketing campaign promoting our exclusive right to the Flip Trees," and that "each lifetime customer relationship Frontgate builds using infringing trees and false advertising is a lifetime relationship potentially [*29] lost to Balsam Hill." *Id.* ¶¶ 18, 20. But without additional evidence indicating that these harms have in fact occurred or are likely to occur, the notion that Frontgate's alleged illegal advertising will cause them in the immediate

future is too speculative to warrant injunctive relief.

Moreover, Frontgate submits a declaration from David Landis, the Vice President of Finance and Treasurer of Cinmar, LLC, who states that Frontgate's description of its trees as "featuring patented inversion technology" was based on its misunderstanding that the pending application on the slotted hinge technology had already issued, and that Frontgate has since removed the offending language from its website. *See* Landis Decl. ¶¶ 10-11 (Dkt. No. 23). Plaintiffs do not dispute that the offending language is no longer on the website, and I take that fact to be true. Frontgate's hard copy catalogs contain alleged illegal advertising, but the only statements in those catalogs identified by plaintiffs are that Frontgate's trees feature "exclusive, state-of-the-art technology guaranteed to make setup a snap," and that Frontgate's "exclusive new Inversion tree goes from packed-away to put-up in about a minute." [*30] Fitton Decl. Ex. P (Dkt. No. 13-17). Plaintiffs have not shown that these statements are likely to cause them immediate harm that cannot be adequately addressed by money damages.

Finally, although it is not dispositive, plaintiffs' delay in seeking a TRO further undercuts their request. Plaintiffs state that they learned on August 18, 2015 that Frontgate was selling the accused trees. Harman Decl. ¶ 16. Presumably, plaintiffs learned of Frontgate's alleged illegal advertising at or around the same time. Yet plaintiffs did not file their complaint until October 20, 2015 and did not seek a TRO until October 26, 2015, just days before the start of the month when plaintiffs state that they generally earn approximately 50 percent of their annual revenue. *See* Harman Decl. ¶ 21 ("[I]n the thirty days of November alone, Balsam Hill typically receives a staggering 50% of our annual revenues. Our sales are thus concentrated almost entirely around the Christmas season. A single poor Christmas season could be devastating to the company."). While this ten-week delay

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 19 of 70

Page 12 of 12
2015 U.S. Dist. LEXIS 154075, *30

would be of little if any concern in most circumstances, given the extent to which plaintiffs emphasize the importance of the holiday shopping [*31] season in claiming that they will suffer irreparable harm, their failure to seek injunctive relief sooner further weighs against this claim.[10] Cf. *Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)* (in trademark infringement case, delay of approximately ten weeks after plaintiff directly learned of alleged misconduct, and approximately nine months after it was reported in the press, undercut claim of irreparable harm).

## CONCLUSION [*32]

Plaintiffs' request for a temporary restraining order, and for the Court to issue an order to show cause why a preliminary injunction should not be issued, is DENIED. Frontgate's motion to strike is also DENIED. By November 16, 2015, plaintiffs shall file with the Court and serve on Frontgate unredacted versions of the documents they filed on November 6, 2015 (Dkt. No. 37). If plaintiffs wish to file the unredacted versions under seal, they shall do so pursuant to *Civil Local Rule 79-5* and my Standing Order on Administrative Motions to File Under Seal. I will look to plaintiffs' sealing motion, if any, in deciding whether the redacted versions of the documents they submitted on November 6, 2015 may remain under seal.

**IT IS SO ORDERED**.

Dated: November 12, 2015

/s/ William H. Orrick

WILLIAM H. ORRICK

United States District Judge

---

[10]   On the subject of delay, plaintiffs' delay in filing the documents in support of their standing argument — which plaintiffs' counsel represented at the hearing could be submitted "at any time" — does not help their case. While three days is not a long period of delay, and I understand that there were some technical difficulties in filing the documents under seal, it is unclear why it took so long to get the documents on file, despite plaintiffs' claim of urgency in having their TRO request heard and decided as soon as possible. Plaintiffs' failure to submit the documents before the November 3, 2015 hearing — or at the very least immediately following it — simply does not comport with the diligence that one would expect from a party that, according to its briefing, is in the process of suffering irreparable harm.

✚ Positive

As of: July 5, 2016 3:51 PM EDT

## *Prof'l Towing & Recovery Operators v. Box*

United States District Court for the Northern District of Illinois, Eastern Division

December 11, 2008, Decided; December 11, 2008, Filed

No. 08 c 4096

**Reporter**

2008 U.S. Dist. LEXIS 100002; 2008 WL 5211192

PROFESSIONAL TOWING & RECOVERY OPERATORS OF ILLINOIS, et al., Plaintiffs, v. CHARLES E. BOX, in his official capacity as Chairman of the Illinois Commerce Commission & Transportation Division, Defendant.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by *Prof'l Towing & Recovery Operators of Ill. v. Box, 2013 U.S. Dist. LEXIS 116079 (N.D. Ill., Aug. 16, 2013)*

**Counsel:** [*1] For Professional Towing & Recovery Operators of Illinois, an Illinois non-profit association, Plaintiff: Donald S. Rothschild, LEAD ATTORNEY, Jonathan Patrick Stringer, Goldstine, Skrodzki, Russian, Nemec & Hoff, Ltd., Burr Ridge, IL; Michael P. McGovern, The McGovern Law Firm, Knoxville, TN.

For Wes's Service, Inc., North Shore Towing, Inc., Plaintiffs: Donald S. Rothschild, LEAD ATTORNEY, Jonathan Patrick Stringer, Goldstine, Skrodzki, Russian, Nemec & Hoff, Ltd., Burr Ridge, IL.

For Charles E Boxm, in his official capacity a Chairman of the Illinois Commerce Commission & Transportation Division, Lisa Madigan, in her official capacity as Attorney General for the State of Illinois, Defendants: Thomas A. Ioppolo, LEAD ATTORNEY, Alice Elizabeth Keane, Illinois Attorney General's Office, Chicago, IL.

**Judges:** Robert M. Dow, Jr., United States District Judge.

**Opinion by:** Robert M. Dow, Jr.

# Opinion

### MEMORANDUM OPINION

Before the Court is Plaintiffs' motion for preliminary injunction [18]. For the reasons stated below, the motion is granted in part and denied in part.

### I. Background

In this lawsuit, Plaintiffs Professional Towing & Recovery Operators of Illinois, Wes's Service, Inc., and North Shore Towing, Inc. ("Plaintiffs") [*2] seek preliminary injunctive relief against enforcement of several provisions of the Illinois Commercial Safety Towing Law ("the State Towing Law"), codified in the Illinois Vehicle Code at *625 ILCS 5/18d-101, et seq.* Plaintiffs contend that the challenged provisions are preempted by federal law. They have sued Charles Box, in his official capacity as Chairman of the Illinois Commerce Commission and Transportation Division ("ICC"). Notwithstanding the State of Illinois' *Eleventh Amendment* immunity from suit in federal court, Chairman Box is a proper defendant in this action under *Ex Parte Young, 209 U.S. 123, 156, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*, which permits federal courts to enjoin state officers "who threaten or are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal

2008 U.S. Dist. LEXIS 100002, *3

Constitution." A claim that state law conflicts with, and therefore is preempted by, federal law may be maintained under *Ex parte Young* so long as Plaintiff only seeks prospective declaratory or injunctive relief, and not money damages against the State. See *Marozsan v. United States, 852 F.2d 1469, 1494-95 (7th Cir. 1988)*.

**A. The state law at  [*3] issue.**

Although the State Towing Law was passed by the General Assembly and signed into law by Governor Blagojevich in 2007, it did not go into effect until July 1, 2008. On August 28, 2008, the ICC adopted final rules implementing the Act. Those rules were published at *92 Ill. Admin. Code 1715.5, et seq.,* and took effect on September 15, 2008. The State Towing Law applies in counties with a population of more than one million people and in counties with fewer than one million people that have adopted the Commercial Relocation of Trespassing Vehicles Law (*625 ILCS 5/18a*; *625 ILCS 5/18d-180*). At the present time, only 5 of the 102 counties in Illinois are affected: Cook, Will, Kane, DuPage, and Winnebago Counties.

The State Towing Law regulates "commercial vehicle safety relocators," which the law defines as persons or entities "engaged in the business of removing damaged or disabled vehicles from public or private property by means of towing or otherwise, and thereafter relocating and storing such vehicles." *625 ILCS 5/18d-105*. Thus, the law applies to all businesses that tow and store damaged or disabled vehicles. The State Towing Law includes the following statement of "[p]ublic interest  [*4] and public welfare":

> The General Assembly finds and declares that commercial vehicle towing service in the State of Illinois fundamentally affects the public interest and public welfare. It is the

intent of the General Assembly, in this amendatory Act of the 95th General Assembly, to promote the public interest and the public welfare by requiring similar basic *consumer protections and fraud prevention measures* that are required of other marketplace participants, including the disclosure of material terms and conditions of the service to consumers before consumers accept the terms and conditions. The General Assembly also intends that the provisions in this amendatory Act of the 95th General Assembly *promote safety for all persons and vehicles that travel or otherwise use the public highways of this State.* The General Assembly finds that it is in the public interest that persons whose vehicles are towed from the public highways know important basic information, such as where they can retrieve their vehicles and the cost to retrieve their vehicles, so that they can *avoid vehicle deterioration and arrange for a prompt repair of the vehicles.*

*625 ILCS 5/18d-110* (emphasis added). As that  [*5] statement makes clear, the General Assembly's objectives in enacting the State Towing Law included "consumer protection," "fraud prevention," and "promot[ing] safety." *Id.*

While it is unclear whether the brief transcript of the House debate attached to Plaintiffs' reply brief constitutes the entirety of the legislative history of the State Towing Law, all of the legislative history currently before the Court at least marginally reinforces some of the objectives referenced in the text of the statute -- although it focuses primarily on what appear to be consumer protection concerns. [1] As Representative McCarthy stated during the House of Representatives' consideration of the bill, it was intended "to address the problem in some of the counties up in the northeast part of the state where some towers were taking advantage of a lot of the local residents." Representative

---

[1]   It is unclear whether there are any transcripts of Senate debates or any other legislative materials, such as committee hearings. No such materials have been provided in the parties' submissions to date.

2008 U.S. Dist. LEXIS 100002, *5

McCarthy acknowledged that a prior version of the bill "would have been bothered by a federal preemption about setting rates for towers" and that the bill that ultimately was passed and enacted into law was "a complete disclosure" bill to "protect[]" citizens from "abuse[] by some of these towers who don't do it the right **[*6]** way." He later reiterated that "the way the Senate passed" an earlier iteration of the bill "would go against a federal preemption," and that the bill presented for consideration in the House contained "protections" for "our consumers." [2]

In Plaintiffs' second amended complaint, they challenge the following specific provisions of the State Towing Law as preempted by federal law:

. *Section 18d-115*, requiring towing companies engaged in consensual towing [3] to obtain a safety relocator's registration certificate from the ICC, for which the companies must pay an annual fee of $ 450 and an additional fee of $ 150 per towing vehicle;

. *Section 18d-120*, requiring towing companies to obtain specific authorization prior to towing a damaged or disabled vehicle, to provide specific and detailed written disclosures to vehicle **[*8]** owners or operators, and to maintain copies of completed disclosures for a minimum of five years;

. *Section 18d-125*, requiring towing companies to issue itemized final invoices to vehicle owners or operators on demand and to retain copies of such invoices for a period of five years;

. *Section 18d-130*, requiring towing companies to post signs at their storage facilities advising customers of their rights;

. *Section 18d-135*, requiring towing companies to maintain copies of all disclosures and invoices for five years and to make such records available for inspection by the ICC and imposing penalties or fines for violations;

. *Section 18d-145*, requiring copies of the safety regulator's registration certificate to be carried in each tow truck;

. *Section 18d-150*, prohibiting towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability;

. *Section 18d-155*, imposing penalties and fines for failure to comply with the Towing Safety Law; and

. *Section 18d-165*, requiring that charges accrued by vehicle owners or operators for consensual tows to be payable by cash or major credit card.

---

[2]   In addition to the transcript of the brief discussion of the State Towing Law in the Illinois House of Representatives, Plaintiffs have attached to their briefs several documents from the web site of a Chicago television station and a news release by the Governor's Office, all of which stress the consumer protection objectives of the State Towing Law. See, *e.g.*, "New State Towing Regulations Curb Accident Chasers," Aug. 31, 2007 (http://cbs2chicago.com/investigations/towing_companies.Accident2.339571.html); News Release, Office of the Governor, "Gov. Blagojevich signs 'Truth in Towing' law for Illinois motorists," August 31, 2007 ("Governor Rod R. Blagojevich today signed legislation designed to protect Illinois motorists from excessive fees and other **[*7]** abuses from unlawful towing companies"). While the Court has examined those documents, because the statements reflected in them were not made by members of the General Assembly during their consideration of the legislation at issue, the Court is hesitant to give them much, if any, weight as "legislative history." See *Metzl v. Leininger, 57 F.3d 618, 618, 621 (7th Cir. 1995)* (concluding that a proclamation by the governor discussing the purposes of a statute enacted the previous year making Good Friday a legal and school holiday throughout the state "is not definitive evidence of the statute's original purpose").

[3]   Consensual **[*9]** towing occurs when the vehicle operator requests that a tow truck come to the scene of an accident or the location of a disabled vehicle and the vehicle is towed with the knowledge and consent of the operator. Non-consensual towing occurs when a vehicle is towed without the knowledge and consent of the operator or owner -- for example, when a car is parked illegally, either on public or private property. In this case, Plaintiffs challenge the State Towing Law only as it applies to consensual towing.

2008 U.S. Dist. LEXIS 100002, *8

## B. The federal law at issue.

According to Plaintiffs, the nine challenged provisions of the State Towing Law conflict with, and thus are preempted by, *Section 14501(c)* of the Interstate Commerce Act, as amended by the Federal Aviation Administration Authorization Act and the I.C.C. Termination Act of 1995. *49 U.S.C. § 14501(c)*. *Section 14501(c)* states, in pertinent part:

> (1) General rule. -- Except as provided in paragraphs (2) and (3), a State * * * may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier * * ** with respect to the transportation of property. [4]

> (2) Matters not covered. -- Paragraph (1) **[*10]** --

> (A) *shall not restrict the safety regulatory authority of a State with respect to motor vehicles,* the authority of a state to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization; * * *

*49 U.S.C. § 14501(c)* (emphasis added). *Section 14501(c)* thus expressly contains both a "general rule" of preemption and an exception for certain "[m]atters not covered" by that general rule. [5]

## C. The procedural history of this case.

Plaintiffs filed this lawsuit on July 18, 2008. They contend (i) that the challenged provisions of the

State Towing Law have a direct and substantial effect on the "prices, routes, and services" **[*11]** of towing-motor carriers engaged in consensual towing operations in violation of federal law, and (ii) that those provisions are not saved from federal preemption under the exception for state safety regulations. After the filing of the lawsuit, Defendants temporarily deferred enforcement of the new law. Subsequently, the ICC adopted its implementing regulations and commenced enforcement. Plaintiffs then brought their motion for a preliminary injunction [18]. While the briefing on that motion was in progress and following negotiations between the parties, Defendant filed the following stipulation [25]:

> In the event the Court deems any portion of the Safety Towing Law, *625 ILCS 5/18d-101 et seq.,* to be preempted by federal law, the Defendant, Charles E. Box, Chairman of the Illinois Commerce Commission & Transportation Division, agrees that any fines or penalties levied for violations of those preempted sections will be refunded.

While Plaintiffs thus expect to recover any "fines or penalties" levied for violations of portions of the State Towing Law that may be found to be preempted in the final analysis, Plaintiffs have acknowledged that they "are not seeking money damages" from Defendant **[*12]** (or, by extension, from the State) in this case. Pls. Reply Br. at 12. As a result of that clarification, and of Plaintiffs' decision to bring this action against Chairman Box in his official capacity, there appears to be no *Eleventh Amendment* bar to any of Plaintiffs' requested relief, nor has Defendant suggested any such bar.

Before turning to the legal analysis, the Court notes the limited record on which the motion for

---

[4]   It is undisputed that "[t]ow trucks * * * are 'motor carrier[s] of property' falling within *§ 14501*'s compass." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.,* 536 U.S. 424, 430, 122 S. Ct. 2226, 153 L. Ed. 2d 430 (2002).

[5]   The other exceptions to preemption in *Sections 14501(c)(2)(C)* and *(c)(5)* apply to non-consensual towing, and thus are not at issue here.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 24 of 70

Page 5 of 20
2008 U.S. Dist. LEXIS 100002, *12

preliminary injunction has been presented for decision. In support of their motion, Plaintiffs have provided affidavits of two individuals who are involved in the towing business. Both affiants, William Howard and Brian Booker, relate information concerning the enforcement by the ICC of certain provisions of the State Towing Law. Mr. Booker also avers that complying with the State Towing Law will require towing operators to spend additional time on the sides of busy roadways and will cause operators to interact more with members of the public while performing the additional services required under the Law. At the September 18 hearing on the presentation of the motion, counsel for Defendant indicated that Defendant might wish to put in evidence -- either in the form [*13] of affidavits or live witnesses -- in opposition to Plaintiffs' motion and in support of Defendant's contention that the new law advances safety concerns. However, at the next status on October 8, counsel for Defendant advised the Court that Defendant would not be presenting affidavits or other evidence in connection with the briefing on the motion for preliminary injunction, but anticipated submitting evidence, including affidavits, at the summary judgment stage.

As a consequence of the limited record, the Court's rulings necessarily are more tentative than they might be on a more robust record. For example, a more developed record may shed light on the extent to which provisions of the State Towing Law impact the "prices, routes, and services" of towing companies -- and whether any such impact is significant or merely incidental or remote. In a similar vein, further factual inquiry may illuminate the extent to which the various provisions of the state law are genuinely responsive to legitimate safety concerns. It also bears mentioning that, as Plaintiffs have recognized (Pls. Reply Br. at 12 n.4), the stipulation pursuant to which Defendants have agreed to refund any fines or penalties [*14] imposed under any provision that is found to be preempted has significantly altered the

irreparable harm calculus that the Court must undertake in deciding whether to grant the preliminary injunctive relief that Plaintiffs have requested. Compare Pls. Opening Br. at 12 with Pls. Reply Br. at 12 & n.4.

To be sure, the abbreviated record and the corresponding risk that the Court's opinion may rest on a less than complete understanding of the issues in the case are by no means unusual or unique to this case. As the Eleventh Circuit recently explained, "[w]hile there may be clear cut cases where preemption questions can be resolved on the pleadings, * * * it is far more common to resolve issues like the ones here at summary judgment with the benefit of a complete understanding of the impact of the regulations." *Taylor v. Alabama, 275 Fed. Appx. 836, 842, 2008 WL 1868083, at *5 (11th Cir. Apr. 29, 2008)*.

## II. Analysis

### A. Preliminary injunction standard

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997)*. In the [*15] Seventh Circuit, a court must consider the following factors in deciding whether to grant a preliminary injunction: (i) the prospect of some likelihood of success on the merits of the claim; (ii) the presence of irreparable harm to the moving party, (iii) the absence of an adequate remedy at law; (iv) the balance of the harms between the parties, and (v) the public interest. See, *e.g., Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-88 (7th Cir. 1984)*. The first two factors must be considered at the threshold, for when the moving party has no chance of success on the merits or cannot make any showing of irreparable harm, a motion for preliminary injunction ordinarily will be denied on that ground

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 25 of 70

Page 6 of 20
2008 U.S. Dist. LEXIS 100002, *15

alone. See *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co., 255 F.3d 460, 463 (7th Cir. 2001)*; *Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992)*. Under the "sliding scale" approach employed in this circuit, "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." See, *e.g., Ty, Inc. v. The Jones Group, 237 F.3d 891, 895 (7th Cir. 2001)*. "The sliding scale approach **[\*16]** is not mathematical in nature; rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id. at 895-96*.

**B. Federal preemption law**

Plaintiffs' likelihood of success on the merits of this litigation turns on questions of preemption law. As discussed below, the basic principles of preemption law are both relatively straightforward and well-established. However, the application of those principles to the specific federal and state laws in question, on the incomplete record before the Court, and with the overlay of the preliminary injunction standard, raises more challenging issues for the Court's consideration and resolution. Moreover, given the current posture of the case, the Court's preliminary assessment of the *likelihood* of success on the merits necessarily is tentative and subject to revision based on additional evidence or argument at summary judgment.

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be **[\*17]** the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Since *McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L. Ed. 579 (1819)*, it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana, 451 U.S. 725, 746, 101 S. Ct. 2114, 68 L.*

*Ed. 2d 576 (1981)*. When considering preemption, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)*. Accordingly, the "purpose of Congress" is the ultimate touchstone of preemption analysis. *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992)*.

The federal statute at the center of the current dispute has its genesis in the Airline Deregulation Act of 1978 ("ADA"). Congress enacted the ADA to foster "maximum reliance on competitive market forces" by prohibiting states from enacting or enforcing any law "relating to rates, routes, or services from any air carrier." *Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)*. When Congress decided to preempt state trucking regulation, **[\*18]** it borrowed the language of the ADA, simply substituting "motor carrier" in place of "air carrier." Pursuant to the specific provision at issue in this case, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier * * * with respect to the transportation of property." *49 U.S.C. § 14501(c)(1)*.

Because *Section 14501(c)(1)* expressly preempts contrary state law, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993)*. And because the scope of federal preemption under *Section 14501(c)(1)* is set out with some specificity, to the extent that a state law is *not* "related to" a "price, route, or service" of motor carriers, it is not preempted. See *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S.*

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 26 of 70

Page 7 of 20
2008 U.S. Dist. LEXIS 100002, *18

Ct. 2608, 120 L. Ed. 2d 407 (1992) ("enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted"). In addition, the federal law specifically states that it "shall not restrict [*19] the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2).

The Supreme Court has construed the language of the federal statute on three occasions. Although Morales v. Trans World Airlines, Inc., 504 U.S. 374, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992), involved the preemption provision in the ADA, the interpretation set forth in Morales is equally controlling and instructive here. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 85, 126 S. Ct. 1503, 164 L. Ed. 2d 179 (2006) ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates as a general matter, the intent to incorporate its judicial interpretations as well"). In Morales, the Court determined Congress' use of the phrase "relating to" expressed "a broad pre-emptive purpose" and thus prohibited "[s]tate enforcement actions having a connection with, or reference to" the "rates, routes, or services" of carriers. 504 U.S. at 384. The Court further held that preemption may occur whether the state regulation at issue is direct or indirect. Id. at 386. Preemption will occur at least where state laws have a "significant impact" on the achievement of Congress' [*20] deregulatory and preemption-related objectives, but may not be found where state laws affect federal goals in only a "tenuous, remote, or peripheral * * * manner." Id. at 390. And finally, in view of the principles that it articulated, the Court held that state consumer fraud statutes could not be enforced to block deceptive air fare advertisements. Id. at 390-91.

In City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 122 S. Ct. 2226, 153 L. Ed. 2d 430 (2002), the Supreme Court construed Section 14501(c) in the context of deciding whether the state's preserved "safety regulatory authority" may be delegated to municipalities, thereby allowing local governments to pass laws relating to tow-truck operations. The Court answered that question in the affirmative, and in so doing provided additional guidance on the meaning of the safety exception. The Court initially observed that "[i]t is the expressed intent of § 14501(c)(2)(A) that the preemption rule of § 14501(c)(1) 'not restrict' the existing 'safety regulatory authority of a State.'" City of Columbus, 536 U.S. at 438. The Court added that "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor [*21] carriers of property * * * 'not restrict' the preexisting and traditional state police power over safety." Id. at 439. The Court further explained how to reconcile the deregulatory purpose of the Act as a whole with the preservation of state safety regulatory authority. According to the Court, "declarations of deregulatory purpose * * * do not justify interpreting through a deregulatory prism 'aspects of the State regulatory process' that Congress determined should not be preempted." Id. at 440. That construction reflects the Court's view that "[a] congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of the exception." Id. Nevertheless, while rejecting the "narrowest possible construction," the Court made clear that "[l]ocal regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule." Id. at 442 (emphasis added).

Most recently, in Rowe v. New Hampshire Motor Transport Association, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008), the defendants argued [*22] that Section 14501(c) preempted two provisions of a Maine tobacco law that regulated the delivery of

2008 U.S. Dist. LEXIS 100002, *22

tobacco to customers in the state. The challenged provisions specifically required tobacco shippers to utilize a delivery service that verified the buyer's legal age and imposed on carriers constructive knowledge that packages originating from certain senders contained tobacco products, thereby requiring the carriers to check each shipment against the list of proscribed shippers. *Id. at 993-94*. Those legislative mandates, the Supreme Court observed, would "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future." *Id. at 995*. The Court therefore had no difficulty concluding that both provisions were preempted as improper state interference with competitive market forces. *Id. at 997-98*. In attempting to overcome preemption, the state did not invoke its "safety regulatory authority," but instead argued for a "public health exception." *Id. at 996*. The Court declined to recognize such an exception and found the state laws preempted because they "require motor carrier **[*23]** operators to perform certain services, thereby limiting their ability to provide incompatible alternative services; and they do so simply because the State seeks to enlist the motor carrier operators as allies" in its efforts to enforce its tobacco laws. *Id. at 998*. [6]

## C. Framework for application of preemption **[*24]** principles to the laws at issue

### 1. Does the challenged state law provision fall within the scope of the federal preemption?

Consistent with the trilogy of Supreme Court decisions discussed above, the Court will follow a two-step approach in its examination of each of the challenged provisions of the State Towing Law. In the initial step, the Court must decide whether the challenged provision lies within the scope of federal preemption -- that is, does the provision have a connection with a price, route, or service of any motor carrier with respect to the transportation of property that is more than "tenuous, remote, or peripheral?" In undertaking that threshold inquiry, the Court is guided by the Seventh Circuit's teaching that a state law "relates to" rates, routes, or services "either by expressly referring to them or by having a significant economic effect upon them." *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1432 (7th Cir. 1996)*. Because Defendants do not contend that any of the challenged state provisions relates to the routes that towing companies serve, the specific question in each instance will be whether the state law "relates to" prices or services, **[*25]** whether directly or indirectly.

This Court also must bear in mind that the Seventh Circuit has broadly defined "services" to "include all elements of the [motor] carrier service bargain." *Travel All Over, 73 F.3d at 1434*; see also *Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 226, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995)* (holding that "services" include both matters that are both essential and non-essential to the carrier's operations). And other courts persuasively have read *Rowe* as standing for the proposition that if the "*effect*" of the regulation would be that carriers would have to offer different services than what the market would otherwise dictate, the law ha[s] a sufficient effect on carrier services for preemption to apply." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 2008 U.S. Dist. LEXIS 99691, 2008 WL 4294282, at *4 (C.D. Cal. Sept. 9, 2008)*. Similarly, even if a state law or regulation

---

[6]   The Court respectfully disagrees with Plaintiffs' suggestion (see Pls. Reply Br. at 3) that *Rowe* stands for the proposition that "when state law is not general," it necessarily has a "significant," not a "tenuous, remote, or peripheral" impact on a motor carrier. While in *Rowe* the Supreme Court used a "general" law that affected truckers solely in their capacity as members of the public as an example of a law that might not be preempted, in concluding that the Maine law at issue was preempted, the Court considered separately both whether the state law was "general" and whether the law had a "significant" impact on rates, routes, or services and whether the "connection with trucking" was "tenuous, remote, or peripheral." *Rowe, 128 S. Ct. at 997-98*. This Court therefore reads *Rowe* as requiring a separate inquiry into the impact of the state law, even if the law is not "general."

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 28 of 70

Page 9 of 20
2008 U.S. Dist. LEXIS 100002, *25

does not have a direct impact on prices, in that it does not expressly set or limit prices, the law or regulation may have a substantial indirect effect on prices to the extent that it can be shown to impose significant additional costs on towing companies that they, in turn, may pass on to their customers.

## 2. Is the state provision nevertheless saved [*26] because it is genuinely responsive to safety concerns?

If the Court concludes that a provision of the state law falls within the ambit of the federal preemption because it affects rates or services in a non-trivial manner, the Court must then proceed to the second step of the analysis and consider whether the state law nevertheless is saved from preemption because it lies within the safety exception in *Section 14501(c)(2)*. While the Supreme Court observed that "Congress' clear purpose in *§ 14501(c)(2)(A)* is to ensure that its preemption of States' economic authority over motor carriers of property * * * 'not restrict' the preexisting and traditional state police power over safety" (*City of Columbus, 536 U.S. at 439*), the Court did not have occasion in that case to apply the guidance that it gave lower courts to ensure that "[l]ocal regulation of prices, routes, or services of tow trucks" must be "genuinely responsive to safety concerns" to avoid preemption (*Id. at 442*). Even today "[t]here is little case law interpreting the limits of the safety exception on federal preemption" (*Tillison v. City of San Diego, 406 F.3d 1126, 1129 (9th Cir. 2005))*, particularly in the context of state [*27] laws governing consensual towing operations. It is clear, however, that at a minimum, the Court must be convinced that the state law is not simply a means of "accomplishing some economic regulation, or more precisely consumer protection, while making findings about safety in the preambles of their ordinances." *VRC LLC v. City of Dallas, 460 F.3d 607, 615 (5th Cir. 2006)*. At the same time, the exception appears to encompass "safety concerns

beyond pure motor vehicle operation safety," and state laws may avoid preemption even if they were not enacted "for the exclusive purpose of promoting safety." *Am. Trucking Ass'ns, 2008 U.S. Dist. LEXIS 99691, 2008 WL 4294282, at *11-*12*.

Here, the second step of the analysis is complicated because both the text and the legislative history of the State Towing Law indicate that the General Assembly had both economic and safety regulation in mind when it passed the State Towing Law. As the Fifth Circuit accurately has observed, "safety and consumer protection are not mutually exclusive categories." *VRC LLC, 460 F.3d at 615*. Yet each challenged provision must be considered under the applicable standards. The difficulty comes in sorting out, on the record currently before the Court, [*28] whether those specific provisions are likely candidates for preemption because they engage in forbidden economic regulation or are likely to pass muster because they are "genuinely responsive to safety concerns." Finally, once the Court determines the likelihood of success on the merits of the parties' respective preemption and anti-preemption arguments, it must then apply the other preliminary injunction factors to determine what relief, if any, it may award on an interim basis, pending further development of the record and a final merits ruling at summary judgment or trial.

## D. Analysis of each challenged provision of the State Towing Law

### 1. *Section 18d-115*

It is not entirely clear whether Plaintiffs challenge *Section 18d-115* of the State Towing Law, which requires towing companies to obtain a registration certificate and pay an annual fee of $ 450 and additional fees of $ 150 per towing vehicle. Although Plaintiffs list *Section 18d-115* among the provisions that they seek to invalidate, at various times during the brief history of this

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 29 of 70

Page 10 of 20
2008 U.S. Dist. LEXIS 100002, *28

litigation, it has been suggested that Plaintiffs may be willing to comply with the registration (and insurance) requirements imposed by the new law. [*29] See, e.g., Pls. Reply Br. at 12; Def. Br. at 12 n.3; 9/18/08 Tr. at 5; 10/8/08 Tr. at 10-11.

The Court need not pin down whether Plaintiffs object to the registration provision at this time, because any challenge that Plaintiffs may wish to mount to that provision cannot succeed at the preliminary injunction stage. To begin with, Plaintiffs do not have a high likelihood of success on a preemption claim, for it is not evident from the record that an obligation to register with the ICC affects the services that any towing company provides to its customers. In addition, although the fees imposed here are somewhat greater than the fees imposed by the City of Philadelphia under a similar towing ordinance, the Court is inclined to agree with the decision in *Helmrich Transp. Systems, Inc. v. City of Philadelphia, 2004 U.S. Dist. LEXIS 20413, 2004 WL 2278534, at *4 (E.D. Pa. 2004)*, in which the court held that a one-time $ 250.00 fee for a privilege license and an annual $ 50.00 fee for a towing license imposed "practical impediments" that were "so low that any effect on the towing companies' prices, routes, or services can only be called 'indirect, remote, or tenuous.'"

Finally, even if Plaintiffs might be able to show [*30] on a fuller record that the fees imposed by the General Assembly have a more significant impact on prices, they cannot show irreparable harm absent a showing that those fees could lead to insolvency or otherwise pose a serious threat to the viability of Plaintiffs' businesses. See, e.g., *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1140 (7th Cir. 1994)* (economic loss generally does not justify a preliminary injunction unless a damages remedy would come too late to save the plaintiff's business); *Wis. Gas Co. v. FERC, 244 U.S. App. D.C. 349, 758 F.2d 669, 673 (D.C. Cir. 1985)* ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business"). Plaintiffs have made no showing that the registration fees are so onerous that they may lead to insolvency. Moreover, although the stipulation filed by Defendant covers only "fines" or "penalties," Defendant's argument (Def. Br. at 12) that "Plaintiffs have not provided any evidence that if the registration requirements in the Towing Law are determined by this Court to be preempted, the ICC would not reimburse the registration fees paid" at least leaves open the possibility of [*31] such reimbursements in the event that (i) Plaintiffs challenge the registration requirement at the summary judgment stage and (ii) the Court rules that the registration requirement is preempted. For all of these reasons, any irreparable harm to Plaintiffs is too speculative to give rise preliminary injunctive relief in light of the modest showing by Plaintiffs on their likelihood of success on the merits.

**2.** *Section 18d-120* [7]

**a. Likelihood of success on the merits**

In analyzing Plaintiffs' challenge to the authorization and written disclosure requirements imposed by *Section 18d-120*, the Court again finds the decision in *Helmrich* instructive. In that case, the court found that a similar local law attempted to "regulate * * * the way in which towing companies relate with their clients" (*2004 U.S. Dist. LEXIS 20413, 2004 WL 2278534, at *4*), and thus fell within the scope of federal preemption. Or, put slightly [*32] differently, *Section 18d-120* "require[s] carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not

---

[7]   Although Plaintiffs list Section 18d-120 as a provision that they challenge in this lawsuit, the Court has been unable to discern any specific arguments targeting Sections 18d-120(d) or (e). Accordingly, in this decision at the preliminary injunction phase, the Court discusses only Sections 18d-120(a) through (c).

2008 U.S. Dist. LEXIS 100002, *32

to offer)." *Rowe, 128 S. Ct. at 995*. However, as explained above, even if state law "relates to" the towing companies' prices or services, the law ultimately must be upheld if its effect is minimal or if it falls within the safety exception.

### i. Specific authorization requirement -- *Section 18d-120(a)*

On the current record, the Court fails to see how the "specific authorization" requirement can be saved either because it has a minimal effect or because it constitutes an appropriate state safety regulation. First, it seems unlikely that obtaining the authorization on the road side can be said to have an "indirect, tenuous, or remote" effect on the total package of services provided by a towing operator. In contrast to a pure disclosure requirement -- which in most instances can be discharged by handing over a largely pre-printed sheet of paper -- an authorization requirement suggests a need for explanation, and perhaps even some give-and-take, on the part of the towing operator in at least some, if not many, instances. While the net **[*33]** result may amount to a good business practice, it has the effect of imposing on towing companies a service that the market may not require and that the towing operators may prefer not to provide, and similarly limits the ability of towing companies to provide incompatible alternative services. See *Rowe, 128 S. Ct. at 995-98*.

Second, even if the burden on the towing companies were minimal, the safety rationale does not appear likely to apply. As noted above, Plaintiffs are challenging the state law only as it applies to consensual tows, which the Court understands to encompass only tows that have been requested by the vehicle operator (or another authorized person). If that understanding is correct,

then there is no basis (at least on the current record) for concluding that Defendants are likely to be able to show that the requirement of a second, formal authorization by the vehicle operator was motivated by safety concerns. It seems far more likely that the legislative intent in requiring another manifestation of consent, after the mandated disclosures (including as to price) have been made, was consumer protection. For both of these reasons, the Court concludes that Plaintiffs have **[*34]** shown a substantial likelihood of success on their argument that the specific authorization requirement in *Section 18d-120(a)* is preempted. [8]

### ii. Disclosure requirements -- *Section 18d-120(b)*

The written disclosure portion of *Section 18d-120(b)* presents a closer and more challenging question on the likelihood of success on the merits prong. As Defendants point out, the disclosures can be provided on a pre-printed form, thus suggesting a "tenuous, remote, or peripheral" effect on the services provided by the towing operator. In a manner of minutes, if not seconds, the operator might be able to fill in the blanks as to any information **[*35]** that is not already listed on the form. Moreover, some of the information that the state law mandates -- for example, the name of the towing company, the address of the location to which the vehicle will be towed, and the cost for the towing services -- may well be responsive to safety concerns. Providing basic information of that nature would advance the express statutory purpose of arranging for prompt release and repair of vehicles (see *625 ILCS 5/18d-110*), which many courts have found to advance a legitimate safety concern. For example, on two separate occasions, the Ninth Circuit has endorsed the notion that legislation is

---

[8]   The Court adds that its finding that Plaintiffs have a substantial likelihood of success on the merits of their claim that *Section 18d-120(a)* -- or any other provision of the State Towing Law -- is preempted does not prevent towing companies from obtaining specific authorization before towing a vehicle if they choose to do so as a business practice. The fact that a particular business practice cannot be *compelled* by an act of the state legislature does not by any stretch of the imagination mean that the practice is *prohibited*. See *Rowe, 128 S. Ct. at 995-98*.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 31 of 70

Page 12 of 20
2008 U.S. Dist. LEXIS 100002, *35

"safety-related" if it "expedites recovery of towed vehicles." *Tillison v. Gregoire, 424 F.3d 1093, 1104 (9th Cir. 2005)*; *Tillison v. City of San Diego, 406 F.3d 1126, 1129-30 (9th Cir. 2005)*. Some state courts have adopted a similar view. See, *e.g.*, *Crane Towing, Inc. v. Gorton, 89 Wn.2d 161, 570 P.2d 428, 434 (Wash. 1989)* (holding that legislation that "tends to expedite recovery of their vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public").

On the other hand, the itemized description of the vehicle owner or operator's rights **[*36]** under the State Towing Law seems less targeted to safety concerns and more responsive to consumer protection issues. But on this record, the Court is not in position either to determine whether the effect of the itemized description requirement is "significant" (and thus preempted) or "remote" (and thus not preempted). Nor is the Court in position to apprehend how the itemized description provisions may be said to "genuinely respond to safety concerns," because Defendants have "not yet carried [their] burden of proving that the safety exception applies" to the description provisions. *Helmrich, 2004 U.S. Dist. LEXIS 20413, 2004 WL 2278534, at *5*.

### iii. Record keeping -- *Section 18d-120(c)*

*Section 18d-120* also requires towing companies to maintain copies of all completed disclosure forms for a minimum of five years. The Court questions whether a record retention requirement can be said to affect the "services" that a towing operator provides, because it is not self-evident how record keeping bears on "elements of the service bargain" between the vehicle owner and the towing firm. *Travel All Over, 73 F.3d at 1434*. Perhaps a fuller record will be illuminating in that respect. It also is unclear whether the record keeping **[*37]** obligation may have at least a substantial indirect effect on prices. On the evidence to date, the Court can only speculate on the incremental additional cost to the towing

companies as a result of the record keeping aspects of the legislation. But even if the evidence were to show a non-trivial imposition on services or prices, the Court is hard pressed to imagine how a record keeping requirement of that duration relates to safety concerns. Accordingly, Plaintiffs have at least some likelihood of success on the merits of their challenge to the record keeping provision in *Section 18d-120* (and the similar requirements in *Sections 18d-125* and *18d-135*), provided that they can establish on a fuller record that the provision has a significant effect on their services or prices.

In sum, as to *Section 18d-120(b)*, the Court concludes that Plaintiffs have shown a substantial likelihood of success on the merits of their challenge to the requirement that towing operators provide an itemized description of the owner or operator's customer rights, some likelihood of success on their challenge to the record keeping requirement, and only a minimal likelihood of success on their challenge to the disclosure **[*38]** of the name, address, and telephone number of the towing company, the address of the location to which the vehicle will be towed, and the total cost of the towing company's services. Although the record is sparse, the Court finds that Defendants are likely to be able to sustain the basic disclosures (name, address, cost) as genuinely responsive to safety concerns -- particularly in view of the cases cited above holding that promptly reuniting the owners of disabled vehicles with their cars may promote safety.

### b. Irreparable harm/adequacy of remedy at law

The most significant remaining question as to *Section 18d-120* relates to Plaintiffs' showing of irreparable harm, if any, from continued enforcement of the challenged provisions pending a final disposition of this case. As noted above, the ICC's stipulation that it will refund any fines or penalties imposed under any section of the

2008 U.S. Dist. LEXIS 100002, *38

State Towing Law that is determined to be preempted has altered the irreparable harm calculus significantly. [9] To their credit, Plaintiffs acknowledge the impact of the stipulation and the fact that they "are not seeking money damages" in this case. Pls. Reply Br. at 12. Because Plaintiffs therefore cannot [*39] point to any pecuniary harm, they assert that "the irreparable harm element is currently not at issue because it is essentially presumed to exist in that if the 2007 State Towing Law is adjudicated to be preempted, Defendant would not be able to enforce a preempted law." *Id.* at 12 n.4. In other words, it is Plaintiffs' view that "because the 2007 State Towing Law violates the supremacy clause of the Constitution, Plaintiffs will suffer irreparable harm and are entitled to injunctive relief" at this preliminary stage of the case. *Id.* at 13. [10]

In support of that argument, Plaintiffs point to case law stating that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson, 589 F.2d 300, 303 n.3 (7th Cir. 1978)*; see also *Campbell v. Miller, 373 F.3d 834, 840 (7th Cir. 2004)* (Williams, J., dissenting) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary"). The Court respectfully concludes that the cases on which Plaintiffs rely do not support the conclusion that a likelihood of success on the merits of a

preemption claim gives rise to either a *per se* rule or even a strong presumption of irreparable harm leading to the entry of a preliminary injunction in many, if not most, cases. The Court instead agrees with the summary of the law articulated in a recent decision from the Southern District of New York:

> The irreparable harm flowing from a possible violation of the Supremacy Clause appears to be of a different nature than that which arises from an infringement of *First Amendment* rights. [*41] District courts in this Circuit have noted that while "a violation of constitutional rights can constitute *per se* irreparable harm, * * * *per se* irreparable harm is caused only by violations of 'personal' constitutional rights * * * to be distinguished from provisions of the Constitution that serve 'structural' purposes," like the Supremacy Clause.

*New York State Rest. Ass'n v. New York City Bd. of Health, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008)*. Accord *Am. Trucking Ass'ns, 2008 U.S. Dist. LEXIS 99691, 2008 WL 4294282, at *14* (explaining that "[i]n the case of Supremacy Clause violations," the presumption of irreparable harm "is not necessarily warranted"); *Am. Petroleum Inst. v. Jorling, 710 F. Supp. 421, 432 (N.D.N.Y. 1989)* ("In the court's view, the [defendant's] asserted violation of the Supremacy Clause cannot, without more, serve as the basis

---

[9]   Although the stipulation thus makes Plaintiffs' case for a preliminary injunction weaker, that is only because, as a result of the stipulation, Plaintiffs already have obtained some of the relief that they requested in their initial motion and supporting brief.

[10]   It is important to note that Plaintiffs make essentially the same irreparable harm argument as to each of the challenged provisions. Thus, the Court's extensive analysis of irreparable harm in the context of the challenge to the provisions of Section 18d-120 significantly informs the Court's consideration of the irreparable harm element as to each of the other challenged provisions discussed [*40] below, and thus will not be repeated.

2008 U.S. Dist. LEXIS 100002, *41

for a finding of irreparable harm"). [11]

On the basis of the cases cited above, the Court concludes that Plaintiffs are not entitled to a presumption of irreparable harm because the constitutional rights at stake here are not "personal" in nature. Nevertheless, Plaintiffs may be entitled to injunctive relief if they can demonstrate the absence of an adequate remedy at law and the presence of irreparable harm in the circumstances of this case. Moreover, under the sliding scale approach, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side." *Abbott Laboratories, 971 F.2d at 12*.

On the record to date, and especially in view of the stipulation, the Court does not find that Plaintiffs have made a particularly strong [*43] showing of irreparable harm if they were obligated to continue complying with many of the provisions of the State Towing Law until a final determination can be made on the merits. [12] Yet, as to a few of the challenged provisions that appear, at least on the current record, to impose economic regulation to advance consumer protection goals without an evident connection to safety concerns, Plaintiffs' likelihood of success is sufficiently high that a compelling showing of irreparable harm is not required.

As indicated above, the specific authorization requirement [*44] imposed in *Section 18d-120(a)*

is one such provision. In applying the remaining preliminary injunction factors to that provision, the Court notes initially that it finds instructive the analysis by Judge Tinder in *Government Suppliers Consolidating Services, Inc. v. Bayh, 734 F. Supp. 853, 863 (S.D. Ind. 1990)*. In that case, the court determined that the plaintiffs lacked an adequate remedy at law where (i) the relief that the plaintiffs sought was a declaratory judgment that certain provisions of a state statute are unconstitutional and an injunction against enforcement of those provisions and (ii) the plaintiffs were barred by the *Eleventh Amendment* from seeking money damages. *Id at 863*. The same circumstances are present here. The Court also finds that the potential danger to towing operators who would be required to solicit authorizations along the side of often busy and sometimes dark highways (as attested in the affidavits) provides sufficient evidence of harm to support the issuance of injunctive relief in light of Plaintiffs' strong case on the merits. [13]

### c. Balance of harm/public interest

The Court concludes that the remaining factors -- the balance of harms and the public interest -- "largely overlap" where, as here, Plaintiff "sues a government entity to enjoin the enforcement of a law or regulation." *New York State Rest. Ass'n, 545 F. Supp. 2d at 368*. Again, largely as a result of the stipulation, neither side can point to grave

---

[11]   Plaintiffs' reliance on *Morales* in support of their request of injunctive relief (see Pl. Open. Br. at 12) is misplaced. As other courts have explained, *Morales* "addressed the question of irreparable harm in the context of a permanent injunction, after the appellate court had found that the state law at issue was clearly preempted [*42] by federal law. Thus, these cases stand only for the proposition that when there is a very high likelihood of success on the merits of the preemption claim, little or no additional showing with respect to the other three factors is necessary." *New York State Rest. Ass'n, 545 F. Supp. 2d at 368*. That approach is entirely consistent with the "sliding scale" approach applied in the Seventh Circuit. See *Abbott Laboratories, 971 F.2d at 12*.

[12]   Plaintiffs suggest that they may be in jeopardy of defending baseless lawsuits under the Illinois consumer fraud statute, but there is no evidence in the record of any such lawsuit having been filed to date. Accordingly, the Court must conclude that Plaintiffs' concern remains speculative, and thus cannot support a finding of irreparable harm. See *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 704 (7th Cir. 2005)* ("speculative injuries do not justify" a preliminary injunction); *Id. at 705-06* ("plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries").

[13]   However, apart from the authorization requirement in *Section 18d-120(a)*, which may on occasion place towing operators unnecessarily [*45] in harm's way on the road side, none of the provisions of the new law appears to pose a substantial risk of danger to anyone. And the principal harm identified by Plaintiffs in their opening brief as a result -- possible fines and penalties -- has been alleviated by Defendant's stipulation.

2008 U.S. Dist. LEXIS 100002, *44

risk of harm regardless of the disposition of Plaintiffs' motion. Cf. *Am. Trucking Assn's, 2008 U.S. Dist. LEXIS 99691, 2008 WL 4294282, at *15* (noting that even in Supremacy Clause cases, "a presumption of harm is warranted in cases where there was also an actual harmful effect"). Thus, as to most of the specific provisions at issue, both the balance of harms and the public interest appear to favor the side that has the better likelihood of success on the merits, for the public has an interest in the enforcement of laws that promote safety or otherwise [*46] are valid, but does not have an interest in the enforcement of state laws that conflict with federal laws. See *Felder v. Casey, 487 U.S. 131, 138, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988)* ("Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield'") (quoting *Free v. Bland, 369 U.S. 663, 666, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962)).* [14]

* * * * *

In sum, with respect to the authorization requirement in *Section 18d-120(a),* all of the preliminary injunction factors cut in Plaintiffs' favor. In regard to the other challenged aspects of *Section 18d-120,* the Court concludes that Plaintiffs have [*47] not established a sufficiently high likelihood of success on the merits to warrant preliminary injunctive relief given the minimal showing of irreparable harm and the absence of a compelling case on the other preliminary injunction factors.

**3.** *Section 18d-125*

*Section 18d-125* requires towing companies to provide their customers with a detailed, "itemized final invoice" of charges upon demand and to retain copies of such invoices for five years. As with other provisions of the State Towing Law, it "relates to" the services that a towing company must provide by "requiring carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future." *Rowe, 128 S. Ct. at 995*. And given the detail mandated by the statute, it seems very unlikely that the invoice obligation could be deemed to have a "remote or peripheral" effect. Nor does a requirement to provide a detailed invoice appear to have a legitimate connection to safety concerns. In contrast to the bottom line price itself -- which (as noted above) the Court could conceive of bearing on the ability of the owner or operator to retrieve and [*48] repair the damaged vehicle, which in turn could be said to relate to safety concerns -- a detailed, itemized invoice advances consumer protection interests primarily, if not exclusively.

For these reasons, the Court finds that Plaintiffs have a substantial likelihood of success on the merits of their claim that the invoice requirement imposed in *Section 18d-125* is preempted. The Court further concludes that, as with the authorization requirement (see pp. 24-25, *supra*), Plaintiffs lack an adequate remedy at law. All that Plaintiffs seek is an injunction, and once they provide the invoices, they will have no viable way of recovering either time or money from their customers or the ICC. To be sure, in contrast to the authorization provision, the invoice provision does not carry with it the added harm of dangers on the road side (unless the law was interpreted to permit a demand for a final, itemized invoice when the tow is arranged). Still, on balance, the Court concludes that Plaintiffs' very strong case

---

[14]   As with irreparable harm, the parties for the most part advanced their balance of harms and public interest arguments across the board as to all of the challenged provisions, rather than analyzing those factors separately for each provision. Accordingly, the Court's analysis of those factors in regard to Section 18d-120 largely applies to the other challenged provisions as well, unless specifically noted below.

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 35 of 70

Page 16 of 20
2008 U.S. Dist. LEXIS 100002, *48

on the merits, the absence of an adequate remedy at law, the balance of hardships, and the public interest all point in the direction of awarding preliminary injunctive relief under the [*49] sliding scale. Accordingly, Defendants will be enjoined from enforcing *Section 18d-125*.

**4.** *Section 18d-130*

*Section 18d-130* of the State Towing Law requires towing companies to display at their storage facilities signs advising customers of their rights under the Law. Provided that the information on the sign is accurate -- that is to say that the sign does not suggest to customers that towing companies must comply with any provisions of the State Towing Law that are determined to be preempted -- the Court cannot envision any preemption problem. Even if the signs could be said to have some effect on the "services" that a towing company provides, their effect on the full bundle of the company's services would appear to be "tenuous, remote, or peripheral." Accordingly, the Court concludes that Plaintiffs have a minimal likelihood of success on the merits and are not entitled to a preliminary injunction against enforcement of *Section 18d-130*.

**5.** *Section 18d-135*

*Section 18d-135* tracks the record keeping requirements of *Sections 18d-120(b)* (as to disclosures) and *18d-125* (as to invoices), and imposes fines for violations of those requirements. To the extent that the obligation to provide the [*50] records in the first place is enjoined or invalidated -- as is the case with respect to the final invoice requirement in *Section 18d-125*, obviously there can be no lawful obligation to retain such records. However, apart from that observation, the Court's analysis with respect to the record keeping requirement in *Section 18d-120* applies equally to *Section 18d-135*. While

Plaintiffs have at least some likelihood of success on the merits of their challenge to the record keeping provisions, provided that they can establish on a fuller record that the provision has a significant effect on their services or prices, they are not entitled to a preliminary injunction against enforcement of any of the record keeping requirements relating to the disclosures mandated in *Section 18d-120* based on the record to date. [15]

**6.** *Section 18d-145*

*Section 18d-145* requires towing operators to carry a copy of the company's [*51] registration certificate in each tow truck. Even more so than the registration requirement itself, the obligation to carry a copy of the registration certificate would appear to impose such a "tenuous, remote, or peripheral" effect on the company's services that it would not be subject to preemption under *Section 14501(c)(1)*. See *Helmrich, 2004 U.S. Dist. LEXIS 20413, 2004 WL 2278534, at *3-*4* (upholding licensing requirements, including requirement that towing operators "carry copies of their towing licenses in each of their tow trucks"). Accordingly, the Court concludes that Plaintiffs have a minimal likelihood of success on the merits and are not entitled to a preliminary injunction against enforcement of *Section 18d-145*.

**7.** *Section 18d-150*

*Section 18d-150* prohibits a towing company from including in its contracts any provision that waives or limits the liability of the company, in tort, contract, or under any other cause of action that the vehicle owner or operator may have against the company. The link between waiver or limitation on liability clauses and "prices" or "rates" has been recognized by Illinois courts. See, *e.g.,* *In re Ill. Bell Switching Station Litig., 161 Ill. 2d 233, 252, 641 N.E.2d 440, 204 Ill. Dec. 216 (1994)* (Miller, J., [*52] specially concurring)

---

[15]   The State Towing Law does not appear to impose an obligation on towing companies to retain separate records relating to the authorization -- or even to obtain in writing -- the authorization mandated in Section 18d-120(a) and preliminarily enjoined today in the Court's separate injunction order.

2008 U.S. Dist. LEXIS 100002, *52

("The liability exclusion found in Illinois Bell's tariff plays an important part in keeping rates low; if Bell is to bear the risk of liability for damages of the type sought here, then it will have to charge all its customers higher rates for the services it provides"). Because *Section 18d-150* appears to have an effect on a towing company's prices, it likely falls within the scope of federal preemption under *Section 14501(c)(1)*. Defendants have not suggested -- nor can the Court envision -- what safety concern is addressed by *Section 18d-150*. Of all the provisions in the State Towing Law, *Section 18d-150* appears to most directly advance the General Assembly's "consumer protection" goals, but without any readily discernable safety motive.

Based on the foregoing analysis and on the current record, the Court finds that Plaintiffs have a high likelihood of success on their claim that *Section 18d-150* constitutes a forbidden economic and consumer protection measure that is preempted by *Section 14501(c)(1)* and not saved by *Section 14501(c)(2)*. In addition, the Court believes that Plaintiffs have the better of the argument on the absence of an adequate remedy at law **[\*53]** and irreparable harm elements. Once Plaintiffs have lost the opportunity to solicit the waiver or liability limitation at the time that the tow is commenced, that opportunity is gone forever, and the Court cannot conceive of any remedy against Defendant that could restore Plaintiffs' rights. Furthermore, because Plaintiffs have a strong case on the merits and Defendant has not pointed to any specific harm to the State or the public interest from the issuance of a preliminary injunction against enforcement of *Section 18d-150*, the Court finds that the balance of harms and the public interest likewise favor Plaintiffs' position.

In concluding that *Section 18d-150* likely is preempted by federal law, this Court of course expresses no opinion on the wisdom of the legislation. Whether, as a matter of public policy, towing operators should be permitted to solicit

waivers and liability limitations is not the question before the Court. This Court's sole function is to determine whether the state laws at issue in this case conflict with, and therefore are preempted by, federal law. Because *Section 18d-150* appears to have an effect on the prices that towing companies charge their customers without **[\*54]** advancing any safety concern, the Court finds that Plaintiffs are likely to prevail on their preemption challenge. And that finding, coupled with the Court's analysis of the other factors above, leads the Court to grant the requested preliminary injunctive relief as to *Section 18d-150*.

## 8. *Section 18d-155*

*Section 18d-155* permits the ICC to request documentation and to investigate the business practices of towing companies to determine whether they are in compliance with the law. It also authorizes the ICC to impose penalties and fines for violations of the State Towing Law. Plaintiffs' challenge to this provision is somewhat puzzling. To the extent that one or more provisions of the State Towing Law is preempted, Plaintiffs obviously need not comply with any such provision (or provisions). But to the extent that the provisions of the State Towing Law are not preempted, those provisions -- by definition -- do not have any unlawful effect on the relationship between towing operators and their customers. For these reasons, the Court fails to see how Plaintiffs can obtain any independent relief through their challenge to *Section 18d-155* and thus denies preliminary injunctive relief as to **[\*55]** that section.

## 9. *Section 18d-165*

*Section 18d-165* requires towing companies to accept either cash or a credit card for payment of towing charges. That requirement plainly relates to services; as with other provisions of the State Towing Law, requiring towing companies to accept a credit card compels them to offer a service that they might prefer not to offer. See *Rowe, 128 S.*

2008 U.S. Dist. LEXIS 100002, *55

*Ct. at 995*. [16] It therefore will be preempted unless Defendants can demonstrate that the safety exception applies.

Again, the Court's ability to fully assess the merits is limited by the underdeveloped record. All that the statute and the legislative history establish in regard to safety is that one of the General Assembly's goals in enacting the State Towing Act as a whole was to "promote safety" and that the General Assembly felt that the "public interest" is served by making information available to vehicle operators so that the may "avoid vehicle deterioration and arrange for a prompt repair of the[ir] vehicles." *625 ILCS 5/18d-110*. Counsel for Defendant has indicated that Defendant may submit affidavits from motorists [*56] or other evidence at the summary judgment stage to support Defendant's contention that the credit card requirement does in fact respond to a legitimate safety concern. The Court is aware that other courts have upheld similar provisions as "rationally related to the goal of expediting recovery of vehicles" (*Berry, 7 Cal. App. 4th at 591*). As the California Court of Appeals explained,

> Permitting payment by credit cards allows owners to redeem their vehicles quickly, without the need to travel to a bank. For some vehicle owners, the averted inconvenience is even greater because they may not have cash in a bank. A credit card allows these vehicle owners to defer the towing charge and pay it in installments, thereby avoiding additional storage charges which would be incurred while they gathered sufficient cash to redeem their vehicles.

*Id.;* see also *Crane Towing, 570 P.2d at 434*. And, as noted above, at least one federal court of appeals, in turn, has deemed the goal of "expediting recovery of vehicles" to be a "safety-related" goal. See *Tillison, 424 F.3d at 1104*.

On balance, the Court finds that, on a fuller record complied at the summary judgment stage, Defendant may well prevail on his [*57] contention that the credit card requirement is an appropriate exercise of the state's "safety regulatory authority" (*49 U.S.C. § 14501(c)(1)*) that is "genuinely responsive to safety concerns" (*City of Columbus, 536 U.S. at 442*). But because that outcome is by no means certain, the Court must conclude that Plaintiff has some likelihood of success on the merits. Under the "sliding scale," Plaintiffs therefore must present a reasonably strong case on the remaining elements of the preliminary injunction inquiry, including irreparable harm.

Here, Plaintiffs have made clear that they "are not seeking money damages" (Pls. Reply Br. at 12), and have not attempted to create a record as to any pecuniary harm -- even harm that is not recoverable from Defendant -- that may result from continued enforcement of *Section 18d-165* pending a final ruling on the merits. For the reasons explained above, the Court cannot presume irreparable harm on the basis of a claim of preemption -- especially where, as here, the Court finds that the challenged provision stands a fair chance of being sustained under the safety exception. For similar reasons, neither the balance of harms nor the public interest favors [*58] injunctive relief as to *Section 18d-165* at this time. Accordingly, the Court declines to enter a preliminary injunction enjoining enforcement of *Section 18d-165* pending further development of the record and consideration on the merits at the summary judgment stage or at trial.

* * * * *

Based on the foregoing analysis, the Court grants preliminary injunctive relief to Plaintiffs and enjoins Defendant from enforcing the following provisions (or portions thereof):

. *Section 18d-120(a)*, requiring towing companies to request specific authorization

---

16   The credit card requirement may also affect prices, although the record is silent in that regard.

2008 U.S. Dist. LEXIS 100002, *58

after the disclosures set forth in *18b-120(b)* but prior to towing a damaged or disable vehicle;

. *Section 18d-125*, requiring that towing companies issue an itemized final invoice to vehicle operators or owners upon demand and to retain copies of such invoices for a period of five years;

. *Section 18d-135*, to the extent that it requires record keeping by towing companies of the itemized final invoices required by *Section 18d-125* and imposes fines/penalties for not providing itemized final invoices upon demand; and

. *Section 18d-150*, prohibiting towing companies from including in their contracts with owners or operators of damaged or disabled vehicles [*59] clauses that waive or limit the towing companies' liability.

However, the Court concludes that Plaintiffs have not shown that preliminary injunctive relief is warranted for the following provisions (or portions thereof):

. *Section 18d-115*, requiring towing companies engaged in consensual towing to obtain an safety relocator's registration certificate from the ICC, for which the companies must pay both an annual and a per vehicle fee;

. *Section 18d-120(b)-(c)*, requiring the towing companies to provide specific and detailed written disclosures to vehicle owners or operators before towing a damaged or disabled vehicle and to maintain copies of completed disclosures for a minimum of five years;

. *Section 18d-130*, requiring towing companies to post signs at their storage facilities advising customers of their rights;

. *Section 18d-135*, to the extent that it requires record keeping by towing companies of disclosures and imposes fines and penalties

related to the enforcement of the disclosure requirements under *18d-120(b)*;

. *Section 18d-145*, requiring copies of the safety regulator's registration certificate to be carried in each tow truck;

. *Section 18d-155*, imposing penalties and fines for failure [*60] to comply with the State Towing Law; and

. *Section 18d-165*, requiring that charges accrued by vehicle owners or operators for consensual tows to be payable by cash or major credit card.

Consistent with these rulings, the Court today enters in a separate document an order stating that from today's date until a final judgment is issued after summary judgment or a trial in this case, or further order of the Court, Defendant and other officers and agents of the ICC and other persons bound within the meaning of *Federal Rule of Civil Procedure 65(d)(2)* are preliminarily enjoined from enforcing, including by issuing tickets, citations, and notices of violations, (i) *625 ILCS 18d-120(a)*, which requires towing companies to request specific authorization after the disclosures set forth in *18b-120(b)* but prior to towing a damaged or disabled vehicle; (ii) *625 ILCS 18d-125*, which requires that towing companies issue an itemized final invoice to vehicle operators or owners upon demand and to retain copies of such invoices for a period of five years; (iii) *625 ILCS 18d-135*, to the extent that it requires record keeping by towing companies of the itemized final invoices required by *Section 18d-125* [*61] and imposes fines/penalties for not providing itemized final invoices upon demand; and (iv) *Section 18d-150*, which prohibits towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability. In all other respects, the motion for preliminary injunction is denied.

Finally, in regard to the matter of bond, *Federal Rule of Civil Procedure 65(c)* states that "[t]he

2008 U.S. Dist. LEXIS 100002, *61

court may issue a preliminary injunction * * * only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In their opening brief, Plaintiffs requested that the Court waive the bond requirement altogether, or in the alternative, require only a minimal bond. In support of that position, Plaintiffs pointed to their likelihood of success on the merits and the reasonableness of the scope of the requested injunction. In his response brief, Defendant did not address either the bond requirement or Plaintiffs' request for no bond or a minimal bond.

The case law indicates that a "district court can require a bond **[*62]** of nominal amount in appropriate cases" (*Coyne-Delany Co. v. Capital Dev. Bd., 717 F.2d 385, 391 (7th Cir. 1983)),* provided that the amount of the bond adequately serves the purposes of *Rule 65(c),* and thus takes into account "defendant's demand for a bond to reimburse it for any injury it may improperly suffer as a result of an erroneous grant of the preliminary injunction." *Reinders Bros., Inc. v. Rain Bird E. Sales Corp., 627 F.2d 44, 54 (7th Cir. 1980).*

The Court views Defendant's silence on the matter of bond as an indication that Defendant has no objection to Plaintiffs' contention that a minimal bond, or no bond at all, would serve the purposes of *Rule 65(c).* While the Court declines to impose no bond at all, it sees no potential for substantial injury to Defendant if it turns out that the preliminary injunction was granted in error. Accordingly, the Court determines that a bond in the amount of $ 1,000.00 will suffice to advance the purposes of *Rule 65(c).* Any party that believes that the amount of the bond should be increased or decreased may file an appropriate motion for so long as the preliminary injunction remains in effect. See 13 *Moore's Federal Practice, § 65.50[1],* **[*63]** at 65-93 (3d ed. 2006).

### III. Conclusion

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' motion for preliminary injunction [18], enters today on a separate document the preliminary injunction to which the Court finds Plaintiffs are entitled, and imposes a $ 1,000 bond as security for that preliminary injunction.

Dated: December 11, 2008

/s/ Robert M. Dow, Jr.

Robert M. Dow, Jr.

United States District Judge

⚠ Caution

As of: July 5, 2016 3:51 PM EDT

## *Grand Cent. Sanitation v. City of Bethlehem*

United States District Court for the Eastern District of Pennsylvania

November 2, 1994, Decided ; November 2, 1994, Filed, Entered

Civil Action NO. 94-5928

**Reporter**

1994 U.S. Dist. LEXIS 15825; 1994 WL 613674

GRAND CENTRAL SANITATION, INC., et. al. v. CITY OF BETHLEHEM

## LexisNexis® Headnotes

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Evidence > ... > Preliminary Questions > Admissibility of Evidence > General Overview

*HN1* A preliminary injunction is an extraordinary remedy that should be afforded only in limited circumstances. In determining whether to grant a request for a preliminary injunction, a court considers: (1) the likelihood that plaintiffs will prevail on the merits at a final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.To obtain interim injunctive relief, a plaintiff must produce sufficient evidence to establish that all four of these factors favor preliminary relief. Further, a plaintiff must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if the relief is not granted. Injunctive relief will not be sustained where or both are absent.

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > Remedies > Damages > Monetary Damages

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

*HN2* ″Irreparable harm ″must be of a peculiar nature, so that compensation in money alone cannot atone for it. A purely economic injury that can be compensated with money damages cannot satisfy the irreparable injury requirement. A plaintiff who fails to produce evidence of ″actual or imminent harm which cannot otherwise be compensated by money damages, has failed to sustain its substantial burden of showing irreparable harm.

**Counsel:** **[*1]** For GRAND CENTRAL SANITATION, INC., EAST PENN SANITATION, INC., PLAINTIFFS: STEPHEN D. BROWN, DECHERT, PRICE & RHOADS, PHILA, PA, LEONARD N. ZITO, ZITO, MARTINO AND KARASEK, BANGOR, PA, JOEL M. SCHEER, FISHBONE AND SCHEER, EASTON, PA, ELIZABETH T. HEY, DECHERT, PRICE AND RHOADS, PHILA, PA.

For CITY OF BETHLEHEM, PENNSYLVANIA, DEFENDANT: JOSEPH F. LEESON, JR., LEESON, LEESON & LEESON, BETHLEHEM, PA, MICHAEL D. KLEIN, LE BOEUF, LAMB, GREENE AND MAC RAE, HARRISBURG, PA.

**Judges:** RENDELL

**Opinion by:** BY THE COURT; MARJORIE O. RENDELL

1994 U.S. Dist. LEXIS 15825, *2

## Opinion

Rendell, J.

November 2, 1994

MEMORANDUM

This matter is before me on a complaint, and accompanying motion for preliminary injunctive relief, which challenges the City of Bethlehem's "flow-control ordinance" as violative of the *Commerce Clause of the United States Constitution*. For the reasons set forth below, and after due consideration of the motion, defendant's response, plaintiffs' reply, and arguments presented at a hearing on plaintiffs' motion, I will deny the motion and proceed to the trial of this matter.

A. Parties

Plaintiffs Grand Central Sanitation, Inc., ("Grand Central") and East Penn Sanitation, Inc., ("East Penn") are corporations located in Northampton County, **[*2]** Pennsylvania, that engage in the business of collecting and transporting municipal waste. In addition to its collection business, Grand Central operates a landfill in Northampton County. East Penn also operates a processing facility in Northampton County, at which recyclable or reusable products are separated from the municipal waste and sold. Both Grand Central and East Penn are authorized by the Pennsylvania Department of Environmental Resources ("DER") to collect municipal waste from the Defendant City of Bethlehem ("Bethlehem"). Bethlehem is a third class city under Pennsylvania law, see *53 Pa.Cons.Stat.Ann. § 101*, with over seventy thousand residents, and is located in both Lehigh and Northampton Counties.

B. Bethlehem's Plan and Ordinance

In 1989, Bethlehem, in accord with the Municipal Waste Planning, Recycling and Waste Reduction Act, *53 Pa.Stat.Ann. § 4000.101 et. seq.*, ("Act

101"), developed a waste management plan ("Plan") to address the municipal waste disposal, transport, processing, and storage needs of the city. In September of 1989, pursuant to Act 101, Bethlehem submitted the Plan for, and subsequently received, DER approval. The mayor of Bethlehem signed **[*3]** the Plan on August 24, 1994, and it took effect on September 3, 1994. See 53 Pa.Cons.Stat.Ann. § 36014.

Pursuant to § 4000.304(d) of Act 101, Bethlehem incorporated a "flow control" provision into its Plan to direct the path of municipal waste. The flow control provision currently reads as follows:

> "the City of Bethlehem shall have sole authority to control the municipal waste stream. All municipal waste generated in the City of Bethlehem shall be delivered to the [Bethlehem] Landfill, or directly to a facility outside the Commonwealth of Pennsylvania unless directed elsewhere by the Director of Public Works[;]"
>
> Ordinance 935.06

However, that portion of the foregoing flow control provision which permits Bethlehem municipal waste to be taken directly out of state has yet to receive DER approval and will not be enforceable until the DER approves this language. Accordingly, on October 14, 1994, the Director of Public Works notified Grand Central that all municipal waste generated in Bethlehem must be disposed of at Bethlehem's landfill from and after October 24, 1994.

C. Litigation and Standard for Preliminary Injunction

On September 29, 1994, plaintiffs, arguing that **[*4]** the ordinance discriminates against interstate commerce in violation of the *Commerce Clause*, filed this suit seeking to have the flow control provision of Bethlehem's municipal waste ordinance declared unconstitutional. Plaintiffs also

1994 U.S. Dist. LEXIS 15825, *4

request a preliminary injunction precluding Bethlehem from enforcing its flow control ordinance until this Court has determined the constitutionality of the ordinance.

In evaluating plaintiffs' request, I must bear in mind that *HN1* a preliminary injunction is an extraordinary remedy that should be afforded only in limited circumstances. See *Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)* (citation omitted). In determining whether to grant a request for a preliminary injunction, I am to consider:

> 1. "The likelihood that [plaintiffs] will prevail on the merits at a final hearing;
>
> [2.] The extent to which the plaintiffs are being irreparably harmed by the conduct complained of;
>
> [3.] The extent to which the defendant[] will suffer irreparable harm if the preliminary injunction is issued; and
>
> [4.] The public interest."

*Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 191-92 (3d Cir. 1990)* [*5] (quoting *Bill Blass, Ltd. v. Saz Corp., 751 F.2d 152, 154 (3d Cir. 1984)).*

To obtain interim injunctive relief, a plaintiff must produce sufficient evidence to establish that all four of these factors favor preliminary relief. *Optician's Ass'n, 920 F.2d at 192.* Further, a plaintiff must ""demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if the relief is not granted."" *Frank's, 847 F.2d at 102* (citation omitted). Injunctive relief will not be sustained where either or both are absent. Id.

D. Irreparable Harm

*HN2* "Irreparable harm" must be of a peculiar nature, so that compensation in money alone

cannot atone for it."" *Optician's Ass'n, 920 F.2d at 195* (citation omitted). A purely economic injury that can be compensated with money damages cannot satisfy the irreparable injury requirement. Id. (citation omitted). A plaintiff who fails to produce evidence of "actual or imminent harm which cannot otherwise be compensated by money damages[,] . . . has failed to sustain its substantial burden of showing irreparable [*6] harm." *Frank's, 847 F.2d at 102-03.*

Plaintiffs argue that a violation of their rights under the *Commerce Clause* is per se irreparable harm, but I am not persuaded by the authority relied upon for this proposition. The case of *Elrod v. Burns, 427 U.S. 347, 373-74, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976),* is routinely cited for this principle. See Mid-American Waste Sys. Inc., v. Fisher, No. C-2-94-493 (S.D. Ohio May 31, 1994); *C & A Carbone, Inc. v. Town of Clark-stown, 770 F. Supp. 848, 854 (S.D.N.Y. 1991);* see also *Garcia v. Bauza Salas, 686 F. Supp. 965, 971 (D. Puerto Rico 1988)* (relying on treatise); cf. *Citicorp Servs., Inc. v. Gillespie, 712 F. Supp. 749, 753 (N.D. Calif. 1989)* (noting that courts in 9th Circuit have presumed irreparable injury when constitutional violation is asserted, relying on *First Amendment* cases). However, Elrod involved a violation of a plaintiff's *First Amendment* rights. While the *Commerce Clause* is an integral component of our Constitution, I do not believe [*7] that injury from its violation is necessarily equivalent to the unique, individual injury accompanying a violation of the *First Amendment.* Moreover, plaintiffs have been unable to point to any circuit court authority which establishes that any constitutional violation, let alone a *Commerce Clause* violation, constitutes per se irreparable injury.

Further, Plaintiffs have not demonstrated that they will suffer anything other than an economic injury with minimal or unestimated impact. Grand Central offers, by way of affidavit, that it would be difficult and costly to segregate Bethlehem

1994 U.S. Dist. LEXIS 15825, *7

waste from the daily waste collected in order to dispose of it in Bethlehem's landfill, which, along with the unpredictability of a business subject to prevailing economic conditions, environmental risks, and landfill capacities, makes damages suffered as a result of the ordinance "difficult to measure," [1] Perin Affidavit, PP 42-43. Grand Central further avers that the ordinance will increase Grand Central's *costs* and "perhaps" cause it to lose business. See Perin Affidavit P 43. East Penn, by way of affidavit, asserts that enforcement of the ordinance "will certainly harm" East Penn's business. [*8]  See DeLorenzo Affidavit P 17. Neither Grand Central nor East Penn has demonstrated a "peculiar" injury justifying the extraordinary remedy of a preliminary injunction. While, as plaintiffs have argued, measuring the business lost as a result of the ordinance may be difficult, this difficulty is not of such a degree as to constitute irreparable injury; it is merely economic injury that is not precisely quantifiable at this time. Theirs is a slight economic injury which could be compensated with monetary damages. Accordingly, plaintiffs have failed to demonstrate that they will suffer irreparable harm if Bethlehem is permitted to continue enforcing its flow control ordinance.

[*9]  E. Remaining Factors

Although plaintiffs' request for a preliminary injunction must be denied because of the absence of irreparable injury, I will briefly address the remaining factors.

1. Balancing of the Hardships

Regarding the balancing of the hardship to be suffered if preliminary relief is not granted, plaintiffs advanced the argument at the preliminary injunction hearing that they will be seriously prejudiced by having to adjust their collection schedule. While I believe that such a rearrangement may be difficult, I do not believe that the inconvenience caused, even assuming that it would be significant, works in plaintiffs' favor. With respect to Bethlehem, I similarly find that it would not be seriously inconvenienced if I were to grant the preliminary injunction. Until a week ago, Bethlehem employed other arrangements to address the problem of municipal waste without flow control. Bethlehem presented no evidence to indicate that reverting to that system would pose an undue hardship. Therefore, I find that the balance of the hardship works to neither party's advantage. As such, it does not weigh in favor of granting the injunction.

2. Public Interest

Regarding [*10]  the public interest, I find that the public interest likewise does not favor either plaintiffs or defendant, While it is in the interest of the citizens of Bethlehem to have a system of municipal waste disposal that is environmentally sound and promotes public health and welfare,

---

[1]   The permit issued to Grand Central by the DER allows Grand Central to accept up to three thousand tons of municipal waste per day at its landfill. See Affidavit of Nolan Perin, P 10. Grand Central collects less than 1.5 tons of waste per day, on average, from Bethlehem. See Defendant's Memorandum of Law in Support of its Response in Opposition to Plaintiffs' Motion for Preliminary Injunction at 4, 16 ("Defendant's Brief"). Therefore, Grand Central is precluded by the Bethlehem flow control ordinance from collecting approximately .05% of its daily waste collection. Pursuant to the permit issue to East Penn by DER, East Penn can accept up to 200 tons of municipal waste per day, see Affidavit of Thomas DeLorenzo P 6. East Penn's president avers that the average daily tonnage received from Bethlehem is twenty-five tons. See Id. at P 8. Defendant, relying on the permit application that East Penn filed in February of this year, avers that the average daily tonnage is 11 tons. See February 2, 1994, Application for Municipal Waste Hauling License of East Penn Sanitation, Inc., PP 11-12. Therefore, East Penn is precluded by the Bethlehem flow control ordinance from collecting between 5.5% and 12.5% of its daily waste collection.

At the preliminary injunction hearing, plaintiffs' counsel, in discussing the collection routes developed by plaintiffs, asserted that approximately 8% of the trash collected is from Bethlehem. However, he did not state how he arrived at this figure or in any way give support for this conclusion, and I find no support for this offer in any of the affidavits or testimony adduced at the hearing.

1994 U.S. Dist. LEXIS 15825, *10

there is no indication that the arrangement for the disposal of municipal waste in place before Bethlehem's landfill became operational last week, namely, the waste disposal plans already in effect in the two counties, was hazardous in any way. The public interest concern is clearer in the long term, and as such, does not impact my decision regarding preliminary relief.

3. Probability of Success on the Merits

Finally, with respect to the probability of success on the merits, I find that while this factor at this moment probably weighs in favor of plaintiffs, the controlling law is unsettled and does not alter my analysis. Recently, the United States Supreme Court, in *C & A Carbone, Inc. v. Town of Clarkstown, 128 L. Ed. 2d 399, 114 S. Ct. 1677 (1994)*, struck down a flow control ordinance that directed all waste to a local enterprise, employing broad language [*11]  and reasoning. While Carbone's reach is seemingly wide-ranging, encompassing the flow-control measure at issue cf. Southcentral Pa. Waste Haulers Ass'n v. Bedford-Fulton-Huntingdon Solid Waste Auth., #93-1318 (M.D. Pa. June 24, 1994), the Third Circuit Court of Appeals has yet to reexamine its position on flow control ordinances as espoused in *J. Filiberto Sanitation, Inc. v. State of New Jersey Dep't of Envt'l Protection, 857 F.2d 913 (3d Cir. 1988)* in light of Carbone. However, the

case of Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, #943-2669 (D.N.J. Sept. 8, 1993), concerning the continued validity of flow control ordinances, is currently pending before the Third Circuit. I anticipate that the appellate court's ruling in this case will have a substantial impact upon this litigation. The uncertainty of Carbone's breadth in this circuit creates difficulty in giving weight to plaintiffs' probability of success on the merits at some future date.

Plaintiffs cite *Constructors Ass'n of Western Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978)* for the proposition that if a plaintiff [*12]  shows a strong likelihood of success on the merits but only a limited irreparable injury, injunctive relief may issue. While I do not dispute this proposition, it does not help plaintiffs. Even if I viewed Carbone as providing an indication of ultimate success by plaintiffs on the merits, plaintiffs have failed to establish even minimal irreparable injury. Where irreparable injury is totally lacking, I cannot grant injunctive relief.

It is hereby ORDERED that Plaintiffs' Motion for a Preliminary Injunction is hereby DENIED.

BY THE COURT:

MARJORIE O. RENDELL, J.

ⓘ Cited
As of: July 5, 2016 3:51 PM EDT

## Pennsy Supply Inc. v. Susquehanna River Basin Comm'n

United States District Court for the Middle District of Pennsylvania

February 20, 2007, Decided ; February 20, 2007, Filed

CIVIL NO. 1:CV-06-2454

### Reporter

2007 U.S. Dist. LEXIS 11844; 2007 WL 551573

PENNSY SUPPLY, INC., Plaintiff vs. SUSQUEHANNA RIVER BASIN COMMISSION, Defendant

**Counsel:** **[*1]** For Pennsy Supply, Inc., on its own behalf and on behalf of all others similarly situated, Plaintiff: Audrey J Daly, Kareem Peat, Michael A. Finio, LEAD ATTORNEYS, Saul Ewing LLP, Harrisburg, PA.

For Susquehanna River Basin Commission, Defendant: Robert B. Hoffman, LEAD ATTORNEY, Wolf Block Schorr and Solis-Cohen, LLP, Harrisburg, PA.

**Judges:** William W. Caldwell, United States District Judge.

**Opinion by:** William W. Caldwell

## Opinion

*MEMORANDUM*

I. *Introduction.*

We are considering plaintiff, Pennsy Supply, Inc.'s, motion for a preliminary injunction against defendant, Susquehanna River Basin Commission. The Commission is the creation of an interstate compact between the United States, Maryland, New York and Pennsylvania, and coordinates the water-resource efforts of the federal government and the three states in the Susquehanna River Basin. Pennsy operates quarries in the Basin and uses Basin water for its operations.

In December 2006, the Commission adopted new regulations to manage the Basin's water resources, *71 Fed. Reg. 78570*-01 (Dec. 29, 2006) (to be codified at 18 C.F.R. Parts 806, 807, and 808). In response, Pennsy filed this lawsuit, alleging, among other things, **[*2]** that the Commission violated its own rules and the *Due Process Clause* in the way it adopted the new regulations. It seeks declaratory and injunctive relief against their enforcement. Pennsy also wants to make this a class action to represent all users of Basin water.

On January 17, 2007, a hearing was held on the motion for preliminary injunctive relief. The parties presented no testimony but did submit a stipulation of facts and exhibits. We will deny the motion on the ground that Plaintiff has failed to show irreparable injury, an essential showing for obtaining a preliminary injunction.

II. *Standard of Review.*

Preliminary injunctive relief is an ″'extraordinary remedy . . . which should be granted only in limited circumstances.'″″ *South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771, 777 (3d Cir. 2001)* (quoted case omitted).

> To obtain a preliminary injunction, the moving party must demonstrate: (1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. Moreover, the district court also should take into account, when relevant, (3) the possibility **[*3]** of harm to

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 46 of 70

Page 2 of 4
2007 U.S. Dist. LEXIS 11844, *3

other interested persons from the grant or denial of the injunction, and (4) the public interest. *See In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982).* Thus, "a failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." *Id. at 1143.*

*Id.* "Moreover, establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989)* (internal quotation marks and brackets omitted) (quoted case omitted).

III. *Discussion.*

Plaintiff argues the following constitutes irreparable injury: (1) the impact on Plaintiff's day-to-day business operations from the improper withholding of water withdrawal permits (doc. 3, Pl.'s Br. in Supp. at p. 26); (2) the impairment of Plaintiff's "business relations with customers" from the refusal to grant water withdrawal permits, "thus jeopardizing Plaintiff's future presence in the Basin" and "[c]onceivably . . . grind[ing] to a halt most business **[*4]** operations that rely on water to continue" (*id.* at p. 27); (3) "exposure to daily, accumulating costs for access to resources that it owns and that are not within the authority of the Commission to regulate" (*id.*); (4) injury from the constitutional claims here, the alleged due-process, *commerce-clause* and takings claims, that presumptively establish irreparable harm (doc. 20, Pl.'s Reply Br. at p. 3); and (5) the inability to recover the interim costs of compliance with the new regulations if the regulations are found invalid since under the compact the Commission is not an agency that can be sued for the purposes of the Federal Tort Claims Act, *see 28 U.S.C. § 1346(b)(1),* or the Tucker Act. *Id., § 1346(a)(2).*

We deal first with the argument that claims of constitutional violations are presumptively considered irreparable injury. In *Hohe, supra,* the

Third Circuit rejected that idea. *Hohe* dealt with the *First Amendment* and the plaintiffs there, state employees, requested a preliminary injunction prohibiting the collection of fair-share union dues so that they would not be forced to subsidize the union's ideological activities. **[*5]** All of the fees were being escrowed. In rejecting the request, the Third Circuit noted that:

> It is well-established that "[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976).* But the assertion of *First Amendment* rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. *See Rushia v. Town of Ashburnham, 701 F.2d 7, 10 (1st Cir. 1983).* Rather the plaintiffs must show "a chilling effect on free expression." *Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).* It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore v. Superior Ct., 739 F.2d 466, 472 (9th Cir. 1984)* . . . Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction. *See City of Los Angeles v. Lyons, 461 U.S. 95, 112-13, 103 S.Ct. 1660, 1671, 75 L.Ed.2d 675 (1983).* **[*6]**

*868 F.2d at 72-73.*

Accordingly, the court refused the injunctive relief sought because the workers' interest in not contributing to the ideological causes of the union was adequately protected by an escrow of all the fair-share fees deducted. Based on *Hohe,* we likewise reject Plaintiff's claim here that the mere invocation of constitutional rights establishes irreparable harm.

2007 U.S. Dist. LEXIS 11844, *6

In support of its argument of presumptive irreparable harm, Plaintiff cites *Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)* (plurality opinion); *Marks v. Stinson, 19 F.3d 873 (3d Cir. 1994)*; *Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996)*; *N. Pa. Legal Servs., Inc. v. County of Lackawanna, 513 F. Supp. 678 (M.D. Pa. 1981)*; and *Atl. Coast Demolition & Recycling v. Board of Chosen Freeholders, 893 F. Supp. 301 (D.N.J. 1995)*. These cases do not persuade us.

*Elrod*, *Marks* and *N. Pa. Legal Servs.* are distinguishable. *Elrod* was a *First Amendment* case where *First Amendment* rights of political-party affiliation were either being impaired or chilled. *427 U.S. at 373, 96 S.Ct. at 2689-90, 49 L.Ed.2d at 565*; [*7] see also *Conchatta, Inc. v. Evanko, 83 Fed. Appx. 437, 442 (3d Cir. 2003)* (nonprecedential) (distinguishing *Elrod* because of actual injury to *First Amendment* rights in that case). *Marks* did not discuss presumptive irreparable harm at all. And *N. Pa. Legal Servs.* also involved actual injury to the plaintiffs' *First Amendment* right of free expression because the defendant county was going to cut off funding to the plaintiff legal services corporation. *513 F. Supp. at 681*. Finally, *Atl. Coast Demolition & Recycling* found irreparable injury only after the plaintiff had established "a high degree of monetary damages over an extended period of time." *Commonwealth Federal Sav. & Loan Asso. v. First Nat'l Bank, 513 F. Supp. at 309*. Moreover, that court also stated that "the violation of dormant *Commerce Clause* rights unaccompanied by other irreparable harm does not weigh heavily on the moving party's side of the scale." *Id. See also Norfolk S. Corp. v. Oberly, 594 F. Supp. 514, 522 (D. Del. 1984)* (any violation of the *commerce clause* does not constitute irreparable injury *per se*").

We turn next to Plaintiff argument that there is irreparable injury because the interim [*8] costs of its compliance with the new regulations are not recoverable against the Commission if the regulations are later declared invalid. We think *A.O. Smith Corp. v. FTC, 530 F.2d 515 (3d Cir. 1976)*, answers this argument. In *A.O. Smith,* the district court issued a preliminary injunction against a new FTC rule partially on the basis of "the unrecoverable costs and commitment of diverse business resources . . . incident to preparation and compliance with the Commission orders . . ." *United States v. Rivera, 513 F.2d at 526*. The Third Circuit held this was not irreparable injury, stating:

At issue was a preliminary injunction-a form of relief requiring a strong showing of necessity. Furthermore, the alleged injury was "unrecoverable costs and commitment of diverse business resources." Without intending to disparage the importance of such an injury, we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like [*9] these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, "peculiar". *See Gause v. Perkins, supra.* These are not "small" corporations; there is no contention that compliance with the LB program would render any appellee unable to meet its debts as they come due. Nor is there any contention that the cost of compliance would be so great vis a vis the corporate budget that significant changes in a company's operations would be necessitated. Nor is this a case where compliance would permanently injure the corporation's reputation, or its goodwill. If, in the final analysis, the Commission's authority to order the reports is upheld, the cost of compliance will have to be considered a necessary business expense, albeit government mandated, and not a loss of profits in any usual sense of that term.

2007 U.S. Dist. LEXIS 11844, *9

*Id. at 527-28* (footnote omitted).

Plaintiff is making the same claim here. Pennsy Supply argues that if the regulations are ultimately enjoined, the unrecoverable nature of the costs of complying with the Commission's new regulations in the interim constitutes irreparable injury, but as *A.O. Smith* establishes, this is simply **[\*10]** an example of a corporation spending money to comply with a government regulation, not some type of peculiar harm to the business calling for equitable relief. *See also Constructors Assoc. of W. Pa. v. Kreps, 573 F.2d 811, 818-19 (3d Cir. 1978)* (citing *A.O. Smith* in rejecting the plaintiffs' argument that "being forced to seek out and deal with minority contractors with whom they would ordinarily not do business, thereby disrupting their commercial relationships" was irreparable injury because while it may be an alteration in past practices it is not a "'peculiar' injury").

It also follows from *A.O. Smith* and *Constructors Assoc. of W. Pa.* that Plaintiff's first two arguments for irreparable injury fail, the impact on Plaintiff's day-to-day business operations from the improper withholding of water withdrawal permits and the impairment of Plaintiff's business relations with customers from the refusal to grant water withdrawal permits, jeopardizing its future presence in the Basin. Again, these are simply the consequences of complying with a government regulation. There is also a lack of factual support for these contentions. *See Premier Sys. Consultants, Ltd. v. Mahin, 1999 U.S. Dist. LEXIS 19294, 1999 WL 1212186 at \*3 (E.D. Pa.)* **[\*11]**.

Finally, Plaintiff's argument for irreparable injury from "exposure to daily, accumulating costs for access to resources that it owns" fails because it also lacks factual support. In this regard, Plaintiff has failed to provide specifics for the amount of the costs, stipulating that it "has not quantified the expected additional costs to it from application of the new regulations." (Doc. 23, Stipulations, P 39).

We will issue an appropriate order. [1]

/s/ William W. Caldwell

United States District Judge

Date: February 20, 2007

*ORDER*

AND NOW, this 20th day of February, 2007, it is ordered that Plaintiff's motion (doc. 2) for a preliminary injunction is denied.

/s/ William W. Caldwell

United States District Judge

---

[1]   We add that the class-action elements of the complaint do not incline us to grant relief.

Grant Sullivan

Ⓐ Neutral

As of: July 5, 2016 3:51 PM EDT

## *Petroplex Int'l v. St. James Parish*

United States District Court for the Eastern District of Louisiana

May 5, 2016, Decided; May 5, 2016, Filed

CIVIL ACTION NO: 15-140 SECTION: ″H″(4)

**Reporter**

2016 U.S. Dist. LEXIS 59881

PETROPLEX INTERNATIONAL ET AL VERSUS ST. JAMES PARISH ET AL

**Prior History:** *Petroplex Int'l, LLC v. St. James Parish, 2015 U.S. Dist. LEXIS 141757 (E.D. La., Oct. 19, 2015)*

**Counsel:** [*1] For Petroplex International, LLC, Mainline Energy Partners No. 2, LLC, Homeplace Ventures No. 2, LLC, Plaintiffs: Christine S. Keenan, LEAD ATTORNEY, Kullman Firm (Baton Rouge), Baton Rouge, LA; Alysson L. Mills, Brent Bennett Barriere, Rebecca Sha, Sharonda R. Williams, Fishman Haygood (New Orleans), New Orleans, LA.

For St. James Parish, Louisiana, Ryan Donadieu, Individually and in his Official Capacity as Planning/Permitting Supervisor for the Parish of St. James, Timothy Roussel, Individually and in his Official Capacity as Parish President for the Parish of St. James, Defendants: Ernest Paul Gieger, Jr., LEAD ATTORNEY, Andrew A. Braun, Jonathan S. Ord, Tara Elizabeth Clement, Gieger, Laborde & Laperouse, LLC (New Orleans), New Orleans, LA.

**Judges:** JANE TRICHE MILAZZO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JANE TRICHE MILAZZO

## Opinion

**ORDER AND REASONS**

Before the Court is Plaintiffs' Motion for a Preliminary Injunction (Doc. 25). This matter came before the Court for evidentiary hearing on February 1, 2016. For the following reasons the Motion is **DENIED**.

**BACKGROUND**

This case arises out of the development of a proposed tank farm in St. James Parish. Plaintiffs Mainline Energy Partners No. 2, LLC (″Mainline″) and [*2] Homeplace Ventures No. 2 LLC (″Homeplace″) own adjoining tracts of land fronting the west bank of the Mississippi River in St. James Parish (the ″Petroplex Property″). The property was leased to Plaintiff Petroplex International, LLC (″Petroplex″).[1] Plaintiffs have pursued the tank farm project since they purchased the tract of land in 2007. In 2008, Plaintiffs applied for and received permits from the Louisiana Department of Environmental Quality. In 2011, Plaintiffs' received a loan of approximately $20,000,000 to develop the facility. On April 2, 2014, while Plaintiffs were entering the final phases of planning, the Parish Council adopted Ordinance 14-03 to serve as a Master Land Use Plan for the Parish (the ″Land Use Ordinance″). Under the Land Use Ordinance, the tank farm was not a permissible use of the

---

[1] Mainline and Homeplace are the sole members of Petroplex.

2016 U.S. Dist. LEXIS 59881, *3

Petroplex Property. Plaintiffs thereafter applied to the Council for approval of the use of the Petroplex Property as a tank farm. At its May 7, 2014 meeting the Council adopted St. James Parish Resolution 14-84 (the "Resolution"), which, subject to certain conditions, approved Petroplex's use of the property as a tank farm. The Resolution required, inter alia, that Petroplex begin [*3] construction at the site no later than July 31, 2014.[2]

Plaintiffs contend that, in reliance on the resolution, they began construction on the facility prior to July 31, 2014. Defendants dispute this assertion, arguing instead that Plaintiffs were merely moving dirt around on the property to appear as though construction had commenced. Eventually the Council requested that Petroplex provide information on the status of construction, which it did at the November 5, 2014 Council meeting. At that time, representatives from project investors provided an update on the project. At the end of this meeting, Parish Attorney Victor Frankiewicz advised the Council that, in his opinion, Plaintiffs were not in compliance with the Resolution and that they had [*4] failed to acquire a required building permit from the Parish. The Parish Council did not take any action at this meeting, and urged Petroplex to proceed with construction without delay. Petroplex represented that it would have "steal on the ground" by January. On December 3, 2014 the Parish, acting through Parish President Timothy Roussel and Permitting/Planning Supervisor Ryan Donadieu, issued a Stop Work Order.

Following the issuance of the Stop Work Order, Plaintiffs met with parish officials on December 4, 2014, and provided additional information regarding their purported compliance with the terms of the Resolution. On December 8, 2014, Parish council advised that the Parish would not

withdraw the Stop Work Order. Plaintiffs then contacted Roussel and the Council and requested a hearing before the Council and a new resolution authorizing Petroplex to proceed with construction. Plaintiffs allege that, though they were allowed to make a presentation at the January 7, 2015 Council meeting, they were never afforded a hearing and the Stop Work Order remains in place to this day.

Plaintiffs then filed the instant lawsuit and moved for a preliminary injunction. In this Motion, Plaintiffs [*5] request a preliminary injunction precluding the Parish from enforcing the Land Use Ordinance, the Resolution, and the Stop Work Order. Plaintiffs' suit challenges the Land Use Ordinance on the basis that it is unduly vague and arbitrary and capricious in violation of substantive due process protections. Plaintiffs also allege that the Stop Work Order was issued without notice and a hearing, in violation of procedural due process protections. Plaintiffs' arguments regarding the Land Use Ordinance and the Resolution were rendered moot by the Court's ruling granting summary judgment to Defendants on Plaintiffs' claims regarding this issue. Accordingly, the Court need only consider Plaintiffs' due process claims stemming from the issuance of the Stop Work Order. Defendants respond, opposing the Motion for a Preliminary Injunction.

**LEGAL STANDARD**

An applicant for preliminary injunctive relief must show: (1) a substantial likelihood that he will prevail on the merits; (2) a substantial threat that he will suffer irreparable harm if the injunction is not granted; (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin; and (4) granting the preliminary injunction

---

[2]   The Resolution defines "construction" as "permanent on-site fabrication, erection, or installation of a permitted facility (such as pile driving, installing structural supports and foundations, laying structural pipework, or construction permanent storage structures) that is continuously pursued with reasonable diligence to complete the permitted facility within a reasonable time frame."

2016 U.S. Dist. LEXIS 59881, *6

[*6]  will not disserve the public interest.[3] A preliminary injunction is an extraordinary remedy.[4]

Accordingly, a preliminary injunction which should only be granted when the party seeking it has clearly carried the burden of persuasion on all four requirements.[5] In the end, a preliminary injunction is treated as an exception rather than the rule.[6]

## LAW AND ANALYSIS

The Court finds that Plaintiffs have not prevailed on any of the four requirements needed for the issuance of a preliminary injunction. This Order will address each in turn.

## I. Plaintiffs are Unlikely to Prevail on the Merits

Plaintiffs contend that they are likely to prevail on the merits of their claims. As the Court has already resolved Plaintiffs' substantive due process claims regarding the constitutionality of the Land Use Ordinance, it need only focus on the due process claims stemming from the issuance of the Stop Work Order and the propriety of whatever process, if any, was afforded Plaintiffs. There are three interrelated issues in this analysis: First, whether the Plaintiffs had a constitutionally protected property interest in proceeding with construction of the tank farm; second, whether they were afforded sufficient [*7]  process before being deprived of this property interest; and third, whether the Stop Work Order violates substantive due process protections. The Court will address each in turn.

## A. Whether Plaintiffs Have a Property Interest in the Resolution

Plaintiffs argue that they have a constitutionally protected property interest to proceed with construction on the tank farm facility. To prevail on a due process claim, a Plaintiff must first establish that he has a property right to which due process protections apply.[7] "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."[8] Property interests are not created by the constitution, "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."[9] As a legal matter, a permit, once issued, may constitute a sufficient property interest to invoke due process protections.[10] This is especially [*8]  the case where a plaintiff has expended large amounts of money in reliance on the permit.[11] Moreover, the holder of a permit has a property right where an official's discretion to

---

[3]   *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003).

[4]   *Miss. Power & Light Co. v. United Gas Pipe Line*, Co., 760 F.2d 618, 621 (5th Cir. 1985).

[5]   *Id.*

[6]   *St. of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).

[7]   *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995).

[8]   *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

[9]   *Id.* at 577.

[10]   See *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012).

[11]   *St. Raymond v. City of New Orleans*, 769 So. 2d 562, 564 (La. App. 4 Cir. 2000).

2016 U.S. Dist. LEXIS 59881, *8

terminate or suspend work allowed by the permit is substantially limited.[12]

In reviewing the Resolution and the evidence introduced at the hearing, the Court concludes that the Resolution conferred a property right on Plaintiffs to construct the tank farm as outlined therein. On its face the Resolution provides Petroplex with approval to construct the tank farm. The Parish's ability to rescind this approval was limited. Based on the evidence introduced at the hearing, it is clear that the Parish led Plaintiffs to believe that they could start construction with no further permitting. Indeed, Plaintiffs were not told that they needed further permits until November, despite the fact that the Parish was continually monitoring activity at the site. The Parish argues that the Resolution's conditional approval terminated automatically because the terms of the Resolution were not met. Due process protections require, however, that a hearing be held to make such a determination.

## B. Procedural Due Process

Having [*9] found that Plaintiffs' had a property right in the Resolution, the Court turns to the question of whether they were deprived of this right without notice and a hearing in violation of procedural due process protections. Plaintiffs claim that their procedural due process rights were violated by the summary issuance of a stop work order without notice or a hearing. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" before final deprivation of a constitutionally protected property interest.[13] The Court must weigh three factors in determining

what process is due: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[14]

Plaintiffs contend that they were afforded no process associated with the issuance of the Stop Work Order. Defendants dispute this [*10] assertion, arguing that the Parish in fact provided sufficient process as requested by Plaintiffs. Defendants argue that Plaintiff's simply failed to take advantage of post-issuance protections that were available to them.[15] They further argue that the Parish administration received and considered Petroplex's evidence of compliance with the resolution and considered its request for a new construction deadline.

The Court need not resolve the issue of whether Plaintiffs were afforded adequate process at this juncture because it finds that, even if Plaintiffs had been afforded process, they are unlikely to prevail on the merits of their procedural due process claims. Plaintiffs were not in compliance with the terms of the Resolution, nor were they in a position to timely correct any deficiencies. The remedy for a procedural due process violation is determined by the injury resulting from the denial of constitutionally required process.[16] Accordingly, if Plaintiffs were neither in compliance with the Resolution nor in a position to cure their noncompliance, [*11] they are not entitled to

---

[12] *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072, 357 U.S. App. D.C. 396 (D.C. Cir. 2003).

[13] *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[14] *Id.* at 335.

[15] Defendants specifically point to St. James Parish Ordinance Section 18-12, which allows for an appeal process of a determination made by the building official.

[16] *Carey v. Piphus*, 435 U.S. 247, 263, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).

2016 U.S. Dist. LEXIS 59881, *11

injunctive relief allowing them to proceed with construction.[17]

The Resolution defines "construction" as "permanent on-site fabrication, erection, or installation of a permitted facility (such as pile driving, installing structural supports and foundations, laying underground pipework, or construction permanent storage structures) that is continuously pursued with reasonable diligence to complete the permitted facility within a reasonable time frame." Plaintiffs allege that they timely began "dirt work" at the site when a bulldozer was delivered on July 30, 2014. The Court finds, however, that the "work" being done with this bulldozer was not permanent construction as defined by the Resolution, and that Plaintiffs were not prepared to commence meaningful construction at the site by the July 31 deadline or at any time thereafter. Indeed, the Court finds that, despite their assertions at the November council meeting, Plaintiffs were in no position to have "steel on the ground" in January of 2015. Even if the Court considers the Parish Council's actions at the November Council meeting to constitute a tacit acknowledgement that it would consider "steel on the [*12] ground" in January 2015 as "compliance" with the Resolution, Petroplex would still have been unable to timely comply. Specifically, Plaintiffs did not have final architectural plans or construction documents to support their construction activity. The drawings submitted to the Parish were identified on their faces to be preliminary, and they did not bear the stamp of a licensed design professional. Of particular significance, the geotechnical report issued by Eustis Engineering was preliminary, and specifically notes that further analysis would be required before construction began. Such follow-up analysis was, however, never conducted. Furthermore, the work being done was off the footprint as permitted by the LADEQ. No

geotechnical engineers were on site to monitor the putative preloading activities. No Louisiana licensed contractor was working the project until October of 2014, and at that time was only supervising the dirt movement. Accordingly, the Court finds based on the evidence introduced at the hearing that Plaintiffs failed to timely commence construction on July 31, 2014, as required by the Resolution, and that they were unable to remedy any deficiencies within any reasonable [*13] time frame. At no time before or since the July 31 deadline or the issuance of the Stop Work Order have Plaintiffs been prepared to immediately commence construction, despite their multiple assertions to the contrary. Accordingly, injunctive relief is precluded.

## C. Substantive Due Process

Assuming that they had a property interest in developing the tank farm facility, Plaintiffs aver that the issuance of the Stop Work Order was arbitrary and capricious in violation of substantive due process protections. To prevail on a substantive due process claim, a plaintiff must show both that they had a constitutionally protected property right to which due process protection applied and that the right was infringed upon by government action that was not rationally related to a legitimate government interest.[18] Defendants contend that the issuance of the Stop Work Order was far from arbitrary and capricious, but rather was warranted by Plaintiffs' deceitful activities on the property aimed at feigning construction. Having determined that Plaintiffs did not commence work as required by the Resolution, this Court agrees. Defendants issuance of a Stop Work Order was rationally related to a legitimate [*14] government interest—namely, halting construction that was not permitted by the Resolution. Accordingly, Plaintiffs are unlikely to prevail on the merits of their substantive due process claims.

---

17   *See* *Hopkins v. Saunders*, 199 F.3d 968, 979 (8th Cir. 1999).

18   *Energy Mgmt. Corp v. City of Shreveport*, 467 F.3d 471, 481 (5th Cir. 2006).

2016 U.S. Dist. LEXIS 59881, *14

## II. Plaintiffs Have Not Shown Irreparable Injury

In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages.[19] Plaintiffs rely on an isolated quote from a Northern District of Mississippi case in arguing that violations of constitutional rights constitutes irreparable harm as a matter of law.[20] They do not cite to any binding precedent in support of this broad rule. Other circuits have noted that such a rule is confined only to *First Amendment* and *Fourth Amendment* right to privacy jurisprudence.[21] Accordingly, the Court will not apply such a far-reaching rule here. Defendants argue that the harms claimed by Plaintiffs are economic in nature and could be fully compensated with a money judgment. This Court agrees. Plaintiffs' alleged harms include lost investors, inability to repay loans, and loss of their property through foreclosure. These harms are all economic in nature and would be properly compensable with monetary damages. Accordingly, a preliminary injunction is not appropriate.

## III. Threatened Injury Does Not Outweigh the Threatened Harm to the Party Enjoined and Granting the Injunction Would Disserve the Public Interest

Plaintiffs claim Defendants can show no meaningful harm arising from the inability to enforce the Stop Work Order. The Court disagrees. Should the Parish be enjoined from enforcing the Stop Work Order, Plaintiffs would be allowed to begin construction without a final determination on the merits. If the Parish ultimately prevails in this matter, construction would halt and the Parish would be saddled with an incomplete industrial facility. A large swath of undeveloped land would be taken out of commerce. Additionally, enjoining the Parish in this fashion would undercut its ability to apply and enforce its own land use laws. The public interest would be disserved by an injunction for many of the same reasons, as such a situation would result in a major disruption in the community. Accordingly, the Court finds that the threatened harm to the party enjoined would be great and that an injunction would disserve the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is **DENIED**.

New Orleans, Louisiana **[*16]**  this 5th day of May, 2016.

/s/ Jane Triche Milazzo

**JANE TRICHE MILAZZO**

**UNITED STATES DISTRICT JUDGE**

---

[19]   *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

[20]   *Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992).

[21]   *Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. V. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) **[*15]** .

⚠ Caution

As of: July 5, 2016 3:51 PM EDT

# *Gonzalez v. Arizona*

United States District Court for the District of Arizona

October 11, 2006, Decided

No. CV 06-1268-PHX-ROS, No. CV 06-1362-PHX-ROS (cons), No. CV 06-1575-PHX-ROS (cons)

**Reporter**

2006 U.S. Dist. LEXIS 76638

Maria M. Gonzalez, et al., Plaintiffs, vs. State of Arizona, et al., Defendants.

**Subsequent History:** Subsequent appeal at, Remanded by *Purcell v. Gonzalez, 127 S. Ct. 5, 166 L. Ed. 2d 1, 2006 U.S. LEXIS 8000 (U.S., 2006)*

Affirmed by *Gonzalez v. Arizona, 2007 U.S. App. LEXIS 9125 (9th Cir. Ariz., Apr. 20, 2007)*

**Prior History:** *Gonzalez v. Arizona, 2006 U.S. Dist. LEXIS 93477 (D. Ariz., Sept. 11, 2006)*

## LexisNexis® Headnotes

Governments > State & Territorial Governments > Elections

*HN1* In Arizona, individuals wishing to register to vote must present satisfactory evidence of United States citizenship at the time they register. *Ariz. Rev. Stat. § 16-166*. Satisfactory evidence of citizenship includes one of the following: the number of the applicant's driver license or nonoperating identification license issued after October 1, 1996; a legible photocopy of the applicant's birth certificate; a legible photocopy of pertinent pages of the applicant's United States passport; a presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization; other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986; or

the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number. If an individual does not present such evidence, his or her registration will be rejected, often with instructions how the registration should be resubmitted.

Governments > State & Territorial Governments > Elections

*HN2* Registered voters in wishing to vote in-person on election day must present some form of identification to the poll workers. *Ariz. Rev. Stat. § 16-579*. Proposition 200 provides a list of acceptable forms of identification and the Secretary of State has promulgated regulations setting forth the specific types of identification that are acceptable. A voter may present either one form of identification with her photograph, name, and address, or two forms of identification that bear her name and address. A voter may present one of the following: a valid driver license; nonoperating identification license; tribal enrollment card or other form of tribal identification; or some other federal, state, or local government issued identification. If a voter does not have or does not wish to present one of the forms listed above, two of the following types of identification may be presented: utility bill; bank or credit union statement; vehicle registration; Indian census card; property tax statement; tribal enrollment card; vehicle insurance card; recorder's certificate; or federal, state, or local government issued identification, including

2006 U.S. Dist. LEXIS 76638, *76638

a voter registration card issued by the county recorder. Certain counties also accept "Official Election Mail," which includes the voter's name and address and is sent free of charge to registered voters, as a form of non-photographic identification.

Governments > State & Territorial Governments > Elections

**HN3** By law, any election called pursuant to the laws of Arizona shall provide for early voting. Ariz. Rev. Stat. § 541(A). Every registered voter is eligible to vote by early ballot. Without the identification for voting at the polls, a registered voter may request an early ballot, complete the ballot, and then return the ballot through the mail or drop it off at a polling place. *Ariz. Rev. Stat. § 16-548*. An early ballot may also be dropped off at any polling place up through election day. Counties also allow for in-person early voting at certain polling places. No identification is required of early voters that wish to vote in-person and language assistance is available at certain early voting locations.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

**HN4** A plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Governments > State & Territorial Governments > Elections

**HN5** The United States Court of Appeals for the Ninth Circuit has been unable to settle on a single test for determining if a preliminary injunction should issue. A preliminary injunction is appropriate where plaintiffs demonstrate either: (1) a likelihood of success on the merits and the

possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in their favor. The public interest must also be considered when evaluating certain preliminary injunction requests. In cases involving the public interest, such as those impacting elections, the preliminary injunction test has been formulated to require plaintiffs to establish: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiffs if preliminary relief is not granted; (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest. This test creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Governments > State & Territorial Governments > Elections

**HN6** The United States Court of Appeals for the Ninth Circuit has recognized that a request for a preliminary injunction in a case involving state elections is unique. Observing that a federal court cannot lightly interfere with or enjoin a state election, the Ninth Circuit recognized that election cases are different from ordinary injunction cases. Interference with impending elections is extraordinary and interference with an election after voting has begun is unprecedented.

Constitutional Law > Elections, Terms & Voting > Poll Taxes

**HN7** *U.S. Const. amend. XXIV* states in part that the right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

2006 U.S. Dist. LEXIS 76638, *76638

Constitutional Law > Elections, Terms & Voting > Poll Taxes

**HN8** The *Twenty-fourth Amendment* nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed.

Constitutional Law > Elections, Terms & Voting > Poll Taxes

Governments > Federal Government > Elections

**HN9** The constructive poll tax under *Ariz. Rev. Stat. § 16-166* does not fit within the traditional definition of a poll tax. Black's Law Dictionary defines a "poll tax" as a fixed tax levied on each person within a jurisdiction.

Constitutional Law > Congressional Duties & Powers > Elections > Time, Place & Manner Restrictions

Governments > State & Territorial Governments > Elections

**HN10** Election laws will invariable impose some burden upon individual voters. States have always retained the power to regulate their own elections.

Constitutional Law > Elections, Terms & Voting > Poll Taxes

Constitutional Law > Equal Protection > Nature & Scope of Protection

Governments > State & Territorial Governments > Elections

**HN11** Upon adoption of the *Twenty-fourth Amendment*, no state could condition the federal franchise upon payment of a poll tax. The United States Supreme Court has turned to the *Equal Protection clause* to resolve the constitutionality of the poll tax for state elections.

Constitutional Law > Equal Protection > Poverty

Constitutional Law > Equal Protection > Nature & Scope of Protection

Governments > State & Territorial Governments > Elections

**HN12** In Harper, the United States Supreme Court found that a state violates the *Equal Protection Clause of the Fourteenth Amendment* whenever it makes the affluence of the voter or payment of any fee an electoral standard. That holding is premised on the finding that the interest of the state, when it comes to voting, is limited to the power to fix qualifications. Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process.

Constitutional Law > Equal Protection > General Overview

Constitutional Law > Equal Protection > Nature & Scope of Protection

**HN13** Whether embodied in the *Fourteenth Amendment* or inferred from the *Fifth Amendment*, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.

Constitutional Law > Congressional Duties & Powers > Elections > Time, Place & Manner Restrictions

Constitutional Law > Elections, Terms & Voting > General Overview

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

Governments > State & Territorial Governments > Elections

**HN14** In Burdick, the United States Supreme Court specifically rejected the idea that any burden upon the right to vote must be subject to strict scrutiny. Instead of strict scrutiny, a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the *First* and *Fourteenth Amendments* that the plaintiff seeks to vindicate against the precise interests put forward by the state as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

Grant Sullivan

2006 U.S. Dist. LEXIS 76638, *76638

If a restriction is determined to be severe, the restriction must be narrowly drawn to advance a state interest of compelling importance. If, however, a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the *First* and *Fourteenth Amendment* rights of voters, the state's important regulatory interests are generally sufficient to justify the restrictions.

Constitutional Law > Congressional Duties & Powers > Elections > Time, Place & Manner Restrictions

Constitutional Law > Elections, Terms & Voting > General Overview

Governments > State & Territorial Governments > Elections

*HN15* United States Supreme Court cases establish that there is no bright line separating permissible election-related regulation from unconstitutional infringements. Often, courts are required to make hard judgments given the interests involved. The United States Court of Appeals for the Ninth Circuit has observed that courts will uphold as "not severe" restrictions that are generally applicable, even-handed, politically neutral, and which protect the reliability and integrity of the election process. Also, regulations promoting traditional goals, such as accurate and complete voter registration do not qualify as severe.

Constitutional Law > Congressional Duties & Powers > Elections > Time, Place & Manner Restrictions

Governments > Federal Government > Elections

Governments > Local Governments > Elections

Governments > State & Territorial Governments > Elections

*HN16* There must be a substantial regulation of elections if they are to be fair and honest.

Civil Rights Law > Protection of Rights > Voting Rights > Racial Discrimination

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

*HN17* See *42 U.S.C.S. § 1973(a)*.

Civil Rights Law > Protection of Rights > Voting Rights > Racial Discrimination

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

Evidence > Burdens of Proof > General Overview

*HN18* *42 U.S.C.S. § 1973(a)* allows disparate impact claims. *Section 1973(a)* requires proof only of a discriminatory result, not of discriminatory intent.

Civil Rights Law > Protection of Rights > Voting Rights > Racial Discrimination

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

*HN19* In determining whether a challenged voting practice violates *42 U.S.C.S. § 1973(a)*, the district court must examine the totality of the circumstances and determine, based upon a searching practical evaluation of the past and present reality whether the political process is equally open to minority voters. This examination is intensely fact-based and localized. There are a variety of factors a court may use when evaluating the totality of circumstances.

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

Governments > State & Territorial Governments > Elections

*HN20* See *42 U.S.C.S. § 1971(a)(2)(A)*, *(B)*.

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

Governments > State & Territorial Governments > Elections

*HN21* Early voting is an inherently different procedure from voting in person, requiring a state

2006 U.S. Dist. LEXIS 76638, *76638

which allows both in-person and absentee voting to apply different standards, practices, or procedures to these two groups of voters. It is not a violation of *42 U.S.C.S. § 1971(a)(2)(A)* for a state to apply different standards to two inherently different procedures.

Civil Rights Law > ... > Voting Rights > Voting Rights Act > Interference With Voting Rights

Governments > State & Territorial Governments > Elections

**HN22** Presenting identification in order to prove one's identity is by definition not an "error or omission on any record or paper" for purposes of *42 U.S.C.S. § 1971(a)(2)(B)*.

**Counsel:** **[*1]** For Maria M Gonzalez, Plaintiff: Carlos Becerra, Diego M Bernal, Nina Perales, Mexican American Legal Defense, San Antonio, TX, US.; Daniel R Ortega, Jr, Roush McCracken Guerrero Miller & Ortega, Phoenix, AZ.; Neil Bradley, ACLU Southern Regional Office, Atlanta, GA, US.

For Bernie Abeytia, Arizona Hispanic Community Forum, Chicanos Por La Causa, Friendly House, Jesus Gonzalez, Debbie Lopez, Southwest Voter Registration Education Project, Luciano Valencia, Valle Del Sol, Plaintiffs: Carlos Becerra, Nina Perales, Mexican American Legal Defense, San Antonio, TX, US.; Daniel R Ortega, Jr, Roush McCracken Guerrero Miller & Ortega, Phoenix, AZ.; Neil Bradley, ACLU Southern Regional Office, Atlanta, GA, US.

For The Inter Tribal Council of Arizona, Inc., Plaintiff: Benjamin Jay Blustein, Jon Marshall Greenbaum, Lawyers Committee for Civil Rights Under Law, Washington, DC, US.; Carlos Becerra, Mexican American Legal Defense, San Antonio, TX, US.; Daniel B Kohrman, AARP Foundation Litigation, Washington, DC, US.; David Jeremy Bodney, Karen J Hartman, Steptoe & Johnson LLP, Phoenix, AZ.; Elliot M Mincberg, People for the American Way Foundation, Washington, DC,

US.; Joe P Sparks, Sparks **[*2]** Tehan & Ryley PC, Scottsdale, AZ.; Neil Bradley, ACLU Southern Regional Office, Atlanta, GA, US.; Sara S Greene, Thomas Lee Hudson, David B Rosenbaum, Osborn Maledon PA, Phoenix, AZ.

For Arizona Advocavy Network, Steve M Gallardo, League of United Latin American Citizens Arizona, League of Women Voters of Arizona, People For the American Way Foundation, Plaintiffs: Carlos Becerra, Mexican American Legal Defense, San Antonio, TX, US.; Karen J Hartman, Steptoe & Johnson LLP, Phoenix, AZ.; Neil Bradley, ACLU Southern Regional Office, Atlanta, GA, US.

For Hopi Tribe, Plaintiff: Benjamin Jay Blustein, Lawyers Committee for Civil Rights Under Law, Washington, DC, US.; Carlos Becerra, Mexican American Legal Defense, San Antonio, TX, US.; Daniel B Kohrman, AARP Foundation Litigation, Washington, DC, US.; David Jeremy Bodney, Karen J Hartman, Steptoe & Johnson LLP, Phoenix, AZ.; David B Rosenbaum, Sara S Greene, Thomas Lee Hudson, Osborn Maledon PA, Phoenix, AZ.; Elliot M Mincberg, People for the American Way Foundation, Washington, DC, US.; Joe P Sparks, Sparks Tehan & Ryley PC, Scottsdale, AZ.

For Agnes Laughter, Plaintiff: Dana Lee Bobroff, Navajo Nation Department of Justice,   **[*3]** Window Rock, AZ.; Judith M Dworkin, Marvin S Cojen, Patricia Ferguson, Sacks Tierney PA, Scottsdale, AZ.

For Navajo Nation, a federally recognized Indian tribe, Plaintiff: Brenna L Clani, Dana Lee Bobroff, Navajo Nation Dept of Justice, Window Rock, AZ, US.; Judith M Dworkin, Marvin S Cojen, Patricia Ferguson, Sacks Tierney PA, Scottsdale, AZ.

For Shelly Baker, La Paz County Recorder, Berta Manuz, Greenlee County Recorder,

2006 U.S. Dist. LEXIS 76638, *3

Defendants:Dennis Ira Wilenchik, Wilenchik & Bartness PC, Phoenix, AZ.

For Jan Brewer, in her official capacity as Secretary of State of Arizona, Defendant: Mary Ruth O'Grady, Peter Alex Silverman, Office of the Attorney General, Phoenix, AZ.; Bruce L Skolnik, Office of the Attorney General, Tucson, AZ.

For Candace Owens, Coconino County Recorder, Patty Hansen, Coconino County Election Director, Defendants: Jean E Wilcox, Coconino County Attorneys Office, Flagstaff, AZ.

For Christine Rhodes, Cochise County, Recorder, Linda Haught Ortega, Dixie Mundy, Gila County Election Director, Brad Nelson, Pima County Election Director, Karen Osborne, Maricopa County Election Director, Yvonne Pearson, Greenlee County Election Director, Penny Pew, Apache [*4] County Election Director, Helen Purcell, Maricopa County Recorder, F Ann Rodriguez, Pima County Recorder, Defendants: Dennis Ira Wilenchik, Wilenchik & Bartness PC, Phoenix, AZ.; M Colleen Connor, MCAO Division of County Counsel, Phoenix, AZ.

For Lynn Constabile, Yavapai County Election Director, Laura Dean-Lytle, Pinal County Recorder, Judy Dickerson, Graham County Election Director, Donna Hale, La Paz County Election Director, Susan Hightower Marlar, Yuma County Recorder, Gilberto Hoyos, Pinal County Election Director, LeNora Johnson, Apache County Recorder, Patti Madrill, Yuma County Election Director, Joan McCall, Mohave County Recorder, Melinda Meek, Santa Cruz County Election Director, Suzie Sainz, Santa Cruz County Recorder, Thomas Schelling, Cochise County Election Director, Allen Tempert, Mohave County Election Director, Ann Wayman-Trijillo, Yavapai County Recorder, Wendy John, Graham County Recorder, Defendants: Dennis Ira Wilenchik, Wilenchik & Bartness PC, Phoenix, AZ.

For Kelly Dastrup, Navajo County Election Director, Laurette Justman, Navajo County Recorder, Defendants: Dennis Ira Wilenchik, Wilenchik & Bartness PC, Phoenix, AZ.; Lance B Payette, Navajo County [*5] Attorney, Holbrook, AZ.

For STATE OF ARIZONA, Defendant: Mary Ruth O'Grady, Peter Alex Silverman, Office of the Attorney General, Phoenix, AZ.; Bruce L Skolnik, Office of the Attorney General, Tucson, AZ.

For Yes on Proposition 200, Intervenor Defendant: Joel M Spector, William Perry Pendley, Mountain States Legal Foundation, Lakewood CO US.

For Amicus Curiae, Protect AZ Now and WA Legal Foundation, Protect Arizona Now, PAN, Washington Legal Foundation, Amicus: Dan W Montgomery, Law Office of Dan Montgomery, Tuczon AZ.

**Judges:** Roslyn O. Silver, United States District Judge.

**Opinion by:** Roslyn O. Silver

# Opinion

## ORDER

Each group of Plaintiffs in the three consolidated cases filed a Motion for Preliminary Injunction. The Court held a two-day hearing on August 30 and August 31, 2006. On September 11, 2006, the Court issued a short order denying the request for a preliminary injunction. (Doc. 183) Pursuant to *Federal Rule of Civil Procedure 52(a)*, the

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 61 of 70

Page 7 of 16
2006 U.S. Dist. LEXIS 76638, *5

following are the Court's findings of fact and conclusions of law. [1]

 [*6] **I. Proposition 200**

Passed in 2004, Proposition 200 made two changes to Arizona law relevant to the requests for a preliminary injunction. First, individuals wishing to register to vote must present identification at the time they register. Second, individuals must present identification when they wish to cast their vote at a polling location on election day. Proposition 200 allows for different types of identification depending on whether an individual is registering to vote or verifying identity on election day.

**A. Identification for Registration**

After passage of Proposition 200, *HN1* individuals wishing to register to vote must present "satisfactory evidence of United States citizenship" at the time they register. *Arizona Revised Statutes ("A.R.S.") section 16-166*. Satisfactory evidence of citizenship includes one of the following: "[t]he number of the applicant's driver license or nonoperating identification license issued after October 1, 1996"; "[a] legible photocopy of the applicant's birth certificate"; "[a] legible photocopy of pertinent pages of the applicant's United States passport"; "[a] presentation to the county recorder [*7] of the applicant's United States naturalization documents or the number of the certificate of naturalization"; "[o]ther documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986"; or "[t]he applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number." Id. If an individual does not present such evidence, his or her registration will be rejected, often with instructions how the registration should be

resubmitted. (Doc. 175, Ex. 1, p.30) (deposition of Karen Osborne stating rejected registrations are sent back to applicant with instructions on how to cure deficiencies and a stamped envelope for return to County Recorder).

**B. Identification for Voting**

*HN2* Registered voters wishing to vote in-person on election day must present some form of identification to the poll workers. *A.R.S. § 16-579*. Proposition 200 provides a list of acceptable forms of identification and the Secretary of State has promulgated regulations setting forth the specific types of identification that are acceptable. Id. (Doc. 150, Ex. 3.) A voter may present either one form of identification [*8] with her photograph, name, and address, or two forms of identification that bear her name and address. A voter may present one of the following: a valid driver license; nonoperating identification license; tribal enrollment card or other form of tribal identification; or some other federal, state, or local government issued identification. Id. (Doc. 150 Ex. 3) If a voter does not have or does not wish to present one of the forms listed above, two of the following types of identification may be presented: utility bill; bank or credit union statement; vehicle registration; Indian census card; property tax statement; tribal enrollment card; vehicle insurance card; recorder's certificate; or federal, state, or local government issued identification, including a voter registration card issued by the county recorder. (Doc. 150 Ex. 3) Certain counties have also chosen to accept "election material" as a form of non-photographic identification. Such "election material" is "Official Election Mail" that includes the voter's name and address and is sent, free of charge, to registered voters. (Doc. 150 Ex. 18)

**C. Early Voting**

---

[1]   The parties subsequently filed notices of appeal. (Doc. 184, 189) "Ninth Circuit law follows the general rule that a party's filing a notice of appeal… divests the district court of jurisdiction over the matters appealed." Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1450 (Fed. Cir. 1988). But the Court has jurisdiction to enter findings of fact and conclusions of law because doing so will aid appellate review. See id. (district court retained jurisdiction to enter findings of fact and conclusions of law because it would aid appellate review).

2006 U.S. Dist. LEXIS 76638, *10

Arizona has maintained **[\*9]** an extensive early voting process. *A.R.S. §§ 16-541-542*. **HN3** By law, "[a]ny election called pursuant to the laws of [Arizona] shall provide for early voting." *A.R.S. § 541(A)*. Every registered voter is eligible to vote by early ballot. Id. Without the identification for voting at the polls, a registered voter may request an early ballot, complete the ballot, and then return the ballot through the mail or drop it off at a polling place. *A.R.S. § 16-548*. (8/30/06 Transcript pp. 106-107) An early ballot may also be dropped off at any polling place up through election day. Id. Counties also allow for in-person early voting at certain polling places. [2] No identification is required of early voters that wish to vote in-person and language assistance is available at certain early voting locations. (Transcript pp. 105-106)

**[\*10] II. Procedural History**

Plaintiffs seek an injunction prohibiting the enforcement of both the registration and in-person voting identification requirements in advance of this Fall's elections. Registration for the primary election closed on August 14, 2006, early voting began on August 10, 2006, and the election itself was held on September 12, 2006. It is already too late for a preliminary injunction to affect the primary election. Registration for the November 7, 2006 election closed on October 9, 2006 and early voting began October 5, 2006. (Doc. 175 Ex. 4) In light of these deadlines, the timing of each of the cases is relevant to the preliminary injunction issue. The relatively late filing of these three lawsuits, and the rejection by certain Plaintiffs of the Court's expedited briefing and hearing schedule, undermines Plaintiffs' claims

---

[2]   The Coconino County Recorder was asked about this process on cross-examination. (The following comes from the Realtime transcript.)

Q. And can you describe the process that the voter goes through when he or she shows up at your office to vote at the early voting site?

A. Yes. If you're talking about if--if you're talking about the county elections office, that's one thing. It may be somewhere else, like we have a branch in Tuba City, so I'll use the county elections office. They come in, they identify who they are. They sign in. They're given a ballot to vote. They're shown, you know, there is both sides, giving some instructions. They are pointed over to the Votermatic to complete that ballot, to seal it, to sign it, and return it to us.

Q. So in effect, it's almost identical to what the voter goes through at the polling place?

A. Except there is no ID asked for.

Q. No identification?

A. No identification is asked for per statute. The idea is it's an early ballot, because we check the signature, so no ID is asked for.

Q. So to vote early at one of these voting sites, a voter could show up, assuming there are no challenges, 33 days before the election--

A. That's correct.

Q. Vote a ballot, and not have to produce identification?

A. That's correct, because the ballots are all turned in back to us with their signatures on them, to compare to the rolls before they are determined if that ballot counts or doesn't count.

(8/30/06 Transcript pp. 106-107)

Grant Sullivan

that immediate relief is mandated. See *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985)* (*HN4* "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

### A. Gonzalez, et al. v. State of Arizona et al., 06-1268

 [*11] Maria M. Gonzalez, et al. ("Gonzalez Plaintiffs"), filed their complaint on May 9, 2006, requesting a temporary restraining order and a preliminary injunction that same day. (Case 06-1268, Doc. 1, 3, 7) The Gonzalez Plaintiffs filed on May 16, 2006 an alternative application for a temporary restraining order focusing on a statutory argument. (Doc. 13) The Court held a status hearing on May 17, 2006 and set an expedited briefing schedule for the temporary restraining order issue. (Doc. 26) Oral argument solely on this issue was held on June 9, 2006. (Doc. 64) The Court denied the temporary restraining order ten days later. (Doc. 68) In the order denying the temporary restraining order, the Court set forth an expedited briefing schedule for the preliminary injunction. (Doc. 68)

One week after the briefing schedule was set, Plaintiffs submitted a request for a three week extension of all deadlines. (Doc. 82) Defendants objected to any extension, arguing that an extension would "leave insufficient time to resolve the legal issues and deal with election administration concerns prior to the primary election and perhaps the general election." (Doc. 88) The Court held a status conference [*12] to resolve the appropriate dates, expressing concern whether a decision could be issued before the elections. After hearing from both sides, the Court directed the parties to meet and propose mutually agreeable dates. (Doc. 98) The parties eventually agreed on a new schedule, setting the due date for the Gonzalez Plaintiffs' brief *four weeks* later than originally set by the Court. (Doc. 97) The Court entered an Order adopting the parties' proposed dates. (Doc. 101) The parties later sought additional extensions. (Doc. 135, 156, 163)

### B. Inter Tribal Council of Arizona, et al. v. Jan Brewer, et al., 06-1362

The Inter Tribal Council of Arizona, Inc., et al. ("ITCA Plaintiffs"), filed their complaint on May 26, 2006 but did not file a separate motion or application for a temporary restraining order or preliminary injunction at the time the complaint was filed. (Case 06-1362, Doc. 1) The ITCA Plaintiffs sought consolidation with the Gonzalez case and consolidation was granted on June 6. (Doc. 13)

### C. Navajo Nation, et al. v. Jan Brewer et al., 06-1575

The Navajo Nation, et al. ("Navajo Nation Plaintiffs"), filed a complaint and a motion for preliminary injunction [*13] on June 20, 2006. (Case 06-1575, Doc. 1) On June 30, Defendant Jan Brewer requested that this case be consolidated with the Gonzalez case. (06-1268, Doc. 92) The Navajo Nation Plaintiffs opposed the consolidation request, arguing that unique factual and legal issues were present such that consolidation would not be proper. (06-1575, Doc. 15) On July 17, the Navajo Nation Plaintiffs filed a motion to expedite hearing on their preliminary injunction request. (Doc. 14) According to that motion, the Court needed to provide relief prior to the primary election scheduled for September 12, 2006. The case was ordered consolidated on August 4. (Doc. 25)

Taken together, the three groups of Plaintiffs filed suit approximately eighteen months after Proposition 200 became effective and only four months before the primary election and six months before the general election. (Doc. 175 p.2 n. 1) When the Court set an expedited briefing schedule, Plaintiffs objected to the schedule and requested additional time. These delays raise serious questions regarding Plaintiffs' need and desire for immediate injunctive relief.

### III. Standard for Preliminary Injunction

2006 U.S. Dist. LEXIS 76638, *13

*HN5* The Ninth Circuit has been [**14**] unable to settle on a single test for determining if a preliminary injunction should issue. "A preliminary injunction is appropriate where plaintiffs demonstrate either (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [their] favor." *Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir. 2003)* (quotation omitted). The public interest must also be considered when evaluating certain preliminary injunction requests. Id. In cases involving the public interest, such as those impacting elections, the preliminary injunction test has been formulated to require Plaintiffs to "establish (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff[s] if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff[s], and (4) advancement of the public interest." Id. This test "creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court [**15**] that the public interest and balance of hardships tip in their favor." *Id.*

*HN6* The Ninth Circuit, sitting en banc, recognized that a request for a preliminary injunction in a case involving state elections is unique. Observing that "a federal court cannot lightly interfere with or enjoin a state election," the court recognized that "election cases are different from ordinary injunction cases. *Interference with impending elections is extraordinary* and interference with an election after voting has begun is unprecedented." *Id. at 918* (emphasis added) (citations omitted). Accordingly, Plaintiffs needed to make a particularly strong showing that they were entitled to injunctive relief.

**IV. Plaintiffs' Arguments**

All three Plaintiffs groups assert that Proposition 200 acts as an unconstitutional poll tax, violates the *Equal Protection Clause of the Fourteenth Amendment*, and impedes the fundamental right to vote. The Navajo Nation Plaintiffs raise claims pursuant to the Voting Rights Act and the Civil Rights Act. And the ITCA and Gonzalez Plaintiffs argue that Proposition 200 conflicts with the National Voter Registration Act of 1993 (the "NVRA"), the argument [**16**] that was rejected by the Court in the Order denying the request for a temporary restraining order. After consideration of the parties' filings, the evidence presented at the preliminary injunction hearing, and the additional briefing requested on the poll tax issue, the Court finds that "[P]laintiffs have shown a possibility of success on the merits" of some of their arguments but the Court "cannot say that at this stage they have shown a strong likelihood." *Southwest, 344 F.3d at 919*. Also, the balance of hardships and the public interest tips in favor of Defendants.

**A. Poll Tax**

Plaintiffs assert that Proposition 200 constitutes a poll tax in violation of the *Twenty-fourth Amendment to the United States Constitution. HN7* That Amendment states, in relevant part,

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

The parties agree that the most instructive case is *Harman v. Forssenius, 380 U.S. 528, 85 S. Ct. 1177, 14 L. Ed. 2d 50 (1965).* [**17**] There the Supreme Court addressed the constitutionality of Virginia's system. At the time, a Virginia statute required the payment of a $ 1.50 annual poll tax. Potential voters not wishing to pay the poll tax could file a certificate of residency each election

Case No. 1:16-cv-01237-JLK   Document 32-10   filed 07/05/16   USDC Colorado   pg 65 of 70

Page 11 of 16
2006 U.S. Dist. LEXIS 76638, *17

year. According to Harman, **HN8** the *Twenty-fourth Amendment* "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed." *Id. at 540-541*. Therefore, the Court determined that Virginia's system would be invalid if it "impos[ed] a material requirement solely upon those who refuse[d] to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id. at 541*. The Court concluded that the residency certificate was a "cumbersome procedure" and held that "the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax." *Id. at 542*.

The issue in Harman was not that the state was imposing certain procedural hurdles to voting, such as certificates of residency, but that the system explicitly included a poll tax. *Id. at 538* **[*18]** ("[I]t is important to emphasize that the question presented is not whether it would be within a State's power to abolish entirely the poll tax and require all voters--state and federal--to file annually a certificate of residence."). In the present case, the parties agree that there is no explicit poll tax at issue. The only issue is whether requiring forms of identification should be classified as a poll tax under the reasoning in *Harman*. The types of identification required by Proposition 200 are different depending on whether an individual is registering to vote or simply providing identification at the polls. Registration and poll-identification requirements are addressed separately.

## 1. Registration Identification

Obtaining proper forms of identification for purposes of registering to vote will cost potential voters between 10 and 100 dollars. (Doc. 149

p.13) These amounts represent the price of obtaining a birth certificate, drivers license, or passport. The cost of certain of these forms is not within Defendants' control. [3] From statistics submitted by the ITCA Plaintiffs, the vast majority of eligible voters already possess a useable form of identification such **[*19]** that no additional fee will be required to register to vote. (Doc. 150 Ex. 21) (showing that approximately 98% of eligible individuals already possess adequate forms of identification). The Court has reservations regarding the reliability of these statistics and no other reliable evidence was presented regarding the number, if any, of eligible individuals that wish to register to vote and must obtain new foams of identification. It is undisputed that some individuals will have to obtain a form of identification, but that requirement cannot be considered a poll tax. (Doc. 150 Ex. 33, 34)

**HN9** The constructive poll tax at issue here does not fit within the traditional definition of a poll tax. Black's Law Dictionary defines a "poll tax" as a "fixed tax levied on *each person* within a jurisdiction." Black's Law Dictionary 1498 (8th ed. 2004) (emphasis added); see also *United States v. State of Texas, 252 F. Supp. 234, 239 (W. D. Tex. 1966)* **[*20]** ("The poll tax is imposed on all residents of the State…."). The poll tax here will not have to be paid by approximately 98% of potential voters who already possess appropriate identification. The poll tax is only indirectly connected to the right to vote. Rather than paying a fee to be eligible to vote, Arizona voters must pay a fee for the issuance of a form of identification. Arizona does not bar from voting individuals who have not paid any voting fee to Arizona or completed any Arizona specific voting paperwork. [4] Finally, Proposition 200 could impose some burdens on the limited class of individuals that do not currently possess

---

[3]   For example, Defendants have no control over the cost of federal forms of identification.

[4]   Some individuals who do not pay any fee to the State of Arizona or complete any paperwork for the State will be eligible to vote. A.R.S. § 28-3165(J) (providing that persons aged 65 or older and disabled persons are entitled to identification at no cost); (Doc. 150 Ex. 3) (allowing federal forms of identification).

2006 U.S. Dist. LEXIS 76638, *20

appropriate identification but *HN10* "[e]lection laws will invariable impose some burden upon individual voters." *Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992)*. States have always "retain[ed] the power to regulate their own elections." Id. Arizona has chosen to require individuals prove they are eligible to participate in elections. Defining the fees some voters must pay to prove their eligibility (via proper identification) as "poll taxes" "would tie the hands of States seeking to assure that elections are operated equitably and efficiently. [*21] " [5] Id. Plaintiffs have not shown a strong likelihood of success on this issue.

[*22] **2. Identification at the Polls**

Proposition 200 allows for a wide variety of forms of identification at the polls. Some of those forms, such as "Official Election Mail," are sent to prospective voters free of charge. Certain counties, including Coconino County, plan on sending out two pieces of election mail. Thus, certain voters will receive, free of charge, the requisite two forms of identification for identification at the polls. (Transcript p.100) Again, the Court was not presented with sufficiently reliable information regarding the number of voters that do not have adequate forms of identification and will not be receiving, free of charge, adequate forms of identification prior to the elections. Also, the wide variety of acceptable forms of identification renders the connection between a poll tax and these forms of identification even more attenuated than the registration identification requirements. Finally, registered individuals who do not wish to present identification at the polls have the option of participating in early voting. No identification is required of early voters and early voting is open to all registered voters. Early voters may vote by mail, or if they [*23] prefer to vote in-person they may go to an early-voting polling location. Plaintiffs have not shown a strong likelihood of success on the issue of identification at the polls constituting a poll tax.

**B. Equal Protection**

A case involving Virginia's poll tax is also the basis for Plaintiffs' Equal Protection argument. Because the *Twenty-fourth Amendment* is addressed to *federal* elections, Virginia's poll tax for state elections was not automatically barred by the adoption of that Amendment. *Harman, 380 U.S. at 540* (*HN11* "Upon adoption of the Amendment, of course, no State could condition the *federal* franchise upon payment of a poll tax.") (emphasis added). The Supreme Court turned to the *Equal Protection clause* to resolve the constitutionality of the poll tax for state elections.

*HN12* In *Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966)*, the Court found "that a State violates the *Equal Protection Clause of the Fourteenth Amendment* whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Id. at 666*. That holding is premised on the finding that "the interest of the State, when it comes [*24] to voting, *is limited to the power to fix qualifications.* Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." *Id. at 668* (emphasis added). Accordingly, here Plaintiffs argue that the costs in obtaining proper identification result in making the affluence of the voter a relevant factor. Proposition 200 makes the affluence of the voter a relevant factor only in the same manner that a variety of other requirements do so as well.

---

[5]   In addition to the fees for obtaining the state-issued identification, Plaintiffs also claim that Arizona is assessing a poll tax through the "copying fees," "gas costs," and "bureaucratic hurdles" associated with obtaining a state-issued identification. (Doc. 198 p.11) This is unrealistic. Were Plaintiffs' arguments accepted, Arizona would not be allowed to implement *any* identification requirement because there would inevitably be some second-level costs, such as "bureaucratic hurdles," present in such a scheme. Finding second-level costs constitute poll taxes would cripple Arizona's ability to conduct elections, not the intent of the ***Twenty-fourth amendment***.

The State of Arizona seeks to enforce the basic voter qualification of citizenship. The state does so by requiring individuals verify their identity when registering to vote and when voting in person. [6] These verification requirements understandably impose some cost on voters. The State of Arizona operates a limited number of polling locations. Travel to and from these polling locations imposes some cost on voters. A strict interpretation of Plaintiffs' argument would mean that requiring individuals to travel to the polls violates the *Equal Protection Clause*; voters with some financial means undoubtedly have an easier time traveling to the polls than poorer individuals.

[*25]  If states were barred from having any policies that impose a disproportionate burden on voters based on their wealth, every election conducted in the United States would be conducted in violation of the *Equal Protection Clause*. This is not a finding the Court will make. The State is not distinguishing among voters based on wealth, rather it is distinguishing between individuals that are able to prove their eligibility to vote and those that are not. [7] Plaintiffs have not shown a likelihood of success on this issue.

### [*26] C. Fundamental Right to Vote

All Plaintiffs argue that Proposition 200 infringes on the fundamental right to vote in violation of the *Fourteenth Amendment*. The parties agree that the appropriate framework for evaluating this claim comes from *Burdick v. Takushi, 504 U.S. 428, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992)*. **HN14** There the Supreme Court specifically rejected the idea that "any burden upon the right to vote must be subject to strict scrutiny." *Id. at 433*. Instead of strict scrutiny, "[a] court considering a challenge to a state election law must weigh the character

and magnitude of the asserted injury to the rights protected by the *First* and *Fourteenth Amendments* that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id. at 434*. If a restriction is determined to be "severe," the restriction "must be narrowly drawn to advance a state interest of compelling importance." Id. (quotations omitted). If, however, "a state election law provision imposes only [*27] reasonable, nondiscriminatory restrictions upon the *First* and *Fourteenth Amendment* rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." Id. (quotations omitted).

**HN15** Supreme Court cases establish that there is "'[n]o bright line separat[ing] permissible election-related regulation from unconstitutional infringements.'" *Rubin v. City of Santa Monica, 308 F.3d 1008, 1014 (9th Cir. 2002)* (quoting *Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997))*. Often, "courts are required to make 'hard judgments' given the interests involved." Id. The Ninth Circuit has observed that "[c]ourts will uphold as 'not severe' restrictions that are generally applicable, even-handed, politically neutral, and which protect the reliability and integrity of the election process." *Id.* Also, regulations promoting traditional goals, such as "accurate and complete voter registration" do not qualify as severe. *Hussey v. City of Portland, 64 F.3d 1260, 1265 (9th Cir. 1995)*.

Assessing the severity of the restrictions in this case requires an intense factual inquiry. Plaintiffs

---

[6]  Plaintiffs repeatedly argue that Proposition 200 was unnecessary and unwise. This is not an issue for the Court to decide. See F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993) (**HN13** "Whether embodied in the *Fourteenth Amendment* or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

[7]  Again, the many opportunities to vote available, such as voting by mail, substantially reduces the burden on voters without the means to travel to the polls.

2006 U.S. Dist. LEXIS 76638, *28

[*28]  presented some evidence that hundreds, possibly thousands, of individuals will not be able to secure the requisite identification to enable them to vote. But at best these numbers represent less than 3% of the voting population, and it is not clear what percentage of these individuals wish to vote but are *actually* unable to obtain identification. Also, **HN16** ″there must be a substantial regulation of elections if they are to be fair and honest.″ *Rubin, 308 F.3d at 1014* (quoting *Storer v. Brown, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974))*. Proposition 200 is a ″generally applicable″ attempt at protecting the ″reliability and integrity of the election process.″ *Id.* While not wishing to downplay the burden on certain individuals, Plaintiffs have not established that Proposition 200 represents a ″severe″ burden. Because Plaintiffs have not proven the burden is ″severe,″ the State of Arizona's interest in ensuring the integrity of elections is sufficient to justify Proposition 200. Plaintiffs have not shown a substantial likelihood of success on this issue.

## D. Voting Rights Act

The Navajo Nation Plaintiffs make two statutory arguments not made by the other two [*29] groups of Plaintiffs. [8] The first statutory argument is based on *Section 2* of the Voting Rights Act, which states

> **HN17** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color….

*42 U.S.C. § 1973(a)*. **HN18** This section allows disparate impact claims. See *Smith v. Salt River Project Agr. Imp. and Power Dist., 109 F.3d 586, 594 (9th Cir. 1997)* (″*Section 2* requires proof only of a discriminatory result, not of discriminatory intent.″). Because disparate impact claims are cognizable, if Plaintiffs can show that Navajos will suffer disproportionate harm under Proposition 200, a preliminary injunction may be appropriate.

[*30] **HN19** ″In determining whether a challenged voting practice violates *§ 2*, the district court must examine the totality of the circumstances and determine, based upon a searching practical evaluation of the past and present reality… whether the political process is equally open to minority voters. This examination is intensely fact-based and localized.″ *Smith v. Salt River Project Agr. Imp. and Power Dist., 109 F.3d 586, 591 (9th Cir. 1997)* (citations and quotations omitted). There are a variety of factors a court may use when evaluating the totality of circumstances. *Id. at 594 n.6* (listing factors contained in Senate Report). The Court was not presented with adequate evidence on any of these factors to enable an appropriate evaluation. Accordingly, the Navajo Nation Plaintiffs have not met their burden of showing a substantial likelihood of success.

## E. Civil Rights Act

The other statutory argument made only by the Navajo Nation Plaintiffs involves two subsections of the Civil Rights Act: *42 U.S.C. § 1971(a)(2)(A)* and *42 U.S.C. § 1971(a)(2)(B)*. *Subsection (A)* provides

> **HN20** No person acting under [*31] color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard,

---

[8]   The Navajo Nation Plaintiffs do not attack the identification for registration aspects of Proposition 200; they only take issue with the identification at the polls requirements. The Court ordered additional briefing on the Navajo Nation Plaintiffs' statutory claims. Because the statutory claims are ″intensely fact-based and localized,″ a more detailed order addressing these claims will be issued after the conclusion of the hearing scheduled for October 19, 2006. *Smith v. Salt River Project Agr. Imp. and Power Dist., 109 F.3d 586, 591 (9th Cir. 1997)* (citations and quotations omitted).

practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote….

*Subsection (B)* provides no person acting under color of law may

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

Relief does not appear appropriate under either of these subsections.

The Navajo Nation Plaintiffs argue that *subsection (A)* is implicated because Navajos tend to vote at the polls on election day and different standards are applied to early voters and voters at the polls. [9] **HN21** Early voting ″is an *inherently* different procedure from voting in person, requiring a state which allows [*32] both in-person and absentee voting to apply different ′standards, practices, or procedures′ to these two groups of voters.″ *Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 2006 U.S. Dist. LEXIS 20321, 2006 WL 1005537, at *47 (S.D. Ind. 2006).* It is not a violation of *subsection (A)* for a state to apply different standards to two inherently different procedures. Further, the Navajos have not sufficiently dealt with the reality that Navajos can appear, without identification, at the polls and present a previously completed early ballot. Plaintiffs have not shown a likelihood of success on this issue.

The second statutory argument [*33] is that *subsection (B)* prohibits Defendants from preventing someone from voting based on an ″error or omission″ that is ″not material″ for determining voter eligibility. **HN22** Presenting ″identification in order to prove one's identity is by definition not an 'error or omission on any record or paper' and, therefore, *§ 1971(a)(2)(B)* does not apply to this case.″ *Common Cause/ Georgia v. Billups, 439 F. Supp. 2d 1294, 2006 WL 2089771, at *65 (N.D. Ga. 2006).* Plaintiffs have not shown a likelihood of success on this issue.

## F. NVRA

The Court addressed Plaintiffs' arguments pursuant to the NVRA in the Order denying the request for a temporary restraining order. Plaintiffs have not presented any convincing reason for the Court to reverse its prior ruling. Plaintiffs have not shown a likelihood of success on the merits of this claim.

## G. Balance of Hardships

Proposition 200 has been in effect since January 2005 and elections have been held after its adoption. Since its initiation, Defendants have invested ″enormous resources″ in preparing to apply Proposition 200 to this Fall's elections. *See Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 919 (9th Cir. 2003)* [*34] (observing state of California and its citizens had already invested ″enormous resources″ in upcoming election). In July 2005, the State revised the voter registration founs to highlight Proposition 200's identification requirements. (Doc. 158 Ex. 1) Elections workers throughout the state have ″undergone extensive training… to ensure consistent application of the proof of citizenship for voter registration and identification at the polls.″ (Id.) This training includes ″classroom-type

---

[9]   It is not clear that the Voting Rights Act applies to this non-race based claim. *See Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 2006 U.S. Dist. LEXIS 20321, 2006 WL 1005537, at *47 n.106 (S.D. Ind. 2006)* (citing cases establishing Voting Rights Act aimed at eliminating racial discrimination). The Court will assume that it does for purposes of this Order.

2006 U.S. Dist. LEXIS 76638, *34

training of more than 7,000 boardworkers." (Id.) In March 2006, the Maricopa County Recorder launched a public awareness campaign aimed at educating the public regarding Proposition 200's requirements. Maricopa County has sent a new voter registration card to each registered voter and that mailing includes information regarding Proposition 200's requirements. (Id.) An injunction would force Defendants to change their registration and voting procedures, retrain all poll workers, and attempt to communicate with eligible voters regarding the changes. This would undoubtedly cause confusion among election officials, boardworkers, and voters. [10] The balance of hardships tips in favor of Defendants. [*35]

Plaintiffs have not shown a strong likelihood of success and the balance of hardships tips in favor of Defendants.

Accordingly,

**IT IS ORDERED** the Motion to Expedite (Doc. 194) is **DENIED AS MOOT.**

DATED this 11th day of October, 2006.

/s/

Roslyn O. Silver

United States District Judge

---

[10]   Coconino County was the only county that presented credible evidence that the burdens might be overcome. But Coconino County did not address the significant burdens that might result were Proposition 200 enjoined but later found valid. In that event, counties would have to go through voter lists and remove individuals that did not comply with Proposition 200 at the time they registered.