IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-1237 - JLK

**ELECTION SYSTEMS & SOFTWARE, LLC,**
            a Delaware limited liability company; and
**HART INTERCIVIC, INC.,**
            a Texas corporation;
                        Plaintiffs,

                        v.

**WAYNE W. WILLIAMS,**
            in his official capacity as Colorado Secretary of State.
                        Defendant.
_____

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**
_____

JONES & KELLER, P.C.
            Thomas P. McMahon
            tmcmahon@joneskeller.com
            Aaron D. Goldhamer
            agoldhamer@joneskeller.com
            1999 Broadway, Ste. 3150
            Denver, CO 80202
            Tel. (303) 573-1600
            Fax  (303) 573-8133
            Attorneys for Plaintiffs

Dated:  July 12, 2016

JK00841406.1 /font=8

# TABLE OF CONTENTS

RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    Chronology of Actions by the Secretary . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.    Permanent Adoption of New Voting System Rules by the Secretary . . . . . 2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    PLAINTIFFS HAVE VALIDLY ASSERTED A DORMANT COMMERCE
    CLAUSE CLAIM IN THEIR FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . 7

    A.    The Secretary Is Acting as a Governmental
        Regulator, Not a Market Participant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    The secretary's own case citations defeat his argument . . . . . . . . . 9

        2.    The statutory sections cited by the secretary do not suffice . . . . . . 11

    B.    Congress in HAVA Did Not Clearly and Unambiguously
        Authorize States to Enact Uniform Voting System Rules
        Which Discriminate Against Interstate Commerce . . . . . . . . . . . . . . . . . . 12

II.    THE STATE LAW CLAIMS SHOULD NOT BE DISMISSED . . . . . . . . . . . 15

    A.    The Eleventh Amendment Does Not Bar Plaintiffs' Claims . . . . . . . . . . . 15

        1.    Injunctive relief is available on the federal claim . . . . . . . . . . . . . 15

        2.    The Eleventh amendment likewise does not bar a
            federal court from enjoining state officials to conform
            their conduct to the requirements of federal law . . . . . . . . . . . . . . 16

            a.    52 U.S.C. §§21081 et *seq.* make compliance
               with state law a federal duty . . . . . . . . . . . . . . . . . . . . . . 19

HAVA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NVRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    b.     The Secretary has failed to comply with
          state law required by federal law . . . . . . . . . . . . . . . . . . . . . 20

B.     The *Pullman* Abstention Doctrine Is Inapplicable Here . . . . . . . . . . . . . . 21

    1.     Colorado law is not unclear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.     Colorado law doesn't underlie the dormant
        Commerce Clause claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.     This Court Has Jurisdiction to Consider the State Law Claims . . . . . . . . 25

    1.     Plaintiffs' second claim is ripe . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        a.     The issues in this case are fit for judicial
            decision because they are purely legal and
            the injury is certainly impending . . . . . . . . . . . . . . . . . . . . . 26

        b.     The Secretary's actions, taken together, collectively
            demonstrate that he has long since made his decision . . . . 27

    2.     This is not an action for judicial review under
        state law and, so, is not subject to the 35-day
        filing limitations period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    3.     Plaintiffs have standing to bring their unfunded
        mandate claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        a.     Plaintiffs have a close relationship with counties . . . . . . . . 31

        b.     County obstacles are sufficient to confer
            third-party standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

The new voting system rules of the Colorado Secretary of State ("Secretary"), taken together with his other actions, effectively mandate that a uniform voting system be provided by a single vendor for use by all Colorado counties.  The rules and actions give preference to Colorado-based Dominion Voting Systems, Inc. ("Dominion"), to the detriment of out-of-state Plaintiffs Election Systems & Software, LLC ("ES&S"), and Hart InterCivic, Inc. ("Hart").  Although the new rules appear neutral on their face, they are not.  In actuality, they codify technological functions and capabilities designed to match Dominion's voting system and exclude those of ES&S and Hart in violation of the dormant Commerce Clause.

Additionally, the rules and actions conflict with the Colorado election code, which statutorily contemplates that Colorado counties are to have multiple voting systems available to them.  Similarly, the rules exceed the scope of the Secretary's statutorily-granted rulemaking authority and impose an unfunded mandate on Colorado's counties.

## RELEVANT FACTS

That the Secretary's new voting system rules and other actions in effect mandate a uniform voting system provided solely by Dominion is apparent from the following.

### 1.    Chronology of Actions by the Secretary

In December 2015 the Secretary proposed revisions to various election rules in 8 CCR 1505-1, including Rule 11.9.2.  The latter proposal indicated that, except for voting systems certified by the Secretary on or before December 31, 2014, a county would only be able to purchase or lease a voting system certified and selected by him on or after December 15, 2015 *as Colorado's uniform voting system*.  Cmplt. ¶38.

A week later, the Secretary announced via letter to the state's County Clerks and

Recorders that he had decided to select a <u>single</u> uniform voting system from Dominion for acquisition and use by all Colorado counties in conducting elections.  Cmplt. ¶40.

In response, Douglas County requested pursuant to C.R.S. §24-4-103(4.5) that the Secretary conduct a regulatory analysis of the proposed amendment to Rule 11.9.2, including an analysis of:  who would pay for switching to the single Dominion voting system; what the cost would be; what the effect would be of not switching to a single voting system; and what other alternatives had been considered.  Cmplt. ¶41.

The Secretary responded that, among other things:  county taxpayers would bear the costs, while *there would be no cost to the Secretary or any other state agency*; not switching would mean each county would be able to make its own decision about purchasing a voting system based on price and capabilities; and no alternatives to implementing a single uniform voting system had been considered.  Cmplt. ¶42.

Then, in January 2016 the Secretary announced that he had moved toward completing the testing and certification of Dominion's system and tentatively negotiated with Dominion on the counties' behalf.  Cmplt. ¶45.  On February 17, 2016, the Secretary entered into a contract for Dominion to be *the future provider* of voting systems to Colorado counties.  The contract is six years in length and may be extended by the Secretary for an additional two years.  Cmplt. ¶49.

## 2.    Permanent Adoption of New Voting System Rules by the Secretary

Meanwhile, on February 9, 2016, the Secretary permanently adopted election rules 11.9 and 21.4, 8 CCR 1505-1, many aspects of which differ significantly from the December 2015 proposed rules. The adopted rules eliminated any reference to a uniform voting system,

instead adding exclusive and restrictive requirements and considerations.  Cmplt. ¶47.

Rules 11.9 and 21.4, and their technical/functional requirements and considerations, are only met by, and appear tailored to the features of, the Dominion system, which had been selected in December 2015 by the Secretary as the provider of the uniform voting system for Colorado.  They have no basis in the Colorado election code.  Cmplt. ¶47.c.

Those new voting rules have the collective effect of – without expressly calling for a uniform voting system – functionally mandating that all Colorado counties adopt a single uniform voting system whose requirements can only be met by Dominion's product.  *E.g.*:

• New rule 11.9.2(b) allows only *replacement* of damaged, defective or inoperable existing electronic and electromechanical voting systems, components or devices – but not (i) *replacement* by ES&S and Hart of undamaged, non-defective or operable existing electronic and electromechanical voting systems, components or devices, or (ii) *upgrades* by ES&S and Hart to existing systems, components or devices.  Cmplt. ¶48.a.

• New rule 11.9.3(c) favors a voting system utilizing commercial, off-the-shelf hardware rather than proprietary, purpose-built hardware components.  Dominion's system does so across-the-board.  The ES&S system does not and so is disfavored; Hart's system does so in certain places and not in others, causing it to be less favored.  Cmplt. ¶48.b.

• New rules 11.9.3(d), 11.9.4(c) and 21.4.7(e) effectively require a voting system to enable users to operate or access all election management systems within a single interface on the same server or workstation.  Dominion's system does; the ES&S and Hart systems do not, effectively disqualifying them.  Yet, there is no operational reason for these functions to be on the same high priced server.  In fact, there are internal control, and single point of

failure, reasons why they should not be on the same server.  Cmplt. ¶48.c.

• New rules 11.9.3(g)(1), 11.9.4(a) and 21.4.16(a) effectively require a voting system to enable election judges to adjudicate, resolve and duplicate ballots digitally rather than manually.   Dominion's system does; ES&S' system doesn't, effectively disqualifying it.  Cmplt. ¶48.d.

• New rules 11.9.3(g)(2), 11.9.4(b) and 11.9.5 effectively require a voting system to have ballot scanners equipped with automatic document feeders, enabling election judges to scan multiple ballots rather than a single ballot at a time.  Dominion's system does; the ES&S and Hart systems do not, effectively disqualifying them.   Yet, there is no operational benefit to this requirement.  Cmplt. ¶48.e.

• New rule 21.4.7(e) effectively prohibits a voting system from deploying, separately from a traditional election management system, any data management applications that do not capture or tabulate votes.  Dominion's system utilizes integrated applications; the ES&S and Hart systems don't, effectively disqualifying them.  Cmplt. ¶48.f.

• New rules 21.4.14 (b)-(c) and 21.4.15(b)-(d) impose arbitrary and restrictive formatting requirements in a manner that is highly irregular for administrative rules, particularly in light of the fact that the formatting requirements appear to be tailored exactly to the manner in which Dominion system operates.  Cmplt. ¶48.f.

## STANDARD OF REVIEW

**Fed. R. Civ. P. 12(b)(1)**.  The Secretary has moved under Fed.R.Civ.P. 12(b)(1) to dismiss Plaintiffs' state law claims on the basis that this Court lacks subject matter jurisdiction to hear them.  *See* Motion at 20-25.  Accordingly, it is Plaintiffs' burden "to

allege facts demonstrating the appropriateness of invoking judicial resolution of the dispute." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).

The factual allegations of a complaint are not presumed true in a factual attack on subject matter jurisdiction.  To resolve disputed jurisdictional facts under Rule 12(b)(1), a court may consider evidence outside the pleadings without converting the motion to one for summary judgment.  *Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000).

Conversely, however, a court is required to convert a Rule 12(b)(1) motion to a Rule 12(b)(6) motion or a Rule 56 motion where the jurisdictional issue is intertwined with the merits of the litigation.  That is the case "if subject matter jurisdiction is dependent on the same statute which provides the substantive claim ...."  *Id.* (citing *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995)).

**Fed. R. Civ. P. 12(b)(6)**.  The Secretary has also moved under Fed.R.Civ.P. 12(b)(6) to dismiss all of Plaintiffs' claims, both federal and state, on the basis that they fail to state a claim on which relief can be granted.  Fed.R.Civ.P. 8(a)(2) establishes the requisites of a claim for relief.   It "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' "  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

On a Rule 12(b)(6) motion, all factual allegations of the complaint must be accepted as true, *Twombly,* 550 U.S. at 555-56 (*cited in Erickson v. Pardus,* 551 U.S. 89, 94 (2007)), and construed most favorably for the plaintiff, *Scheurer v. Rhodes,* 416 U.S. 232, 236 (1974); *accord Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Plus,

all reasonable inferences must be drawn in the plaintiff's favor. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

Applying these standards, courts then merely "look for plausibility in th[e] complaint." *Twombly*, 550 U.S. at 564 (*quoted in Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007)). A complaint need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' " however. *Id.* As long as the "[f]actual allegations [are] enough to raise a right to relief above the speculative level, ... [the case] may proceed even if it appears 'that a recovery is very remote and unlikely' ...." *Twombly*, 550 U.S. at 555-56 (quoting *Scheurer*, 416 U.S. at 236). A plaintiff must simply "frame a 'complaint with enough factual matter (taken as true) to *suggest*' that ... [it] is entitled to relief." *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (emphasis added, quotation omitted).

"[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation and citation omitted).

## ARGUMENT

The Secretary first proposed a new election rule to have a single uniform voting system for Colorado. Next, he tentatively selected Colorado-based Dominion as the sole provider of a single statewide voting system. Then he solidified that choice by entering into a memorandum of understanding with Dominion. After that he addressed the Colorado

County Clerks Association on the topic of a "uniform voting system," presenting it and Dominion as a *fait accompli*. Ultimately, he contracted with Dominion for it to be *the provider* of voting systems for Colorado's counties. Meanwhile, the Secretary adopted permanent voting system rules avoiding any mention of a "uniform voting system" but which were written to incorporate the manner in which only Dominion's system operates.

These are the actions of a government regulator, not those of a voting systems vendor that is a "market participant." And, they have nothing to do with the actual conduct of elections under the Help America Vote Act of 2002, 42 U.S.C. §§15301 to 15545 ("HAVA"). The purported defenses to Plaintiffs' dormant Commerce Clause claim are a sham. Nor is there any lack of subject-matter jurisdiction with regard to the state law claims.

## I.    PLAINTIFFS HAVE VALIDLY ASSERTED A DORMANT COMMERCE CLAUSE CLAIM IN THEIR FIRST CLAIM FOR RELIEF

The Commerce Clause grants Congress the power to regulate commerce among the States. U.S. Const., art. I, §8, cl.3. It has long been recognized as "limit[ing] the power of ... States to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (citations omitted). It constitutes a "substantive 'restriction on permissible state regulation' of interstate commerce" and is a "self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Id.* at 447 (citations omitted). This implicit rule of law is known as the dormant Commerce Clause. It " 'denies ... states the power ... to *discriminate* against ... the interstate flow of articles of commerce.'" *Bioganic Safety Brand, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1183 (D. Colo. 2001) (emphasis added) (citing *Or. Waste Sys. v. Dept. of Envtl. Quality*, 511 U.S. 93, 98 (1994)).

A state regulation may violate the dormant Commerce Clause by "*discriminat[ing] against interstate commerce* ... on its face or *in practical effect*," Bioganic, *id.* (emphasis added), such as by "discriminat[ing] in favor of in-state economic interests." Bioganic, *id.* at 1183-84. " '[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys., 511 U.S. at 99. That occurs where an in-state commercial interest is directly or indirectly favored by the challenged governmental action at the expense of out-of-state competitors. *See* Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 95 (2d Cir. 2009). That is the case here.

### A.   THE SECRETARY IS ACTING AS A GOVERNMENTAL REGULATOR, NOT A MARKET PARTICIPANT

The Secretary urges, however, that the dormant Commerce Clause does not apply to a governmental entity acting as a "market participant" rather than a "market regulator." As he concedes, citing Reeves, Inc. v. Stake, 447 U.S. 429, 435 n.7 (1980), the "single inquiry" is whether the challenged program constitutes direct state participation in the market. Put differently in another case cited by Defendant, the issue is whether the Secretary is actually participating in the market as the proprietor of a business or simply regulating the actions of other private participants in the market, *see* Chance Mgmt. v. South Dakota, 97 F.3d 1107, 1111 (8th Cir. 1996), *i.e.*, vendors of voting systems and counties wishing to acquire them.

There exists no bright-line rule distinguishing governmental regulation of commerce from market participation. Rather, courts must make fact-specific determinations on a case-by-case basis in each particular context whether the government is acting like a private

business or a governmental entity.  *Selevan*, 584 F.3d at 93-94.

Here, as if saying it makes it so, the Secretary simply asserts over and over that he is a participant in the voting systems market rather than a governmental regulator of that market.  Fatally, however, he fails to articulate any facts demonstrating that to be the case. Indeed, the authorities he cites conclusively demonstrate that he is *not* a market participant.

### 1.    The Secretary's Own Case Citations Defeat His Argument

In *Red River Serv. Corp. v. City of Minot*, 146 F.3d 583, 585 (8th Cir. 1998), the city owned and operated a landfill.  As such, it was engaged in proprietary business activities as a seller of landfill capacity and waste disposal services.  *See id.* at 587.  Accordingly, it was a market participant rather than a market regulator.  *Id.* at 586.  Likewise, in *Reeves, Inc. v. Stake*, 447 U.S. at 440, the state of South Dakota owned and operated a cement plant and, so, as a seller of cement was a market participant.  And, in *Chance Mgmt. v. South Dakota*, 97 F.3d 1107, 1111-12 (8th Cir. 1996), South Dakota was the owner and operator of a money-making state lottery business and, as such, was a gaming market participant.  Plus, in *Dep't of Revenue v. Davis*, 553 U.S. 328, 331-32 (2008), Kentucky was an issuer of state bonds and, thus, a market participant in the money-making business of selling bonds.

Unlike those situations, the Secretary does not participate in commerce as the owner of a voting system vendor business in a money-making enterprise.  *Cf.* Cmplt. ¶3.  Rather, he examines voting systems of other private businesses and determines whether they comply with statutorily-prescribed requirements and rules establishing minimum standards addressing statutorily-prescribed criteria.  Cmplt. ¶22.b.  If they do, he *must* certify them and approve them for acquisition by Colorado counties.  Cmplt. ¶23.  It is Dominion, ES&S and

Hart that participate in business for profit as vendors of voting systems.  Cmplt. ¶¶1-2, 4.

Similarly, in _White v. Mass. Council of Constr. Emp'rs_, 460 U.S. 204, 214-15 (1983), the city of Boston expended its own funds in entering into construction contracts, thereby becoming a participant in the market for construction projects as a purchaser.  Likewise, in _Hughes v. Alexandria Scrap Corp._, 426 U.S. 794, 796-97, 809 (1976), the state of Maryland participated in the market for scrap automobiles as a purchaser by paying "bounties" for such items.  _Bldg. & Constr. Trades Council v. Assoc'd Bldrs. & Contrs._, 507 U.S. 218, 232-33 (1993), also cited by Defendant, is not a dormant Commerce Clause case but is analogous.  As the purchaser of construction contractor services, a government agency was engaged in proprietary conduct.

Here, the Secretary does not purchase or lease voting systems from vendors, _see_ Cmplt. ¶¶3, 22.b, 23; Colorado's 64 counties do, Cmplt. ¶18.  Nor did the Secretary expend any money in first entering into a memorandum of understanding, and later an actual contract, with Dominion.[1]  _Cf._ Cmplt. ¶¶45.b, 49.  Thus, his attempt to analogize himself to a mayor determining qualifications for contractors with the city is flawed because in the analogy the city is a market participant as a purchaser of services but here the Secretary isn't.

What the Secretary has done is engage in a direct attempt to govern private economic

---

[1]  Defendant offers no support for the argument that, as an inducement for counties to switch to Dominion voting system in 2016 or 2017, paying 50% of the associated implementation, training and program management fees, Cmplt. ¶46 – _but not the acquisition costs themselves_ – somehow makes the Secretary a "direct participant in the ... voting systems market ...."  Nor does Defendant offer any support for the argument that, by supposedly leveraging the state's negotiating and purchasing power, _id._ ¶42, and tentatively negotiating pricing with Dominion on the counties' behalf, _id._ ¶46 – _but not actually paying the purchase costs_ – the Secretary somehow became a direct participant in the voting systems vendor business.  In neither case has the Secretary become a participant in the market as a purchaser of voting systems.

relationships.  He has sought to dictate to Colorado's counties with whom they may deal in the acquisition of voting systems.  The exercise of such power by government "*is the essence of regulation*."  <u>White</u>, 460 U.S. at 218-19 (Blackmun, J., concurring in part and dissenting in part) (emphasis added) (*quoted in* <u>Davis</u>, 553 U.S. at 346).  The Secretary is <u>not</u> a market participant, so that exception is not applicable here.

### 2.      The Statutory Sections Cited by the Secretary Do Not Suffice

The Secretary goes on to urge that a few Colorado election code sections authorize him to do what he has done:  selecting Dominion as the sole provider of a single, statewide voting system for Colorado; entering into a memorandum of understanding with it in that regard; contracting with it to be *the provider* of voting systems for Colorado counties; and adopting new voting system rules to support those actions.  But, the statutory sections on which he relies[2] make no mention of a "uniform voting system."

In construing those sections, reference to what other states' election codes say about their voting systems is instructive.  *See, e.g.,* <u>New Mexico ex rel. League of Woman Voters v. Herrera</u>, 203 P.3d 94, 100-01 (N.M. 2009) (finding support for construction of New Mexico's "voter intent" statute by comparing its language with that of other states' "voter intent" statutes).  In that regard, unlike Colorado, other states with uniform voting systems have express authorization for those systems in their election codes.  For example:

- "*The secretary of state shall select a uniform voting system* under the provisions of this section...."  Mich. Comp. Laws Ann. §168.37 (2016) (emphasis added).

- " '*Uniform voting system*' means the type of voting system that *is used* at all

---

[2]  C.R.S. §§1-1-110(1), 1-1.5-101(1)(h), 1-5-608.5(3)(b), 1-5-613, 1-5-616 & (1), 1-5-623(3)(a).

elections *in every election precinct throughout the state*."  *Id.* §168.4(h) (2016) (emphasis added).

• "*The Secretary of State may implement a uniform system of electronic voting* in any county participating in the pilot project for *establishing a uniform system of electronic voting* provided for in Act 91-562....*"  Ala. Code §17-7-27 (2016) (emphasis added).

• "After the *establishment of the uniform system of electronic voting* through the implementation of the pilot project, the Secretary of State may provide for the orderly acceptance of counties requesting to participate in *the state uniform system*....*"  *Id.* §17-7-29 (2016) (emphasis added).

• "*The voting system selected and certified [by the State Board]* for voting in polling places and ... for absentee voting *shall be used in all counties*."  Md. Code Ann., Elec. Law §9-101(a)-(b) (2016) (emphasis added).

The absence of such express authorization here is fatal to the Secretary's argument. That conclusion is underscored by Colorado election code provisions authorizing the state's counties to choose – not the Secretary to mandate – which voting systems to select, adopt and use.  C.R.S. §1-5-603 *authorizes counties to adopt* for use in elections *any kind of voting machine* fulfilling the requirements for voting machines set forth in C.R.S. §§1-5-601 *et seq*. C.R.S. §1-5-612(1) *authorizes counties to adopt* electronic or electromechanical voting systems – including hardware, firmware and software upgrades.  C.R.S. §1-5-616(4) requires the Secretary to adapt voting systems certification standards to ensure that new technologies are available *for selection by counties*.

## B.   CONGRESS IN HAVA DID NOT CLEARLY AND UNAMBIGUOUSLY AUTHORIZE STATES TO ENACT UNIFORM VOTING SYSTEM RULES WHICH DISCRIMINATE AGAINST INTERSTATE COMMERCE

After first urging that he is a market participant rather than a governmental regulator, the Secretary reverses course and argues that he can mandate a single statewide uniform voting system precisely because HAVA authorizes states to regulate elections.  He also

suggests that he can do so because HAVA unambiguously authorizes states to establish election technology and administration requirements more strict than those of HAVA as long as they don't conflict with HAVA's requirements.

These are sleight-of-hand, apples and oranges arguments.  Regulating elections, *see* 52 U.S.C. §21084-85, or establishing election technology/administration requirements, *see id.* §21084, are completely different matters than imposing a single statewide uniform voting system that discriminates against interstate commerce – a matter HAVA does not address.

As Defendant concedes, where a Congressional enactment neither preempts the states from regulating in a particular area nor authorizes or consents to their doing so, state regulation is subject to the dormant Commerce Clause.  "As to the state regulation at issue in this case, ... Congress has been silent – it has not preempted or consented to," *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1135 (10th Cir. 2016), the concept of a single statewide uniform voting system, much less one that discriminates against interstate commerce.

And, even regarding authorization or consent for states to regulate in a particular area, courts "will not assume that" Congress "has ... authoriz[ed] state regulations that burden or *discriminate against interstate commerce* ... unless such an intent is *clearly expressed*." *Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59, 66 (2003) (emphasis added, citations omitted). A court may exempt a local law from the requirements of the dormant Commerce Clause "only when the congressional direction to do so has been '*unmistakably clear*,' " *Maine v. Taylor*, 477 U.S. 131, 139 (1986) (emphasis added) (quoting *S.–Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)), and the defendant has demonstrated "a *clear and unambiguous* intent on behalf of Congress to permit the *discrimination against interstate*

commerce ...." _Wyoming v. Oklahoma_, 502 U.S. 437, 458 (1992) (emphasis added).

Congressional *authorization to discriminate* exists when a federal law: *quite clearly* authorizes or consents to states regulating a particular aspect of commerce, *see* _Prudential Ins. Co. v. Benjamin_, 328 U.S. 408, 429 (1946); or provides that nothing in any provision of law *either directly or indirectly* limits the states' authority to regulate a particular aspect of commerce, *see* _Hillside Dairy_, 539 U.S. at 65-66.  HAVA says nothing of either sort with respect to uniform voting systems; it is silent.

In contrast, *authorization to discriminate* does not exist when a federal law:  merely clarifies that it does not preempt state law, or deprive a state of its existing authority, with regard to a particular aspect of commerce, *see* _New England Power Co. v. New Hampshire_, 455 U.S. 331, 341 (1982); or expressly recognizes state laws addressing a particular aspect of commerce, *see* _Granholm v. Heald_, 544 U.S. 460, 487 (2005), _Sporhase v. Nebraska, ex rel. Douglas_, 458 U.S. 941, 959–60 (1982).

Regarding the general topic of voting systems, HAVA's language aligns with the latter cases.  It simply recognizes that states are not prohibited from establishing election technology and administration requirements that exceed HAVA's minimum requirements, provided they do not conflict with HAVA.  *See* 52 U.S.C. §21084.  "But saying that the statute does not prohibit such additional standards is not the same as saying that the dormant Commerce Clause does not prohibit burdens on interstate commerce."  _Puppies 'N Love v. City of Phx._, 116 F.Supp.3d 971, 983 (D. Ariz. 2015).

Indeed, as Defendant concedes, under HAVA states enjoy wide latitude.  *See* 52 U.S.C. §21085.  "[T]he HAVA statute gives the states substantial discretion on how to

implement its requirements." *Cty. of Nassau v. New York*, 724 F.Supp.2d 295, 303 (E.D.N.Y. 2010) (citing 42 U.S.C. §15484-85 [now 52 U.S.C. §§21084-85]). "Significantly, ... HAVA expressly leaves '[t]he specific choices on the methods of complying with [its] requirements ... to the discretion of the State.' " *Id.* at 305 (citing same).

Thus, HAVA "does not *clearly and unambiguously* authorize [states] to enact ... [regulations] that discriminate[] against interstate commerce." *Puppies 'N Love*, 116 F.Supp.3d at 983 (emphasis added). "[I]t does not explicitly say that the [state] may enact ... [regulations] that discriminate[] against out-of-state [vendors] in purpose or effect" by favoring an in-state voting system vendor. *Id.* Thus, Defendant's argument that Congress has merely expressed an "unambiguous intent to permit state to regulate ... voting systems" misses the mark. And, the Secretary's argument that some of the new voting system rules may further HAVA's underlying objectives is simply irrelevant here. Defendant's HAVA argument fails.[3]

## II.   THE STATE LAW CLAIMS SHOULD NOT BE DISMISSED

### A.   THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFFS' CLAIMS

#### 1.   Injunctive Relief is Available on the Federal Claim

Plaintiffs are suing the Secretary in his official capacity. Cmplt. ¶3. On their dormant

---

[3]  Defendant cites four Supreme Court cases for the proposition that state laws have been upheld against dormant Commerce Clause scrutiny because Congress expressly authorized the states' exercise of regulatory power. None of those cases involved HAVA, and all are inapplicable here. *Hillside Dairy*, 539 U.S. at 66, and *Prudential*, 328 U.S. at 429-31, are distinguished above. *New York v. United States*, 505 U.S. 144, 171 (1992), is distinguishable because Congress expressly authorized states to burden interstate commerce in the particular subject-matter area (transport of low-level radioactive waste). *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n*, 332 U.S. 507 (1947), is distinguishable  because Congress expressly intended states to regulate natural gas to the extent it had not preempted the field. *Id.* at 521, 524.

Commerce Clause claim under 42 U.S.C. §1983 they primarily seek to enjoin him from engaging in the conduct alleged in that [First] claim.  Cmplt. ¶¶A(1), (2)(a).[4]  In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court established a fundamental exception to Eleventh Amendment immunity.  It recognized "that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir.1995) (collecting cases).

Apropos here, "[t]he very purpose of §1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action under color of state law ...." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).  "In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in §1983 actions by expressly authorizing a 'suit in equity' as one of the means of redress." *Id.*

"Not all federal laws – indeed, not even all constitutional provisions – confer rights that can be enforced through §1983....  But the Commerce Clause does." 13D Charles Alan Wright & Arthur R. Miller *et al.*, Federal Practice & Procedure §3573.2 (3d ed., 2016 update).  Persons "injured by state action that violates ... the [dormant] Commerce Clause may sue and obtain injunctive and declaratory relief." *Dennis v. Higgins*, 498 U.S. at 447.

### 2. The Eleventh Amendment Likewise Does Not Bar a Federal Court from Enjoining State Officials to Conform Their Conduct to the Requirements of Federal Law

---

[4]  The request for monetary damages, Cmplt. ¶A(2)(b), was only made in the alternative.

"[I]n *Ex parte Young* ... the Attorney General of Minnesota was enjoined to conform his future conduct of that office to the requirement of the Fourteenth Amendment." *Edelman v. Jordan*, 415 U.S. 651, 664 (1974).  Similarly, the Secretary here may be enjoined by this Court to conform his future conduct of that office vis-a-vis voting rules to federal statutory requirements.  Indeed, "[t]he [*Ex parte Young*] doctrine ... is based on the idea that the power ... to enjoin 'continuing violation[s] of federal law [is] necessary to vindicate the federal interest in assuring the supremacy of that law.' " *Fond du Lac Band*, 68 F.3d at 255 (citations omitted).

Additionally, where federal law makes compliance with state law a federal duty, federal  courts have jurisdiction to compel state officials to obey state law.  *See Wisconsin Hosp. Assoc. v. Reivitz*, 820 F.2d 863, 868 (7th Cir. 1987) (Posner, J.) (finding exception to *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)).   In that event, "enforcement of the federal law by the federal courts requires the exercise of federal subject matter jurisdiction, and the Eleventh Amendment bar gives way." *Am. Soc. of Consultant Pharmacists v. Patla*, 138 F.Supp.2d 1062, 1071-72 (N.D. Ill. 2001) (citing *Reivitz*, 820 F.2d at 868).  Put another way, "the Eleventh Amendment does not bar a federal court from enjoining state officials to conform their conduct to the requirements of federal law." *Matter of Reserves Dev. Corp.*, 78 B.R. 951, 956 (W.D. Mo. 1986) (citing *Barnes v. Cohen*, 749 F.2d 1009, 1019 (3rd Cir.1984)).[5]

---

[5]   Furthermore, a federal court may determine that a state's interpretation of its own law or regulations is inconsistent with the law or regulations themselves without violating the Eleventh Amendment where, as here, the state official's conduct also violates federal law.  *See Barnes*, 749 F.2d at 1018-19.  Thus, without running afoul of that amendment, this court may determine that the Secretary's interpretation of his rulemaking authority is inconsistent with the Colorado statutory

Section 5 of the Fourteenth Amendment permits Congress to abrogate sovereign immunity by providing that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. "[T]he Constitution ... expressly gives authority for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment." _Ex parte Commonwealth of Virginia_, 100 U.S. 339, 347-48 (1880). The Supreme Court has "recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution." _Seminole Tribe of Florida v. Florida_, 517 U.S. 44, 59 (1996) (citing _Fitzpatrick v. Bitzer_, 427 U.S. 445, 455 (1976)). The Court in _Fitzpatrick_ acknowledged "that Congress may, ... for purpose of enforcing the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." 427 U.S. at 456 (quoting U.S. Const. amend. XIV, § 5).

Similarly, section 2 of the Fifteenth Amendment provides Congress the same power. _Mixon v. Ohio_, 193 F.3d 389, 398-99 (6th Cir. 1999) (concluding that Section 2 of the Fifteenth Amendment mirrors Section 5 of the Fourteenth Amendment, both of which grant Congress the power to enforce the Amendments); _Hall v. Louisiana_, 974 F. Supp. 2d 944, 953 (M.D. La. 2013) (plaintiff's claims against legislature under §2 of Voting Rights Act not proscribed by Eleventh Amendment sovereign immunity); _Reaves v. United States Dep't of Just._, 355 F.Supp.2d 510, 515 (D.D.C.2005) ("it is reasonable to conclude that Congress, in

---

provisions conferring that authority (Fourth Claim).

passing the Voting Rights Act, effected a valid abrogation of state sovereign immunity"); *see also* <u>City of Boerne v. Flores</u>, 521 U.S. 507, 518 (1997) (collecting cases and noting the Supreme Court has "concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States"); <u>*South Carolina v. Katzenbach*</u>, 383 U.S. 301, 308 (1966) (upholding several provisions of Voting Rights Act).

> a.   **52 U.S.C. §§21081 *et seq.* make compliance with state law a federal duty**

In accord with the preceding, the following federal statutory sections of HAVA and the National Voter Registration Act, 42 U.S.C. §1973gg to gg10 (n/k/a 52 U.S.C. §20501 *et seq.*), require that state law conform to federal requirements and make compliance with that state law a federal duty.

**<u>HAVA</u>**
- 52 U.S.C. § 21111 (authorizing federal court action against state for declaratory and injunctive relief necessary to cause state to carry out uniform and *nondiscriminatory* election technology and administration requirements under 52 U.S.C. §§21081-21083).

- 52 U.S.C. §21081 (establishing federal elections voting system requirements);

  - (a)(6) (requiring states to adopt uniform and *nondiscriminatory* standards defining what constitutes, and what will be counted as, a vote for each category of voting system used in state).

- 52 U.S.C. §21082 (a) (establishing provisional voting requirements);

  - (b) (establishing voting information requirements);

  - (d) (requiring each state to comply with section's requirements as of January 1, 2004)

- 52 U.S.C. §21083(a) (establishing computerized statewide voter registration list requirements);

- (a)(1)(A) (requiring each state, acting through chief election official, to implement in uniform and *nondiscriminatory* manner a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at state level containing name and registration information of every legally registered voter in state and assigning unique identifier to each);

- (a)(5)(B) (establishing requirements for chief state election and motor vehicle officials regarding matching election, motor vehicle and social security information);

- (b)(1) (prescribing that states shall, in uniform and *nondiscriminatory* manner, require certain individuals to meet requirements of subparagraph (2) regarding voting in person or by mail);

- (d)(2)(A) (prescribing state requirements with respect to persons registering to vote by mail).

**NVRA**
- 52 U.S.C. §20507(a) (prescribing requirements for states regarding administration of voter registration);

- (b)(1) (requiring state programs or activities regarding maintenance of voter registration rolls be uniform, *nondiscriminatory* and comply with Voting Rights Act).

The foregoing Acts expressly provide that Congress intends to render states amenable to suit and deprives the Secretary of Eleventh Amendment immunity by expressly authorizing federal court action against states for violating their provisions.

### b.   The Secretary has failed to comply with state law required by federal law

The Secretary has violated the foregoing provisions by failing to carry out their uniform, *nondiscriminatory* election technology and administration requirements. *Project Vote v. Blackwell*, 455 F.Supp.2d 694 (N.D. Ohio 2006), is instructive in this regard. There, the court addressed the interaction of the National Voter Registration Act ("NVRA") and O.R.C. §3503.29, which required paid participants in voter-registration drives to pre-register with the Secretary of State ("SoS"), receive online training through the SoS' office and

submit affirmation of compliance with those provisions for each batch of voter registration forms returned. The court found the state provisions were not "a uniform and *non-discriminatory* attempt to protect the integrity of the electoral process" as required by the NVRA. *Id.* at 703 (emphasis added) (citing 42 U.S.C. §1973gg-6(b)(1) (n/k/a 52 U.S.C. §20507(b)(1)).

In particular, the Ohio provisions were not uniform and non-discriminatory because they applied only to paid workers and required training only on the Internet. Nor was there any showing of how the state's articulated interest in preventing voter fraud was advanced by the provisions. *Id.* at 703. The court concluded that "these pre-registration, training and affirmation requirements" were in conflict with, and thus preempted by, the NVRA. *Id.* at 704 (citing *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir.2005) (NVRA overrides all state laws inconsistent with its specific mandates).

The Secretary's new voting system rules violate 52 U.S.C. §§21081 *et seq.* by erecting barriers that previously did not exist. They are neither uniform nor non-discriminatory; they establish specifications which are met by only one vendor, Dominion, thereby necessarily excluding all other vendors. The Secretary is not entitled to Eleventh Amendment immunity.

### B.    THE *PULLMAN* ABSTENTION DOCTRINE IS INAPPLICABLE HERE

Defendant argues that if Plaintiffs' state law claims are not barred by the Eleventh Amendment, this Court should invoke *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), to abstain from deciding them. Defendant implies that the state law issues raised in those claims are uncertain and underlie Plaintiffs' federal constitutional claim. Thus, the ultimate resolution of those issues someday in state court cases *filed by other*

Plaintiffs[6] might obviate the need for this Court to reach Plaintiffs' federal claim in this case – which, therefore, should not be decided now either.  The argument is a house of cards.

First of all, "the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in [a] Federal court having jurisdiction."  _Colo. River Water Conservation Dist. v. United States_, 424 U.S. 800, 817 (1976).  Indeed, "it was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it."  _Id._ at 813-14 (citation omitted); _see Petrella v. Brownback_, 980 F.Supp.2d 1293, 1298-99 (D. Kan. 2013) (rejecting abstention request).  Rather, "[f]ederal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.' "  _George v. Haslam_, 112 F.Supp.3d 700, 713 (M.D. Tenn.  2015) (quoting _Colo. River_, 424 U.S. at 817).

The _Pullman_ abstention doctrine is to be narrowly construed.  _See Reetz v. Bozanich_, 397 U.S. 82, 86 (1970) (_cited in Petrella_, 980 F.Supp.2d at 1298.  And, as Defendant concedes, _Pullman_ abstention only applies when, among other factors, (i) there exists an uncertain issue of state law (ii) that _underlies_ a federal constitutional claim.[7]  _See Pullman_,

---

[6]  _See Bd. of Cty. Comm'rs of Jefferson Cty. v. Williams_, Case No. 16 cv 31544 (Denver Dist. Ct., Apr. 29, 2016); _Klotz v. Williams_, Case No. 16 cv 31603 (Denver Dist. Ct., May 4, 2016).  But, it is implicit in the _Pullman_ abstention doctrine that the state court proceedings involve _the same_ plaintiffs.  _E.g., George v. Haslam_, 112 F.Supp.3d 700, 714 n.3 (M.D. Tenn.  2015) ("expectation [is] that the federal litigation will resume in the event that _the plaintiff_ does not obtain relief in state court on state-law grounds"; "parties forced by a federal judge to litigate _their_ state-law claims in state court can return to federal court") (emphasis added, citations and internal quotations omitted).

[7]  Such " '[a]bstention ... is appropriate only where ... a clarification of that [unclear state] law [c]ould preclude the need to adjudicate the federal question' " _that is premised upon it_.  _George_, 112 F.Supp.3d at 714 (quoting _Hunter v. Hamilton Cty. Bd. of Elections_, 635 F.3d 219, 233 (6th Cir. 2011).  Abstention under _Pullman_ is designed " 'to provide the state courts an opportunity to settle the underlying state law question and thus avoid the possibility of _unnecessarily_ deciding a constitutional question.' "  _Id._ (emphasis added) (quoting _Assoc. Gen. Contractors of Ohio, Inc. v._

312 U.S. at 501; *Lehman v. City of Louisville*, 967 F.2d  1474, 1478 (10th Cir. 1992). Neither is the case here.

### 1.    Colorado Law Here Is Not Unclear

State law is not unclear for purposes of *Pullman* abstention if the legal standard is not unsettled and the court's task is merely to apply the law to a novel set of facts. *Vinyard v. King*, 655 F.2d 1016, 1019-20 (10th Cir. 1981) (state law was not so unclear as to permit abstention).  Just because the state's highest court has not addressed the precise set of facts presented does not justify abstention.  "[U]nder such circumstances the district court may not abdicate its duty to adjudicate the matter."  *Id.* at 1019 (citations omitted).

That is the situation here.  The Colorado Supreme Court has not addressed whether the Secretary's actions in effectively mandating a single, statewide uniform voting system violate C.R.S. §§1-5-603, 612(1) and 616(4) (Colorado's political subdivisions are the entities authorized to select, adopt and use any kind of voting machine meeting the requirements of §§1-5-601 through 623).  Nor has it addressed whether the Secretary's new voting system rules violate his statutory rulemaking authority under C.R.S. §§1-1-107(2)(a), 1-1.5-104(1)(e), 1-5-613(1), §1-5-616(1) or §1-5-616(4).  But there is nothing unclear about those statutory standards themselves.

And, even if there were, "mere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit."  *Lehman Bros. v.*

---

*Drabik*, 214 F.3d 730, 739 (6th Cir.2000) (quoting *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975)).  "[T]he purpose of Pullman abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that *may moot* the federal controversy."  *Id.* (emphasis added) (citing *San Remo Hotel, L.P. v. City and Cty. of San Francisco*, 545 U.S. 323, 339 (2005).

*Schein*, 416 U.S. 386, 390 (1974).  "Where there is no state law [on] point, the federal court must determine what the state supreme court likely would do when faced with a similar case."  *Holler v. United States*, 724 F.2d 104, 105 (10th Cir.1983) (citing *Hartford v. Gibbons & Reed Co.*, 617 F.2d 567, 569 (10th Cir. 1980).[8]

### 2.    Colorado Law Doesn't Underlie the Dormant Commerce Clause Claim

Even assuming *arguendo* that everything the Secretary has done or didn't do comports perfectly with Colorado law (not that it does), that would not obviate the *effect* of those actions in discriminating against interstate commerce by favoring in-state Dominion over out-of-state ES&S and Hart.  Thus, there is no state law issue underlying the dormant Commerce Clause *claim* brought under §1983 and, so, no basis for abstention.[9]  *See Swickler v. Koota*, 389 U.S. 241, 248 U.S. (1967) (interpretation of New York statute would not avoid or modify constitutional question); *George*, 112 F.Supp.3d at 714 (regardless whether defendant's conduct was contrary to or consistent with state constitution, Plaintiffs' claim for federal rights violation unaffected); *Petrella*, 980 F.Supp.2d at 1298-99 (fact that ruling

---

[8]   If there exist significant enough unsettled questions of state law, the Supreme Court prefers their certification to the state's highest court rather than use of *Pullman* abstention.  However, "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law."  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988).  It only applies to questions of state law that are *both* "unsettled and dispositive."  *Anaconda Minerals Co. v. Stoller Chem. Co.*, 990 F.2d 1175, 1177 (10th Cir.1993) (citation omitted).  As just established above, there are no unsettled questions of state *law* here, just novel facts.  And, as shown immediately below, the state law claims are not dispositive in any event.  Certification, too, is inappropriate.

[9]   As a *defense* to the federal claim, the Secretary seemingly implies that a valid factor justifying doing what he did is that he has statutory rulemaking authority to do so.  As established in n.5 above, however, this Court is able to address that issue despite the Eleventh Amendment.  And, where the Secretary himself so interjects a state law issue, he can hardly be allowed to advance as a basis for abstention that which he self-servingly created out of whole cloth.

in state court action could "potentially affect" funding cap in Kansas statute did not provide basis for _Pullman_ abstention).

    _Pullman_ abstention necessitates "exceptional circumstances." _George_, 112 F.Supp.3d at 713 (citation and internal quotation omitted).   Contrary to that, abstention in this case would mean that, without their consent and through no fault of their own, Plaintiffs – who have properly invoked this federal court's jurisdiction to consider their constitutional claim – would be subject to a state court determination that involves neither them nor their claims.

> "There are fundamental objections to [that] conclusion .... Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that [w]hen a [f]ederal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction .... Nor does anything in the abstention doctrine require or support such a result.

_England v. La. State Bd. of Med. Exam'rs_, 375 U.S. 411, 415 (1964) (citation and internal quotation omitted).  _Pullman_ abstention is inapplicable here.

### C.   THIS COURT HAS JURISDICTION TO CONSIDER THE STATE LAW CLAIMS

#### 1.   Plaintiffs' Second Claim Is Ripe

    Plaintiffs' Second Claim is for violation by the Secretary of his statutory duty under C.R.S. §1-5-608.5 to certify their voting systems.  In response, the Secretary argues that he had no duty to issue a decision on Plaintiffs' certification applications until after this lawsuit was filed; therefore, this issue is not ripe.  The Secretary is wrong.

    The purpose of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." _Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council_, 857 F.2d 55, 63 (2d Cir. 1988) (citations and internal

quotations omitted).  An analysis of ripeness is twofold, requiring the court to evaluate both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration."  *Id.* (citations and internal quotations omitted).  Both factors mandate proceeding here.

> a.  **The issues in this case are fit for judicial decision because they are purely legal and the injury is certainly impending**

"The fitness of an issue for judicial decision depends ... in part on the extent to which [it] is 'purely legal, and will not be clarified by further factual development.' "  *Id.* (quoting <u>Thomas v. Union Carbide Agric. Prods. Co.</u>, 473 U.S. 568, 580 (1985) (issue purely legal).

> "Where the *inevitability* of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect ....  One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough.

<u>Blanchette v. Conn. Gen. Ins. Corps.</u> (<u>Reg'l Rail Reorg. Act Cases</u>), 419 U.S. 102, 143 (1974) (emphasis added) (citations and internal quotations omitted); *see also* <u>Volvo</u>, 857 F.2d at 64 (same); <u>Gov't Suppliers Consolidating Servs., Inc. v. Bayh</u>, 734 F. Supp. 853, 861 (S.D. Ind. 1990) (same).[10]

In <u>Reg'l Rail</u>, the district court had determined that the issue before the court was not ripe for adjudication because several further decisional steps were required by the statutory scheme in question.  419 U.S. at 103, 138.  The Supreme Court, however, found the issue ripe despite the remaining alleged contingencies.  It assumed that, at some point in time, there

---

[10]  *See also* <u>Gov't Suppliers Consol'g Servs., Inc. v. Bayh</u>, 975 F.2d 1267 (7th Cir. 1992) (finding various commerce clause violations).

would have to be compliance with the statute's mandatory terms. Accordingly, the Court concluded that implementation of the challenged statute would lead "inexorably" to the final result, even though the exact date couldn't be precisely determined. *Id.* at 140

Likewise, in the present case, the issue is purely a legal one. It is "inevitable" that the Secretary will not certify Plaintiffs' systems under the new voting system rules of February 9, 2016. They are effectively disqualified by the new voting system rules. Cmplt. ¶¶47.c, 48.a-f. The Secretary's following actions make clear he won't do so: the December 22, 2015 selection of Dominion as the single uniform voting system provider; the January 20, 2016 announcement that he had moved ahead with testing and certification of Dominion's system and tentative negotiations with Dominion; the February 9, 2016 adoption of election rules 11.9 and 21.4; entry into the February 17, 2016 contract with Dominion; and the subsequent certification of Dominion's system for acquisition, installation and use by Colorado counties. *See* Cmplt. ¶66.

And, the hardship to the Plaintiffs of withholding judicial consideration is self-evident. Their injury is more than impending, it is immediate. They are losing their customers. Cmplt. ¶72.b, c. Counties that remain their customers can no longer update their systems or acquire new ones from them. *Id.* ¶72.d(i), (ii). Nor can Plaintiffs compete to sell their systems to counties that currently are not customers. *Id.* ¶72.d (iii).

> **b.    The Secretary's actions, taken together, collectively demonstrate that he has long since made his decision**

As a practical matter, the Secretary has indeed made the decision – in the negative – as evidenced by his actions. First, he proposed a new election rule to have a single uniform

voting system for Colorado.  Next, he tentatively selected Colorado-based Dominion as the sole provider of a single statewide voting system.  Then, he solidified that decision by entering into a memorandum of understanding with Dominion.  After that he addressed the county clerks association on the topic of a "uniform voting system," presenting it and Dominion as a *fait accompli* and discussing the transition of 41 out of 64 counties to Dominion's system within the next two years.  Then he adopted permanent voting system rules incorporating the manner in which only Dominion's system operates.  Ultimately, he entered into a contract with Dominion for it to be ***the*** voting systems provider for Colorado.

The Secretary is not going to certify the ES&S and/or Hart systems because they don't meet his new rules.  And if he did, he would not approve those systems for acquisition by Colorado counties.  Doing so would breach his contract with Dominion.  It would also unleash a political firestorm by undercutting the 22 counties that have already acquired the Dominion system.  The Secretary's decision has been made; there is no lack of ripeness.

### 2.    This Is Not an Action for Judicial Review under State Law and, So, Is Not Subject to the 35-day Filing Limitations Period

Defendant also urges that Plaintiffs' Third (new voting rules conflict with election code), Fourth  (new voting rules exceed statutory rulemaking authority) and Fifth (unfunded mandate) Claims are untimely.  That is premised on the argument that they weren't filed within the 35-day period for judicial review actions under state law.

But, this is an action for declaratory and injunctive relief, not for judicial review under the Colorado Administrative Procedure Act, C.R.S. §24-4-101 *et seq.*  Defendant seemingly implies – without ever actually asserting, much less citing any authority for the proposition

– that an action for judicial review is a necessary prerequisite before filing claims under state law for legal or equitable relief.  That is simply incorrect.  The law is actually to the contrary.  *See, e.g.,* attached Ex. 1 [*Crow v. Penrose-St. Francis Healthcare Sys.*, No. 09 CA 2288, (Colo.App. Aug. 12, 2010)] at 2 (aggrieved plaintiff need not pursue judicial review before seeking relief in district court); *see also id.* at 4-5 (citing *Peper v. St. Mary's Hosp. & Med. Ctr.*, 207 P.3d 881, 886 (Colo. App. 2008) (common law claims may be brought without pursuing judicial review); *Lee v. Banner Health*, 214 P.3d 589, 596 (Colo. App. 2009) (same)).  Simply put, judicial review and claims for legal and/or equitable relief constitute two different, alternative approaches available to Plaintiffs.

Nor do any of the cases cited by Defendant hold to the contrary.  Indeed, they support Plaintiffs' position here.  As Defendant concedes and his cited cases establish,[11] Colorado substantive law – as determined by Colorado appellate courts – applies to state law claims brought in federal court under supplemental (formerly pendent) jurisdiction.  *See, e.g.*, *Luna v. City & Cty. of Denver*, 537 F.Supp. 798, 801 (D. Colo. 1982).  Thus, *Crow* controls.

### 3.      Plaintiffs Have Standing to Bring Their Unfunded Mandate Claim

Plaintiffs' fifth claim for relief is that the Secretary's actions violate the "unfunded mandate" statute, C.R.S. §29-1-304.5.  The Secretary responds by asserting the ES&S and Hart lack standing as third-parties to bring that claim.  In determining such a motion, courts must accept as true all material allegations of the complaint, which they must construe in favor of the complaining party.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

---

[11]  *Romer v. Bd. of Cnty. Comm'rs*, 956 P.2d 566, 572 n.8 (Colo. 1998), and *Buzick v. Pub. Emps. Ret. Ass'n*, 849 P.2d 869, 870 (Colo. App. 1992), are distinguishable from the situation here because they *were* judicial review actions.

Under the doctrine of "third-party" or "*jus tertii*" standing, however, Plaintiffs may assert the rights of others not before the court (*i.e.*, counties forced to acquire Dominion's single, statewide uniform voting system) by "mak[ing] two additional showings." *Aid for Women v. Foulston*, 441 F.3d 1101, 1111-12 (10th Cir. 2006) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). "First, Plaintiffs must show that 'the party asserting the right has a close relationship with the person who possesses the right.' Second, Plaintiffs must show that 'there is a hindrance to the possessor's ability to protect his own interests.' " *Foulston*, 441 F.3d 1111-12 (citation omitted).

These are questions of fact. *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976). In determining them, considerations include whether, as here, Plaintiffs have a financial stake in the outcome of the litigation and a claim that their own constitutional rights are being impaired, *see id.* at 118 (Stevens, J., concurring). The Supreme Court has noted that it has "been quite forgiving with these criteria in certain circumstances," such as in the First Amendment context. *Kowalski*, 543 U.S. at 130 (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). And, because the right to vote "is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

Indeed, "[i]t is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' " *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). The right to vote includes " 'the manner of its exercise,' " *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)). One aspect

of "the manner of its exercise" is when a State places restrictions on the method of voting.

Accordingly, the criteria for third-party standing should be applied in a deferential manner here.  *See* <u>Foulston</u>, 441 F.3d at 1112; *see also* <u>Barrows v. Jackson</u>, 346 U.S. 249, 258 (1953) (relaxation of standing rule called for).

#### a.    Plaintiffs have a close relationship with counties

ES&S and Hart have close, mutually-advantageous contractual relationships with counties across the the state.  They currently have voting systems in place or provide election support services in the following (46 out of 64) Colorado counties:  ES&S in Adams, Alamosa, Archuleta, El Paso, Huerfano, Jefferson, La Plata, Mineral, Montezuma, Pitkin, Saguache and Teller; Hart in Bent, Boulder, Cheyenne, Conejos, Costilla, Crowley, Custer, Delta, Dolores, Douglas, Fremont, Garfield, Grand, Hinsdale, Jackson, Kit Carson, Kiowa, Lake, Las Animas, Lincoln, Moffat, Montrose, Morgan, Otero, Ouray, Phillips, Prowers, Rio Blanco, Rio Grande, Routt, San Juan, San Miguel, Summit and Yuma.  Cmplt. ¶72.a.

As such, they are "fully, or very nearly, as effective a proponent of the [unfunded mandate] right as," <u>Singleton</u>, 428 U.S. at 115, the Clerks and Recorders in the 64 counties affected by the Secretary's mandate imposing a statewide uniform voting system at their expense.  Third-party standing may lie when the litigant has a relationship as an "advocate" for the third-party.  *See* <u>Barrows</u>, 346 U.S. at 258 (seller of land was entitled to defend against damage action for breach of restrictive covenant); *see also* <u>Carey v. Population Servs., Int'l</u>, 431 U.S. 678, 683-84 (1977) (contraceptives vendor had third-party standing on behalf of customers to challenge statute restricting sale of contraceptives) (collecting cases); <u>Reese Bros., Inc. v. U.S. Postal Serv.</u>, 531 F. Supp. 2d 64, 69 (D.D.C. 2008) (Reese and

former clients had mutually advantageous contractual relationship, justifying standing).

### b. County obstacles are sufficient to confer third-party standing

"[A] plaintiff need only show that a third party faces 'some hindrance' [in order] to attain third party standing – '[the third] party need not face insurmountable hurdles.'" *E. Coast Test Prep LLC v. Allnurses.com, Inc*., __ F.Supp.3d__, 2016 WL 912192, at *3 (D. Minn. Mar. 7, 2016) (quoting *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc*., 280 F.3d 278, 291 (3d Cir.2002) and citing *Powers v. Ohio*, 499 U.S. 400, 411 (1991). " '[A]n absolute impossibility of suit' is not necessary to meet the requirement, and 'a practical disincentive to sue may suffice,' even if 'a mere disincentive is less compelling than a concrete impediment.' " *Id.* (quoting 280 F.3d at 290 n.14 and 15 James Wm. Moore *et al*., MOORE'S FEDERAL PRACTICE §101.51(3)(c) (3d ed. 2015)).

In the latter regard, the County Clerks and Recorders face challenges of differing electorates and budget constraints that result in disproportionate burdens relating to voting systems, particularly in smaller counties. Colorado's two largest counties are the Denver and El Paso, each of which has a population in excess of 600,000. Cmplt. ¶53. The vast majority of Colorado's counties, however – 50 out of 64 – have populations of less than 50,000. Half – 32 – of Colorado's 64 counties have populations of less than 15,000. Three have populations of less than 1,000. *Id.* ¶54. A voting system that is best for the state's two largest counties is undoubtedly not the most appropriate choice for its 50 smallest counties. *Id.* ¶55.

The financial burden imposed on these counties by the Dominion mandate is

excessive, if not crippling.

• One county with 60,000 residents would incur or has insureds an estimated purchase price for Dominion's system that is 90% higher – with quoted annual license and related costs an estimated 50% higher – than the alternative, federally-certified system the county piloted in November 2015.  *See id.* ¶56.b(1).

6+ • Another county with 25,000 residents would incur or has incurred an estimated annual maintenance price for Dominion's system that is almost quadruple (from $8,500 to $31,000) what it pays for its current system.  *See id.* ¶56.b(2).

• Garfield County (which participated in the pilot evaluation) would incur or has incurred an estimated higher initial cost of 92% or $240,000, and thereafter estimated higher annual costs of 54.5% or $12,000 ($34,000 versus $22,000) – $120,000 more over 10 years – for Dominion's system as compared to Hart's.  *See id.* ¶56.b(4).

• Gilpin County (which participated in the pilot evaluation) will incur or has incurred an estimated $84,000 cost increase in 2016 alone to implement Dominion's system, which will unnecessarily scan their entire 4,000 ballots in about 20 minutes.  *See id.* ¶56.b(5).

• Grand County would incur or has incurred an estimated $40,000 cost increase for Dominion's system as compared to Hart's.  *See id.* ¶56.b(6).

• Lincoln County does not have funds in its 2016 budget to acquire Dominion's system.  *See id.* ¶56.b(8).

These counties face exactly the kind of "practical obstacles" the Supreme Court has recognized as sufficient to confer third-party standing.  *See* <u>Munson</u>, 467 U.S. at 956.  A right-holder's hindrance need not be "insurmountable," just "genuine." <u>Singleton</u>, 428 U.S.

at 116-17.  That is the situation here.

## CONCLUSION

Plaintiffs have brought a viable dormant Commerce Clause claim because the Secretary is acting as a governmental regulator and Congress has not clearly and unambiguously authorized states to enact uniform voting system rules discriminating against interstate commerce.  And, this Court has jurisdiction to hear Plaintiffs four state law claims. The dismissal motion should be denied in its entirety.

Dated:  July 12, 2016.


JONES & KELLER, P.C.
    *S/ T.P. McMahon*
Thomas P. McMahon
tmcmahon@joneskeller.com
Aaron D. Goldhamer
agoldhamer@joneskeller.com
1999 Broadway, Ste. 3150
Denver, CO 80202
Tel. (303) 573-1600
Fax  (303) 573-8133
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2016, I filed a true and correct copy of the foregoing

"**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**" with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following email addresses:

> LeeAnn Morrill
> LeeAnn.Morrill@coag.gov
>
> Grant T. Sullivan
> Grant.Sullivan@coag.gov
>
> Christopher Jackson
> Christopher.Jackson@coag.gov


_____*s/Renae Mesch*_____
Renae Mesch