IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-1237 - JLK

**ELECTION SYSTEMS & SOFTWARE, LLC,**

     a Delaware limited liability company; and

**HART INTERCIVIC, INC.,**

     a Texas corporation;

Plaintiffs,

          v.

**WAYNE W. WILLIAMS,**

     in his official capacity as Colorado Secretary of State.

Defendant.

_____

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
_____

JONES & KELLER, P.C.

    Thomas P. McMahon

    tmcmahon@joneskeller.com

    Aaron D. Goldhamer

    agoldhamer@joneskeller.com

    1999 Broadway, Ste. 3150

    Denver, CO 80202

    Tel. (303) 573-1600

    Fax  (303) 573-8133

Attorneys for Plaintiffs

Dated:  July 19, 2016

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REPLY TO FACTS ALLEGED IN THE SECRETARY'S RESPONSE . . . . . . . . . . . . 5

    1.    Replacement of Damaged, Defective, or Inoperable Voting System
        Applications, Components or Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.    Commercial off-the shelf hardware components . . . . . . . . . . . . . . . . . . . . . 6

    3.    Digital ballot adjudication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    4.    Ballot scanners with automatic document feeders . . . . . . . . . . . . . . . . . . 10

    5.    Single user interface on same server or workstation . . . . . . . . . . . . . . . . 11

    6.    Ballot-level cast vote records ("CVR") and exports in comma-separated
        value ("CSV") file formats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    7.    Election night reporting ("ENR") data and exports with specified
        fields . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.  TRADITIONAL PRELIMINARY INJUNCTION REQUIREMENTS ARE MET . . 14

    A.    Plaintiffs Have Established Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Any delay does not undercut Plaintiffs' irreparable harm . . . . . . . 14

        2.    Tenth Circuit authority establishes that a violation of Commerce
            Clause rights is itself an irreparable harm . . . . . . . . . . . . . . . . . . . 16

        3.    Plaintiffs have established additional irreparable injuries . . . . . . 18

    B.    Any Injury to the Secretary by a Preliminary Injunction
        does not Outweigh the Harm Threatened to Plaintiffs . . . . . . . . . . . . . . . 20

C.      Restraining the Voting Systems Rules will not Adversely Affect
        the Public Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.      Plaintiffs are More Than Likely to Prevail on the Merits of
        All Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.      Dormant Commerce Clause Claim . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.      State Law Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.     ALTERNATIVE PRELIMINARY INJUNCTION REQUIREMENTS
        ARE ALSO MET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Plaintiffs Election Systems & Software, LLC ("ES&S"), and Hart InterCivic, Inc. ("Hart"), reply as follows to Defendant Wayne N. Williams' (the "Secretary") Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

## INTRODUCTION

The Response represents the Secretary's continuing effort to disguise a predetermined decision to install Dominion Voting Systems, Inc. ("Dominion"), as the sole voting systems provider in Colorado.  He has done so through voting system rules specifically designed to provide Dominion, in the long term, with a monopoly position to the detriment of Colorado counties, in violation of Colorado statutes, in excess of his rulemaking authority and in derogation of interstate commerce.

Although the Secretary now asserts that the challenged rules are facially neutral and not meant to favor Dominion, his actions tell another story.  He continues, post-rules adoption, to tout the "uniform voting system."  He has made it quite clear that even if other voting system providers meet the standards for certification, they are not guaranteed to be approved for purchase by counties.  He has gone out of his way to communicate with Dominion alone in order to ensure its selection as the sole provider of voting services in Colorado will be protected.  And he has delayed the effective date of rules 21.4.14 and 21.4.15 to accommodate Dominion.  Rather than promulgating neutral voting systems elections rules, the Secretary has acted to effectuate his desired outcome of having only a single voting system provider, Dominion.

## SUMMARY OF FACTUAL BACKGROUND

Plaintiffs' Motion for Preliminary Injunction ("Motion," Doc. 2) sets forth the

relevant facts leading to this dispute.  In sum, they are that the Secretary has: long-pursued a "uniform voting system" for Colorado; disregarded a five-to-two majority vote of his own Pilot Election Review Committee ("PERC") in favor of Colorado employing multiple voting systems, instead announcing and then underscoring that Dominion had been selected as the single voting system provider; adopted voting system rules tailored to Dominion's system; entered into a contract with Dominion to be *the* voting system provider for Colorado's counties; published a post-rules adoption guest opinion column in the Denver Post rationalizing his decision to have a single, statewide uniform voting system provided by Dominion as the sole vendor; and, as recently as last month, continued in a national presentation to tout Dominion as the single source voting systems provider for Colorado.

Meanwhile, the Secretary has bent over backwards to protect Dominion's would-be monopoly position at the expense of Colorado's counties, who bear the cost of administering elections.  For instance, a December 29, 2015, meeting between Dominion and the Secretary pertained to "UVS [Universal Voting System] Contract Discussion," whereby Dominion and the Secretary discussed "Essential Contract Terms & Conditions (State of Colorado and Dominion only, county input will follow)[.]"  Attached Ex. 11 (meeting invitation) SEC2.  Dominion's ability to shape its contract, prior to any input from the actual consumers of voting services – the counties – is telling.

Later, in January 2016, the Secretary himself sent a text message to Dominion's Regional Sales Manager, Steven Bennett, stating "Douglas and Jeffco commissioners and clerks are attacking selection and limit to single vendor.  Need your help."  Attached Ex. 12

(text message) at SEC14817-18.  Shortly thereafter, Mr. Bennett specifically requested a private meeting with the Secretary and sought to "begin [to] coordinate efforts[.]"  *Id.* at SEC14820-21.

Also in January 2016, Dominion expressed to the Secretary – via email, not public comments in the rulemaking process – that the proposed new rules concerning data exports were "too 'strict' in the format of the output."  Attached Ex. 13 (SEC8441); *see* attached Ex. 14 (Staiert Depo. tr. excerpt) 29:17 - 30:11.  Indeed, the effective date for new Rules 21.4.14 and 21.4.15 concerning data output formats was delayed for over a year so that Dominion would have time to meet their requirements.   Attached Ex. 15 (Shellman Depo. tr. excerpt) at 24:11 - 27:9, 45:22 - 49:6.  In recognition of Dominion's difficulties in this respect, communications between Dominion and the Secretary concerning a Memorandum of Understanding between them took particular pains to carve out this requirement.  *See* Ex. 14 (Staiert Depo. tr. excerpt) at 37:14 - 38:2.

The Response suggests that because the Secretary has preliminarily determined the voting system of another vendor, Clear Ballot Group, Inc. ("Clear Ballot"), "facially" complies with the requisites for certification, the resulting future Colorado marketplace for voting systems will not be a Dominion-dominated monopoly.  However, Clear Ballot has not been certified as a voting system provider, and the "approval" process for its purchase by counties is an entirely separate inquiry.   Attached Ex. 16 (6/2/16 Shellman ltr. to Clear Ballot); Ex. 15 (Shellman Depo. tr. excerpt) at 31:22 - 32:7, 33:15-19.  Indeed, the wording of the letter carries the implication that, even if certified, Clear Ballot's system is unlikely to

be approved for purchase by counties.  *See* Ex. 14 (Staiert Depo. tr. excerpt) 33:20 - 34:24

This outcome is foreshadowed by the Secretary's post-rules February 19, 2016 guest opinion column in the Denver Post.  There, he  referenced his "selection of a new uniform voting system for our state"; "[u]niformity ...  results in lower costs"; "the most important reason for a uniform system is fairness"; "the selection of one vendor"; "Dominion Voting Systems Inc., a corporation with its principal place of business right here in Denver ...." Attached Ex. 17 (2/19/16 Den. Post).  The outcome is further underscored by the Secretary presentation one month ago at the 2016 State Certification Testing of Voting Systems National Conference.  Attached Ex. 18 (Power Point presentation).  There, 4½ months after the new Voting System Rules were adopted, two SoS employees addressed the topic of "*Colorado Uniform Voting System*: Lessons Learned."  (Emphasis added.)

The June 20, 2016 presentation referenced "the lessons learned with ... *implementing a uniform voting system in Colorado* ... that can be helpful to other states that are ... considering the move to a *uniform voting system*."  *Id.* at 2 (emphasis added).  Among the lessons learned was to "[d]efine what a *uniform voting system* is ... [i]s it *a single vendor supplying the same system* ... [or] multiple vendors that function uniformly and provide uniform output?"  *Id.* at 5 (emphasis added).  Colorado chose the former.  "Secretary of State Wayne Williams *selected Dominion ... to be the single source voting system provider* for the State of Colorado ...."  *Id.* at 3 (emphasis added).  The presentation reiterated that "Dominion [had been] selected as *the uniform voting system provider*," with permanent certification having been granted in February 2016 and a primary election being conducted in June 2016

with 18 Dominion counties.  *Id.* at 4 (emphasis added).

All of the foregoing belies the artful wording of the Response and attached declarations giving the impression Dominion will have competition in the provision of voting systems in Colorado.  Indeed, since adoption of the challenged Rules the Secretary has been convening a <u>Universal</u> Voting System implementation committee involving only Dominion, <u>not</u> a voting system<u>s</u> implementation committee involving all the current vendors with systems in Colorado.  Attached Ex. 19  (Depo. Ex. 24).  And, the Secretary has continued to provide Dominion, but no other vendor, an opportunity to provide input on the rules <u>after</u> their adoption.  Ex.15 (Shellman Depo. tr. excerpt)  45:22 - 48:4.

## <u>REPLY TO FACTS ALLEGED IN THE SECRETARY'S RESPONSE</u>

Although the Secretary's recitation of background facts focuses on other states where Plaintiffs are the sole voting systems providers, the Response undertakes no analysis of those states' statutory regimes.  Indeed, in many other states a single uniform voting system is expressly contemplated by statute.  *See* Plaintiffs' Response to Motion to Dismiss [Doc. 33 at 11-12].  The Secretary's focus in the Response on other states is, in any event, irrelevant because Colorado's statutes contemplate multiple voting systems.  *See, e.g.,* C.R.S. §§1-5-603, 608.5(3)(a), 612(1), 616(4).

The Response also sets forth various factual allegations concerning voting system technology which are incorrect and misleading.

**1.     Replacement of Damaged, Defective, or Inoperable Voting System Applications, Components or Devices.**  New Voting System Rule 11.9.2 & subsection (a) reference voting systems, devices or related components certified for use in Colorado by the

Secretary before January 1, 2016, and purchased, leased or used by a political subdivision (i.e., county) before that date.  In that context, New Voting System Rule 11.9.2 & subsection (b) provide that the Secretary will approve a county's application to purchase lease or use such a system, device or component only where it is to replace the same or a substantially similar item that is damaged, defective or inoperable.  And even then, subsection (c) limits such approval only to instances where doing so won't materially impair the county's future economic ability to purchase or lease a new voting system certified after January 1, 2016. Attached Ex. 20 (Hoffman Declaration) ¶2; attached Ex. 21 (Lichtenheld Declaration) ¶2; attached Ex. 22 (Perez Declaration) ¶¶5-6.

Thus, upgrades or enhancements to – or replacement of – a current system, device or component will not be approved where the existing item is undamaged, is not defective and is functional.  But, Colorado counties are authorized by statute to adopt electronic and electromechanical voting systems including hardware, firmware and software upgrades. C.R.S. §1-5-612(1).  Ex. 20 ¶3; Ex, 21 ¶3; Ex. 22 ¶7.  The rule conflicts with the statute.

The net effect is that existing voting systems may be used for the time being. However, a new requirement for systems to perform a "risk-limiting audit" takes effect in 2017 and none of the systems currently in use in Colorado have the ability to perform that function.  Therefore, counties will be forced to purchase a new system by next year. The only system they will be able to purchase is that of Dominion, which is the only voting system certified by the Secretary after January 1, 2016.  Ex. 20 ¶4; Ex, 21 ¶4; Ex. 22 ¶8.

**2.**      **Commercial off-the-shelf hardware components.**  In the preceding regard,

new Rule 11.9.3(c) provides the Secretary will approve a county's application to purchase, lease or use a voting system, device or related component  certified by him after January 1, 2016, after considering whether it uses commercial off-the-shelf hardware components (as Dominion's system does) rather than proprietary hardware components purpose-built by a voting system vendor to fit its own system.  But, as indicated above, C.R.S. §1-5-612(1) authorizes counties to adopt voting systems, including hardware upgrades.  It doesn't restrict such upgrades to commercial off-the-shelf products.  Ex. 20 ¶5; *see* Ex. 22 ¶7.

Contrary to Declarations offered by the Secretary, commercial off-the-shelf ("COTS") products are not going to be less expensive than products purpose-built by a vendor.  For example, COTS scanners have a life expectancy of 3-5 years (based on manufacturer information), while purpose-built systems have a life expectancy of 15-20 years.  ES&S has tabulators being used in counties today that are 25+ years old.  So over the course of a voting system's use, a new COTS unit will have to be replaced 4-5 times during the operational life of one purpose built unit.  Additionally, off-the-shelf hardware in many cases has been modified by the voting system vendor that uses it.  And, at the very least, the vendor must upload proprietary software to the COTS hardware, which incurs additional cost.  And, if the market calls for less expensive, purpose-built equipment, a voting system vendor may very well develop it. For example, ES&S has recently developed a less expensive model of its DS850 central count tabulator.  Ex. 20 ¶6; Ex. 22 ¶18.

Nor, contrary to the Secretary's suggestion, are voting systems using COTS components necessarily more "scalable" (able to be expanded or contracted) than purpose-

built systems, so as to enable counties to configure them to meet their individual needs. A COTS system can be designed in a way that is not scalable. A system using purpose-built components can be very scalable. The Secretary's attempt to link COTS devices to scalability is misleading. Ex. 22 ¶17.

Moreover, acquiring COTS equipment is not as easy as has been portrayed. While looking for a replacement or add-on unit, a county is still required to maintain a certified voting system. But, it is unlikely an election system vendor will keep in its warehouse third party COTS equipment that meets specifications certified by the state. So, the county will have to contact third parties in an effort to track down a specific model of a specific manufacturer's equipment matching the COTS equipment that was initially certified by the Secretary. That can be a drawn-out process. A remote county might have to acquire the specific, certified COTS hardware from a large city and then wait for installation of the correct proprietary software. Thus, a county in need of a replacement COTS unit during a critical time could find itself without the ability to acquire the replacement, forcing it to conduct an election with less equipment than might be needed. Conversely, if a county needs additional purpose-built hardware, the voting system vendor will have it readily available and can load firmware from the warehouse and deliver the entire package in a day. Ex. 20 ¶7; *see* Ex. 22 ¶¶10-12, 14, 21.

And, if a COTS manufacturer discontinues a specific model or updates its hardware so that the previously-certified model is no longer available, the certification process must begin again – including testing by the manufacturer and by the State, and everything else that

goes into the lengthy certification process.  Ex. 20 ¶8; *see* Ex. 22 ¶¶14-15, 21.

Effectively requiring use of COTS equipment reduces the options available to counties.  It forces them to rely on third-party manufacturers that, because the COTS equipment they manufacture isn't designed for election use, have no concern for the election process.  Technology will continue to evolve and change in the election industry.  To effectively rule out purpose-built hardware as an option simply because it isn't sold in a public store is counterproductive and eliminates the application of new technology in Colorado that could lead to a better method of conducting elections.  Ex. 20 ¶9; *see* Ex. 22 ¶¶ 13-14.

The user manual for the COTS scanner made by Cannon (which is what Dominion uses for a vote tabulator) states that scanning folded or creased documents - which is what all absentee ballots are - can cause a paper jam or malfunction.  It also indicates that use of thin, two-sided paper – which some ballots may be – could cause the scanner to pick up a mark on the other side.  Finally, a mark made by pencil – such as on a ballot – will dirty the rollers and could cause streaks or marks on subsequent documents (ballots).  All of this is problematic in the voting system context.  Ex. 20 ¶10 (citing attachments 20.1 & 20.2).

Finally there is no history regarding COTS hardware being used in tabulation of election ballots.  The United States Election Assistance Commission ("EAC") includes this concern in its report, *Considerations for Implementing Voting Systems with COTS Products*,[1]

---

[1]  Available at:
http://www.eac.gov/assets/l/Documents/Considerations%20for%20Implementing%20Voting%20Systems%20with%20COTS%20Products%20FINAL%20for%20Web%20Posting%2002.03.16.pdf.

U.S. Election Assistance Comm'n, Managing Election Tech. Series: #3.  Among  other cautions, the EAC indicates there is no guarantee that using COTS components in any given circumstance will prove cheaper and easier to implement.  *Id.* at 1.  The report further states that "its [COTS] use should be the product of careful analysis, reasoning, well-formed policy, and practicable engineering decisions."  *Id.*  Instead, the rule favors  one vendor, Dominion, over others and puts the entire Colorado election process at risk.  Ex. 20 ¶11.

Overall, effectively mandating the use of COTS subjects counties to supply life chains and government approval processes entirely outside the control of voting system vendors, presenting myriad potential problems in acquiring the tools needed to administer elections. *See* Ex. 22 ¶¶10-22.  If counties wish to submit themselves to those risks they should be free to do so.  But, they should not be forced to do so.

3.   **Digital ballot adjudication.**  New Rules 11.9.3(g)(1), 11.9.4(a), and 21.4.16 (a) effectively require that, in order for a voting system to be approved for purchase by a county, the system must have digital – rather than manual – adjudication capability for ballots with marginal or ambiguous voter markings.  Digital adjudication is one means by which an election official can identity, analyze, and resolve ballot issues.  But, manual adjudication is another.  Digital adjudication may not be necessary for all counties, especially smaller ones with a very limited number of voters.  Manual adjudication may work just fine for them. And, digital capability adds expense.  Consequently, an individual county is in the best position to determine which approach is best for it.  Ex. 20 ¶12; Ex. 21 ¶8; Ex. 22 ¶30.

4.   **Ballot scanners with automatic document feeders.** New Rules 11.9.3(g)(2),

11.9.4(b), 11.9.5 and 21.4.16(b) effectively require that, in order for a voting system to be approved for purchase by a county, the system's ballot scanners must have automatic document feeders enabling the scanning of multiple ballots rather than a single ballot at a time. While that is a convenience, it adds significant cost to a voting system. An ES&S scanner without a feeder sells for under $5,600, whereas Dominion has quoted its scanners at about $18,000 with the feeder – over three times as much. And, as indicated above, Dominion's COTS scanner has a life expectancy of 3-5 years, so counties will have to replace these units and incur the more-than triple overcharge several times during the same period that the ES&S purpose-built tabulator will continue to work. For a small county that may process less than 3,000 ballots in an entire election, that is a huge amount to have pay, particularly when its employees are able to hand-feed ballots into the scanner over the course of several days as they arrive in the mail. Even if a county has 1,000 ballots to process on Election Day itself, they could all be hand fed into the ES&S scanner within 3 hours. Ex. 20 ¶13; Ex. 21 ¶9; Ex. 22 ¶37.

     **5.**     **Single user interface on same server or workstation.** New Rules 11.9.3(d), 11.9.4(c) and 21.4.7(e) effectively require that, in order for a voting system to be approved by the Secretary for purchase by a county, the system must have a single user interface on the same server or workstation. There is no functional need for this requirement, which is unprecedented. But, Dominion's system operates that way. This therefore appears written solely to tailor these rules to Dominion's system. Ex. 21 ¶5; Ex. 22 ¶¶25-26

     In her declaration, Deputy Secretary Suzanne Staiert misuses the term "integrated."

She says that "Integrated voting systems that comply with this [single user interface] requirement are preferable in Colorado over bifurcated, disjointed voting systems that spread the functions of election administration across multiple subsystems." Ex. 21 ¶6; Ex. 22 ¶27.

But, "[i]ntegrated" and "a single workstation" on one PC are not the same thing. The Hart system is integrated, but uses multiple workstations so that work can be divided efficiently and not bottlenecked by several different people with different needs and/or roles needing to work on the system simultaneously. Having multiple workstations can provide redundancy and disaster recovery options that are not available when everything is installed on a single server or workstation, which constitutes a single point where systemwide failure can occur. The single user interface is an arbitrary requirement imposed not for efficiency but, apparently, simply to customize these rules to Dominion's approach. It is without practical benefit. Ex. 21 ¶7; Ex. 22 ¶¶27-29.

**6.      Ballot-level cast vote records ("CVR") and exports in comma-separated value ("CSV") file formats.** A comma-separated values (CSV) file stores tabular data (numbers and text) in plain text. Each line of the file is a data record. Each record consists of one or more fields, separated by commas. The use of the comma as a field separator is the source of the name for this file format. Ex. 22 ¶33.

New Voting System Rule 21.4.14 and subsection (b) provide that, for a voting system to be approved by the Secretary for purchase by a county, by year-end 2016 it must be able to aggregate in a single file and export from the system all ballot-level cast vote records in a comma-separated  value text format. That is not problematic. Ex. 21 ¶10; Ex. 22 ¶33.

The issue is not the availability of the CSV format but, rather, the specificity of the manner in which data is required to be exported. Subsection (c) spells out highly-detailed requirements for a voting system's exports that are unrealistic. The exports are specified as having to come directly from the voting system software, not first be exported and then be formatted outside the system in order to be compatible with the state system. The "export and then format process" is standard operating procedure in technology applications. Formatting CSV files outside any company-wide software system is common throughout technology solutions. Yet Rule 21.4.14(c)(1)-(7) essentially sets in concrete one highly specific arrangement of data export that only Dominion can do immediately. It is also unusual to lock such detailed and unique specifications into the administrative rules precisely because the State's formatting needs are likely to change in the future. Ex. 21 ¶11; Ex. 22 ¶¶34-36.

Dominion was creating its voting system on-the-fly during the PERC pilot process in the November 2015 election. It also had an extra pilot election in May 2015 to test its system. Dominion was the only vendor allowed to do so. That gave it the unfair advantage of being able to develop custom imports and exports ahead of time. These highly-detailed specifications tailored to Dominion eliminate other vendors from being able to obtain certification and ensure implementation of a uniform voting system . Ex. 21 ¶12; Ex. 22 ¶31.

**7.     Election night reporting ("ENR") data and exports with specified fields.**

New Voting System Rule 21.4.15 provides that, in order for a voting system to be approved by the Secretary for purchase by a county, by year-end 2016 it must meet specific

requirements for election night reporting ("ENR") data and exports. These specifications are spelled out in great detail in subsection (c)(1)-(3) and subsection (d)(1)-(13). They are unrealistic, since Rule 21.4.14(c) indicates that the exports must be native to the voting system, not exported and then formatted externally. Again, formatting CSV files outside a company-wide software system is common throughout technology solutions. The required level of detail for election night reporting is unprecedented, and designed to exclude vendors other than Dominion from qualifying for certification. Ex. 21 ¶13; Ex. 22 ¶¶38-39.

In sum, the specifications of the New Voting Rules – including in particular, but not limited to – the highly-detailed format in which data is to be exported, do not address what technology is required but, rather, how technology is to be implemented. This is virtually unprecedented, and indicative of the fact that the Secretary had and has a hidden agenda of excluding all current voting system vendors except Dominion. *See* Ex. 22 ¶4.

## ARGUMENT

Both the traditional the alternative preliminary injunction standards are met here. *See* Mot. Prelim. Inj. pp. 10-12 (discussing the requirements under the traditional and alternative tests for preliminary injunctive relief).

## I.  TRADITIONAL PRELIMINARY INJUNCTION REQUIREMENTS ARE MET.

### A.    Plaintiffs Have Established Irreparable Harm.

#### 1.    Any delay does not undercut Plaintiffs' irreparable harm.

The Secretary suggests that Plaintiffs can suffer no irreparable harm because they purportedly did not seek preliminary injunctive relief until 3½ months after the Secretary adopted the new rules. This assertion is unsupported by the record and legal authority.

Contrary to the Secretary's argument, any delay in filing was <u>approximately 7 weeks</u> in total, not 3½ months.  This encompasses the short period of time from when the new election rules became effective on <u>March 30, 2016</u>,[2] and when Plaintiffs filed the instant Motion for a Preliminary Injunction just 7+ weeks later on May 23, 2016.  The Secretary's case citations regarding delays that are longer than the limited amount of time here are therefore inapposite and should be disregarded.

In any event, delay is but one of many factors in the irreparable harm analysis and it is not dispositive.  For instance, the Tenth Circuit has held that a three-month delay in filing did not defeat a claim of irreparable injury.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994)) (noting"[the delay in that instance did not alter the outcome of the proceedings.").  The same is true here; the Secretary has not yet acted.

The Secretary strains to present a number of decades-old cases from other circuits purportedly illustrating that a delay in seeking a preliminary injunction defeats a finding of irreparable harm as a matter of law.  "However, these cases merely confirm that delay is simply one consideration in the overall irreparable harm analysis."  *RoDa Drilling*, 552 F.3d at 1211 n.4 (rejecting defendant's reliance on such cases).  To illustrate, the Secretary cites

---

[2]  The Secretary agrees that the new rules in question did not become effective until March 30, 2016. Mot. Dismiss p. 2 ("The new rules . . . became effective on March 30, 2016."); *see also* the Colorado Secretary of State website, available at: https://www.sos.state.co.us/CCR/KeywordSearch.do?startDate=&submit=Search&keyword=voter&endDate=&id=&d-49216-p=2 (reflecting effective date of March 30, 2016).

out-of-context trademark infringement cases[3] where despite the alleged "imminent harm" from the infringement, the plaintiff delays bringing suit and, thus, causes the complained-of harm. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Unlike the *GTE* trademark infringement case relied on by the Secretary, this case is not a situation where Plaintiffs sat on their hands and caused their own harm. *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1260-61 (D. Utah 2009).

Finally, the Secretary has not claimed, and he cannot claim, that he is somehow disadvantaged by any 7-week delay. A purported delay has not caused or altered the outcome, has not caused any harm as a result, and has not prejudiced the Secretary. *Kan. Health Care Ass'n.,* 31 F.3d at 1543-44; *Nilson*, 690 F. Supp. 2d at 1256, 1259 (rejecting the argument that movant's 2 ½-year delay undermined its claim of irreparable harm).

### 2.   Tenth Circuit authority establishes that a violation of Commerce Clause rights is itself an irreparable harm.

As even the Secretary concedes, the Tenth Circuit has held that a violation of Commerce Clause rights is itself an irreparable injury. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *ACLU v. Johnson*, 194 F.3d 1149, 1160-63 (10th Cir. 1999). Contrary to the Secretary's misstatement (Resp. Mot. Prelim. Inj. p. 31, n.5) that the Tenth Circuit did not address the issue in *ACLU v. Johnson*, the Tenth Circuit did. *ACLU v. Johnson*, 194 F.3d

---

[3] *See, e.g., Pharmacia Corp. v. Alcon Labs., Inc*., 201 F. Supp. 2d 335, 382-83 (D. N.J. 2002) ("A trademark plaintiff has a 'duty to police' for allegedly infringing uses [of its mark]") (emphasis added); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.") (emphasis added).

at 1160 ("Although we need not reach this issue, . . . we do so, albeit briefly.") (emphasis added).  The Tenth Circuit held that "dormant implication of the Commerce Clause prohibits state . . . regulation . . . that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" *Id.* (quotation omitted). "We therefore agree with the district court that [the regulation] represents an attempt to regulate interstate conduct . . . , and is accordingly a *per se* violation of the Commerce Clause." *Id.* at 1161.

Other courts agree that a violation of Commerce Clause rights constitutes *per se* irreparable harm. *Bioganic Safety Brand, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1182-85 (D. Colo. 2001) (citing *ACLU v. Johnson*, 194 F.3d at 1163, *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D. N.Y.1997)).  "By showing that the Colorado statute imposes an undue burden on the interstate commerce and thus violates the Dormant Commerce Clause, [plaintiff] has established that it will suffer an irreparable injury if an injunction is not granted." *Id.* at 1185.  "Deprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury." *Pataki*, 969 F. Supp. at 168; *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F. Supp. 848, 854 (S.D. N.Y. 1991) (deprivation of constitutional rights under Commerce Clause "unquestionably constitutes irreparable injury.") (emphasis added).[4]

In the face of this authority, the Secretary can only muster outdated, out-of-district

---

[4]  *See also, e.g., Allen v. State of Minn.*, 867 F. Supp. 853, 859 (D. Minn. 1994) (violation of Commerce and Contracts Clause constitutes irreparable harm); *Gov. Suppliers Consolidating Servs., Inc. v. Bayh*, 734 F. Supp. 853, 863-64 (S.D. Ind. 1990) (regulation that violates Commerce Clause causes irreparable injury regardless of showing of economic harm); *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753-54 (N.D. Cal. 1989) (Commerce Clause violation "give[s] rise to a presumption of irreparable harm.").

lower court cases that are inapplicable.[5]  The sole intra-circuit case cited by the Secretary, *S. W. Shattuck Chem. Co. v. City & County of Denver*, 1 F. Supp. 2d 1235, 1238-39 (D. Colo. 1998), actually <u>supports</u> Plaintiffs' claim of irreparable harm.  There, the court observed that a plaintiff establishes irreparable injury by virtue of a constitutional deprivation where the constitutional injury <u>involves some continuing or future injury which cannot be compensated by monetary damages</u> alone <u>or</u> where a fundamental right is implicated.  *Id.* Similarly, ES&S and Hart have demonstrated irreparable injury because they will suffer a type of harm that cannot be rectified by a later award of damages because they will effectively be put out of business in Colorado.  *Id.*  Damages cannot fully compensate for Plaintiffs' loss of years of effort and livelihood, among other things.  *Tri-State Generation & Trans. Ass'n v. Shoshone River Power, Inc*., 805 F.2d 351, 356 (10th Cir. 1986); *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980); *accord Roso-Lino Bevg. Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984).

### 3.      Plaintiffs have established additional irreparable injuries.

As outlined above, because a constitutional right is implicated, no further showing of irreparable injury is necessary.  *Kikumura*, 242 F.3d at 963.  Even so, Plaintiffs have

---

[5]  *See, e.g., N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D. N.Y. 2008), <u>*reversed by*</u> *N.Y. State Restaurant Ass'n v. N.Y. City Bd. Of Health*, 556 F.3d 114 (2nd Cir. 2009) (reversed preemption case); *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders,* 893 F. Supp. 301, 308-09 (D. N.J. 1995) (noting that violation of the dormant Commerce Clause <u>does</u> constitute irreparable harm, and even more so when it is accompanied by additional harm, such as plaintiff's assertion of lost business, which is sufficient irreparable harm); *Prof'l Towing & Recovery Operators of Ill. v. Box*, No. 08 C 4096, 2008 WL 5211192, at **12-13 (N.D. Ill. Dec. 11, 2008) (discussing that although a likelihood of success on the merits of a <u>preemption claim</u> might not necessarily give rise to *per se* irreparable harm, Plaintiffs are nonetheless entitled to injunctive relief if they can establish irreparable harm).

demonstrated additional irreparable harm that is likely to occur before the Court rules on the merits. *RoDa Drilling*, 552 F.3d at 1210 (only "[p]urely speculative harm" does not suffice); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

In an effort to dismiss the additional irreparable injuries that ES&S and Hart will suffer, the Secretary first argues that economic loss is not recoverable. Indeed, Plaintiffs' claim would be insufficient if it was <u>solely</u> based on simple economic loss, in and of itself. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). But this is not Plaintiffs' claim. Plaintiffs need not demonstrate additional harm because a violation of Commerce Clause rights is itself an irreparable injury, but Plaintiffs have nonetheless shown a variety of additional injuries, such as: they are already losing and will continue to lose business, they are threatened with being forced out of business altogether in Colorado, the damages they will suffer are uncertain, and they will suffer loss of goodwill and reputation. Mot. Prelim. Inj. pp. 14-18.

Moreover, loss of customers, loss of goodwill, and threats to a business's viability constitute irreparable harm. *Hill's Pet Nutrition, Inc. v. Nutro Products, Inc*., 258 F. Supp.2d 1197, 1205 (D. Kan. 2003). Many factors support irreparable harm determinations, such as inability to calculate damages, harm to goodwill, diminishment of competitive positions, loss of employees' unique services, and lost opportunities. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1263 (10th Cir. 2004). Contrary to the Secretary's unrealistic argument, Plaintiffs' loss of customer goodwill is <u>not</u> subject to precise calculation. ES&S and Hart will lose the continuity of business which comes from years of

19

establishing and fostering customer relationships.  The effect on the volume of Plaintiffs'
revenues is inherently difficult to measure because it is uncertain how many additional new
customers Plaintiffs may have been able to generate.  Mot. Prelim. Inj. pp. 14-16.  The longer
Plaintiffs are precluded from providing new voting systems in Colorado, the more goodwill
and customers they will lose, *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir.
1990), and their national business reputations will suffer.

The Secretary's allegation that Plaintiffs are claiming irreparable injury simply for the
cost of complying with the new election rules is disingenuous and, of course, assumes that
the new rules do not discriminate against interstate commerce, do not alter the entire
competitive structure of the marketplace, and do not violate Plaintiffs' constitutional rights,
privileges and immunities.  This is not the case.

### B.    Any Injury to the Secretary by a Preliminary Injunction does not Outweigh the Harm Threatened to Plaintiffs.

Plaintiffs have set forth the harm not only threatened to, but already suffered by, them
should an injunction not issue.  Mot. Prelim. Inj. pp. 12-16.  The Response fails to identify
any harm the Secretary will suffer if a preliminary injunction is granted.  The Secretary does
not—and cannot—challenge Plaintiffs' assertion that "issuance of the requested relief will
essentially leave the Secretary in the same position he occupied prior to adoption of [the
challenged election rules] on February 9, 2016, with regard to multiple competing voting
systems."  *Id.* at 16.  There is no harm to Defendant against which Plaintiffs' ample
threatened harm is outweighed.

Indeed, rather than point to any "specific harm that the Secretary . . . will suffer if

enjoined from enforcing the voting systems rules," the Secretary simply claims an amorphous "adverse impact on the public interest" as a substitute for any showing of harm to the Secretary. This failure to identify any harm to the Secretary is unsurprising, but no accident. The Rules at issue, and the Secretary's actions pursuant to those rules to date, run contrary to the five-to-two vote of the Secretary's own PERC in favor of multiple voting systems.

Instead of identifying <u>any</u> harm Defendant will suffer should a preliminary injunction issue, the Response attempts to conflate the alleged harm that the Defendant possibly might suffer with the alleged harm to the public. Defendant's citation to a single foreign district court case—*Jackson v. Leake*, 476 F. Supp. 2d 515 (E.D. N.C. 2006)—does not counsel in favor of disregarding this prong of the preliminary injunction test.[6] The *Jackson* court cited no authority for its cursory analytic merger of the threatened-harm-to-defendant and the public interest prongs, and the Court should reject Defendant's invitation to upend well-established law by doing so.

Having failed to identify any harm the Secretary will suffer should a preliminary injunction issue, and in the presence of ample identified harms to Plaintiffs should a preliminary injunction not issue, Plaintiffs have met their burden with respect to this prong.

**C.**     **Restraining the Voting Systems Rules will not Adversely Affect the Public Interest.**

---

[6]   Defendant cites no Tenth Circuit or United States Supreme Court authority in support of his assertion that his threatened injury outweighs the injury to Plaintiffs. The sole local authority cited—*Libertarian Party of Colo. v. Buckley*, 938 F. Supp. 687 (D. Colo. 1996)—is inapposite, as it concerned a scheme for the order of placement of candidate names on ballots, and the constitutional injury resulting from that scheme "if it exists at all, is minimal." *Id.* at 693. By contrast, the litany of threatened injuries to Plaintiffs is substantial. Mot. Prelim. Inj. pp. 12-17.

The Secretary hyperbolically asserts that an injunction "threatens the integrity of the election process . . . disserving the public interest."   However, the Secretary provides no evidence that prior to the adoption of the challenged rules Colorado elections were in a state of chaos.  Indeed, aside from isolated instances of electoral problems, the Response provides no evidence that Colorado elections were in such a sorry state of disrepair so as to excuse the Secretary's overstepping of his statutory mandate in election administration.

The Response avoids specific description of the issues surrounding harm to the "public interest" in the cited authorities because those cases present questions inapposite to the instant case.  For instance, *Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547 (6th Cir. 2004), concerned the appeal of two orders entered two days and one day (following the filing of complaints five days and six days, respectively) before the 2004 national general election concerning third-party challenges to voter qualifications at polling sites.  *Id.* at 549.  After acknowledging that the "balance of harms in this case is close," the court specified that it was an important factor in its public interest analysis to not have election rules "changed at the last minute."  *Id.* at 551.  No such temporal proximity to the actual election date is present in this case, and *Summit Cnty.* is therefore not instructive on the public interest issue.  Indeed, Plaintiffs do <u>not</u> seek a last-minute change to the rules, but a restoration of the status quo which served the public well prior to the Secretary's actions.

Likewise, *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195 (D. N.M. 2008), does not inform the public interest analysis here.  There, the court considered third-party voter registration activities and statutes regulating those activities.  The court

focused on evidence showing that, in New Mexico, there were well-documented cases of third-party voter registration fraud and neglect that impacted more than one thousand voter registrations. *Id.* at 1201-02. In light of this evidence, the court concluded:

> Past incidents demonstrate that, absent [the challenged statute], voter-registration fraud and the disenfranchisement of New Mexico citizens are not only possible, but likely. An injunction from the Court prohibiting the enforcement of [the challenged statute] is thus adverse to the public interest. Any injunction would also upset the status quo that has existed for three years . . . .

*Id.* at 1247.

Similarly, *Miller v. Am. Tel. & Tel. Corp.*, 344 F. Supp. 344 (E.D. Pa. 1972), does not inform the public interest prong. There, shareholders in a private corporation sought to enjoin that corporation from providing telephone service to the Democratic National Committee until an antecedent debt was paid. *Id.* at 345. Despite tangentially relating to elections, *Miller—a* shareholder suit—does not inform this case and does not advance the Secretary's argument.

Here, the Response identifies only an isolated instance of actual problems experienced in the past that the new rules are meant to address: the process of adjudication for write-in ballots may have delayed elections results in one county in 2014. This isolated problem does not excuse the unlawful promulgation of new rules and does not demonstrate that a sufficient public interest in the new rules outweighs the tremendous damage to the public interest that the new rules will cause. The Secretary otherwise points to alleged improvements in elections administration that would flow from the new rules forcing counties into the selection of a single provider. Rather than force counties, at their expense (and to Plaintiffs'

detriment), into supposed solutions via *ultra vires* new rules, counties should be free, as the statutes require, to negotiate with multiple election systems providers and choose among those that best serve their election needs.

Defendant asserts—apparently without irony—that the challenged Rules seek to advance legitimate public election integrity interests "by updating the integral machinery used administer Colorado's elections."  However, the Rules actually prevent Colorado counties from updating their election machinery in their preferred manner, by forbidding the upgrading or replacement of undamaged equipment previously-used by the counties and forcing them into using Dominion.  *See* new Rule 11.9.2(b); Ex. 20 ¶¶2-4; Ex. 21 ¶¶2-4, Ex.22 ¶¶5-8.  And, many local election officials have objected to the at-issue Rules.

Defendant asserts that *Gonzalez v. Arizona*, Nos. CV 06-11268, 1362, & 1575, 2006 U.S. Dist. LEXIS 76638, \*\*33-35 (D. Ariz. 2006), stands for the proposition that "federal courts 'cannot lightly interfere' with the electoral process,"(internal quotation marks omitted). But, federal courts in fact did interfere with the electoral process in that case in subsequent appellate proceedings.  *See Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012) (holding that state election scheme was preempted by federal law), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013).  State administration of elections is an area where federal courts may in fact tread when warranted, as here.

Significantly, the Response does not address the public interest factors in favor of injunctive relief that Plaintiffs enumerated in the Motion.  For instance, Plaintiffs set forth reasons why smaller Colorado counties will be forced to pay more under the challenged

Rules for Dominion's services, despite not needing the ballot-processing capacity that they will be forced to purchase.  Mot. Prelim. Inj. p. 17.  The Motion enumerated the significant cost increases for counties of various sizes to purchase Dominion's services (*id*. at 18).  The Motion described how the challenged Rules will stifle innovation in elections-systems (*id*. at 18-19).  The Motion set forth how the stifling of competition under the Rules will disserve the public interest in the provision of customer service (*id*. at 19).  The Response leaves unchallenged these important public interest factors weighing in favor of injunctive relief.

### D.     <u>Plaintiffs are More Than Likely to Prevail on the Merits of All Claims</u>.

As demonstrated, Plaintiffs have satisfied the first three conditions of the traditional test.  Therefore, the standard for meeting the fourth "probability of success" prong is more lenient, requiring that Plaintiffs only make a *prima facie* showing that they have a "fair ground for litigation."  *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

### 1.     Dormant Commerce Clause Claim

As discussed in their Response to Defendant's Motion to Dismiss, which Plaintiffs incorporate here by reference, the market participation exception does not bar Plaintiffs' dormant Commerce Clause claim and HAVA did not authorize states to enact laws that discriminate against interstate commerce. (Resp. Mot. Dismiss pp. 7-15).

The Secretary now advances new and different arguments why the dormant Commerce Clause claim is purportedly not likely to succeed.  The test that the Secretary

seeks to apply—the *Pike* test—is not applicable[7] and is not the test through which Plaintiffs

seek relief.[8]   The applicable test is simple: Whether the new election rules discriminate

against out-of-staters without a valid purpose.  *Epel*, 793 F.3d at 1171-72*; Herrmann*, 656

F.3d at 1233; *KT & G Corp. v. Att'y Gen. of Okla*., 535 F.3d 1114, 1143 (10th Cir. 2008).

This is the test that ES&S and Hart have invoked and it is the standard that applies to the new

discriminatory election rules.  "Legislation of this stripe is condemned as 'virtually <u>invalid</u>

<u>*per se*</u> and can survive <u>only</u> if the discrimination is demonstrably justified by a valid factor

unrelated to economic protectionism.'"  *Epel*, 793 F.3d at 1171-72 (quoting *KT & G*., 535

F.3d at 1143) (emphasis added).   Discriminatory laws are those that mandate different

treatment of in-state and out-of-state economic interests that benefits the former and burdens

the latter.  *Or. Waste Sys. v. Dept. of Envtl. Quality,* 511 U.S. 93, 99 (1994).  This occurs

where an in-state commercial interest is directly or indirectly favored at the expense of

out-of-state competitors.  *Selevan v. N.Y. Thruway Auth*., 584 F.3d 82, 95 (2d Cir. 2009).

Here, the new election rules discriminate against out-of-state entities by excluding

them from doing business in Colorado, to the sole economic benefit of in-state Dominion.

*See Epel*, 793 F.3d at 1171-72. The new rules favor its in-state commercial interest at the

---

[7] The *Pike* test assists courts in determining when <u>nondiscriminatory</u> state laws should nonetheless be invalidated because they impose an undue burden on interstate commerce. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1233 (10th Cir. 2011) *aff'd*, 133 S. Ct. 2120 (2013) (citing *Pike v. Bruce Church, Inc*., 397 U.S. 137 (1970)).

[8] Indeed, the Tenth Circuit recently criticized the *Pike* standard as being "an unwieldy test" with substantial "difficulties associated with applying" it. *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 595 (2015). The Tenth Circuit criticized *Pike* as being "[the farthest reaching" test that can be applied in the dormant Commerce Clause context. *Id.*  "By any reckoning, [*Pike* is] a pretty grand, even 'ineffable,' all-things-considered sort of test." *Id.*

expense of these out-of-state competitors and are therefore *per se* invalid.  *Id.*; *KT & G.*, 535 F.3d at 1143; *see also S. Waste Sys., LLC v. The City of Coral Springs, Fla.*, 687 F. Supp. 2d 1342, 1353 (S.D. Fla. 2010).

Moreover, the discriminatory voting system rules and the Secretary's actions lack any public purpose unrelated to economic protectionism. *Herrmann*, 656 F.3d at 1233 (emphasizing that such discrimination, at a minimum, "invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives."). As discussed, the evidence undermines the Secretary's argument that the new rules reduce costs and improve the efficiency and accuracy of election administration.  For instance, as established above, mandating the use of COTS, digital adjudication, automatic document feeders, single user interface, and external formatting does not reduce costs or improve efficiency and accuracy.  In fact, the new election rules prevent Colorado counties from updating their election machinery in their preferred manner and instead force them into using Dominion, in violation of C.R.S. §1-5-612(1), among other things.

The Secretary suggests that the new rules are not discriminatory because they are geographically neutral on their face.   Yet, he has boasted to the public that the sole vendor he selected for the new uniform voting system, Dominion, has "its principal place of business right here in Denver ...."  Ex. 17.  And, in any event, the standard is simply whether the new rules discriminate against out-of-staters without a valid purpose, such as here, where an in-state interest is directly or indirectly favored by the state action at the expense of out-of-state competitors.  *See Selevan*, 584 F.3d at 95.  In any event, the Secretary's assertion that the

new rules are facially neutral is undermined by his actions, such as his long pursuit of a "uniform voting system," his disregard of the PERC's majority vote in favor of multiple voting systems, his announcement instead that Dominion would be the single provider, his contracting with Dominion for the same, and his continued confirmation following the new rules of having implemented a uniform voting system with Dominion as the sole provider.

The Secretary's argument that the rules do not discriminate in practical effect is, again, not the legal standard and is also not the case. The evidence establishes a clear indication that Dominion will face no competition in the long term. To illustrate, contrary to the Secretary's misleading contention, Clear Ballot has in fact not been approved as a voting systems provider. Likewise, Dominion is in effect not subject to the same rules as Plaintiffs and other out-of-state entities because the new rules appear specifically tailored to impose arbitrary requirements that, at this point, only Dominion's system can meet.

Similarly failing is the Secretary's allegation that the dormant Commerce Clause does not protect ES&S and Hart because they are "particular interstate firms". The new election rules effectively mandate only one voting system provider (in-state Dominion), to the exclusion of all out-of-state companies, not just ES&S and Hart. This has been a predetermined decision by the Secretary to install Dominion as the sole voting system provider in Colorado under the guise of rules designed to provide Dominion with a monopoly position to the detriment of all other out-of-state competitors.

### 2.    State Law Claims

As set forth in their Response to Defendant's Motion to Dismiss, incorporated here,

Plaintiffs' state law claims are not barred by the Eleventh Amendment, the Court should not abstain from hearing those claims, the Court has jurisdiction over those claims, and Plaintiffs have standing to assert those claims. (Resp. Mot. Dismiss pp. 15-33).

While the Secretary asserts that Plaintiffs seek to enjoin "lawfully-promulgated rules," the very lawfulness of those rules—which were promulgated in drastically different form than first announced in the rulemaking process—is squarely at issue in other litigation between the Secretary and various counties. *See Bd. of Cty. Comm'rs of Jefferson Cty v. Williams*, Denver District Court Case No. 2016CV031544; *Klotz v. Williams*, Denver District Court Case No. 2016CV31603. Moreover, Plaintiffs are not relying on a "strained interpretation of Colorado's statutes governing the Secretary's rulemaking authority." Rather, as set forth previously (Resp. Mot. Dismiss pp. 11-12), Plaintiffs invoke the plain language of those statutes, which contemplate multiple voting systems. *See, e.g.,* C.R.S. § 1-5-616(4). The challenged rules, in conjunction with the Secretary's actions to date, mandate a single voting system in contravention of the statutory scheme.

## II. ALTERNATIVE PRELIMINARY INJUNCTION REQUIREMENTS ARE ALSO MET.

Despite having already met the traditional test for preliminary injunctive relief, Plaintiffs have also shown in the alternative that the Court should issue a preliminary injunction because the Secretary is engaged in, or is about to be engaged in, practices prohibited by laws that provide for injunctive relief to prevent such violations. Thus, it is unnecessary for them to establish the usual equitable grounds because the statute requirements are met and Congress has already held that such violations must be enjoined.

*Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259-60 (10th Cir. 1981); *see Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004).

The Secretary half-heartedly alleges that the Court should simply ignore this mandatory precedent because he believes the Plaintiffs are not likely to succeed on the merits of their claims.  First, as described above, Plaintiffs have established that they are more than likely to succeed on the merits of all of their claims.  Second, the Secretary misses the mark—the inquiry under this alternative test is simply whether Plaintiffs have shown that the Secretary has engaged in or is about to engage in practices barred by laws that provide for injunctive relief.  *Lennen*, 640 F.2d at 259-60.  Evidence proves that he has.

In his last-ditch effort to avoid application of established precedent, the Secretary suggests "it is far from clear" that this alternative basis approach applies to requests for preliminary injunctive relief in §1983 cases.  He does not cite to a <u>single</u> authority indicating that §1983 cases are an exception to this long-standing mandate.  Instead of providing affirmative authority standing for this proposition, the Secretary string cites three inapplicable §1983 cases.  Unlike this case where ES&S and Hart seek to maintain the status quo, in those cases the Plaintiffs sought mandatory or prohibitory injunctions to alter the status quo (requests that are therefore is subject to <u>heightened scrutiny</u>[9]) and there was <u>no</u> request for relief under the alternative test.  *See Evans v. Fogarty*, 44 Fed. App'x 924, 926 (10th Cir. 2002) (considering whether the request was for a mandatory or prohibitory

---

[9]  The Tenth Circuit has made clear that "'in cases where the requested preliminary injunction alters the status quo . . . the movant will ordinarily find it difficult to meet its heavy burden of showing that the four factors, on balance, weigh heavily and compellingly in its favor, without showing a substantial likelihood of success on the merits.'" *Kikumura*, 242 F.3d at 955 (quoting *SFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1101 n.11 (10th Cir. 1991)).

injunction, both of which require a heightened showing of all four factors); *Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1181-99 (D. N.M. 2011) (imposing heightened scrutiny on plaintiff's request for relief that would alter the status quo, and observing that plaintiff would find it "difficult to meet [this] heavy burden of showing that the four factors, on balance, weigh heavily and compellingly in its favor."); *Bannister v. Bd. Of Cnty. Comm'rs*, 829 F. Supp. 1249, 1525-53 (D. Kan. 1993) (granting plaintiff's request for a preliminary injunction under the traditional test, as there was no request under the alternative test).

Here, the evidence shows that such violations have occurred or are about to occur, which is itself adequate basis for preliminary injunctive relief under § 1983. *See* 42 U.S.C. §1983; *Dennis v. Higgins*, 498 U.S. 439, 447 (1991); *Lennen*, 640 F.2d at 261. For this additional reason, the Court should issue preliminary injunctive relief.

## CONCLUSION

Accordingly, the Court should grant Plaintiffs' Motion with Authorities for Temporary Restraining Order and/or Preliminary Injunction in its entirety.

Dated: July 19, 2016.

JONES & KELLER, P.C.
  *S/ T.P. McMahon*
Thomas P. McMahon
tmcmahon@joneskeller.com
Aaron D. Goldhamer
agoldhamer@joneskeller.com
1999 Broadway, Ste. 3150
Denver, CO 80202
Tel. (303) 573-1600
Fax  (303) 573-8133
Attorneys for Plaintiffs

32

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2016, I filed a true and correct copy of the foregoing

"**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**" with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following email addresses:

LeeAnn Morrill
LeeAnn.Morrill@coag.gov

Grant T. Sullivan
Grant.Sullivan@coag.gov

Christopher Jackson
Christopher.Jackson@coag.gov


_____*s/Renae Mesch*_____
Renae Mesch