```
 1           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 16-cv-1237-JLK-MJW
 3     _____

 4              RULE 30(b)(6) DEPOSITION OF:
        DWIGHT K. SHELLMAN, III, ESQ. - July 8, 2016
 5              COLORADO SECRETARY OF STATE

 6     _____

     ELECTION SYSTEMS & SOFTWARE, LLC, a Delaware limited
 7   liability company; and HART INTERCIVIC, INC., a Texas
     corporation,
 8
     Plaintiffs,
 9
     v.
10
     WAYNE W. WILLIAMS, in his official capacity as
11   Colorado Secretary of State,

12   Defendant.

13     _____

14              PURSUANT TO NOTICE, the Rule 30(b)(6)
     deposition of DWIGHT K. SHELLMAN, III, ESQ., COLORADO
15   SECRETARY OF STATE, was taken on behalf of the
     Plaintiffs at 1999 Broadway, Suite 3150, Denver,
16   Colorado 80202, on July 8, 2016, at 10:06 a.m., before
     Tracy C. Masuga, Registered Professional Reporter,
17   Certified Realtime Reporter, and Notary Public within
     Colorado.
18

19

20

21

22   H+G

23

24   Hunter+Geist, Inc.

25   303.832.5966     1900 Grant Street, Suite 1025    ■ www.huntergeist.com
     800.525.8490     Denver, CO 80203                 ■ scheduling@huntergeist.com

                      Your Partner in Making the Record
```

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT 15

Election Systems & Software v. Williams        DWIGHT K. SHELLMAN, III, ESQ.                    7/8/2016

**21**

1   A. I am not certain of the date, but I know
2   that we held a kickoff meeting with representatives of
3   my office and with Dominion only one week later on
4   December 29.
5   Q. Okay. All right. Let me -- let me get
6   another document marked. Hold on one second here.
7       MR. McMAHON: Can we get this marked as
8   10.
9       (Deposition Exhibit 10 was marked.)
10  Q. (BY MR. McMAHON) Did you -- you have
11  Exhibit 10 there?
12  A. Yes, I do.
13  Q. Okay. If you look at the bottom of the
14  first page. And reading these email strings, you
15  always have to do it in reverse.
16  A. Yeah.
17  Q. This, I take it, was an email that you
18  sent. It says from you to you with copies to a number
19  of other people.
20  A. Yes.
21  Q. Okay. Including Steve Bennett at
22  Dominion?
23  A. That's correct.
24  Q. Okay. And the subject was "Plans to
25  move to a new voting system in 2016."

**22**

1   A. Yes.
2   Q. Okay. And the first paragraph, second
3   sentence indicates that "yesterday, Secretary Williams
4   selected Dominion . . . as Colorado's Uniform Voting
5   System going forward." Do you see that?
6   A. Yes, sir.
7   Q. Do you see that?
8   A. Yes. I'm sorry. Yes.
9   Q. Okay. And then if you go over to the
10  next page, and about a third of the way down, there's
11  a heading that says "Contract Negotiations," okay?
12  A. Uh-huh.
13  Q. It says, "The [Secretary's] office is
14  working with Dominion to negotiate a master agreement
15  governing the sale of the voting system to Colorado
16  counties." Do you see that?
17  A. Yes.
18  Q. Okay. So the day after the
19  announcement, the secretary's office was already
20  working with Dominion?
21  A. I think at most, the scope of our work
22  there had been to schedule the meeting for the 29th.
23  Q. Okay. All right.
24  A. But we were getting on it quickly.
25  Q. Okay. All right. And so was the

**23**

1   meeting on the 29th kind of the first substantive
2   matter?
3   A. Yes.
4   Q. Were there communications back and forth
5   between the secretary's office and Dominion
6   preparatory to the meeting on the 29th?
7   A. I don't recall any, other than I believe
8   our chief of staff, Gary Zimmerman, sent out a meeting
9   invitation, and the meeting invitation had a very
10  rough outline of some agenda items.
11  Q. Let's get this marked as 11.
12      (Deposition Exhibit 11 was marked.)
13  Q. Now, do you recognize this as an email
14  from yourself on the 24th to Steve Bennett at
15  Dominion?
16  A. I sure do. I had forgotten about this.
17  Q. Okay. And the subject is "Contract
18  negotiations and development meetings"?
19  A. Uh-huh.
20  Q. And apparently, you had a telephone
21  conversation earlier that day?
22  A. That's what it says, yeah.
23  Q. Let me ask you this: Up at the top
24  where it says "Sent," it says, "Thursday, December 24,
25  at 12:22 a.m."

**24**

1   A. That would not surprise me.
2   Q. You were working late, huh?
3   A. Yeah.
4   Q. Okay. So at some point -- I take it the
5   phone conversation must have been on the 23rd?
6   A. Yes.
7   Q. Okay. All right. And so the Zimmerman
8   agenda that you're talking about is something
9   different than this?
10  A. Yes. It sure is.
11  Q. Okay. All right. Okay. And so in here
12  there are references -- if you look to the bottom of
13  the first page there, there are references to Rule
14  21.4.7(e), 21.4.14, and 21.4.15. Do you see those?
15  A. Yes, I do.
16  Q. Why were those rules singled out?
17      (At this time Mr. Jackson left the
18  room.)
19  A. These were top-of-mind development items
20  that needed to be addressed. In the case of
21  Rule 21.4.7(e), that needed to be addressed before the
22  primary election, because state law does not, we
23  believe, permit a copyright notice of a voting system
24  provider to appear on a ballot.
25      And then in the case of 21.4.14 and

Election Systems & Software v. Williams    DWIGHT K. SHELLMAN, III, ESQ.    7/8/2016

25

1  21.4.15, we knew from the pilot elections that were
2  conducted in November that the voting system did not
3  satisfy these requirements, neither of which actually
4  go into effect under the rule until 12/31/2016, but
5  the --
6      Q.  Wait.  I'm sorry.  Let me -- until --
7  until December 31 of this year?
8      A.  Yes.  Those two rules have a deferred
9  effective date.
10     Q.  Oh, so those two rules do not apply yet?
11     A.  That's correct.
12     Q.  Is a deferred effective date found
13 somewhere?  If you look at Exhibit 5.
14     A.  Yeah.  I'm confusing myself.  5.
15     Q.  Okay.  So I see what you're saying here.
16 So basically, if voting systems are certified on or
17 after the first of 2016, they have to meet these
18 requirements for ballot-level cast vote records and
19 exports, that's 21.4.14, and election night reporting
20 data and exports, that's 21.4.15, they have to meet
21 those by December 31 of this year?
22     A.  That's correct.
23     Q.  Okay.  So there's a -- okay.
24     A.  And I highlighted those items because --
25 especially in the case of the cast vote records, that

26

1  is a big development item for Dominion, and it's
2  really essential in Colorado that that be completed by
3  the end of this year, because our state law requires
4  us to implement risk-limiting audits in 2017.
5      Q.  Okay.  Let me ask you, then, to take a
6  look at Exhibit 1, if you can find that.  So that's
7  the December 15 proposed rules.
8      A.  Yes.
9      Q.  And if you look at 21.4.14 and 21.4.15,
10 they, as proposed -- essentially the cutoff date there
11 was December 15 of last year; that any voting system
12 submitted for certification after December 15 would
13 have to comply with the requirements of 21.4.14 and
14 21.4.15?
15     A.  That's correct.
16         (At this time Mr. Jackson entered the
17 room.)
18     Q.  So basically, between December of 2015
19 and February 9 of 2016, the compliance date for
20 21.4.14 and 21.4.15 was pushed back?
21         MR. SULLIVAN:  Objection.  That's
22 outside the notice.  It's not a communication with
23 Dominion.
24         MR. McMAHON:  It's a foundational
25 question.

27

1         MR. SULLIVAN:  You can ask him if he
2  knows, but he's not going to be able to bind the
3  secretary.
4         MR. McMAHON:  Well, I think he can.  But
5  anyway, we'll worry about that later.
6      A.  Well, just comparing the two versions of
7  the rules, the ones formally adopted have that
8  deferred effective date, and the ones initially
9  proposed do not.
10     Q.  (BY MR. McMAHON)  Okay.  And so what, if
11 any, communications occurred between the secretary's
12 office and Dominion regarding pushing that effective
13 date back?
14     A.  I do not know of any communications
15 regarding the insertion of the deferred effective date
16 in the formally adopted rules with Dominion.
17     Q.  Was there any discussion back and forth
18 between Dominion and the secretary's office that
19 Dominion would have difficulty meeting the
20 requirements of 21.4.14 and 15 unless the effective
21 date was pushed back?
22     A.  There were no discussions with Dominion
23 in that regard, so the answer is no.
24     Q.  There were internal discussions with the
25 secretary's office?

28

1      A.  Yes, yes.
2      Q.  Dominion never asked to have the date
3  pushed back?
4      A.  No.
5      Q.  Okay.  So it's something the secretary's
6  office did voluntarily without a request from
7  Dominion?
8      A.  That's correct.
9      Q.  Okay.  And it did it to accommodate
10 Dominion?
11     A.  Well, it did it because in the case of
12 Rule 21.4.14, Colorado is the only jurisdiction in the
13 country that effective next year will require
14 risk-limiting audits, and as a result of that, no
15 voting system that's on the market complies with the
16 ballot-level cast vote record export in the format
17 that we desire.
18         So the internal discussions were, this
19 cannot happen, you know, on December 15, 2015 or
20 January 1, 2016, but it's an essential requirement
21 before we get to 2017.
22     Q.  Okay.  And then what about 21.4.15?
23         MR. SULLIVAN:  Objection.  It's not a
24 communication with Dominion.
25     A.  Yeah, well, we -- the Secretary of

scheduling@huntergeist.com    HUNTER + GEIST, INC.    303-832-5966/800-525-8490

**41**

1  objection.
2      Q. (BY MR. McMAHON) Let me rephrase that.
3  Would it be a breach of the contract if the secretary
4  certified another system and then approved a county's
5  application to acquire the system? Would that be a
6  breach of the master service agreement?
7      MR. SULLIVAN: Same objection and form.
8  You're asking him to speculate as to a legal question
9  of a breach of contract?
10     MR. McMAHON: He's a lawyer.
11     MR. SULLIVAN: That's not a
12 communication with Dominion. And you're asking him to
13 speculate.
14     MR. McMAHON: It's foundational.
15     MR. SULLIVAN: No, it's not. Same
16 objection.
17     A. Well, I'll give you my response, and the
18 answer is no, it would not be a breach of the
19 agreement. We made it very clear to Dominion before
20 the master agreement was signed that there was --
21 under no circumstances could the secretary guarantee
22 or warrant exclusivity across the state for a single
23 provider.
24     Q. (BY MR. McMAHON) And so what
25 communications went on between the secretary's office

**42**

1  and Dominion between the December 22 announcement
2  letter, where it's going to be all Dominion all the
3  time, to making it clear to Dominion that's not
4  necessarily going to be the case? What were those
5  communications?
6      A. Well, I believe the communications
7  occurred in the context of the negotiation of the
8  master agreement, the memorandum of understanding that
9  at least kind of formed a predicate for the ultimate
10 agreement. No, it wasn't in the memorandum of
11 understanding. It was in early drafts of the master
12 agreement itself.
13     And I believe those early drafts said
14 something to the effect that -- in that recital that
15 we've discussed, that it said "the uniform voting
16 system," or something to that effect.
17     Q. Let's go back to Exhibit --
18     A. It's Exhibit 6.
19     Q. -- 6. Do you have that?
20     A. Yes, I do.
21     Q. Okay. So that's the Master Voting
22 Systems Agreement?
23     A. Yep.
24     Q. Is there somewhere in there that you can
25 direct me to that spells out that there might be other

**43**

1  voting system providers who would be certified whose
2  systems would be approved for acquisition?
3      A. Not in this document.
4      Q. But it was in prior drafts of the
5  document?
6      A. In prior drafts, one of the recitals
7  specifically said Dominion -- something like, and I'm
8  paraphrasing, the secretary selected Dominion as the
9  future provider of a uniform voting system in
10 Colorado, and that language was removed.
11     Q. Okay. I'm going to ask to have that
12 document produced, because I don't think we've got
13 that.
14     A. I believe those drafts were included in
15 our production.
16     Q. Okay.
17     A. But we'll see -- we'll double-check.
18     Q. Okay. Yeah, if we have it, then
19 obviously -- okay.
20     A. And so just to finish my response, after
21 the formal adoption on February 9, and before this
22 agreement was signed on February 17, we notified
23 Dominion that sole provider of a uniform voting system
24 was no longer an option.
25     Q. Was no longer an option functionally or

**44**

1  was no longer an option in the contract language?
2      MR. SULLIVAN: Objection, form.
3      A. I'm not sure I understand the
4  distinction.
5      Q. (BY MR. McMAHON) Okay. You say --
6  here. Okay. You say that after February 9 and before
7  February 17, you notified -- you, the office, notified
8  Dominion that sole provider of a uniform voting system
9  was no longer an option. And my question is, do you
10 mean it's no longer an option that -- that it could be
11 the sole provider? What do you mean by "option"?
12     MR. SULLIVAN: Objection, form.
13     A. Meaning that we were not contracting
14 with Dominion to be the sole provider of a voting
15 system in Colorado. We were contracting with Dominion
16 to be a provider of a voting system in Colorado.
17     Q. (BY MR. McMAHON) If that's true, why
18 does the December 17 contract say "the provider," not
19 "a provider"?
20     MR. SULLIVAN: Objection. That's not a
21 communication with Dominion.
22     MR. McMAHON: Two sides of the same
23 coin.
24     A. I'm not sure there's a difference.
25     Q. (BY MR. McMAHON) Between "a" and "the"?

## 45

1  A. Yeah. In the context of Exhibit 6, at
2  the time this -- Dominion is the future provider,
3  because they were the, you know, only system, subject
4  to their certification, which occurred after this.
5  But if you look at the prior drafts of this agreement,
6  I think the intent of the parties is very clear: This
7  is no longer a guaranteed exclusive contract.
8  MR. SULLIVAN: Well, and, Counsel, can I
9  just -- "the future provider" language that you're
10  talking about is in a sentence that discusses the
11  December 22 announcement by the secretary.
12  MR. McMAHON: Right. I see that.
13  All right. Let's take a break here, and
14  I'm going to try to see if we can find prior drafts.
15  And my thought -- off the record.
16  (Recess taken, 11:07 a.m. to 11:39 a.m.)
17  MR. McMAHON: Let's get this marked as
18  24, if you would.
19  MR. SULLIVAN: 24?
20  MR. McMAHON: 24.
21  (Deposition Exhibit 24 was marked.)
22  Q. (BY MR. McMAHON) Mr. Shellman, do you
23  recognize Exhibit 24 as a UVS Implementation Weekly
24  Team Status Meeting Notes document for a meeting on
25  February 18 of this year?

## 46

1  A. Yes.
2  Q. Okay. And that would be the day after
3  the voting systems agreement had been signed?
4  A. That's correct.
5  Q. Okay. And then if you look at the first
6  page there under Description, it indicates "Updates
7  with Dominion."
8  A. Yes, uh-huh.
9  Q. And then if you go to the second page
10  under Discussion, right about the middle there's an
11  entry stating, "When can Dominion provide input to
12  rules? Technical team has concerns about complying
13  with the requirements. Requested a meeting with
14  CDOS," that would be your office, "and Dominion
15  technical team to discuss issues and to fully
16  understand requirements and how to best comply with
17  them." Do you see that?
18  A. I do.
19  Q. Now, is that -- who is this coming from?
20  Is this -- is this the secretary's office asking
21  Dominion to provide input to the rules?
22  A. I believe this is Dominion, because
23  the -- I believe -- in this particular case, this is
24  Dominion requesting the ability to provide input on
25  the rules.

## 47

1  Q. And when you say "input on rules,"
2  are -- the rules have already been promulgated.
3  A. Yes.
4  Q. So what input on rules are they talking
5  about?
6  A. What we're talking about here is -- and
7  once again, this particularly concerns the cast vote
8  record Rule 21.4.14 and 15. And Dominion, under the
9  master agreement, is required to develop and submit
10  the next version of this voting system to -- for
11  certification to the secretary's office by the end of
12  this year. And I think it's fair to say Dominion has
13  concerns about its ability to comply with the cast
14  vote record rule.
15  And I do know that there's a meeting on
16  February 23 referenced here that did take place, and
17  Dominion was told that it needed to comply with the
18  rule as drafted --
19  Q. And the --
20  A. -- in the next version of its system.
21  (At this time Mr. Jackson left the
22  room.)
23  Q. Okay. So which -- first of all, which
24  rule are we talking about?
25  A. I believe it's 21.4.14.

## 48

1  Q. And that's the one -- okay. And that's
2  the one that has to be complied with by the end of the
3  year?
4  A. That's right.
5  Q. And so you're saying it's a next-
6  generation Dominion system?
7  A. Yes.
8  Q. Okay. It won't be just they'll add it
9  to this system?
10  A. The way voting systems work is you
11  develop a new version -- and they do this because each
12  version has to go through a certification campaign.
13  So the new version of Dominion, among other things,
14  requires a slightly different configuration of the
15  ballot-marking devices for the next version, and as --
16  which is a fair amount of development that Dominion
17  needs to do. And as part of that, Dominion has been
18  advised that we expect them to develop the cast vote
19  record export in the manner required by the rule.
20  Q. Okay. And is the same thing -- so
21  they're having difficulty with that?
22  A. They have expressed concerns about it.
23  Q. Okay. So that's 21 -- they expressed
24  concerns about complying with 21.4.14?
25  A. That's correct.

DWIGHT K. SHELLMAN, III, ESQ.

63

REPORTER'S CERTIFICATE

STATE OF COLORADO         )
                          ) ss.
CITY AND COUNTY OF DENVER )

       I, TRACY C. MASUGA, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public 19924005553, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DWIGHT K. SHELLMAN, III, ESQ., was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 15th day of July, 2016.

       My commission expires April 24, 2020.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

*[signature: Tracy C. Masuga]*
Tracy C. Masuga
Certified Realtime Reporter
Registered Professional Reporter