IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-1237 - JLK

**ELECTION SYSTEMS & SOFTWARE, LLC,**
    a Delaware limited liability company; and
**HART INTERCIVIC, INC.,**
    a Texas corporation;
        Plaintiffs,

v.

**WAYNE W. WILLIAMS,**
    in his official capacity as Colorado Secretary of State.
        Defendant.

## DECLARATION OF BRYAN HOFFMAN

I, Bryan Hoffman, pursuant to 28 U.S.C. § 1746, do depose and state as follows.

1. I am Vice-President of Corporate Sales - West for plaintiff Election Systems & Software, LLC ("ES&S"). I am responsible for tabulation, poll book and software sales and for aftermarket sales, hardware maintenance and software license agreements. I am familiar with the voting system situation in Colorado and am competent to testify to the following matters based upon my own personal knowledge relating to new voting system rules adopted by the Colorado Secretary of State ("Secretary") on February 2, 2016.

**Replacement of Damaged, Defective, or Inoperable Voting System Applications, Components or Devices – Voting System Rule 11.9.2 (b)**

2. Rule 11.9.2 & subsection (a) reference voting systems, devices or related components certified for use in Colorado by the Secretary of State ("Secretary") before January 1, 2016, and purchased, leased or used by a political subdivision (*i.e.*, county) before

JK00842078.2 //font=8

**EXHIBIT 20**

that date. In that context, Rule 11.9.2 & subsection (b) provide that the Secretary will approve a county's application to purchase lease or use such a system, device or component only where it is to replace the same or a substantially similar item that is damaged, defective or inoperable. And even then, subsection (c) limits such approval only to instances where doing so won't materially impair the county's future economic ability to purchase or lease a new voting system certified after January 1, 2016.

3. Thus, upgrades or enhancements to – or replacement of – a current system, device or component will not be approved where the existing item is undamaged, is not defective and is functional. But, Colorado counties are authorized by statute to adopt electronic and electromechanical voting systems including hardware, firmware and software upgrades. C.R.S. § 1-5-612(1).

4. The net effect is that existing voting systems may be used for the time being. However, a new requirement for systems to perform a Risk Limiting Audit takes effect in 2017 and none of the systems currently in use in Colorado have the ability to perform that function. Therefore, counties will be forced to purchase a new system by next year. The only system they will be able to purchase is that of Dominion Voting Systems, Inc. ("Dominion"), the only voting system certified by the Secretary after January 1, 2016.

**COTS Components – Rule 11.9.3(c)**

5. In the preceding regard, Rule 11.9.3(c) provides that the Secretary will approve a county's application to purchase, lease or use a voting system, device or related component certified by him after January 1, 2016, following consideration of whether it uses commercial off-the-shelf hardware components (as Dominion's system does) rather than

proprietary hardware components purpose-built by a voting system vendor to fit its own system. But, as indicated above, C.R.S. §1-5-612(1) authorizes counties to adopt voting systems, including hardware upgrades. It doesn't restrict such upgrades to commercial off-the-shelf products.

6. Contrary to the Declarations offered by the Secretary,[1] commercial off-the-shelf ("COTS") products are not going to be less expensive than products purpose-built by a vendor.

  a. For example, COTS scanners have a life expectancy of 3-5 years (based on manufacturer information), while purpose-built systems have a life expectancy of 15-20 years.

  b. ES&S has tabulators being used in counties today that are 25+ years old. So over the course of a voting system's use, a new COTS unit will have to be replaced 4-5 times during the operational life of one purpose built unit.

  c. Additionally, off-the-shelf hardware in many cases has been modified by the voting system vendor that uses it. And, at the very least, the vendor must upload proprietary software to the COTS hardware, which incurs additional cost.

  d. And, if the market calls for less expensive, purpose-built equipment, a voting system vendor may very well develop it. For example, ES&S has recently developed a less expensive model of its DS850 central count tabulator.

7. Moreover, acquiring COTS equipment is not as easy as has been portrayed.

---

[1] (Doc. 32-1, 32-6, 32-7, 32-8, 32-9).

While looking for a replacement or add-on unit, a county is still required to maintain a certified voting system. But, it is unlikely an election system vendor will keep in its warehouse third party COTS equipment that meets specifications certified by the state. So, the county will have to contact third parties in an effort to track down a specific model of a specific manufacturer's equipment matching the COTS equipment that was initially certified by the Secretary. That can be a drawn-out process. A remote county might have to acquire the specific, certified COTS hardware from a large city and then wait for installation of the correct proprietary software. Thus, a county in need of a replacement COTS unit during a critical time could find itself without the ability to acquire the replacement, forcing it to conduct an election with less equipment than might be needed. Conversely, if a county needs additional purpose-built hardware, the voting system vendor will have it readily available and can load firmware from the warehouse and deliver the entire package in a day.

8. And, if a COTS manufacturer discontinues a specific model or updates its hardware so that the previously-certified model is no longer available, the certification process must begin anew – including testing by the manufacturer, testing by the State and everything else that goes into the lengthy certification process.

9. Effectively requiring use of COTS equipment reduces the options available to counties. It forces them to rely on third-party manufacturers that, because the COTS equipment they manufacture isn't designed for election use, have no concern for the election process. Technology will continue to evolve and change in the election industry. To effectively rule out purpose-built hardware as an option simply because it isn't sold in a

public store is counterproductive and eliminates the application of new technology in Colorado that could lead to a better method of conducting elections.

10. The user manual for the COTS scanner made by Cannon (which is what Dominion uses for a vote tabulator) states that scanning folded or creased documents – which is what all absentee ballots are – can cause a paper jam or malfunction. It also indicates that use of thin, two-sided paper – which some ballots may be – could cause the scanner to pick up a mark on the other side. Finally, a mark made by pencil – such as on a ballot – will dirty the rollers and could cause streaks or marks on subsequent documents (ballots). All of this is problematic in the voting system context. *See* attached Exhibits 11.1 & 11.2.

11. Finally there is no history regarding COTS hardware being used in tabulation of election ballots. The United States Election Assistance Commission ("EACH") includes this concern in its report, Considerations for Implementing Voting Systems with COTS Products,[2] U.S. Election Assistance Comm'n, Managing Election Tech. Series: #3. Among other cautions, the EACH indicates there is no guarantee that using COTS components in any given circumstance will prove cheaper and easier to implement. *Id.* at 1. The report further states that "its [COTS] use should be the product of careful analysis, reasoning, well-formed policy, and practicable engineering decisions." *Id.* Instead, however, the rule simply favors one vendor, Dominion, over others and puts the entire Colorado election process at risk.

---

1. Available at:
http://www.eac.gov/assets/1/Documents/Considerations%20for%20Implementing%20Voting%20Systems%20with%20COTS%20Products%20FINAL%20for%20Web%20Posting%2002.03.16.pdf.

JK00842078.2 /font=8                                              5

**Digital Ballot Adjudication – Rules 11.9.3(g)(1), 11.9.4(a), 21.4.16(a)**

12. These rules effectively require that, in order for a voting system to be approved for purchase by a county, the system must have digital – rather than manual – adjudication capability for ballots with marginal or ambiguous voter markings. Digital adjudication is one means by which an election official can identify, analyze, and resolve ballot issues. But, manual adjudication is another. Digital adjudication may not be necessary for all counties, especially smaller ones with a very limited number of voters. Manual adjudication may work just fine for them. And, digital capability adds to the expense. Consequently, an individual county is in the best position to determine which approach is best for it.

**Ballot Scanners with Automatic Document Feeders – Rules 11.9.3(g)(2), 11.9.4(b), 11.9.5, 21.4.16(b)**

13. These rules effectively require that, in order for a voting system to be approved for purchase by a county, the system's ballot scanners must have automatic document feeders enabling the scanning of multiple ballots rather than a single ballot at a time. While that is a convenience, it adds cost to a system. An ES&S scanner without a feeder sells for under $5,600, whereas Dominion has quoted its scanners at about $18,000 with the feeder – over three times the cost. And, as stated previously, Dominion's COTS scanner has a life expectancy of 3-5 years, so counties will have to replace these units and incur the more-than-triple overcharge several times during the same period that the ES&S purpose-built tabulator will continue to work. For a small county that may process less than 3,000 ballots in an entire election, this is a huge amount to have pay, particularly when its employees are able

to hand-feed ballots into the scanner over the course of several days as they arrive in the mail. Even if a county has 1,000 ballots to process on Election Day itself, they could all be hand fed into the ES&S scanner within 3 hours.

* * * * *

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18 day of July, 2016.

_____
Bryan Hoffman

- ==Note that scanning the following types of documents can cause a paper jam or malfunction.== To scan such a document, make a photocopy of the document and then scan the photocopy.

 ==Wrinkled or creased documents==

 Carbon paper

 Curled documents

 Coated paper

 Torn documents

 Extremely thin, translucent paper

 Documents with paper clips or staples

 Documents with excessive paper dust particles.

- To scan bound multi-page documents such as invoice booklets, place the bound edge against the feeder inlet and scan by manual feeding.
- To use the Long Document Mode, feed document pages manually, one after another.

EXHIBIT 20.1

...paration Off] key on the control panel is lit and the
...cument Feed Tray is raised.



Separation
Off key

## IMPORTANT

...cument must meet the following criteria to be scannable:
...en scanning a multipage document, pages must be
...ped together so that they have the same size, thickness,
...d weight. Scanning different types of paper at one time may
...se the scanner to jam.
...ays make sure that the ink on a document is dry before
...nning it. Scanning documents with the ink still wet may soil
...rollers or scanning glass, cause lines or smudges to
...ear on images, or dirty other documents.
...ays clean the rollers or scanning glass after scanning a
...ument written in pencil. Scanning documents with pencil
...tten on them may soil the rollers or scanning glass, cause
...nes to appear in images, or dirty other documents.
...en scanning a two-sided document that is printed on thin
...er, the image on the opposite side of each page may show
...ough. Adjust the scanning brightness from the application
...nm, or enable the [Prevent Bleed Through/Remove
...kground] setting before scanning.

**EXHIBIT 20.2**