IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-1237 - JLK

**ELECTION SYSTEMS & SOFTWARE, LLC,**
    a Delaware limited liability company; and
**HART INTERCIVIC, INC.,**
    a Texas corporation;
        Plaintiffs,

v.

**WAYNE W. WILLIAMS,**
    in his official capacity as Colorado Secretary of State.
        Defendant.

## DECLARATION OF EDWARD PEREZ

I, Edward Perez, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1. Currently, I am the Director of Product Management for plaintiff Hart InterCivic, Inc. ("Hart" or "Hart Intercivic"). *See* (Perez Aff., Doc. 2-4, p.1, ¶3). I am responsible for Hart's product portfolio, including voting systems and third-party electronic poll books (as well as for supervising Hart's Certification Manager, who directly manages federal and state voting system certification efforts). As such, I am familiar with the voting system situation in Colorado and, based upon my own personal knowledge, am competent to testify to the following matters relating to the new voting system rules adopted by the Colorado Secretary of State ("Secretary") on February 9, 2016.

2. On that date, the Secretary adopted election rules 11.9 and 21.4 under 8 CCR 1505-1 which were significantly different than the December 15, 2015 proposed rules. The

**EXHIBIT 22**

adopted rules eliminated any reference to a uniform voting system, instead adding exclusive and restrictive requirements and considerations. *Id.* at p. 3, ¶7.

**Colorado Voting System Standards for Certification - R. 11.9.2(b), 11.9.3(c), 11.9.3(d), 11.9.3(g)(1), 11.9.3(g)(2), 11.9.4(a), 11.9.4(b), 11.9.5, 21.4.14(b)-(c), 21.4.15(b)-(d), 21.4.16(a)-(b)**

3. In my 13 years of studying election technology, and 8 years of expertise concerning issues of compliance and certification for dozens of states across the country:

a. I have never encountered a state that codifies the requirements contained in February 9, 2016 Rules 11.9.2(b), 11.9.3(c), 11.9.3(d), 11.9.3(g)(1), 11.9.3(g)(2), 11.9.4(a), 11.9.4(b), 11.9.4(c), 11.9.5, 21.4.7(e), 21.4.14(b)-(c), 21.4.15(b)-(d), 21.4.16(a)-(b) ("Election Rules"), with the specificity reflected in there.

b. In particular, I have never encountered any other state that makes voting system certification dependent upon compliance with the degree of specification in the Voting System Rules cited above.

4. Specifications regarding how applications are bundled, how workstations are configured and the detailed format in which data is to be exported do not address what technology is required but, rather, how technology is to be implemented. This is not only highly unusual, it is unprecedented in my experience. That such detailed implementation specifications have been worked into a certification regime is *prima facie* indicative that other factors are behind the changes mandated by the Secretary of State ("Secretary"). The effect is to limit choice for Colorado's counties and to "starve" them of their ability to continue their relationships with their current vendors. The rules appear especially designed to favor Dominion Voting Systems, Inc ("Dominion").

2

**Replacement of Damaged, Defective, or Inoperable Voting System Applications, Components or Devices - Voting System Rule 11.9.2(b).**

5. Rule 11.9.2 and subsection (a) reference voting systems, devices or related components certified for use in Colorado by the Secretary before January 1, 2016 and purchased, leased or used by a political subdivision (*i.e.*, county) before that date. In that context, Rule 11.9.2 and subsection (b) provide that the Secretary will approve a county's application to purchase lease or use such a system, device or component only where it is to replace the same or a substantially similar item that is damaged, defective or inoperable. And even then, subsection (c) limits such approval only to instances where doing so won't materially impair the county's future economic ability to purchase or lease a new voting system certified after January 1, 2016.

6. Colorado Deputy Secretary of State Suzanne Staiert argues in her declaration that the Voting Systems Rules do not require a county to convert to a new compliant voting system by any certain date. While it may be true that the rules do not literally require such a conversion, they effectively do so, by limiting the reasons for which an expansion of current systems is allowed by the Secretary. Counties' investments in their current systems are limited to replacement of existing components that are damaged, defective or inoperable. That has the effect of "choking off" or starving current customers of their investment and affinity with their current systems and current vendors, and is effectively "pushing them off a cliff" where they have nowhere to land but in the arms of the state's single favored vendor - Dominion.

7. Thus, upgrades or enhancements to - or replacement of - a current system, device

3

or competent will not be approved where the existing item is undamaged, is not defective and is functional. But, Colorado counties are authorized by statute to adopt electronic and electromechanical voting systems including hardware, firmware and software upgrades. C.R.S. § 1-5-612(1).

8. The net effect is that existing voting systems may be used for the time being. However, a new requirement for systems to perform a Risk Limiting Audit takes effect in 2017 and none of the systems currently in use in Colorado have the ability to perform that function to the Secretary's specifications. Therefore, counties will be forced to purchase a new system by next year. The only system they will be able to purchase is that of Dominion Voting Systems, Inc. ("Dominion"), the only voting system certified by the Secretary after January 1, 2016.

### COTS Components - Rule 11.9.3(c).

9. This rule effectively requires that, in order for a voting system to be approved by the Secretary for purchase by a county, the system must use commercial off-the-shelf hardware components ("COTS"), rather than proprietary, purpose-built hardware components.

10. The Defendant argues that "[t]he ability to quickly and efficiently replace broken or inoperable voting systems components is vitally important when administering elections." But, utilizing COTS hardware components will not accomplish this. It is simply not that easy to (1) always obtain the same, previously-certified replacement part or model, or (2) ensure that a close substitute will in fact work with the necessary software.

4

11. Every time a county tries to replace something without having the benefit of an expert service integrator who can qualify and test the new configuration, the county runs the risk that something is in fact not the same configuration, not compatible in the same way and potentially not as reliable. Contrary to the Secretary's view, "running everything on COTS" is neither easy nor cheap.

12. The alleged flexibility of COTS must be weighed against the reassurance that comes with certified voting systems which have undergone rigorous federal testing. It is not, for example, an unqualified benefit to use exclusively COTS components for accessible voting, as Dominion does, because supply chain life cycles for consumer electronic COTS components are notoriously short. The tablets on which software runs, for example, probably have a life cycle of only 12-18 months.

13. Not only is the State of Colorado leaving current users of other systems with no choices in the future, but their claims about how best to replace equipment in the future are unsound; the claim that COTS equipment is a "holy grail" does not square wit the facts."

14. Any buyer who is dependent on the COTS marketplace to secure consumer electronics is likely to have their choices constantly changing, and not within the control of their voting system vendor or supplier. And every time hardware changes, there is the risk that the election management software cannot be neatly implemented to run in a reliable manner on the new hardware.

15. Furthermore, if additional modifications must be made to election management software to make it compatible with the needs of *new* hardware – which a county buyer will

no choice but to acquire because the old COTS hardware is no longer available – it is likely to be the county that bears the expense of configuring and testing the software. And, that process implicates considerations such as time involved, availability of personnel resources and qualifications of testing personnel. The rules do not, of course, address the multiple cycles of hardware changes, software modifications, testing and new implementations of new configurations that will be necessary but have not been field tested.

16. In short, being utterly dependent on the fickle market dynamics of COTS is a recipe for ending up with a mosaic of software on different types of hardware, and a cobbled-together mosaic of implemented systems that run counter to the Secretary's desire for "economies of scale" and more uniform systems.

17. Defendants claim that "voting systems that contain off-the-shelf components are scalable, which allows a county to configure its system to fit its particular needs." (Staiert Decl., Doc. 32-1, p.4). First, scalability doesn't necessarily have anything at all to do with COTS components. If "scalable" is defined as "able to be changed in size or scale," that simply goes to a question of system design, not supply chain. A COTS system could be designed in a way that is not scalable. A system that uses purpose-built components could be very scalable. They are simply two separate issues, and the defendants' attempt to link COTS devices to scalability is misleading.

18. Defendant claims that voting systems which are compatible with off-the-shelf hardware components are generally less expensive than systems utilizing or requiring multiple proprietary, purpose- built components. That is not necessarily the case. For

6

example, the short life cycle of some COTS equipment might actually limit its scalability in the short term. It can also contribute to higher costs over the long term due to the potential need to purchase, modify, test and re-implement new configurations of software and hardware multiple times. And, the COTS supply chain cannot be closely controlled the way the supply chain of a proprietary, purpose-built system is controlled by the vendor.

19. Nor do voting systems that utilize off-the-shelf components necessarily offer better financial and operational stability to counties. If a county's COTS equipment vendor suffers financial instability or bankruptcy, it is not necessarily true that the county may continue to obtain necessary replacement components from other sources. Supply chain life cycles for consumer electronic COTS components are notoriously short and constantly changing. See discussion above.

20. Hart InterCivic has considerable experience in this area, having dealt for years with the challenges that come from running proprietary electronic poll book software on netbooks, laptops, and tablets that are constantly reaching end of life, only to be replaced by new models that must be qualified and tested before implementation, to reduce risk in the administration of elections.

21. Furthermore, if additional modifications must be made to election management software to make it compatible with the needs of new hardware, which the buyer has no choice but to acquire (because the old COTS hardware is no longer available), the Election Rules do not address who bears the expense to test that software. Nor do the Rules address time constraints, qualifications of testing personnel, or personnel resources to conduct this

testing. Additionally, the Rules do not contemplate the multiple cycles of hardware changes, software modifications, testing, and new implementations of new configurations that will be necessary, but have not been field tested.

22. In short, being utterly dependent on the fickle market dynamics of COTS is a recipe for ending up with a mosaic of software on different types of hardware, and a cobbled-together combination of implemented systems that run counter to the state's desire for "economies of scale" and more uniform systems. To avoid such undesirable outcomes, Hart InterCivic adopts a balanced approach; Hart uses COTS where it makes the most sense, in the central scanning system.

23. In the case of voter-facing devices, unlike Dominion, Hart systems go through rigorous federal testing and have achieved EAC certification - regardless of whether Colorado requires it.[1] EAC certification brings a level of reassurance and high standards of testing that cannot be said of Dominion's "ImageCast X" accessible voting station, which has never gone through federal testing.

24. For all of these reasons, Hart uses a mixture of COTS and purpose-built equipment in an integrated system that has undergone the highest levels of federal testing and EAC certification. Dominion's system does not. Hart's ability to meet the COTS requirement highlights the duplicity of the Secretary's detailed specifications for Single user interface, which function as a method of reducing the number of potential vendors qualifying

---

[1] The Hart InterCivic - Verity Voting 1.0 and Verity Voting 2.0 (Modification) have achieved EAC certification. http://www.eac.gov/testing_and_certification/default.aspx.

for certification.

### Single User Interface on Same Server/Workstation - Rules 11.9.3(d), 11.9.4(c), and 21.4.7(e)

25. These rules effectively require that, in order for a voting system to be approved by the Secretary for purchase by a county, the system must have a single user interface on the same server or workstation. There is no functional *need* for this requirement, but Dominion's system operates that way. This therefore appears written solely to customize these rules to the Dominion system.

26. In my 13 years of experience as an election technology expert with broad exposure to RFPs, procurement cycles, and dozens of different state certification requirements, I have never seen a state require for certification purposes that all election management system applications run exclusively through a single interface.

27. In her declaration, Deputy Secretary Suzanne Staiert misuses the term "integrated." She says that integrated voting systems which comply with the single user interface requirement are preferable over bifurcated, disjointed voting systems that spread the functions of election administration across multiple subsystems. "Integrated" and "a single workstation" on one workstation or server are not the same thing. Hart's system is integrated, but uses multiple workstations so that work can be divided efficiently and not bottlenecked by several different people with different needs and/or roles needing to work on the system simultaneously. The single user interface is an arbitrary requirement imposed not for efficiency but to customize these rules to Dominion's approach. It is without practical

benefit.

28. The realities of election administration often demand the agility of different workflows on different components, precisely so that bottlenecks do not occur. Running all election management system applications on a single workstation is actually an obstacle to the efficiency that comes from allowing different personnel to simultaneously work on multiple tasks. For example, if a user is working on printing ballots with the ballot definition software, that prevents a different user from scanning test ballots at the same time. The second user would have to wait for the first user to finish whatever they are doing. Similarly, if a user is scanning ballots until late in the day on Election Day, that would prevent another user from doing tabulation tasks, database setup, running reports, and so on, because the workstation can only run one application at one time, instead of allowing different processes to efficiently happen in parallel.

29. Having multiple workstations can provide redundancy and disaster recovery options that are not available when everything is installed on a single workstation or server, which is a single point where systemwide failure can occur.

**Digital Adjudication[2] - Rules 11.9.3(g)(1), 11.9.4(a), 21.4.16(a)**

---

[2] Digital adjudication is one way an election official can identify, analyze, and resolve ballot issues. Manual adjudication via ballot duplication following standardized procedures and documentation is another way. Requiring a digital approach means that small counties which don't need the faster, more expensive equipment are nonetheless precluded from purchasing not-quite-as-fast, less expensive scanners without digital adjudication. Digital adjudication simply may not be necessary for every county, especially small counties; and appears to be simply tailored to Dominion's approach.

30. These rules effectively require that, in order for a voting system to be approved for purchase by a county, the system must have digital – rather than manual – ballot adjudication capability.

31. The State has been using Hart's technology for 10 years.[3] Hart is now on its second-generation digital adjudication system, which is certified by the EAC. (Dominion's system for Colorado is not EAC-certified.) Hart's system is more usable and more intuitive. No other company has an advantage over Hart in digital adjudication. Hart's ability to meet the digital adjudication requirement and far surpasses Dominion. As a result, the Secretary created additional statutory language that would reduce the number of potential vendors qualifying for certification. This was accomplished by creating the highly specific custom imports and exports specifications. To achieve this end, the Secretary allowed Dominion to create its system on-the-fly, during the PERC pilot evaluation process in the November 2015 election. Prior to that, it had an extra pilot election in May of 2015 to test its system. Dominion was the only vendor allowed to do so. That gave it an unfair advantage to be able to develop custom imports and exports specifications for the Secretary ahead of time, as Dominion developed its system. The custom imports and exports, discussed below under cast vote record, were created for the purpose of eliminating competition to ensure a uniform

---

[3] Hart has voting systems in place or provides election support services in the following Colorado counties: Bent, Boulder, Cheyenne, Conejos, Costilla, Crowley, Custer, Delta, Dolores, Douglas, Fremont, Garfield, Grand, Hinsdale, Jackson, Kit Carson, Kiowa, Lake, Las Animas, Lincoln, Moffat, Montrose, Morgan, Otero, Ouray, Phillips, Prowers, Rio Blanco, Rio Grande, Routt, San Juan, San Miguel, Summit and Yuma. (Am.Compl. ¶72.a.ii, Doc. 35)

voting system would be implemented throughout the state.

### Comma-separated Value ("CSV") Format and Cast Vote Record ("CVR") - Rule 21.4.14(b)-(c)

32. This rule requires that the voting system must be able to aggregate in a single file and export all Cast Vote Records ("CVR") in a highly specific comma-separated value (CSV) text format.

33. A comma-separated values (CSV) file stores tabular data (numbers and text) in plain text. Each line of the file is a data record. Each record consists of one or more fields, separated by commas. The use of the comma as a field separator is the source of the name for this file format. Requiring that in subsection (b) of Rule 21.4.14(b)-(c) is fine.

34.     The central issue is the specificity of the manner in which data is exported. The issue is not the availability of CSV format. Hart's system exports data in CSV format. It is not surprising that the State wants voting systems that are able to export in common third-party formats.

35. The problem is that subsection (c) spells out specifications for a voting system's exports (information the voting system provides) that are unrealistic. The issue is the highly irregular practice of "locking into stone" one favored, highly specific arrangement of data export[4] that only Dominion can do immediately, and with relative ease.

36. It is also unusual to lock such detailed and unique specifications into the administrative rules precisely because the State's formatting needs are likely to change in the

---

[4] *See* Rule 21.4.14 (c)(1)-(7).

future. Based on my expert experience, in every other state with which I am familiar, these matters are handled as implementation concerns, not as certification concerns that can limit the availability of technology choices for the state's jurisdictions.

### Ballot Scanners with Automatic Document Feeders - Rules 11.9.3(g)(2), 11.9.4(b), 11.9.5, 21.4.16(b)

37. These rules effectively require that, in order for a voting system to be approved for purchase by a county, the system's ballot scanners must have automatic document feeders enabling the scanning of multiple ballots rather than a single ballot at a time. Ballot scanners with automatic document feeders make sense in certain situations. But for some, smaller counties, single-sheet scanners are an efficient way to get accurate results. There is no reason the Secretary should prescribe such a requirement. It serves no across-the-board purpose, except to exclude certain systems and to customize these rules as well to Dominion's system. It is an arbitrary rule that harms smaller counties.

38. Hart meets the standard for ballot scanners with auto document feeders. Hart's central scanning solution offers COTS scanners with automatic document feeders, just as the competition does. Using these scanners allows the Hart system to support Risk Limiting Audits ("RLA") that require ballots in batches to stay in the same order in which they were originally scanned, just as the state has required. Hart's ability to meet the standards for automatic documents feeders forced the Secretary, for a third time, to create additional statutory language that would reduce the number of potential vendors qualifying for certification. This was accomplished by creating detailed election night reporting

specifications.

### Election Night Reporting Data with Specified Fields - Rule 21.4.15(b)-(d)[5].

39. Rule 21.4.15 (b)-(d) also spells out specifications for a voting system's exports

---

[5] The level of detail required is exemplified by the Rule itself. Rule 21.4.15 (b) - (d) provides:
(b) The ENR export file must be in a tabular format that uses comma-separated value (CSV) format, or a format based on a range of character positions within a line.
(c) The ENR export file must contain a header line that defines all of the fields contained in the export file.
(1) The header names need not exactly correspond to the field names specified subsection (d) of this Rule, but must unambiguously identify the content of each field.
(2) The order of the fields within the export file may deviate from the order specified in subsection (d) of this Rule.
(3) Additional fields contained in the ENR export file but not specified or addressed in subsection (d) of this Rule must not contain only alphanumeric characters.
(d) The ENR export file must include the following items or fields:
(1) Precinct Name. If the county defines the election to report results by precinct, an alphanumeric string consisting of a 10-digit precinct code.
(2) Ballot Style Name. If the county defines the election to report results by ballot style or district, a unique, alphanumeric string for each ballot style.
(2) Precinct ID. If the county defines the election to report results by precinct, a unique integer for each precinct or precinct split.
(3) Registered Voters. The number of registered voters eligible to vote each unique ballot style, or in each precinct or precinct split, as applicable.
(4) Ballots Cast. The number of ballots cast of each unique ballot style, or in each precinct or precinct split, as applicable.
(5) Contest Name. The contest name as it appears on the ballots. If the contest name contains carriage return(s) for ballot formatting purposes, then the carriage return(s) must not appear in the export.
(6) Contest ID. A unique integer for each contest.
(7) Contest Sequence Number. A unique integer that defines the sequence of contests as they appear on the ballots.
(8) Votes Allowed. The maximum number of choices that a voter may select in each contest (e.g., "Vote for 2").
(9) Choice Name. The choice name as it appears on the ballots. Party affiliation may not be included in the choice name.
(10) Choice ID. A unique integer for each choice within a contest.
(11) Party Code. An indicator of party affiliation for each choice, if applicable.
(12) Vote Count. The total number of votes cast for each choice.
(13) Reporting Flag. The reporting flag field must contain a value of "0".

that are unrealistic, since Rule 21.4.14(c) indicates that the exports must be native to the voting system, not exported and then formatted externally. Again, formatting CSV files outside a company-wide software system is common throughout technology solutions. As discussed above, the level of detail required for Election night reporting data with specified fields is unprecedented.

40. I declare under penalty of perjury that the foregoing is true and correct.

**[remainder of page intentionally left blank]**

**[signature page to follow]**

Executed on this 19th day of July, 2016.

_____
Edward Perez