## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Judge John L. Kane

Civil Action No. 16-cv-1237-JLK

**ELECTION SYSTEMS & SOFTWARE, LLC,**
      a Delaware limited liability company, and

**HART INTERCIVIC, INC.**,
      A Texas corporation,

         Plaintiffs,

v.

**WAYNE W. WILLIAMS,**

         Defendant.

_____

## MEMORANDUM OPINION AND ORDER

_____

Kane, J.

      Plaintiffs are third-party electronic voting machine vendors who filed this action seeking to halt the enforcement of new voting systems rules promulgated by the Colorado Secretary of State  ("Secretary") in February 2016. The rules heightened the technical specifications machines must meet before they can be certified for purchase and use in elections by Colorado political subdivisions, impacting Plaintiffs' status as qualified vendors in favor of a single Colorado-based vendor, Dominion. Both Plaintiffs have applications pending before the Secretary for certification of their electronic voting machine systems, both of which were filed before the new rules went into effect.

1

Plaintiffs claim the new rules conflict with Colorado's existing statutory framework for electronic voting machine certification, which they interpret to require the Secretary to certify any electronic voting system that meets federal standards, including theirs.  By enacting new certification standards that only Dominion can meet, Plaintiffs contend the Secretary discriminated against their ability to engage in interstate commerce,  depriving them of their rights under article 1, § 8, cl. 3 of the U.S. Constitution and entitling them to relief under 42 U.S.C. § 1983. Am. Compl. (Doc. 35) at ¶ 71.

The matter is before me on Plaintiffs' Motion for Preliminary Injunction (Doc. 2) and the Secretary's Motion (Doc. 21) to Dismiss.  Having reviewed the record and considered carefully the arguments made in the parties' briefs and at oral argument, I GRANT the Secretary's Motion and DISMISS the case.

I.

STATUTORY AND REGULATORY FRAMEWORK FOR CERTIFICATION AND PURCHASE OF ELECTRONIC VOTING MACHINE SYSTEMS.

I begin with an overview of Colorado's election code and the relevant statutory and regulatory framework for certifying electronic voting machine systems for sale and use in Colorado.

Article 4, section 1 of the United States Constitution leaves the development of election systems to the states. State legislatures are to prescribe the "times, places and manner of holding elections," subject to Congress's authority, "at any time," to "make or alter such regulations." *See id.* Congress has exercised that authority to sweeping effect in

enacting legislation such as the Voting Rights Act of 1965, 42 U.S.C. § 1973, and, relevant for our purposes, the Help America Vote Act of 2002 (HAVA).

HAVA, codified at 52 U.S.C. § 20901 *et seq.* and incorporated in 2003 into Colorado's election code at C.R.S. § 1-1.5-101 *et. seq.*, authorizes federal financial assistance to states for "improving the administration of elections," specifically including improvements to "voting systems and technology and methods for casting and counting votes." 52 U.S.C. § 20901(b)(1)(B), (F). HAVA encourages a "greater role" for state governments "and, in particular, the chief election official of each state," in the oversight and coordination of elections, and in "implementing uniform standards in elections." C.R.S. § 1-1.5-101(1)(g).

"In Colorado, the Secretary of State  is the chief state election official and, in that capacity, is charged by HAVA and existing state statutory provisions with responsibility for supervising the conduct of elections and for enforcing and implementing the provisions of HAVA." C.R.S. § 1-1.5-101(1)(h). In adopting the federal statute, the Colorado general assembly declared that it "intends to . . . [p]rovide the Secretary of State with sufficient authority to ensure that the state of Colorado is fully compliant with HAVA," *id.* at (2)(c), and "further intends that this article be liberally construed to effectuate its purposes as expressed in this section." *Id.* at (3).

At the time of HAVA's enactment and adoption by the Colorado general assembly, the process for payment and procurement of voting equipment was governed by part 6 or article 5 of the Election code, *see* C.R.S. § 1-5-601 *ff.* (enacted in 1993). Political subdivisions were permitted to "adopt" for use in elections "any kind of voting

machine fulfilling the requirements for voting machines set forth in this part 6," § 1-5-603, specifically including "electronic voting systems," § 1-5-608, and were required to provide for the payment of the purchase price or rent for those machines "in such manner as may be in the best interest of the political subdivision." *Ibid.* While § 603 remains generally operative under the code today, the system for electronic voting machine procurement has been revised, amended, repealed, and replaced multiple times since 1993. *See* § 1-5-608 (1993)(governing requirements for electronic voting systems, enacted in 1992 and amended repeatedly until being repealed in its entirety in 2006); § 1-5-609 (1993)(governing acquisition and use of electronic voting machines, repealed in its entirely in 2006); *and* § 1-5-608.5 (2003)(replacing §§ 608 and 609 to govern certification and approval of electronic voting machines post-HAVA, entire section amended in 2004 and again in 2009).

In 2004, the general assembly enacted § 1-5-613 of the code, directing the Secretary of State to "adopt uniform rules [under the state administrative procedures act] for the purchase and sale of voting equipment in the state" and prohibiting political subdivisions after May 28, 2004, from purchasing any voting system other than one that "has been certified for use in this state by the Secretary." It established specific electronic and electromechanical voting systems requirements and standards, §§ 1-5-615 & 616, and the system by which electronic system vendors and political subdivisions must apply to the Secretary for certification and approval of any voting system purchase. § 1-5- 617. In 2008, the general assembly enacted special rules for the retesting of voting systems, § 1-5-622, which it repealed in 2009 when it placed a five-year moratorium on the purchase

and sale of electronic voting systems in Colorado.

The general assembly's frustration around the state's electronic voting machine systems is apparent from the language it used in declaring the 2009-2014 moratorium:

> The general assembly hereby finds and declares that, over the past decade, voting technology used in the state has undergone dramatic changes, creating confusion and difficulties for election administrators, state government, and the voting public. Efforts to address this confusion have been complicated by the timing of periodic substantial investments in voting technology by county governments necessitated by changes in federal and state law.

C.R.S. § 1-5-623(1)(a).  It went on to declare that "[b]etween May 15, 2009, and the 2014 general election, any voting system purchased by a political subdivision shall be a paper-based voting system," . . . and that "the acquisition of electronic voting systems [would] be suspended" so that the Secretary could "assess existing and emerging voting technologies" and "promulgate rules in accordance with [the state APA] as may be necessary to administer and enforce any requirement of this section, *including any rules necessary to specify permissible conditions of use governing electronic voting devices or systems* . . . ." C.R.S. § 1-5-623(1)(b)(II) & (4)(emphasis mine).  It was specifically pursuant to these directives that the Secretary engaged in the rulemaking being challenged here.

## II. BACKGROUND AND PROCEDURAL HISTORY.

In February 2016, pursuant to his role as chief election officer of the state of Colorado, the Secretary promulgated new election rules at 8 Colo. Code Regs. § 1501-1, governing electronic and electromechanical voting systems. These new "Voting Systems Rules" became effective on March 30, 2016, and were the culmination of the moratorium

imposed by the general assembly in C.R.S. § 1-5-623.  The rules are facially neutral,
codifying heightened technological functions and capabilities that any voting system
must meet to be certified for sale or use in political subdivisions throughout the state.

Election Systems & Software, LLC ("ES&S") and Hart InterCivic, Inc. ("Hart")
are national manufacturers of voting systems, which they sell or lease to states or political
subdivisions thereof around the country, including Colorado. They were participants in
the notice and comment process leading up to the adoption of the new rules. On January
26, 2016, believing the new rules mandate a single uniform voting system that would
favor Dominion, ES&S and Hart submitted their voting systems to the Secretary for
certification before the new rules went into effect. *See* Am. Compl. (Doc. 35) at 1.

Just before the 120-day deadline for the Secretary to act on their applications, and
having yet to hear anything regarding their status, Plaintiffs filed suit, seeking to
invalidate the new rules on grounds they would "deprive Colorado's political
subdivisions of their statutory right to acquire and use" their machines, and violate the
dormant commerce clause. Plaintiffs claim the Secretary's rulemaking exceeded his
authority under C.R.S. § 24-4-103(8)(a), and that his failure to certify their otherwise-
qualified machines violates his duties under C.R.S. § 1-5-608.5(3)(a).  Plaintiffs seek
declaratory relief, as well as preliminary and permanent injunctions preventing the
Secretary from either "implementing and applying" the new rules or "proceeding with his
plan to mandate a single uniform voting system for Colorado political subdivisions." *See*
Mot. For TRO and/or Prelim. Inj. (Doc. 2) at 1.

At the time Plaintiffs filed suit, two challenges to the new Voting Systems Rules

were already pending in state court. *See Board of Cnty. Comm'rs of Jefferson Cnty. V. Williams,* Denver Dist. Court No. 16cv31544 (filed Apr. 29, 2016) (consolidated with *Merlin v. Williams*, Denver Dist. Court No. 16cv31603 (filed May 4, 2016)).  These cases were brought using the prescribed procedures for challenging an agency's rulemaking under the state Administrative Procedures Act ("APA"), on the same grounds alleged in this case by Plaintiffs' state law claims, namely, that the rules conflict with Colorado's election code, exceed the Secretary's rulemaking authority, and create an unfunded state mandate on local governments. These cases remain pending before the Denver District Court.

The Secretary now moves to dismiss, arguing Plaintiffs' § 1983 dormant commerce clause allegations fail, as a matter of law, to state a viable claim for relief and that Plaintiffs' state law claims should be dismissed on various jurisdictional and jurisprudential grounds. I agree on both counts.

III.

DISCUSSION.

Congress has legislated clearly and forcefully on the subject of voting systems management and procurement, recommending that the chief election official in every state be given heightened rulemaking authority over them. The Colorado general adopted HAVA wholesale, explicitly expanding the Secretary's authority over Colorado's election system and placing a five-year moratorium on the purchase of new electronic voting machines in the state (from 2009-2014) so the Secretary could develop and promulgate the very rules being challenged in this case. Under these circumstances, any

burden the Secretary's facially-neutral rulemaking has on Plaintiffs' "right" to be free of the anticompetitive effects of that rulemaking in Colorado is so tangential and miniscule in the constitutional scheme of things as to be entirely inactionable.

Plaintiffs' challenge is moreover conceptually ill-fitted to the dormant commerce clause rubric, which is premised on the discriminatory impact of state laws that were duly enacted and otherwise lawful, not laws that are simultaneously challenged as unlawful and invalid under the state's statutory and administrative regulatory scheme. To the extent Plaintiffs' challenge is to the legality of the Secretary's rulemaking under state law, it is different from a dormant commerce clause action and is appropriately left for the state courts to decide. To the extent it is a challenge based on the allegedly discriminatory impact of rules and regulations duly enacted by the Secretary of State, it fails to state a claim.

A. Plaintiffs' Dormant Commerce Clause Challenge.

*Legal standard.*

The prohibition against states passing legislation that improperly burdens or discriminates against interstate commerce is a negative corollary to the affirmative authority to regulate commerce conferred on Congress by the Founders in article I of the U.S. Constitution.  The "dormant Commerce Clause doctrine" thus considers whether state action does or does not intrude upon national markets and offend the Commerce Clause. It was "developed to assure that merchants and farmers would have a free market throughout the nation without suffering embargos or tariffs that might develop in an economically balkanized state," but must be balanced against the concomitant rights and

obligations of states to legislate on subjects reserved to them by the constitution, or mandated by Congress, "even though [such] legislation might indirectly affect commerce." *Town of Foxfield v. Archdiocese of Denver*, 148 P.3d 339, 343 (Colo. App. 2006)(quoting both the majority in *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997) and Justice Scalia, at p. 596, in dissent)).  When a state adopts a law that facially discriminates against interstate commerce, the law is strictly scrutinized. *Id.* When a state law is nondiscriminatory on its face, however, a balancing test is used and the law will be sustained unless "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* at 343-44 (quoting *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970)).

The balancing test articulated in *Pike* is a rational basis test, and state laws survive *Pike* scrutiny where the purpose of the statute is to promote "legitimate state interests" such as conservation or to ease waste disposal problems (*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), and even if it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry.  *See Exxon Corp. v. Maryland,* 437 U.S. 117, 127-28 (1978)(the fact the burden of state regulation falls on some interstate companies "does not, by itself, establish a claim of discrimination against interstate commerce"; the clause protects " [the] interstate market, not particular interstate firms, from prohibitive or burdensome regulations.").

Moreover, scrutiny isn't triggered at all if a state enters into the market as a participant, and then regulates its trade in a manner that favors its citizens. *See Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 339 (2008)(an exception to the dormant

commerce clause's limitation on a state's right to burden interstate commerce occurs when the state itself enters into the market as a purchaser, discussing history).  Under those circumstances, the restraints of the commerce clause fall away, because the commerce clause is concerned with states usurping Congress's authority to regulate commerce as between citizens and individuals who should operate freely within it, and not with a state's ability, once it enters into the market to buy a potential article in commerce, to "restrict[] its own trade to its citizens or businesses within the state." *Id.*, citing *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 808-09 (1976)(the commerce clause was not intended to require independent justification for the latter).

The Secretary invokes the "market participation exception" as grounds for dismissing Plaintiffs' dormant commerce clause claim, and it is on that basis that the Motion is granted.

> *Colorado, through its political subdivisions, is a participant in the electronic voting machines market and therefore excused from scrutiny under the dormant commerce clause doctrine.*

The state is a participant in the electronic voting machines market through the certification, subsidization, implementation, and purchasing services it provides its 64 subdivisions in acquiring them. Congress, through HAVA, allocates substantial funds to the Secretary for the acquisition and purchase of updated voting systems, the "full amount of [which]" the Secretary is directed to "seek . . . for distribution to the counties" in accordance with its provisions. C.R.S. § 1-1.5-104(4).

Plaintiffs' attempt to draw a distinction between the Secretary and Colorado's 64 counties for purposes of the market participant exception is unpersuasive. Where, as here,

the Secretary supports and supervises the purchase of voting machinery by its political subdivisions, there is no compelling analytical difference between a political subdivision and the state for purposes of the dormant commerce clause's market participation exception. *Big Country Foods, Inc. v. Bd. Of Educ. Of Anchorage School Dist.*, 952 F.2d 1173, 1175-80 (9th Cir. 1992)(market participant exception applied where state reimbursed local school districts for purchases under milk contracts); *c.f. W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 495-96 (7th Cir. 1984)(where state imposes home-state preference to be undertaken by school board without any state financial support or supervision, the state is not a market participant in the project but a regulator, and subject to scrutiny under the dormant commerce clause).

The state of Colorado, through its political subdivisions, is a participant in the electric voting systems market and nothing about the Founders' exclusive grant of regulatory authority over interstate commerce precludes Colorado from "restrict[ing] its trade to its own citizens or businesses within the state." *Hughes,* 426 U.S. at 808.

> *Even without the market participant exception, the new rules are a legitimate exercise of the Secretary's regulatory authority and survive* Pike *scrutiny notwithstanding their alleged impact on interstate commerce.*

Even assuming, for the sake of argument, that the Secretary could not avail himself of the market participant exception, Plaintiffs' claim that the new Voting Systems Rules unduly burden interstate commerce by adversely impacting their ability to sell their machines to Colorado political subdivisions fails under the *Pike* balancing test. The Secretary has constitutional and statutory authority over Colorado's election systems, and an explicit federal and state mandate to assess and update Colorado's electronic voting

systems and promulgate rules governing their certification and sale. The new rules are facially neutral and clearly related to this "legitimate state interest," and should be upheld even if they burden Plaintiffs' ability to compete in the Colorado voting machine market, or shift business away from multiple interstate providers to a single in-state one.

There being no viable dormant commerce clause claim based on the facts alleged in the Amended Complaint, that claim is DISMISSED.

> B. Plaintiffs' Claims that the Secretary's Actions Violate State Law are Properly Left to the State Courts to Decide.

The remaining claims in Plaintiffs' Amended Complaint challenge the Secretary's actions in promulgating the new Voting Systems Rules and in failing to certify their machines for purchase by political subdivisions under state law.  Specifically, Plaintiffs claim the new Voting Systems Rules are invalid and that the Secretary's actions violate the state election code.  For their relief, Plaintiffs ask that I declare the Secretary's actions unlawful, invalidate the new rules and prevent the Secretary from implementing them, and compel the Secretary to approve their pending certification applications. A more perfect storm of reasons to decline to exercise jurisdiction over a matter is difficult to imagine. This case is the jurisprudential apotheosis for applying the *Burford* doctrine, which provides that federal courts should abstain on grounds of comity with the states when the exercise of jurisdiction would disrupt a state administrative process or otherwise create needless friction by unnecessarily enjoining state officials from executing their domestic policies. 17A Wright, Miller, Cooper & Amar, *Federal Practice and Procedure:  Jurisdiction 3d,* § 4244, pp. 387-88 (Thomson/West 2007)(citing *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189 (1959)(Brennan, J.)).

> Where timely and adequate state court review is available, a federal court
> sitting in equity must decline to interfere with the proceedings or orders
> of state administrative agencies:  (1) when there are 'difficult questions of
> state law bearing on policy problems of substantial public import whose
> importance transcends the result in the case at bar'; or (2) where the
> 'exercise of federal review of the question in a case and in similar cases
> would be disruptive of state efforts to establish a coherent policy with
> respect to a matter of substantial public concern.'

*Id.* (citing *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) with internal quotes from *Colorado River Water Conservation Dist. V. U.S.,* 424 U.S. 800, 814 (1976)).  Both *Burford* abstention factors are satisfied here. Having disposed of Plaintiffs' federal claim, Colorado's interest in adjudicating Plaintiffs' state law challenges to the Secretary's actions is paramount, perhaps exclusive,[1] and already in progress.

CONCLUSION.

Colorado has limited judicial review of administrative rulemakings to state courts, and such review is currently ongoing in two state court cases that had already been filed at the time Plaintiffs filed their Complaint here. To the extent resolution of Plaintiffs' dormant commerce clause theory of civil rights deprivation requires adjudication of difficult and uniquely state law issues, or disrupts Colorado's efforts to fulfill its constitutionally mandated and exclusive duty to manage the time, place, and manner of elections, *Burford* abstention is appropriate and is so ordered.  To the extent Plaintiffs' theory of constitutional deprivation presumes the validity of the Secretary's rulemaking and rests on the impact that rulemaking has on interstate commerce, their § 1983 claim is

---

[1] As the Secretary points out in his briefing, the Colorado APA is the exclusive means for seeking review of agency action and Plaintiffs, despite having participated in the rulemaking at issue, failed to seek review within the requisite 35 days after the agency action became effective.

dismissed because the facts support no violation of the dormant commerce clause.

The Secretary has a constitutional duty to manage elections in Colorado and both Congress and the Colorado general assembly have expanded the Secretary's authority to assess, update, and promulgate rules governing electronic voting systems and to implement the uniform standards encouraged by HAVA generally. Whether the Secretary exceeded his rulemaking authority in enacting the challenged rules, or acted *ultra vires* in implementing them in Dominion's favor, is a question of state law to be decided by the state courts.  I therefore exercise my discretion under the *Burford* doctrine to abstain from opining further on the matters raised. Because state courts are able to consider Plaintiffs' claims of nefarious intent and discrimination under the dormant commerce clause, my dismissal of Plaintiffs' claims is without prejudice.

Dated August 3, 2016.

John L. Kane
SENIOR U.S. DISTRICT JUDGE