

**User Name:** Grant Sullivan
**Date and Time:** Oct 27, 2016 11:27
**Job Number:** 38917833

## Documents (10)

1. _Steinert v. Winn Group, Inc., 2003 U.S. Dist. LEXIS 4143_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
2. _Garcia v. Tamir, 1999 U.S. Dist. LEXIS 11940_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
3. _Winkel v. Reserve Officer, 1994 U.S. Dist. LEXIS 12412_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
4. _Graham v. Taylor, 2015 U.S. Dist. LEXIS 87832_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
5. _Parker v. Milyard, 2012 U.S. Dist. LEXIS 180105_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
6. _Parker v. Milyard, 2013 U.S. Dist. LEXIS 131880_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
7. _Stender v. Gerardi, 2008 U.S. Dist. LEXIS 83151_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
8. _Lucas v. Kmart Corp., 2006 U.S. Dist. LEXIS 51420_
   **Client/Matter:** FBXLD
   **Search Terms:**
   **Search Type:**
9. _Ryals v. City of Englewood, 2014 U.S. Dist. LEXIS 77304_
   **Client/Matter:** FBXLD
   **Search Terms:**

EXHIBIT D

**Search Type:**

10.  *Nero v. Am. Family Mut. Ins. Co., 2013 U.S. Dist. LEXIS 135669*

**Client/Matter:** FBXLD

**Search Terms:**

**Search Type:**

Grant Sullivan

EXHIBIT D

 Positive
As of: October 27, 2016 11:27 AM EDT

## *Steinert v. Winn Group, Inc.*

United States District Court for the District of Kansas

March 14, 2003, Decided

CIVIL ACTION No. 98-2564-CM

**Reporter**
2003 U.S. Dist. LEXIS 4143; 2003 WL 1342974

LAWRENCE J. STEINERT, Plaintiff, v. THE WINN GROUP, INC, and JAMES G. WINN, Defendants.

**Subsequent History:** Reconsideration denied by, Petition for relief denied by *Steinert v. Winn Group, Inc., 2003 U.S. Dist. LEXIS 25269 (D. Kan., Sept. 24, 2003)*
Reconsideration denied by *Steinert v. Winn Group, Inc., 2004 U.S. Dist. LEXIS 27889 (D. Kan., Nov. 23, 2004)*

**Prior History:** *Steinert v. Winn Group, Inc., 83 F. Supp. 2d 1234, 2000 U.S. Dist. LEXIS 1642 (D. Kan., 2000)*

**Disposition:** [*1] Plaintiff's Motion to Strike, motion for reconsideration, and all requests raised denied. Defendants' Renewed Motion for Award of Attorneys' Fees and for Discovery Related Thereto granted in part.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

*HN1* See U.S. Dist. Ct., D. Kan., R. 54.2.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN2* See *28 U.S.C.S. § 1927*.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN3* Sanctions are appropriately imposed under *28 U.S.C.S. § 1927* for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court. Subjective bad faith is not a necessary showing for application of *§ 1927* sanctions. Instead, proper considerations for the court include whether plaintiff counsel's conduct, when viewed objectively, imposed unreasonable and unwarranted burdens on the court and opposing parties, and whether plaintiff's counsel acted recklessly or with indifference to the law.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN4* An award of sanctions under *28 U.S.C.S. § 1927* is appropriate only where there is a showing of (1) a multiplication of proceedings by an attorney or other person; (2) by conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the cost of the proceedings. Because *§ 1927* is penal in nature an award should only be made in instances evidencing a serious and standard disregard for the orderly process of justice and the court must be aware of the need to ensure that the statute does not dampen attorneys' zealous representation of their clients' interests.

Civil Rights Law > Protection of Rights > Conspiracy Against Rights > General Overview

Governments > Courts > Judicial Precedent

*HN5* Only those groups affiliated with "the

Grant Sullivan

EXHIBIT D

2003 U.S. Dist. LEXIS 4143, *1

conditions prevailing in the South in 1871" are deemed sufficiently invidious to qualify for protection under *42 U.S.C.S. § 1985*, as this was the genesis of the animus the statute was intended to protect against. Under Tenth Circuit precedent, it is clear that the protections of *§ 1985* do not extend beyond the classes already expressly provided coverage by the United States Supreme Court.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN6* The policy underlying *28 U.S.C.S. § 1927* dictates that the attorney bear the costs of his own lack of care.

Legal Ethics > Professional Conduct > Tribunals

*HN7* Where plaintiff's counsel is unable to prosecute his client's case, he has an obligation to remedy that situation rather than seek continuous delay of the court's proceedings.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN8* *28 U.S.C.S. § 1927* only requires that counsel pay personally the excess attorneys' fees reasonably incurred as a result of his improper conduct. Defendants are entitled only to reasonable attorneys' fees for the extra work incurred as a result of a plaintiff's counsel's abuse of the judicial process.

**Counsel:** For Lawrence J Steinert, Plaintiff: John B. Gage, II, The Gage Law Firm, PC, Overland Park, KS.

For Winn Group, Inc., The, James G Winn, Defendants: J. Nick Badgerow, Jeannie M. DeVeney, Spencer, Fane, Britt & Browne, Overland Park, KS.

**Judges:** CARLOS MURGUIA, United States District Judge.

**Opinion by:** CARLOS MURGUIA

# Opinion

## MEMORANDUM AND ORDER

Pending before the court is defendants' Renewed Motion for Award of Attorneys' Fees and for Discovery Related Thereto (Doc. 143) and plaintiff's Motion to Strike (Doc. 152). As set forth below, defendants' motion is granted in part and plaintiff's motion is denied.

### . Background

Plaintiff filed this action on December 7, 1998, asserting claims under *42 U.S.C. 1983and 1985*, and claims under various other state statutes and common law causes of action. On January 27, 2000, this court granted, in part, defendants' motion to dismiss, thereby dismissing with prejudice all of plaintiff's claims arising under *42 U.S.C. 1983 [*2] and 1985*. On August 2, 2001, the court granted plaintiff's motion to voluntarily dismiss with prejudice his remaining claims against defendants. In addition, in its August 2, 2001 order, the court denied defendants' request to condition plaintiff's voluntary dismissal upon an award of their attorneys' fees. However, on September 6, 2001, the court granted defendants' request to conduct post-dismissal discovery for the purpose of seeking a factual basis to support their assertion of entitlement to attorneys' fees. The court limited the post-dismissal discovery to the deposition of plaintiff. In addition, in its September 6, 2001 order, the court granted defendants leave to re-submit their briefing seeking attorneys' fees and to incorporate the additional facts garnered, if any, through the post-dismissal discovery. Defendants deposed plaintiff on April 24, 2002, and now resubmit their request for an award of attorneys' fees in this case.

### . Plaintiff's Renewed Motion to Strike

Plaintiff renews his prior Motion to Strike Defendants' Statement of Consultation (originally raised in Doc. 122). Plaintiff also appears to renew

2003 U.S. Dist. LEXIS 4143, *2

his Motion for Reconsideration (originally raised in [*3] Doc. 136). As set forth below, plaintiff's motions are denied.

## . Renewed Motion to Strike

Plaintiff renews his motion to strike. On November 1, 2000, the court denied plaintiff's original motion to strike defendants' statement of consultation. [1] Plaintiff now asserts that defendants failed to oppose his motion to strike defendants' statement of consultation and that defendants have never moved the court for an extension with respect to the statement of consultation specified in *Rule 54*. Accordingly, plaintiff asserts that his motion to strike "should have been granted long ago … as unopposed pursuant to D. Kan. Rule 7.4." (Pl.'s Mem. in Opp'n at 3). In addition, plaintiff also appears to assert that the court failed to find excusable neglect on the part of defendants sufficient to justify the denial of his original motion to strike. The court does not agree.

[*4] First, contrary to plaintiff's assertion, defendants have opposed plaintiff's motion to strike. On October 24, 2000, defendants filed an Opposition to Plaintiff's Motion to Strike (Doc. 127). In that Opposition, defendants asserted that any untimely submittal was due to excusable neglect and specified that they opposed plaintiff's arguments that their statement of conciliation was submitted untimely. Accordingly, plaintiff's original motion to strike was not "unopposed."

Second, the court notes that the court's order denying plaintiff's motion to strike did take into account whether defendants satisfied the excusable neglect standard at issue. In its November 1, 2000 order denying plaintiff's motion to strike, the court specified that it had "reviewed the arguments presented in the pending motions and in their supporting memoranda, the relevant federal and local rules of civil procedure, and the relevant case law" in making its decision. As noted above, defendants asserted that excusable neglect existed justifying the untimely submittals addressed by the motions at issue. The arguments and law reviewed by the court in reaching its decision included those raised by defendants [*5] and by plaintiff in the original papers. Accordingly, the court finds no basis in plaintiff's arguments for granting plaintiff's renewed motion to strike. Accordingly, plaintiff's renewed motion to strike is denied.

## . Renewed "Motion for Reconsideration"

In addition, plaintiff appears to ask the court to again reconsider its order entered on September 6, 2001, granting defendants leave to conduct post-dismissal discovery related to attorneys' fees. Considering plaintiff's original motion to reconsider its September 6, 2001 order, on April 2, 2002, the court found its September 6, 2001 order was not in error as asserted by plaintiff and denied plaintiff's motion for reconsideration. Plaintiff again asks the court to reconsider its September 6, 2001 order. [2]

[*6]

Plaintiff asserts that the court misconstrued plaintiff's arguments raised in his motion for reconsideration and improperly placed a burden on plaintiff, rather than defendants, to prove that defendants were not entitled to discovery under the circumstances of this case. The court again disagrees with plaintiff. Whether plaintiff raised new arguments in his motion for reconsideration or recycled arguments first presented in opposition to the defendants' original motion, the court found, both in its September 6, 2001 order and its April 2,

---

[1] District of Kansas Local Rule 54.2 specifies that **HN1** "the court will not consider a motion to award statutory attorneys' fees made pursuant to *Fed. R. Civ. P. 54(d)(2)* until the moving party shall have first advised the court in writing that after consultation promptly initiated by the moving party, the parties have been unable to reach an agreement with regard to the fee award. The statement of consultation shall set forth the date of the consultation, the names of the those who participated, and the specific results achieved."

[2] The court notes that plaintiff fails to provide the court with authority for this second motion for reconsideration of the same order. District of Kansas local rules appear to provide for only one motion for reconsideration. The court will examine plaintiff's motion for reconsideration and does not issue an opinion about whether it is procedurally proper under the court's local rules.

2003 U.S. Dist. LEXIS 4143, *6

2002, that whether to allow discovery of information related to a request for fees and expenses is within the discretion of the trial court. *Smith v. Ford Motor Co., 626 F.2d 784, 794 (10th Cir. 1980).* As set out in those prior motions, the court found it was a proper use of its discretion to allow limited post-dismissal discovery in this case. Plaintiff's "renewed" motion for reconsideration on this basis is denied.

### . **Defendants' Renewed Motion for Attorneys' Fees**

Defendants assert they are entitled to an award of attorneys' fees under three separate theories, including an award under *42 U.S.C. § 1988* [*7] as a prevailing party defendant, an award under the exceptional circumstances exception to the American Rule, and an award under *28 U.S.C. § 1927* due to plaintiff counsel's multiplication of the proceedings of the case unreasonably and vexatiously. Having examined the three bases set out by defendants in support of their request for attorneys' fees, the parties' arguments, and the relevant statutory and case law, the court finds that an award of attorneys' fees in this case is appropriate only under *28 U.S.C. § 1927,* as set forth below.

. **28 U.S.C. § 1927***Section 1927* provides that **HN2** "any attorney or other person admitted to conduct cases in any court of the United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to **satisfy personally** the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *28 U.S.C. § 1927* (emphasis added). **HN3** Sanctions are appropriately imposed under *§ 1927* "for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's [*8] duties to the court." *Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987)* (en banc). Subjective bad faith is not a necessary showing for application of *§ 1927* sanctions. Instead, proper considerations for the court include whether plaintiff counsel's conduct, when viewed objectively, imposed "unreasonable and unwarranted burdens on the court and opposing parties,"and whether plaintiff's counsel acted "recklessly or with indifference to the law." *Braley, 832 F.2d at 1507*; *In re TCI Ltd., 769 F.2d 441, 445 (7th Cir. 1985).*

**HN4** An award of sanctions under *§ 1927* is appropriate only where there is a showing of: "(1) a multiplication of proceedings by an attorney or other person; (2) by conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the cost of the proceedings." *Shields v. Shetler 120 F.R.D. 123, 127 (D. Colo. 1988).* Because *§ 1927* is penal in nature an award should only be made "'in instances evidencing a serious and standard disregard for the orderly process of justice'" and the court must be aware of the "need to ensure that the statute does not dampen attorneys' [*9] zealous representation of their clients' interests." *Ford Audio Video Systems, Inc. v. AMX Corp., Inc., 161 F.3d 17, 1998 U.S. App. LEXIS 22565, 1998 WL 658386, at *3 (10th Cir. Sept. 15, 1998)* (quoting *Dreiling v. Peugeot Motors of Am., Inc., 768 F.2d 1159, 1165 (10th Cir. 1985)* (internal quotations omitted)).

At issue here is whether plaintiff's counsel unreasonably and vexatiously multiplied the proceedings by: 1) filing a claim on his client's behalf under *§ 1983* and *§ 1985,* 2) seeking numerous extensions of time either on the day of the relevant deadline or after the deadline had passed, 3) delaying his representation to counsel and to the court that, in addition to the personal difficulties he was facing, a separate and additional reason existed supporting his request for extensions of time, and 4) dismissing his client's remaining claims with prejudice after plaintiff's deposition was noticed. The court finds only issues one and two above provide a basis for an award of *§ 1927* fees against plaintiff's counsel.

### . **Viability of Plaintiff's *§ 1983* and *§ 1985* Claims**

EXHIBIT D

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 7 of 101

Page 5 of 7
2003 U.S. Dist. LEXIS 4143, *9

Plaintiff's counsel filed suit on his clients behalf asserting, in relevant part, claims [*10] under *42 U.S.C. § 1983* and *§ 1985*. Upon motion by defendants, the court dismissed plaintiff's *§ 1983* claim. In their motion, defendants asserted that plaintiff failed to adequately allege action under color of state law, and therefore, under the authority of *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982)*, this claim should be dismissed. In his response, plaintiff conceded that he had "not sufficiently alleged action under color of state law" and conceded to the dismissal of this claim.

In addition, upon motion by defendants, the court dismissed plaintiff's *§ 1985* claim. In their motion, defendants asserted that plaintiff failed to allege the required discriminatory animus against a class of persons covered by *§ 1985*. Plaintiff's Complaint alleged that plaintiff was part of a class of employees or potential employees recruited by defendants to work for a third party. As the court noted in its January 27, 2000 order, the class plead by plaintiff was unified by the treatment to which this third party subjected them and by their need to find, keep, and stay in a job due to financial considerations. [*11] The court's January 27, 2000 order recognized that **HN5** only those groups affiliated with "the conditions prevailing in the South in 1871" are deemed sufficiently invidious to qualify for protection under *§ 1985*, as this was the genesis of the animus the statute was intended to protect against. *Wilhelm v. Continental Title Co., 720 F.2d 1173, 1175 (10th Cir. 1983)*. Moreover, this court recognized that, under Tenth Circuit precedent, it was clear that the protections of *§ 1985* do not extend beyond the classes already expressly provided coverage by the Supreme Court. *Brown v. Reardon, 770 F.2d 896, 907 (10th Cir. 1985)*. Accordingly, the court dismissed plaintiff's *§ 1985* claim, finding the class as plead by plaintiff failed to qualify for the protections of *§ 1985*.

The court now finds that plaintiff's acquiescence in defendants' challenge to plaintiff's *§ 1983* claim and the clarity of the law that plaintiff's class, as plead,

was not the type of class covered by *§ 1985*, establish that plaintiff's counsel failed to fully research the viability of these claims under the facts of this case. Although plaintiff's counsel should not be penalized for [*12] forwarding novel issues or arguments to the court, the court finds that the clarity of the applicable law indicates that by asserting these two claims, plaintiff's counsel acted "recklessly or with indifference to the law." *In re TCI Ltd., 769 F.2d at 445*. **HN6** The policy underlying *§ 1927* dictates "that the attorney bear the costs of his own lack of care." *Id.*

The court finds that plaintiff's counsel's decision to move forward with these claims when no clear legal basis supported them multiplied the proceedings in this case, resulted in an increase in the cost of the proceedings, and was unreasonable and vexatious. *Shields, 120 F.R.D. at 127*.

. **Unreasonable Delays**

The record of this case establishes that plaintiff's counsel engaged in delaying conduct that is abusive of the judicial process. Plaintiff continuously failed to comply with the deadlines set forth by the court for the efficient disposition of his client's claims. Moreover, he sought extensions of time resulting in the delay of the proceedings for more than one year. Plaintiff's counsel engaged in this conduct, despite the court's admonishments throughout the course of the [*13] litigation that such behavior would be unacceptable.

Specifically, plaintiff's counsel sought at least fifteen separate extensions of time. Plaintiff's counsel sought seven extensions of time to respond to defendants' motion to dismiss, resulting in an additional 149 days to the response time. Plaintiff's counsel sought two extensions of time to provide signed employment and medical records authorizations, resulting in an additional 47 days to respond to these requests. Plaintiff's counsel sought five extensions of time to file his motion for leave to amend the Complaint, resulting in an additional 99 days to file the motion. Plaintiff sought three extensions of time to file preliminary witness and

EXHIBIT D

2003 U.S. Dist. LEXIS 4143, *13

exhibit lists, resulting in an additional 36 days of time to file these lists. Plaintiff sought two extensions of time to serve *Rule 26* disclosures, resulting in an additional 98 days to serve these disclosures. Finally, plaintiff sought one extension of time to serve responses to defendants' request for production, resulting in an additional 18 days of time to serve these responses. Moreover, defendants filed three motions to compel plaintiff's compliance with case obligations, and **[*14]** plaintiff's counsel requested additional time to respond to two of them.

Although defendants' counsel did acquiesce to many of the requested extensions, plaintiff's counsel's delay in timely complying with the deadlines set out in this case resulted in a multiplication of the proceedings for approximately 495 days--for more than one full year. Delay of this magnitude should not go unnoticed by the court. Although the court appreciates the personal difficulties plaguing plaintiff's counsel during the pendency of this litigation, the court cannot allow its sympathy for plaintiff's counsel to dictate the application of *§ 1927* attorneys' fees.

It is clear that plaintiff's counsel's requests for approximately 495 days of additional time to comply with court mandated deadlines multiplied the proceedings in this case. Moreover, it is clear that these requests for more time resulted in an increase in the cost of the proceedings to defendants who were required to contemplate and respond to the requests, and in some instances, file papers seeking the court to compel plaintiff's counsel's compliance. In addition, the court finds that this conduct of plaintiff's counsel is easily characterized **[*15]** as unreasonable and vexatious. *Shields, 120 F.R.D. at 127*. The court finds this conduct represents unprofessional conduct which has burdened opposing counsel and this court. *HN7* Where plaintiff's counsel was unable to prosecute his client's case, he had an obligation to remedy that situation rather than seek continuous delay of the court's proceedings. The court finds that plaintiff counsel's overall pattern of conduct

"demonstrates a reckless disregard for his duties to this court." *Julien v. Zeringue, 864 F.2d 1572, 1576 (Fed. Cir. 1989)*.

. **Additional Arguments**

Next, the court has examined the conduct of plaintiff's counsel in delaying his representation to counsel and to the court that, in addition to the personal difficulties he was facing, a separate and additional reason existed supporting his request for extensions of time, and in dismissing his client's remaining claims with prejudice after plaintiff's deposition was noticed. After examining this conduct in light of *§ 1927* principles, examining the relevant case law, and considering the arguments of the parties, the court finds this referenced conduct provides no basis for sanctioning plaintiff **[*16]** counsel's conduct under *§ 1927*.

. **Conclusion**

Accordingly, for the reasons examined above, the court finds an award of "excessive fees," as defined by *§ 1927*, is appropriate here, and such fees are hereby imposed against plaintiff's attorney personally. Defendants' motion is granted on this basis, as set forth above.

. **Amount of Fee Award**

*Section 1927* **HN8** only requires that plaintiff's counsel pay personally the excess attorneys' fees reasonably incurred by defendants in this case as a result of his improper conduct. *S & D Cal. Fruit Exch., Inc. v. Gurino, 783 F.2d 345, 347 (2d Cir. 1986)*. Defendants are entitled only to reasonable attorneys' fees for the extra work incurred as a result of plaintiff's counsel's abuse of the judicial process. The court finds that the excessive fees were incurred by defendants in connection with defendants' defense of the dismissed *§ 1983* and *§ 1988* claims and in connection with defendants' responses to plaintiff's request for extensions of time.

The court now orders defendants to submit to the

Grant Sullivan

EXHIBIT D

court an accounting of only those "excess fees" as described above, with supporting documentation. Defendants shall submit this **[*17]** accounting on or before April 15, 2003. Plaintiff's counsel shall have the opportunity to respond to the accounting on or before April 30, 2003. Thereafter, after careful review of the submitted fee amounts, the court will determine the proper amount of attorneys' fees to be assessed against plaintiff's counsel and issue its award.

. **Order**

IT IS THEREFORE ORDERED that plaintiff's Motion to Strike (Doc. 152) and all requests raised therein are denied.

IT IS FURTHER ORDERED that defendants' Renewed Motion for Award of Attorneys' Fees and for Discovery Related Thereto (Doc. 143) is granted in part, as set forth herein. Plaintiff's

counsel is sanctioned and directed to personally pay defendants damages in the nature of the extra attorneys' fees they incurred due to his abuse of the judicial process.

IT IS FURTHER ORDERED that defendants shall submit to the court on or before April 15, 2003, an accounting of only those "excess fees" as described herein, with supporting documentation. Plaintiff's counsel shall have the opportunity to respond to the accounting on or before April 30, 2003. Thereafter, after careful review of the submitted fee amounts, the court will determine **[*18] the proper amount of attorneys' fees to be assessed against plaintiff's counsel and issue its award.**

**IT IS SO ORDERED. Dated this <u>14th</u> day of March 2003, at Kansas City, Kansas.**

<u>**s/ Carlos Murguia**</u>

**United States District Judge**

---

End of Document

Grant Sullivan

EXHIBIT D

 Caution

As of: October 27, 2016 11:27 AM EDT

## *Garcia v. Tamir*

United States District Court for the Southern District of New York

August 2, 1999, Decided ; August 4, 1999, Filed

99 Civ. 0298 (LAP)

**Reporter**

1999 U.S. Dist. LEXIS 11940; 1999 WL 587902

JOSE GARCIA, MANUEL CARDENAS, and PEDRO ORTEGA, individually and on behalf of all similarly situated current and former employees of defendants, Plaintiffs, -against- ELLIOT TAMIR, HAZIM ABRAHIM, TAMIR PARKING CORP., JACK'S GARAGE CORP., TAMIR GROUP LTD., TPC ANSONIA CORP., TPC-NY # 2 CORP., TPC-NY # 3 CORP., TPC-NY # 4 CORP., TPC 57TH STREET CORP., 2109 BROADWAY GARAGE CORP., TAMIR PARKING LTD., EMILY PARKING CORP., 9 PARK AVENUE CORP. and "JOHN DOES" actual name(s) of such persons or entities being unknown, Defendants.

**Disposition:** [*1] Defendants' motions to dismiss and for sanctions under *28 U.S.C. § 1927* granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

**HN1** The United States Supreme Court set forth a circumstance where abstention is appropriate, applicable in situations involving concurrent jurisdiction of a claim. The principles underlying this standard rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation. Despite the flexibility these considerations lend to the analysis, however, the standard is difficult to meet. Given the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them, the determination should be weighted heavily towards retaining jurisdiction. Thus, only the clearest of justifications will warrant dismissal.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

1999 U.S. Dist. LEXIS 11940, *1

**HN2** The United States Supreme Court has established six factors to consider when determining whether abstention based on concurrent jurisdiction in state and federal courts is appropriate. These are whether the jurisdiction is over any res or property; the inconvenience of the federal forum; the avoidance of piecemeal litigation; the order in which jurisdiction was obtained; whether federal or state law supplies the rule of decision; and whether the state court proceeding will adequately protect the rights of the party seeking federal jurisdiction. In applying these factors, it is important to note that no one factor is necessarily determinative. The balancing of these factors does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case. Therefore, the weight to be given to any one factor may very greatly from case to case and a court must use its discretion in determining the outcome based on the circumstances of the particular case.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN3** Where the state and federal claims are "inextricably linked," the courts recognize the potential for a danger of piecemeal litigation.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN4** If two actions are "virtually identical," so that in its essential elements the same cause of action, regardless of theory or pleadings, is asserted in both courts, then the actions are duplicative in nature. Therefore, even if different relief is sought in the two actions or the claims are not exactly the same, they are parallel as long as the causes of action are comprised of the same essential issues. Merely raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit.

Civil Procedure > Preliminary

Considerations > Federal & State
Interrelationships > Abstention

**HN5** Involvement of all the same issues in a state and a federal action should in itself be given weight as a factor in favor of abstention.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN6** If the actions are parallel, then the danger of piecemeal litigation becomes an important consideration.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN7** Analysis of the factor concerning the order in which jurisdiction is obtained should not rest solely on the order in which the complaints were filed, but should be considered in terms of how much progress has been made in the two actions.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN8** The presence of federal-law issues must always be a major consideration weighing against surrender.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN9** When the applicable substantive law is federal, abstention is disfavored.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

**HN10** The vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN11* See *28 U.S.C.S. § 1927*.

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN12* An award of sanctions under *28 U.S.C.S. § 1927* should only be made when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction

Civil Procedure > ... > Notice of Class Action > Content of Notice > Opt Out Provisions

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview

*HN13* The attempt to manipulate the concurrent system of jurisdiction and distort the intended effect of the individual statutory schemes constitutes an "improper purpose" under *28 U.S.C.S. § 1927*.

**Counsel:** For JOSE GARCIA, MANUEL CARDENAS, PEDRO ORTEGA, plaintiffs: Leon Marc Greenberg, Leon Greenberg, Attorney at Law, New York, NY.

**Judges:** LORETTA A. PRESKA, United States District Judge.

**Opinion by:** LORETTA A. PRESKA

# Opinion

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, United States District Judge:

This action was filed on January 15, 1999 by plaintiff employees Garcia, Cardenas and Ortega against defendant corporations and individual corporate officers Tamir and Abrahim. The complaint alleges that defendants failed to pay overtime and minimum wages to plaintiffs in violation of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. §§ 201-19*. It also includes a retaliation claim pursuant to *29 U.S.C. § 215*. Plaintiffs Garcia and Cardenas also have pending in state court an action against these same defendants involving the same issues. Defendants now move to dismiss the federal complaint based on the standard for abstention established in *Colorado River* and seek sanctions pursuant to *28 U.S.C. § 1927*. For the following **[*2]** reasons, defendants' motion to dismiss and request for sanctions are granted.

BACKGROUND

I. *The State Action*

In May 1998, plaintiffs Jose Garcia and Manuel Cardenas instituted an action in the Supreme Court of New York, Kings County. (*See* Affidavit of W. Matthew Groh in Support of Defendants' Motion to Dismiss and For an Award of Costs and Attorney's Fees sworn to on April 15, 1999 ("Groh Aff.") P 1). In the complaint ("State Compl.") they allege that defendants failed to pay overtime wages and took improper deductions from the wages of plaintiff employees in violation of Articles 6 and 19 of New York's Labor Law. (*See* State Compl. P 80). They further allege that they were not paid an additional hour of wages for each day in which they worked more than 10 hours, as required under 12 NYCRR 142.2-4(a). (*See id.* P 84). Plaintiffs seek all unpaid wages, the costs of the action and attorney's fees, as well as class action certification pursuant to Article 9 of New York's CPLR. (*See id.* PP 79,86,87).

Defendants moved to dismiss the complaint against the individual defendants Elliot Tamir and Hazim Abrahim based on the contention that New York's

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 13 of 101

Page 4 of 11
1999 U.S. Dist. LEXIS 11940, *2

Business Corporation [*3] Law (BCL) § 630(a) requires, *inter alia*, that a judgment against a corporate defendant be returned unsatisfied before any shareholders become individually liable. (*See* Groh Aff. P 5). Furthermore, they argue that the rule states that these shareholders must be established as among the ten largest shareholders of the corporation. (*See id.*). On November 10, 1998, the motion was granted, and the complaint was dismissed as to Tamir and Abrahim. (*See id.* P 8).

In December 1998, plaintiffs attempted to submit an amended complaint ("Am. Compl.") with new allegations against the individual defendants, to which defendants refused to respond. (*See id.* PP 9, 10). Specifically, this amended complaint includes a new theory that Tamir and Abrahim are individually liable because they collected cash revenue that was not included in the corporations' accounts. (*See* Am. Compl. PP 77, 78). Defendants maintain that attempting to assert new theories of liability against these defendants, who have been dismissed from the action, is improper. (*See* Groh Aff. P 10). The amended complaint also contains a claim of retaliation pursuant to New York State Labor Law *§ 215*, seeking [*4] recovery from each defendant of three million dollars in compensatory damages and three million dollars in punitive damages for each plaintiff. (*See* Am. Compl. P 118). It also includes Pedro Ortega as a plaintiff. (*See id.* P 1).

Plaintiffs have filed a motion, which is *sub judice*, seeking an order requiring defendants to respond to the amended complaint. (*See* Groh Aff. P 14). Also pending is an appeal by plaintiffs of the state court's dismissal of the original complaint against Tamir and Abrahim. (*See id.* P 12).

II. *The Federal Action*

The present complaint ("Federal Compl.") alleges violations of the FLSA based on the same failure by the same defendants to make required overtime and minimum wage payments as set forth in the state complaint. (*See* Federal Compl. P 93;

Affidavit of Leon Greenberg in Opposition to Defendants' Motion to Dismiss and For an Award of Costs and Attorney's Fees sworn to on May 14, 1999 ("Greenberg Aff.") P 2). Plaintiffs also include a claim of retaliation identical to that in the proposed amended complaint currently in dispute in the state action, except that it is stated in the federal complaint as a violation of *29 U.S.C. § 215*. [*5] (*See* Federal Compl. PP 115, 119, 123; Greenberg Aff. P 2). Plaintiffs explicitly state that the action is brought "for the limited purposes of granting the plaintiffs herein relief under the FLSA to the extent that the [state] action which is pending between the parties fails to grant the plaintiffs relief under New York State Law against such defendants." (Federal Compl. P 102). Specifically, plaintiffs seek liquidated damages equal to the amount owed in unpaid wages, a remedy available to them under the FLSA, but not under state law. (*See* Greenberg Aff. P 2(a)).

Defendants argue that the federal complaint is virtually identical to the one pending in state court and that this action is therefore duplicative and vexatious. (*See* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss and For an Award of Costs and Attorney's Fees ("Def. Mem.") at 5). Plaintiffs admit that their primary reason for bringing this action is to receive "liquidated 'double damages'" unavailable to them under state law. (*See* Greenberg Aff. P 2(a)). They wish to employ the "opt-out" class action procedure available in state court while reserving the possibility of attaining [*6] the higher liquidated damages available under the federal statute but at the same time avoiding the "opt-in" class action procedure required under the FLSA. (*See* Federal Compl. PP 102-104). They contend that this approach of bringing state claims in state court and federal claims in federal court is proper. (*See* Greenberg Aff. P 2(b)). Furthermore, they contend that the state and federal complaints present different "issues" and therefore are not identical or parallel in nature. (*See id.* P 7).

DISCUSSION

EXHIBIT D

1999 U.S. Dist. LEXIS 11940, *6

## I. *Standard for Abstention*

Defendants argue that the *Colorado River* abstention doctrine is applicable to this case and that "exceptional circumstances" exist that warrant the dismissal of the federal complaint. There are three traditional circumstances in which it is appropriate for a court to abstain from exercising its jurisdiction. [1] In *Colorado River v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976),* **HN1** the Supreme Court set forth an additional circumstance where abstention is appropriate, applicable in situations involving concurrent jurisdiction of a claim. The principles underlying this standard "rest [*7] on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River, 424 U.S. at 817, 96 S. Ct. at 1246* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183, 72 S. Ct. 219, 221, 96 L. Ed. 200 (1952)).* Despite the flexibility these considerations lend to the analysis, however, the standard is difficult to meet. Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," the determination should be weighted heavily towards retaining jurisdiction. *Colorado River, 424 U.S. at 817, 96 S. Ct. at 1246.* Thus, "only the clearest of justifications will warrant dismissal." *Id. at 818, 96 S. Ct. at 1247; See Moses H Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 2, 103 S. Ct. 927, 929, 74 L. Ed. 2d 765 (1983); De Cisneros v. Younger, 871 F.2d 305, 307 (2nd Cir.*

[1] The three traditional circumstances in which abstention is appropriate are when 1) there is a constitutional issue that could be avoided by a state court application of state law; *County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189, 79 S. Ct. 1060, 1063, 3 L. Ed. 2d 1163 (1959); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 498, 61 S. Ct. 643, 644, 85 L. Ed. 971 (1941);* 2) there are issues of state law involved that implicate important policy concerns; *Burford v. Sun Oil Co., 319 U.S. 315, 317, 63 S. Ct. 1098, 1099, 87 L. Ed. 1424 (1943);* and 3) the purpose of the federal action is to restrain a pending state criminal proceeding. *Younger v. Harris, 401 U.S. 37, 43, 91 S. Ct. 746, 750, 27 L. Ed. 2d 669 (1971). See Colorado River Water Conservation v. United States, 424 U.S. 800, 812-14, 96 S. Ct. 1236, 1243-44, 47 L. Ed. 2d 483 (1976).*

*1989); Alliance of American Insurers v. Cuomo, 854 F.2d 591, 602 (2nd Cir. 1988).*

[*8] **HN2**

The Supreme Court has established six factors to consider when determining whether abstention based on concurrent jurisdiction in state and federal courts is appropriate. These are: 1) whether the jurisdiction is over any res or property; 2) the inconvenience of the federal forum; 3) the avoidance of piecemeal litigation; 4) the order in which jurisdiction was obtained; 5) whether federal or state law supplies the rule of decision; and 6) whether the state court proceeding will adequately protect the rights of the party seeking federal jurisdiction. *See Cone, 460 U.S. at 15, 23, 103 S. Ct. 927 at 936-7, 942; Colorado River, 424 U.S. at 818, 96 S. Ct. at 1246-7; Arkwright-Boston Manufacturers Mutual Ins. Co. v. City of New York, 762 F.2d 205, 210 (2d Cir. 1985).* In applying these factors, it is important to note that "no one factor is necessarily determinative." *Colorado River, 424 U.S. at 818, 96 S. Ct. at 1247.* The balancing of these factors "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." *Cone, 460 U.S. at 16, 103 S. Ct. at 937.* [*9] Therefore, "the weight to be given to any one factor may very greatly from case to case," and a court must use its discretion in determining the outcome based on the circumstances of the particular case. *Cone, 460 U.S. at 16, 103 S. Ct. at 937; see De Cisneros, 871 F.2d at 307, Alliance of American Insurers, 854 F.2d at 602.*

The first two factors in the analysis are not applicable to this case. There is no res or property involved in either action, and the federal forum, located in a neighboring borough to Kings County, is not inconvenient. The inapplicability of these factors weighs in favor of exercising jurisdiction. *See De Cisneros, 871 F.2d at 307; General Reinsurance Corp. v. CIBA-Geigy Corp., 853 F.2d 78, 81 (2nd Cir. 1988); Bethlehem Contracting Co. v. Lehrer/McGovern, Inc., 800 F.2d 325, 327 (2nd*

1999 U.S. Dist. LEXIS 11940, *9

*Cir. 1986)*. Thus, the first two factors, although not weighty in this case, favor plaintiffs.

The third factor, the desirability of avoiding piecemeal litigation, strongly favors defendants. **HN3** Where the state and federal claims are "inextricably linked," the Court of Appeals has recognized **[*10]** the potential for a danger of piecemeal litigation. *See De Cisneros, 871 F.2d at 308*; *General Reinsurance, 853 F.2d at 81*. Therefore, it must first be determined whether the state and federal actions are parallel such that they are indeed "inextricably linked." *See De Cisneros, 871 F.2d at 308* (establishing first that the state and federal actions are parallel before determining the severity of the danger of piecemeal litigation); *General Reinsurance, 853 F.2d at 81*. **HN4** If two actions are "virtually identical," so that "in its essential elements the same cause of action, regardless of theory or pleadings, is asserted in both courts," then the actions are duplicative in nature. *Telesco v. Telesco Fuel and Masons' Materials, 765 F.2d 356, 362 (2nd Cir. 1985)*; *Arkwright, 762 F.2d at 211*. Therefore, even if different relief is sought in the two actions, or the claims are not exactly the same, they are parallel as long as the causes of action are comprised of the same essential issues. *See General Reinsurance, 853 F.2d at 81*, *Telesco, 765 F.2d at 362*. "Merely **[*11]** raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit." *Telesco, 765 F.2d at 362*. Furthermore, **HN5** involvement of all the same issues in a state and a federal action should in itself be given weight as a factor in favor of abstention. *See id.* (considering the fact that two actions were parallel as a factor weighing in favor of abstention).

Plaintiffs argue that the federal and state actions they have brought are not duplicative and enumerate the "issues" that they contend distinguish them. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and For an Award of Costs and Attorney's Fees ("Pl. Mem.") at 5). None of the differences, however, apply to the underlying issues that render these claims essentially identical. First, plaintiffs argue that in the federal claim they seek double damages pursuant to the FLSA, (*see* Pl. Mem. at 5), while in the state complaint they do not. Furthermore, they argue, because they are pleading the state case as a class action, liquidated damages in any amount are not available to them under state law. **[*12]** (*See* Pl. Mem. at 5). This difference in recovery, however, does not render the actions fundamentally different. In both actions, the issues concern the alleged failure of defendants to pay overtime and minimum wages they owed plaintiffs. Precisely the same events, therefore, underlie both the state and federal actions. Furthermore, plaintiffs' counsel admitted at oral argument that plaintiffs would have double damages available to them if they brought the FLSA claim in the state action, albeit not through the procedural vehicle of an opt-out class action. *29 U.S.C. § 216(b)*. *See p.11, infra*. The fact that plaintiffs' choice not to bring the federal claim in state court impairs the overall recovery prospects for the putative class and presumably for counsel (but not plaintiffs' individual recovery prospects) does not mean that the actions are not parallel.

Second, plaintiffs argue that the federal and state complaints are different in that the federal action includes the individual defendants, while the state court has dismissed the claim against the individual defendants. (*See* Pl. Mem. at 5-6). This argument seems disingenuous because plaintiffs **[*13]** are currently appealing that dismissal in state court, as well as seeking an Order requiring defendants to respond to an amended complaint that would reintroduce the individual defendants into the state action. Even if these attempts fail, plaintiffs could choose to bring the federal claim, which imposes individual liability, *29 U.S.C. 216(b)*, in state court. Therefore, they cannot assert that this is their only avenue to bring a claim against these two parties.

Third, plaintiffs argue that the class action certification they have chosen to pursue in state court renders the two actions different. (*See id. at*

1999 U.S. Dist. LEXIS 11940, *13

6). The class action will, if approved, require a member of the putative class to opt-out from representation, *CPLR 904*, while the federal claim under the FLSA requires a plaintiff wishing to be a member of the class affirmatively to opt-in. *29 U.S.C. § 216(b)*. This difference, however, does not relate to the issues underlying the two claims. Both claims involve the same allegations that defendants failed to pay overtime and minimum wages that they owed to plaintiffs. The difference in class action rules is merely a procedural one. **[*14]** Therefore, the two causes of action, comprised of the same "essential elements," are "inextricably linked." [2]

Plaintiffs also argue the two actions are different in that the federal complaint includes a claim of retaliation pursuant to *29 U.S.C. § 215*. **[*15]** (*See* Pl. Mem. at 6-7). However, plaintiffs have included a retaliation claim pursuant to *New York Labor Law § 215* in the amended complaint they are seeking to file in state court. To include this as an example of a difference between the federal and state claims is, while technically true, less than candid and of little legal relevance under these facts. The fact that the proposed amended complaint is being contested by the defendants does not alter this conclusion because the contested issue relates to the inclusion of allegations against the individual defendants regarding payment of wages. Even if plaintiffs' current motion for an Order requiring defendants to respond fails, plaintiffs would most likely be able to plead, uncontested, the retaliation claim. (*See* Groh Aff. P 15). Plaintiffs also argue, regarding the difference between the state and federal retaliation

claims, that "it is unclear if the anti-retaliation protections afforded under State Law equal those under the FLSA." (Pl. Mem. at 7) Whether they do or not, differences in the protections afforded by the statutes would not affect the substantive issues underlying the cause of action and so would not alter the **[*16]** duplicative nature of the retaliation claims.

Finally, plaintiffs argue that because the statute of limitations is longer under the state statute than under the federal statute, there may be a problem concerning this Court's ability to hear a state claim. (*See id.*). This argument is not relevant to the discussion because there is no question of this Court's jurisdiction or other ability to hear the state claims brought in state court, assuming the presence of a federal claim. Rather, defendants have questioned plaintiffs' decision to bring the federal claims in this Court, rather than in the state proceeding which was already in progress. Bringing the federal claims in state court would create no statute of limitations problem. Furthermore, since the state and federal claims at issue involve the same set of events, plaintiffs' argument that there is an issue "as to whether it would be appropriate for a Federal Court to hear State claims which involve facts and circumstances arising during an extended period of time in which no Federal law is involved" makes no sense. (*See id.*) If the state claim were barred in federal court due to the statute of limitations, then the federal **[*17]** claim arising from the same set of events would also be barred under the shorter federal statute of limitations.

*HN6* If the actions are parallel, then the danger of piecemeal litigation becomes an important consideration. *See De Cisneros, 871 F.2d at 308* (holding that because the state and federal issues are "inextricably linked," the risk of [piecemeal] adjudication is real in this case. . . ."); *General Reinsurance, 853 F.2d at 81*. The primary concern when piecemeal litigation is involved is that parallel proceedings will lead to "inconsistent and mutually contradictory determinations." *De*

---

[2] Defendants raise this procedural difference as an argument in favor of dismissing the complaint, contending that the concurrent opt-in and opt-out notices will confuse potential plaintiffs. Plaintiffs respond that the actions are not likely to take place concurrently, as the certification process will be lengthy. (*See* Pl. Mem. 14-15). This issue of confusion is entitled to some weight because confusion would undoubtedly occur, whether the notices were concurrent or not and even if they provided explanations for potential plaintiffs regarding the conflicting procedures. Even more troublesome is the issue preclusion problem that may arise, as there may be participation of a number of different plaintiffs in the two actions. This issue is addressed below.

*Cisneros, 871 F.2d at 307*. The danger of inconsistent determinations in this case is substantial. First, because the causes of action in the two proceedings arise from the same set of events, questions of issue preclusion will be likely to arise among the parties that are involved in both actions. This will result in additional litigation related to the preclusion issue itself, *see Arkwright, 762 F.2d at 211*, and, as noted by the Supreme Court, will also create "the serious potential for spawning an unseemly and destructive race [*18] to see which forum can resolve the same issues first [which would be] prejudicial, to say the least, to the possibility of reasoned decisionmaking by either forum." *Arizona v. San Carlos Apache Tribe of Ariz., 463 U.S. 545, 567, 103 S. Ct. 3201, 3214, 77 L. Ed. 2d 837 (1983)*.

Plaintiffs argue that this potential issue preclusion problem can be avoided if this Court, after ordering defendants to produce a list of employees, "takes no further action until the State Court proceedings have concluded." (Pl. Mem. at 12). This, they argue, will allow the state court to determine all issues of fact, leaving the federal court with the "extremely narrow" question of whether to grant double damages. (*Id.*). If they lose in state court, they contend, then "it is unlikely they will have any Federal claims," (*id.*), and the federal complaint would presumably be dropped or dismissed. Plaintiffs offer no support for their contention that this Court is justified in waiting out a proceeding in another forum for the purpose of adopting the conclusions of fact reached in that proceeding.

In addition to the issue preclusion problem, there is a possibility that the difference [*19] between the class action opt-out and opt-in procedures in the two courts will result in a number of plaintiffs who are involved in only one of the actions. This may create a problem because plaintiffs who are only involved in one of the proceedings will not be subject to the preclusive effect of the determinations made in the other. The result would be that the defendants would be absolved from liability in one court, while being held liable for the same set of events in the other. *De Cisneros, 871 F.2d at 308*. Since the opt-out approach is broader in scope, it is possible that the federal proceeding will not involve plaintiffs who are not also parties in the state action. However, if issues of fact are determined in this Court first, the state court will then be faced with the problem of having to preclude these issues in relation to some plaintiffs, while fully relitigating these issues for other plaintiffs. Given plaintiffs' assertion that the state action will not proceed quickly, as "it is extremely unlikely that a final decision on class certification will be made in the State Court action within the next year, and perhaps not for a considerably longer period [*20] of time," (Pl. Mem. at 15), it is possible that determinations of fact could be reached in the federal court first. The danger of inconsistent findings on defendants' obligations in this scenario is apparent. The result would be unfairness to defendants and a waste of judicial resources that is averse to the underlying objective of the abstention doctrine. *See Colorado River, 424 U.S. at 817, 96 S. Ct. at 1246; Arkwright, 762 F.2d at 211*. [3]

[*21] Plaintiffs, citing *Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)*, argue that this problem could also be avoided. They argue that this Court could "impose limits" on the ability of plaintiffs to join this action, such as preventing any party from joining who is not also a party in the state action. While *Hoffmann-La Roche* recognizes a court's "procedural authority to manage the process of joining multiple parties," there is no indication that a court has the right to exclude parties from the action who under the federal rules would be entitled

---

[3] Also, if the state action does proceed more quickly than this one, and if plaintiffs are unable to reintroduce the individual defendants into the state action based on their state claim, then this Court would have to litigate many issues relating to the individual defendants that were already litigated in relation to the corporate defendants. Thus, no matter which action proceeds first, there is the potential for a waste of judicial resources. This factor is weighty considering that if plaintiffs chose to bring this federal claim in state court, these problems would be avoided.

EXHIBIT D

to join. Plaintiffs, therefore, have offered no support for the notion that this Court may only allow plaintiffs already involved in the state action to join this proceeding.

These problems of issue preclusion and the lack of availability of preclusion against any plaintiffs or defendants only involved in one of the actions renders the piecemeal litigation concerns in this case particularly severe. The resulting inconsistency would cause "friction between state and federal courts" and should be avoided. *De Cisneros, 871 F.2d at 308* (quoting *Lumbermens Mut. Casualty Co. v. Connecticut Bank & Trust Co., 806 F.2d 411, 414 (2nd Cir. 1986)*, [*22] *overruled* on other grounds, *515 U.S. 277 (1995)* (declining to apply the exceptional circumstances test to a declaratory judgment action). Applying the exceptional circumstances test "in a pragmatic, flexible manner with a view to the realities of the case at hand" as the Supreme Court has counseled, this factor should be given particular weight in this determination. *See Cone, 460 U.S. at 21, 103 S. Ct. at 939*, *Telesco, 765 F.2d at 361*. As in *Colorado River*, this factor raises serious concerns here relating to judicial economy and consistency and is of primary importance in the analysis. *See De Cisneros, 871 F.2d at 307*; *Arkwright, 762 F.2d at 211*.

The fourth factor concerns the order in which jurisdiction was obtained by the two courts, and, in this case, clearly favors defendants. **HN7** Analysis of this factor should not rest solely on the order in which the complaints were filed, but should be considered "in terms of how much progress has been made in the two actions." *Cone, 460 U.S. at 21, 103 S. Ct. at 940*; *See De Cisneros, 871 F.2d at 308*; *Arkwright, 762 F.2d at 211*. [*23] Here, not only was the state complaint filed first, but considerably more progress has been made in the state action. To date, defendants have filed a motion to dismiss the case against the individual defendants, which was granted. Plaintiffs have appealed that decision. Furthermore, defendants have filed an answer to the complaint, and plaintiffs

have attempted to serve an amended complaint, to which defendants object. In response, plaintiffs are currently seeking an Order requiring defendants to respond. There has also been a significant amount of discovery conducted in the state proceeding. (*See* Groh Aff. P 16). In this proceeding, by contrast, the progress consists merely of the complaint and this motion to dismiss.

The fifth factor, the substantive law to be applied, is nominally in plaintiffs' favor because the complaint includes federal claims pursuant to the FLSA and *29 U.S.C. § 215*. *See Cone, 460 U.S. at 26, 103 S. Ct. at 942* (". . . **HN8** the presence of federal-law issues must always be a major consideration weighing against surrender); *De Cisneros, 871 F.2d at 308* ("**HN9** when the applicable substantive law is federal, abstention [*24] is disfavored"). This factor is not entitled to much weight in this particular case, however, because the federal claims are virtually identical to the state claims asserted in the other action, and their determination is based on precisely the same factual question, *viz.*, whether overtime payments were made. This is apparent from plaintiffs' admission that the federal claims are being asserted by plaintiffs for the sole purpose of taking advantage of remedies unavailable to them under state law. (*See* Greenberg Aff. P 2(a)). The implication is that plaintiffs expect the state claims to address fully questions of defendants' liability with respect to plaintiffs' rights, so that the role of the federal claims is simply to augment plaintiffs' recovery options. Thus, there are no important federal rights at stake, and the federal statute at issue in this action does not substantively differ from the state statute at issue in the state action. Therefore, although generally important, this factor is of less importance given the particular circumstances of this case.

The final factor involves the ability of the state forum to protect the rights of plaintiffs. The state court can [*25] adequately decide the substantive issues underlying both the federal and state actions. This is evidenced by the fact that plaintiffs initially

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 19 of 101

Page 10 of 11
1999 U.S. Dist. LEXIS 11940, *25

chose the state forum for litigation of their claims. Furthermore, plaintiffs are only asking this Court to award a measure of damages - based on the same underlying facts - not available to them under state law, indicating their satisfaction with the state court's ability to decide the substantive issues relating to their federal claims. Finally, plaintiffs may, if they wish, bring the federal claims in state court. *See* 29 U.S.C. 216(b) ("An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction. . . ."). That they may have to forego certain damages by doing so, or choose only one class action strategy, is not a compromise of their rights.

The Supreme Court has found "considerable merit" in an additional factor, stating that "*HN10* the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River.*" Cone, 460 U.S. at 17 n. 20, 103 S. Ct. at 937 n. 20. **[*26]** In this case, there is a hostile history derived from plaintiffs' attempt to keep Tamir and Abrahim in the state law suit. As is clear from the procedural history set out above, the present action in federal court was filed in reaction to the state court's dismissal of Tamir and Abrahim from the state court action. While this alone might not even be sufficient to tip the *Colorado River* balance, plaintiffs' obvious "Chinese Menu" strategy is sufficient. As is clear from plaintiffs' papers and from oral argument, plaintiffs wish to maintain two parallel actions based on precisely the same facts in order to avail themselves of certain advantages from the state scheme and certain advantages from the federal scheme. For example, plaintiffs wish to avail themselves of the federal statute's higher liquidated damages amount but do not wish to be burdened with the federal statute's opt-in class action procedure. Rather, they wish to import the federal statute's higher liquidated damages amount into the state court's opt-out class action procedure. At the same time, plaintiffs wish to avoid the state court's prohibition on the recovery of liquidated damages in a class action. Similarly, **[*27]** plaintiffs wish to avail themselves

of the possibility of recovery against the individual defendants under the federal statute, but do not wish to be burdened with the other less advantageous aspects of the federal statutory scheme. Therefore, plaintiffs propose class action disclosure under the federal scheme, class action certification under the state scheme (that is, on an opt-out basis), factual determinations in the state court, liquidated damages awards in the federal court, and findings of liability made against the individual defendants in the federal court. Plaintiffs supply no support for their being able to proceed in this "one from column A, one from column B" manner. Moreover, plaintiffs proffer no reason why they should be permitted to evade both the state statutory scheme and the federal statutory scheme by manipulating the substantive and procedural laws of the two fora to pick only those most advantageous to them. This blatant attempt to manipulate the concurrent system of jurisdiction is of great weight in this consideration of the vexatious or reactive nature of the action. When combined with the normal *Colorado River* factors, particularly the danger of piecemeal **[*28]** litigation, consideration of the vexatious and reactive nature of this action is more than sufficient to constitute the exceptional circumstances which tip the balance away from this court's exercise of jurisdiction in this matter.

II. *Sanctions*

Defendants rely solely on 28 U.S.C. § 1927 as the basis for their request for sanctions. *HN11* 28 U.S.C. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Congress has articulated the purpose of this statute to be the avoidance of "unnecessary delays in

EXHIBIT D

litigation." H. R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, reprinted in 1980 U.S. Code Cong. & Admin. News 2716, 2782; *See United States v. International Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2nd Cir. 1991)*; *Oliveri v. Thompson, 803 F.2d 1265, 1273 (2nd Cir. 1986)*, *cert. denied, 480 U.S. 918 (1987)*. [*29] Thus, **HN12** an award of sanctions under *§ 1927* should only be made "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri, 803 F.2d at 1273*.

Here, it is clear that plaintiffs' counsel's actions were undertaken in a blatant effort to evade the state and federal statutory schemes. As is set out in more detail above, this second action was filed to take advantage of the federal statute's double recovery provision while evading the less advantageous opt-in class procedures. Similarly, the object was to use the state opt-out class procedures while evading the state limits on liquidated damages in class actions and requirements for recovery from shareholders. **HN13** This attempt to manipulate the concurrent system of jurisdiction and distort the intended effect of the individual statutory schemes constitutes an "improper purpose." My conclusion

is confirmed by Judge Nickerson's opinion in *Bradford v. Olympic Courier Systems, Inc., 1997 U.S. Dist. LEXIS 13978 (E.D.N.Y. 1997)*, where plaintiffs' counsel was sanctioned for an even more blatant attempt [*30] to manipulate the concurrent jurisdiction of state and federal courts in FLSA cases. Therefore, I find that plaintiffs' counsel's filing of this duplicative, vexatious action has unreasonably multiplied these proceedings. Accordingly, defendants' motion for sanctions pursuant to *28 U.S.C. § 1927* is granted.

Defendants shall submit affidavits of their costs and attorneys' fees within five business days of the date hereof. Plaintiffs may respond within five business days thereafter.

CONCLUSION

Defendants' motions to dismiss and for sanctions under *28 U.S.C. § 1927* are granted.

SO ORDERED.

Date: August 2, 1999

New York, New York

LORETTA A. PRESKA, U.S.D.J.

No *Shepard's* Signal™
As of: October 27, 2016 11:27 AM EDT

## *Winkel v. Reserve Officer*

United States District Court for the District of Kansas

August 25, 1994, Decided ; August 25, 1994, Filed, Entered

Case No. 89-4268-RDR

**Reporter**

1994 U.S. Dist. LEXIS 12412; 1994 WL 478806

DAN WINKEL, Plaintiff, v. RESERVE OFFICER OF CITY OF BELOIT, KANSAS, et al., Defendants.

## LexisNexis® Headnotes

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Baseless Filings > General Overview

Civil Procedure > Sanctions > Baseless Filings > Frivolous Lawsuits

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > General Overview

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Prevailing Parties

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Reasonable Fees

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Statutory Attorney Fee Awards

Legal Ethics > Professional Conduct > Frivolous Claims & Conduct

*HN1* Under *42 U.S.C.S. § 1988*, a court may award attorney's fees to a prevailing defendant upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. Under *Fed. R. Civ. P. 11*, sanctions, including a reasonable attorney's fee, may be imposed against attorneys or parties who sign pleadings which are not well grounded in fact or make arguments not supported by existing law or a good faith argument for the extension, modification or reversal of existing law.

In deciding whether to impose *Rule 11* sanctions, a district court must apply an objective standard; it must determine whether a reasonable and competent attorney would believe in the merit of an argument.

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > General Overview

*HN2* Fee awards for defendants in civil rights litigation are not routine and should be granted only where the action brought is found to be unreasonable, frivolous, meritless or vexatious.

Civil Procedure > Sanctions > General Overview

Civil Procedure > Sanctions > Baseless Filings > General Overview

*HN3* *Fed. R. Civ. P. 11* sanctions are meant to serve several purposes, including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. Deterrence is the primary goal of the sanctions. Accordingly, the amount of sanctions is appropriate only when it is the minimum that will serve to adequately deter the undesirable behavior.

**Counsel: [*1]** For DAN WINKEL, plaintiff: Lee R. Barnett, Barnett, Yockers & Renner, P.A., Wakarusa, KS.

For JON A PEFLEY, Reserve Officer of City of Beloit, Kansas, and Deputy Sheriff of Mitchell County, Kansas, as an individual and in his official capacity as a Deputy Sheriff and/or agent of

Mitchell County, Kansas, LARRY BATT, Officer of the City of Beloit, Kansas, as an individual and in his official capacity as a Deputy Sheriff and/or agent of Mitchell County, Kansas, DOUGLAS DAUGHERTY, Sheriff of Mitchell County, Kansas, as an individual and in his official capacity, BELOIT, KS, CITY OF, MITCHELL COUNTY, KS, THE BOARD OF COUNTY COMMISSIONERS OF MITCHELL COUNTY, KANSAS, defendants: James S. Pigg, Fisher, Patterson, Sayler & Smith, Topeka, KS.

**Judges:** ROGERS

**Opinion by:** RICHARD D. ROGERS

# Opinion

*MEMORANDUM AND ORDER*

This case is now before the court upon defendants' long-pending motion for attorney's fees. This case arose from an investigation of plaintiff's tavern. A 19-year-old man, Jon Peffly, working as a reserve police officer for the City of Beloit, entered plaintiff's tavern and purchased a six-pack of 3.2 beer after indicating to plaintiff that he was old enough to buy beer, when in fact he was below the legal [*2] age. Plaintiff did not ask for identification and sold the beer to Peffly. Later, plaintiff was charged with the illegal sale of cereal malt beverages. Plaintiff was eventually tried and acquitted of this charge.

Plaintiff brought this case alleging civil rights violations under *42 U.S.C. § 1983* and state tort claims. This court granted summary judgment against plaintiff's federal law claims on two grounds. First, plaintiff's *§ 1983* claims were barred by the statute of limitations. Second, plaintiff could not identify a privacy interest protected by the *Fourth Amendment* that was violated by the entry and actions inside his public tavern. Citing a similar U.S. Supreme Court case, *Maryland v. Macon, 472 U.S. 463, 86 L. Ed. 2d 370, 105 S. Ct. 2778 (1985)*, this court held that plaintiff's *Fourth Amendment*

rights against illegal search and seizure were not violated. [1] Having granted summary judgment against plaintiff's federal law claims, the court declined to exercise jurisdiction over plaintiff's state law claims.

[*3] Following the summary judgment order, defendants filed the instant motion for attorney's fees. Defendants ask that the court award attorney's fees under the provisions of *42 U.S.C. § 1988* or *FED.R.CIV.P. 11*. **HN1** Under *§ 1988*, a court may award attorney's fees to a prevailing defendant upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. *Cobb v. Saturn Land Co., 966 F.2d 1334, 1338 (10th Cir. 1992)*. Under *Rule 11*, sanctions, including a reasonable attorney's fee, may be imposed against attorneys or parties who sign pleadings which are not well grounded in fact or make arguments not supported by existing law or a good faith argument for the extension, modification or reversal of existing law. *Burda v. M. Ecker Co., 2 F.3d 769, 773 (7th Cir. 1993)*. "In deciding whether to impose *Rule 11* sanctions, a district court must apply an objective standard; it must determine whether a reasonable and competent attorney would believe in the merit of an argument." *Dodd Ins. Services v. Royal Ins. Co., 935 F.2d 1152, 1155 (10th Cir. 1991)*. [*4] In this case, the court shall apply *Rule 11* as it existed prior to the amendments of December 1, 1993. See *Silva v. Witschen, 19 F.3d 725 (1st Cir. 1994)*; *Schrag v. Dinges, 153 F.R.D. 665, 666 (D.Kan. 1994)*.

In this case, we believe attorney's fees are warranted under *§ 1988* and sanctions are warranted under *Rule 11*. The law was clear at the time this case was filed that plaintiff's privacy rights, as protected by the *Fourth Amendment*, were not infringed when the undercover reserve police

---

[1] Plaintiff also alleged a violation of his due process rights, but withdrew this claim in his response to defendants' motion for summary judgment.

EXHIBIT D

officer entered plaintiff's tavern, misrepresented his age, and illegally purchased a six-pack of beer. *Maryland v. Macon, supra*; *Katz v. United States, 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)*. There was no claim in this case that defendants took any action which intruded into an area of plaintiff's tavern which was not open to public view. Instead, plaintiff asserted there was no probable cause to support an investigation of underage beer purchases. However, since defendants did not infringe upon any **[*5]** reasonable expectation of privacy held by plaintiff, no probable cause was needed to support a search warrant, and no exigent circumstances were required for a search without a warrant. Some of the cases cited by plaintiff in opposition to summary judgment in this case involved *§ 1983* claims arising from other bar "searches." But, these cases are clearly distinguishable from this case because they involve allegations of inspections in places where there would be an expectation of privacy. E.g., *Benigni v. City of Hemet, 853 F.2d 1519, 1522 (9th Cir. 1988)* (search behind bar and inside drawers); *Turner v. Dammon, 848 F.2d 440, 445 (4th Cir. 1988)* (cutting open liquor boxes in a storeroom); *Commonwealth v. Cadoret, 388 Mass. 148, 445 N.E.2d 1050, 1053 (Mass. 1983)* (search of a private club by officer who did not pay normal admission charge).

The law was also clear at the time this case was filed that a two-year statute of limitations applied to this case and that federal law controlled questions relating to the accrual of plaintiff's *§ 1983* action. *Newcomb v. Ingle, 827 F.2d 675, 678-79 (10th Cir. 1987)*. **[*6]** The information important to plaintiff's *§ 1983* claim was that defendants initiated a warrantless "search" of his tavern absent any exigent circumstances. This was known to plaintiff on or about February 25, 1987 when plaintiff was served with a citation charging the illegal sale of cereal malt beverages. Nevertheless, plaintiff waited to file this case until December 20, 1989, more than two years after the "search" and more than two years after plaintiff reasonably became aware of the "search." Therefore, the federal claims

in this case were clearly barred by the statute of limitations when this action was filed.

Plaintiff has cited several cases to argue that the federal claims in this case had a reasonable basis in law or fact. We have examined those cases. [2] None of the cases rebut the conclusion that plaintiff should have been aware of the alleged violation of his constitutional rights more than two years before he filed suit. Nor do they support plaintiff's contention that an underage law enforcement agent must have a search warrant or reasonable suspicion of criminal activity before he enters a public tavern and orders some beer.

**[*7]** Plaintiff and his counsel have suggested that his opposition to defendants' summary judgment motion now be considered arguments in favor of modifying existing law. This would seem unfair to defendants since the arguments were not presented in this fashion originally. Even so, we do not believe plaintiff's arguments present a reasonable argument for the extension of protections against illegal search and seizure or a modification of the law regarding the statute of limitations.

Plaintiff has claimed that his modest financial status should limit any fee award granted in this case. However, plaintiff has not presented any affidavits or other evidence to substantiate his financial position. He has the burden to do so. See *White v. General Motors Corp., 908 F.2d 675, 685 (10th Cir. 1990)* cert. denied, *498 U.S. 1069, 112 L. Ed. 2d 850, 111 S. Ct. 788 (1991)* (*Rule 11* case).

Plaintiff and his counsel claim that the motion for fees is part of a national effort to discourage civil

---

[2] The cases are: *Cunningham v. City of Los Angeles, 879 F.2d 481 (9th Cir. 1988)*; *Tarter v. Raybuck, 742 F.2d 977 (6th Cir. 1984)* cert. denied, **470 U.S. 1051, 84 L. Ed. 2d 814, 105 S. Ct. 1749 (1985)**; *P. Mastrippolito & Sons, Inc. v. Joseph, 692 F.2d 1384 (3d Cir. 1982)*; *Eliason Corporation v. Bureau of Safety and Regulation, 564 F. Supp. 1298 (D.Mich. 1983)*; *Chicarelli v. Plymouth Garden Apartments, 551 F. Supp. 532 (D.Pa. 1982)*; *Jeffries v. City of Chicago, 540 F. Supp. 1371 (D.Ill. 1982)*; *Isaacs v. Temple University, 467 F. Supp. 67 (D.Pa. 1979)*.

1994 U.S. Dist. LEXIS 12412, *7

rights litigation. This is immaterial to the court. The court is examining this case and only this case. In doing [*8] so, the court is well aware that *HN2* fee awards for defendants in civil rights litigation are not routine and should be granted "only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." *Christiansburg Garment Co., 434 U.S. 412, 421, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978)*.

Plaintiff has argued that the time defendants' counsel claim they spent in this case (130 hours) is proof that the case was not frivolous. The merit of a case cannot be judged solely by the hours spent defending it. See *Kirk Capital Corp. v. Bailey, 16 F.3d 1485, 1491 (8th Cir. 1994)* (noting inconsistency between assertion that a complaint is patently frivolous and claim that "279.10 or even 179.10 hours" were spent defending against it, but granting *Rule 11* sanctions for a reduced number of hours). There are too many other factors which may affect the time spent upon a case. For instance, in this case there were several claims and several defendants.

Nevertheless, the court does share the opinion that, looking at all the circumstances in this matter, an appropriate fee award should not include [*9] full compensation for 130 hours. The court is mindful that most of the key facts upon which summary judgment was based were or could have been the subjects of stipulations. So, some of the time spent on discovery appears to have been avoidable. After reviewing defendants' counsel's billing statements, the court has made a reduction in the hours claimed to account for the possibility of a more expeditious approach to dismissing this case. This has required some estimation. See *V-1 Oil Co. v. State of Wyoming, 902 F.2d 1482, 1489* (10th Cir.) *cert. denied, 498 U.S. 920 (1990)* (estimation permitted when court is awarding fees for an indiscrete portion of the litigation). Defendants have made a claim for hours spent before this case was filed. We do not believe these hours should be compensated. Time spent unsuccessfully opposing a motion to amend is also part of the fee request. We have

removed these hours from our calculation of the fee award.

Considering these factors and remaining mindful that the court should not deter the private enforcement of civil rights laws, the court shall subtract 60 hours from the fee request in [*10] this matter. The court believes a reasonable hourly rate has been claimed by defendants' counsel. After reviewing the fee statements supporting defendants' motion, the court, pursuant to *42 U.S.C. § 1988*, shall award defendants' fees and expenses against plaintiff in the amount of $ 6,800.25.

The court also believes sanctions under *Rule 11* are proper in this case. As previously discussed, we believe this case was filed and litigated even though it was not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law. Therefore, sanctions are appropriate. The problems with this litigation stemmed from a misunderstanding of the operation of the statute of limitations and the *Fourth Amendment*. It is the responsibility of an attorney to be aware of these matters and to properly advise his client. Therefore, *Rule 11* sanctions shall be awarded against the counsel who signed plaintiff's pleadings in this matter, Mr. Lee Barnett.

The court has considered many factors in deciding what amount of sanctions to assess against Mr. Barnett. *HN3* "*Rule 11* sanctions are meant to serve several purposes, including (1) deterring [*11] future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management." *White v. General Motors Corp., supra, 908 F.2d at 683 (10th Cir. 1990)*. "Deterrence is . . . the primary goal of the sanctions." *Id.* "Accordingly, 'the amount of sanctions is appropriate only when it is the *minimum* that will serve to *adequately* deter the undesirable behavior.'" *Dodd Ins. Services v. Royal Ins. Co., supra, 935 F.2d at 1159* (quoting *White v. General Motors Corp., supra, 908 F.2d at 684-85*) (emphasis in original).

Grant Sullivan

EXHIBIT D

1994 U.S. Dist. LEXIS 12412, *11

Mr. Barnett has not claimed he cannot afford to pay a significant monetary sanction. Mr. Barnett has substantial litigation experience. The court is aware of no prior history of sanctions or misconduct. The court does not believe that malice or bad faith played a role in the sanctionable conduct in this case. As previously stated, the court is mindful that sanctions should not be so severe that civil rights litigation is chilled.

After considering all of these factors, the court [*12] believes a monetary award of $ 1,000.00 should be paid by Mr. Barnett to the court as sanctions under *Rule 11*. The sanctions are ordered paid to the court since the primary purpose of sanctions under the circumstances of this case is for deterrence and not for compensation. See *FED.R.CIV.P. 11* Advisory Committee Note.

In conclusion, defendants' motion for fees and sanctions is granted consistent with the text of this memorandum and order. Pursuant to *42 U.S.C. § 1988*, the court awards attorney's fees and expenses to defendants and against plaintiff in the amount of $ 6,800.25. In addition, the court directs that Mr. Lee Barnett pay the Clerk of the Court $ 1,000.00 as a sanction under *FED.R.CIV.P. 11*.

IT IS SO ORDERED.

Dated this 25th day of August, 1994 at Topeka, Kansas.

RICHARD D. ROGERS

United States District Judge

JUDGMENT IN A CIVIL CASE - August 25, 1994, Filed

X Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED defendants' motion for fees and sanctions is granted. The court awards attorney's fees and expenses to defendants [*13] and against plaintiff in the amount of $ 6,800.25. The court directs that Mr. Lee Barnett pay the Clerk of the Court $ 1,000.00 as a sanction.

August 25, 1994

Date

ENTERED ON THE DOCKET: 8/25/94

---

**End of Document**

Grant Sullivan

 Positive
As of: October 27, 2016 11:27 AM EDT

# *Graham v. Taylor*

United States District Court for the District of Colorado

July 7, 2015, Decided; July 7, 2015, Filed

Civil Action No. 15-cv-00006-GPG

**Reporter**

2015 U.S. Dist. LEXIS 87832

RANDOLPH GRAHAM, Plaintiff, v. KIRK TAYLOR, FRAN LePAGE, (FNU) LIGHTCAP, (FNU) BINFORD, (FNU) ZIOLKOWSKI, (FNU) KIESTER, (FNU) SOSA, (FNU) GONZALEZ, (FNU) GALLARDO, and ANNA CIODORIA, Defendants.

**Subsequent History:** Affirmed by *Graham v. Taylor, 2016 U.S. App. LEXIS 2511 (10th Cir., Feb. 10, 2016)*

**Counsel:** [*1] Randolph Graham, Plaintiff, Pro se, Burlington, CO.

**Judges:** LEWIS T. BABCOCK, Senior United States District Judge.

**Opinion by:** LEWIS T. BABCOCK

## Opinion

ORDER OF DISMISSAL

Plaintiff, Randolph Graham, is a prisoner in the custody of the Colorado Department of Corrections at the Buena Vista Correctional Complex in Buena Vista, Colorado. Mr. Graham initiated this action by filing *pro se* a Prisoner Complaint (ECF No. 1) pursuant to *42 U.S.C. § 1983* claiming his rights under the United States Constitution were violated in 2011 while he was detained at the Pueblo County Detention Facility in Pueblo, Colorado. On January 8, 2015, Magistrate Judge Gordon P. Gallagher ordered Mr. Graham to show cause why this action should not be dismissed as barred by the statute of limitations. Magistrate Judge Gallagher also noted

in the show cause order that Mr. Graham failed to provide a clear and concise statement of the specific factual allegations that support each claim. On June 24, 2015, after being granted multiple extensions of time, Mr. Graham filed an amended Prisoner Complaint (ECF No. 18), a Motion for Appointment of Counsel (ECF No. 19), and a response (ECF No. 20) to the show cause order.

Mr. Graham has been granted leave to proceed *in forma* [*2] *pauperis* pursuant to *28 U.S.C. § 1915*. Therefore, the Court must dismiss the action if Mr. Graham's claims are frivolous. *See 28 U.S.C. § 1915(e)(2)(B)(i)*. A legally frivolous claim is one in which the plaintiff asserts the violation of a legal interest that clearly does not exist or asserts facts that do not support an arguable claim. *See Neitzke v. Williams, 490 U.S. 319, 327-28, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)*. For the reasons stated below, the Court will dismiss the action as legally frivolous.

The Court must construe the amended complaint and other papers filed by Mr. Graham liberally because he is not represented by an attorney. *See Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*; *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)*. If the amended complaint reasonably can be read "to state a valid claim on which the plaintiff could prevail, [the Court] should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall, 935 F.2d at 1110*. However, the Court should not be an advocate for a *pro se*

EXHIBIT D

2015 U.S. Dist. LEXIS 87832, *2

litigant. *See id.*

Mr. Graham asserts three claims for relief in the amended Prisoner Complaint. He specifically contends that his constitutional right of access to the courts was violated when he was denied access to the jail law library (claim one); that jail officials retaliated [*3] against him, apparently by denying him access to the law library and by denying him a grievance form (claim two); and that he was a victim of racial discrimination, apparently in connection with the denial of a grievance form (claim three). Mr. Graham's claims primarily are based on events that occurred between August and October 2011, although he also asserts that he wrote a letter to Pueblo County Sheriff Kirk Taylor regarding these incidents and requesting a grievance form in January 2012. Mr. Graham wrote the January 2012 letter to Sheriff Taylor after he had been transferred out of the Pueblo County Detention Center on December 29, 2011.

The statute of limitations is an affirmative defense. *See Fed. R. Civ. P. 8(c)(1)*. However, dismissal under *§ 1915* on the basis of an affirmative defense is permitted "when the claim's factual backdrop clearly beckons the defense." *Fratus v. DeLand, 49 F.3d 673, 676 (10th Cir. 1995)*. Thus, the Court may dismiss a claim *sua sponte* on the basis of an affirmative defense if the defense is "obvious from the face of the complaint" and "[n]o further factual record [is] required to be developed in order for the court to assess the [plaintiff's] chances of success." *Yellen v. Cooper, 828 F.2d 1471, 1476 (10th Cir. 1987)*.

"Congress did not establish a statute of limitations or a body of tolling [*4] rules applicable to actions brought in federal court under *§ 1983*." *Board of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980)*. Therefore, the Court must borrow "the state law of limitations governing an analogous cause of action." *Id. at 483-84*. In most *§ 1983* actions, "a state statute of limitations and the coordinate tolling rules" are "binding rules of law." *Id. at 484*.

The applicable statute of limitations for a *§ 1983* claim in Colorado is two years. *See Blake v. Dickason, 997 F.2d 749, 750-51 (10th Cir. 1993)*. "Although state law determines the applicable statute of limitations period, federal law governs the particular point in time at which a claim accrues." *Kripp v. Luton, 466 F.3d 1171, 1175 (10th Cir. 2006)*. Under federal law, a *§ 1983* claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (internal quotation marks omitted).

Mr. Graham's claims are premised on events that occurred no later than January 2012 and he alleges facts that demonstrate he was aware of his injuries when they occurred. Because Mr. Graham waited three years before initiating this action on January 2, 2015, the affirmative defense of the statute of limitations is obvious on the face of the complaint.

Mr. Graham presents several arguments in his response to Magistrate Judge Gallagher's show cause order seeking to demonstrate this action is timely. [*5] However, all of his arguments are premised on his mistaken belief that the applicable statute of limitations for his claims was three years instead of two. According to Mr. Graham, a three-year statute of limitations applies to claims for fraud and concealment under Colorado law, *see Colo. Rev. Stat. § 13-80-101(1)(c)*; he initiated this action within three years after he mailed his last letter to Sheriff Taylor in January 2012; and the continuing violation doctrine operates to save his claims against all other Defendants. The Court is not persuaded because Mr. Graham is asserting constitutional claims under *§ 1983* that, as noted above, are subject to a two-year statute of limitations. *See Blake, 997 F.2d at 750-51*. To the extent Mr. Graham contends he is asserting a conspiracy claim under *42 U.S.C. § 1985(3)*, the Court notes that *§ 1985(3)* claims are subject to same statute of limitations as *§ 1983* claims. See *Lyons v. Kyner, 367 F. App'x 878, 881-82 (10th Cir. 2010)*.

Mr. Graham also makes a vague reference to

EXHIBIT D

equitable tolling in his response to Magistrate Judge Gallagher's show cause order. The State of Colorado recognizes the doctrine of equitable tolling to suspend a statute of limitations period "when flexibility is required to accomplish the goals of justice." *Morrison v. Goff, 91 P.3d 1050, 1053 (Colo. 2004)* (internal quotation marks omitted). For example, equitable tolling of [*6] a statute of limitations is appropriate "when plaintiffs did not timely file their claims because of 'extraordinary circumstances' or because defendants' wrongful conduct prevented them from doing so." *Id.*

"[W]hen the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute." *Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980)*. Mr. Graham fails to satisfy this burden because he fails to allege any facts that suggest the applicable statute of limitations should be tolled as a matter of equity or for any other reason. Therefore, the action is barred by the statute of limitations and will be dismissed as legally frivolous.

The Court also certifies pursuant to *28 U.S.C. § 1915(a)(3)* that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status will be denied for the purpose of appeal. *See Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962)*. If Plaintiff files a notice of appeal he also must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with *Fed. R. App. P. 24*. Accordingly, it is

ORDERED that the complaint, the amended complaint, and the action are dismissed [*7] as legally frivolous pursuant to *28 U.S.C. § 1915(e)(2)(B)(i)*. It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied without prejudice to the filing of a motion seeking leave to proceed *in forma pauperis* on appeal in the United States Court of Appeals for the Tenth Circuit.

DATED at Denver, Colorado, this 7th day of July, 2015.

BY THE COURT:

/s/ Lewis T. Babcock

LEWIS T. BABCOCK, Senior Judge

United States District Court

---

**End of Document**

Grant Sullivan

EXHIBIT D

 Positive
As of: October 27, 2016 11:27 AM EDT

## *Parker v. Milyard*

United States District Court for the District of Colorado

November 29, 2012, Decided; November 29, 2012, Filed

Civil Action No. 12-cv-00448-WYD-MJW

**Reporter**
2012 U.S. Dist. LEXIS 180105; 2012 WL 6634798

KEITH PARKER, Plaintiff(s), v. KEVIN MILYARD, RYAN LONG, and JOHN DOE, Defendant(s).

**Subsequent History:** Affirmed by, Adopted by, Injunction denied by, Dismissed by *Parker v. Milyard, 2012 U.S. Dist. LEXIS 180108 (D. Colo., Dec. 20, 2012)*

**Prior History:** *Parker v. Milyard, 2012 U.S. Dist. LEXIS 60468 (D. Colo., May 1, 2012)*

**Counsel:** [*1] Keith Parker, Mr., Pro se, Canon City, CO.

For Kevin Milyard, Mr., Ryan Long, Mr., Defendants: Kathryn Anne Teresa Starnella, Colorado Attorney General's Office, Denver, CO.

**Judges:** Michael J. Watanabe, United States Magistrate Judge.

**Opinion by:** Michael J. Watanabe

## Opinion

**RECOMMENDATION ON PLAINTIFF'S MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND OR PELIMINARY [sic] INJUNCTION UNDER THE RULES OF *FEDERAL RULES OF CIVIL PROCEDURE RULE 65(a)(b)* (Docket No. 26) and DEFENDANTS KEVIN MILYARD AND RYAN LONG'S MOTION TO DISMISS (Docket No. 36)**

**MICHAEL J. WATANABE**

**United States Magistrate Judge**

This case was referred to this court pursuant to an Order of Reference to Magistrate Judge issued by Chief Judge Wiley Y. Daniel on June 14, 2012. (Docket No. 24).

## PLAINTIFF'S ALLEGATIONS

The pro se incarcerated plaintiff, Keith Parker, filed his original, undated Complaint on February 21, 2012 (Docket No. 1). On March 2, 2012, he filed a Motion Request for Reassignment of This Case (Docket No. 7) in which he stated that this case is "a continuing constitutional violation of a [sic] already filed lawsuit 08-cv-00737-MSK-KLM This lawsuit 1983 is in conjunction and accord with cv-00448 and in reality one and the same. . . ." (Docket [*2] No. 7 at 1). That motion was denied as inappropriately filed in this action (Docket No. 10 at 2).

Thereafter, plaintiff was directed to file an amended complaint (Docket No. 11), which he did on June 4, 2012 (Docket No. 18). In that pleading, plaintiff alleges the following. He is a 45-year old African American male serving a twelve-year sentence in the Colorado Department of Corrections ("CDOC") for possession of cocaine. He was released in October 2004 and returned March 2008. He has a serious drug dependency problem. Ever since 2000, he has been attacked by gangs (namely, Black Gangster Disciples, Crips, and some Blood gang-members) which have an "attack on sight order" or

EXHIBIT D

if they cannot get to the plaintiff on sight, then threaten him and make other CDOC offenders upset with him. This is known as a "green light on the plaintiff." (Docket No. 18 at 4, ¶ 2). He is a marked man inside of the CDOC because of his cooperation with law enforcement officials which resulted in the deaths of rival gang members. Nevertheless, nothing is done to protect him.

After a hearing, at which he informed Warden Milyard and others that he feared for his life in general population because there were gangs [*3] out to do him serious bodily harm and he showed them an enemy list and a copy of the 1983 complaint already filed, he was released from administrative segregation on June 3, 2011, and moved to general population on July 21, 2011. Milyard informed plaintiff that if he did not go to general population, Milyard would put plaintiff back into administrative segregation for the rest of his time. There is no protective custody in the CDOC. Plaintiff was assaulted by gang members on three occasions in August 2011 at Sterling Correctional Facility while in a unit that housed the most dangerous offenders, and he was assaulted several more times in September 2011 by gang members, but he was forced to remain in general population.

Finally, the CDOC, including John Doe, has demonstrated and is demonstrating racial discrimination on the plaintiff. He has been treated differently than white offenders seeking protective custody and "has been called a nigger seeking help from the (over seer) in which is a slave derogatory innuendo." The entire CDOC system is mainly white, and there is systematic racism.

Plaintiff seeks punitive, compensatory, consequential, and nominal damages, including damages for [*4] emotional distress, loss of enjoyment of life, and other pain and suffering, as well as declaratory and injunctive relief.

## PENDING MOTIONS

Now before the court for report and recommendation are the Defendants Kevin Milyard and Ryan Long's Motion to Dismiss (Docket No. 36) and the plaintiff's Motion [for] Emergency Temporary Restraining Order ["TRO"] and or Peliminary [sic] Injunction (Docket No. 26). Responses were filed to the respective motions (Docket Nos. 44 and 31). The court has carefully considered these motion papers as well as applicable statutes and case law and the court's file in this case and in Civil Action No. 08-cv-00737-MSK-KLM. The court now being fully informed makes the following findings, conclusions, and recommendations.

Since the plaintiff is not an attorney, his pleading and other papers have been construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. See *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)* (citing *Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)).* Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure [*5] to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . . At the same time, . . . it is [not] the proper function of the district court to assume the role of advocate for the pro se litigant." Id.

## Motion for a TRO and/or a Preliminary Injunction

In his motion for a TRO and/or a preliminary injunction, plaintiff seeks placement in Protective Custody, away from the dangers of the gangs in the CDOC that are allegedly out to do him harm. He asserts the following in his motion. He has been assaulted over twenty times in over a five-year span, with the CDOC having prior knowledge and keeping plaintiff in general population to get assaulted again. He "was assaulted (3) times by gang members while litigation was going on on a prior civil complaint on the same issues, claims in which the same thing is going on again, right now." (Docket No. 26 at 2). "[P]laintiff may suffer serious

bodily injury permanent disfiguring and even death. The plaintiff has been labeled a [sic] informant (snitch) by the gangs all thru out the [CDOC] but as of July 18, 2012 they still (C.D.O.C.) Have the plaintiff [*6] in general population being threaten every single day and attemps [sic] made to assault the plaintiff as soon as he get's [sic] in a place (blind spot) so the gangs can do the most harm." (Docket No. 26 at 2). Plaintiff was transferred to Fremont Correctional Facility, and upon entry, plaintiff informed CDOC that gang members had threatened him and have made attempts to assault the plaintiff, but plaintiff is still in general population. Plaintiff is waiting to get assaulted by gang members who are all known to carry shanks (homemade knives). Plaintiff has been threatened with knives at other facilities.

Injunctive relief is an extraordinary remedy that should be granted only when the moving party clearly and unequivocally demonstrates its necessity. See *Schrier v. University of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005)*. In the Tenth Circuit, the party requesting injunctive relief must establish that: (1) the party will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial [*7] likelihood of success on the merits. *Id.* Furthermore, "[b]ecause the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, . . . [the Tenth Circuit has] identified the following three types of specifically disfavored preliminary injunctions . . . (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that [he] could recover at the conclusion of a full trial on the merits." *Id. at 1258-59* (citation and quotations omitted). In such a case, before the court enters preliminary injunctive relief, the movant must make a heightened showing of the four factors. *RoDa Drilling Co. v. Siegal, 552 F.3d*

*1203, 1209 (10th Cir. 2009)*. "[W]hen the moving party demonstrates that the 'exigencies of the case require extraordinary interim relief,' the district court may grant the motion upon satisfaction of the heightened burden." Id. Furthermore, this court also "consider[s] well-established law that prison management functions should be left to the broad discretion of prison administrators to enable them [*8] to manage prisons safely and effectively. . . . Courts should grant injunctive relief involving the management of prisons . . . only under exceptional and compelling circumstances." *Walker v. Meyer, 2009 U.S. Dist. LEXIS 58074, 2009 WL 1965493, at *4 (D. Colo. July 8, 2009)* (citations omitted).

Here, defendants assert that this motion is very similar to at least two of the approximately eighteen motions for TROs and preliminary and injunctive relief that plaintiff filed in his prior lawsuit, Civil Action No. 08-cv-00737-MSK-KLM. In those two motions, plaintiff also sought to be placed in protective custody because his life was allegedly in grave danger, but those motions were denied. (See Docket Nos. 7, 8, and 14 in other case). In fact, all eighteen of plaintiff's motions for TRO and preliminary injunctive relief were denied in that prior lawsuit. (See Docket No. 31 in this case, at 4 n.4, detailing plaintiff's motions and the orders entered).

In today's report and recommendation, this court is recommending that the defendants' motion to dismiss be granted. Therefore, there is not a substantial likelihood of success on the merits. Furthermore, as found by Judge Weinshienk in plaintiff's prior case with respect [*9] to similar motions for injunctive relief, plaintiff has failed to allege any facts that demonstrate he is facing immediate and irreparable injury. As stated by Judge Wienshienk, "a party seeking a [TRO] must demonstrate clearly, with specific factual allegations that immediate and irreparable injury will result unless a [TRO] iis issued. *See Fed. R. Civ. P. 65(b).*" (See Docket no. 14 at 2 in prior action). Plaintiff has failed to do so in this case as well. It is thus recommended that his motion be

EXHIBIT D

denied.

Motion to Dismiss

The two named defendants, Milyard and Ryan, seek dismissal of the Amended Complaint pursuant to *Fed. R. Civ. P. 12(b)(1)* and *(6)* on the following grounds: (1) plaintiff's claims are barred by the settlement agreement that he and the CDOC executed in connection with Case Nos. 08-cv-00737-MSK-KLM, (2) plaintiff's protective custody housing claim is moot, and (3) the claims against defendants in their official capacities are barred under the *Eleventh Amendment* and should be dismissed.

*Rule 12(b)(1)*:

> empowers a court to dismiss a Complaint for "lack of jurisdiction over the subject matter." *Fed. R. Civ. P. 12(b)(1)*. As courts of limited jurisdiction, federal courts may **[\*10]** only adjudicate cases that the Constitution and Congress have granted them authority to hear. See U.S. CONST. art. III, § 2; *Morris v. City of Hobart, 39 F.3d 1105, 1110 (10th Cir. 1994)*. Statutes conferring jurisdiction on federal courts are to be strictly construed. *See F & S Constr. Co. v. Jensen, 337 F.2d 160, 161 (10th Cir. 1964)*. A *Rule 12(b)(1)* motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971)*. The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)*.

Motions to dismiss pursuant to *Rule 12(b)(1)* may take two forms. First, if a party attacks the facial sufficiency of the complaint, the court must accept the allegations of the complaint as true. *See Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995)*. Second, if a party attacks the factual assertions regarding subject matter jurisdiction through affidavits and other documents, the court may make its own findings of fact. *See id. at 1003*. A court's consideration **[\*11]** of evidence outside the pleadings will not convert the motion to dismiss to a motion for summary judgment under *Rule 56. See id.*

*Cherry Creek Card & Party Shop, Inc. v. Hallmark Marketing Corp., 176 F. Supp.2d 1091, 1094-95 (D. Colo. 2001)*.

Under *Rule 8(a)(2)*, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. A motion to dismiss pursuant to *Rule 12(b)(6)* alleges that the complaint fails "to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. "A complaint must be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* if it does not plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cutter v. RailAmerica, Inc., 2008 U.S. Dist. LEXIS 5687, 2008 WL 163016, at *2 (D. Colo. Jan. 15, 2008)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*). "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not **[\*12]** do . . . ." *Bell Atlantic Corp., 550 U.S. at 555* (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. "[A] plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)* (quoting *Bell Atlantic Corp., 127 S. Ct. at 1974*).

2012 U.S. Dist. LEXIS 180105, *12

The Tenth Circuit Court of Appeals has held "that plausibility refers 'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012)*. The Circuit court has further "noted that '[t]he nature and specificity of the allegations required to state **[*13]** a plausible claim will vary based on context.'" Id. The court thus "concluded the *Twombly/Iqbal* standard is 'a wide middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" Id.

For purposes of a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in the plaintiff's favor. *Morse v. Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998)*; *Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996)*. However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions' . . . ." *Khalik, 671 F.3d at 1190* (quoting *Iqbal, 129 S. Ct. at 1949*)). "Accordingly, in examining a complaint under *Rule 12(b)(6)*, [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id. at 1191*.

This **[*14]** court recommends dismissal of the plaintiff's claims on the basis that they are barred by the settlement agreement he and the CDOC executed in Civil Action No. 08-cv-00737-MSK-KLM on March 23, 2012. The claims plaintiff raises here either were alleged or could have been alleged in that lawsuit, and pursuant to the terms of the Settlement Agreement reached, plaintiff agreed to dismiss such claims. Furthermore, as noted

above, right after this action was commenced, plaintiff himself expressly admitted that this lawsuit is "in reality one and the same" as the other when he moved to consolidate this case with the other. (Docket No. 7).

The Settlement Agreement states in pertinent part:

4. <u>COVENANT NOT TO SUE</u>. Parker further agrees and covenants that, other than in matters identified in the Lawsuit, he did not sue and that in the future, he will not sue, or assert any federal, state, or administrative cause of action of any type or kind, at law or in equity, whether before a court of law or an administrative agency, against the CDOC, or any current and former employee, official, agent, or attorney of any such entity respecting any purported claim, cause of action, liability, expense, or damage **[*15]** arising out of any acts attributable to any of them that arise from the Incidents and the matters asserted in the Lawsuit, as well as during the negotiations generated in the course of reaching this Settlement Agreement and Release.

. . .

9. <u>DISMISSAL OF INSTANT LAWSUIT AND RELATED LAWSUITS</u>. **Parker agrees to dismiss with prejudice the instant Lawsuit, as well as all claims and causes of action arising from or related to the Incidents that Parker did bring or could have brought** against the CDOC, as well as current and former employees, officials, agents, and attorneys of the CDOC, including, but not limited to, all individual defendants that had been a part of this Lawsuit. **All claims and causes of action arising from or related to the Incidents, include all allegations pertaining to purported failures to protect at any CDOC facility in which Parker is or has been housed**; purported retaliatory threats in connection with Parker's grievance filings and/or threats to file a lawsuit or filing the instant Lawsuit; conditions of confinement,

namely for a purported lack of outdoor exercise; the purported failure to provide medical treatment for mental health and chronic drug problems; the purported [*16] reading of his legal mail; and purported due process violations arising from placement in administrative segregation, all of which are alleged, or could have been alleged, to have occurred at any time during the period set forth in Parkers complaint up to and including the date of this Settlement Agreement. Additionally, to effectuate the complete dismissal of the Lawsuit, each Party authorizes his or its counsel to submit a Joint Stipulated Motion to Dismiss with Prejudice the Lawsuit, Civil Action No. 08-cv-00737-MSK-KLM, in its entirety.

(Docket No. 36-1) (emphasis added). This court agrees with the named defendants that pursuant to the Settlement Agreement, plaintiff expressly agreed to dismiss the claims asserted in this lawsuit because such claims had been brought at the time he signed the Settlement Agreement, were (by his own admission in Docket No. 7) related to the claims brought in the prior lawsuit, or concerned events that occurred during the period of time of the prior lawsuit's operative dates and the date of the Settlement Agreement. Plaintiff was represented by counsel during the negotiation and execution of the Settlement Agreement. Defendants note that in exchange [*17] for plaintiff's waiver, the CDOC agreed to transfer plaintiff from his then-current facility (Sterling Correctional Facility) to Arrowhead Correctional Center or other facility that offers the CDOC's Drug & Alcohol Therapeutic Community and where plaintiff's enemies are not housed.

Based upon the findings above, this court finds that the plaintiff's voluntary dismissal with prejudice of his other lawsuit, based upon his Settlement Agreement, is a judgment on the merits, and thus the claims in this case are barred by the doctrine of res judicata. See *Brooks v. Barbour Energy Corp., 804 F.2d 1144, 1146 (10th Cir. 1986).*

**John Doe Defendant**

Plaintiff's claim against defendant John Doe is merely a conclusory claim of systematic racism and racial discrimination against the plaintiff. Such a conclusory claim fails to provide any factual allegations that plausibly suggest the defendant is liable. Therefore, it is recommended that these claims be dismissed *sua sponte* pursuant to *28 U.S.C. § 1915(e)(2)(B)(ii)*.

**WHEREFORE**, for the foregoing reasons, it is hereby

**RECOMMENDED** that the plaintiff's Motion [for] Emergency Temporary Restraining Order be **DENIED**. It is further

**RECOMMENDED** that the Defendants [*18] Kevin Milyard and Ryan Long's Motion to Dismiss (Docket No. 36) be **GRANTED**. It is further

**RECOMMENDED** that the claims against defendant John Doe be dismissed pursuant to *28 U.S.C. § 1915(e)(2)(B)(ii)*.

Based upon the above recommendations, it is further

**ORDERED** that the plaintiff's Motion for Appointment of Counsel (Docket No. 46) and Motion for Status Conference Hearing for Plantiff [sic] (Docket No. 47) are both **DENIED**.

**NOTICE: Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Fed. R. Civ. P. 72(b)(2)*, the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, *Thomas*

2012 U.S. Dist. LEXIS 180105, *18

*v. Arn, 474 U.S. 140, 148-53, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*, **and also waives appellate review of both factual and legal questions.** *Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999)*; [*19] *Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996)*.

Date: November 29, 2012

Denver, Colorado

/s/ Michael J. Watanabe

Michael J. Watanabe

United States Magistrate Judge

**End of Document**

Grant Sullivan

EXHIBIT D

 Positive
As of: October 27, 2016 11:27 AM EDT

## *Parker v. Milyard*

United States District Court for the District of Colorado

August 23, 2013, Decided; August 23, 2013, Filed

Civil Action No. 12-cv-00448-WYD-MJW

**Reporter**

2013 U.S. Dist. LEXIS 131880

KEITH PARKER, Plaintiff(s), v. KEVIN MILYARD, RYAN LONG, and JOHN DOE, Defendant(s).

**Subsequent History:** Adopted by, Motion granted by *Parker v. Milyard, 2013 U.S. Dist. LEXIS 131881 (D. Colo., Sept. 16, 2013)*

**Prior History:** *Parker v. Milyard, 2012 U.S. Dist. LEXIS 180108 (D. Colo., Dec. 20, 2012)*

**Counsel:** [*1] Keith Parker, Mr., Plaintiff, Pro se, Canon City, CO.

For Kevin Milyard, Mr., Ryan Long, Mr., Defendants: Kathryn Anne Teresa Starnella, Colorado Attorney General's Office, Denver, CO.

**Judges:** Michael J. Watanabe, United States Magistrate Judge.

**Opinion by:** Michael J. Watanabe

## Opinion

### RECOMMENDATION ON DEFENDANTS' MOTION FOR ATTORNEY'S FEES PURSUANT TO 42 U.S.C. § 1988(B) (Docket No. 55)

### Entered by Magistrate Judge Michael J. Watanabe

This case was referred to this court pursuant to an Order of Reference to Magistrate Judge issued by Judge Wiley Y. Daniel on June 25, 2012. (Docket No. 24).

In the motion now before the court (Docket No. 55), the two named defendants, Kevin Milyard and Ryan Long, note that plaintiff initiated this lawsuit on February 21, 2012, while he was engaging in settlement negotiations to resolve a prior lawsuit (Civil Action No. 08-cv-00737-MSK-KLM - hereinafter "the prior lawsuit"). Defense counsel sent plaintiff a letter on April 3, 2012, informing him that this lawsuit was barred under the terms of the prior lawsuit's Settlement Agreement and inviting him to dismiss this case voluntarily with prejudice within fourteen days, warning that defendants would seek attorneys' fees and costs in the [*2] event he declined to dismiss. (Docket No. 55-1, Defs.' Ex. A). On May 16, 2012, defense counsel sent a follow-up letter to plaintiff reiterating that this case was barred under the terms of the prior lawsuit's Settlement Agreement. (Docket No. 55-2, Defs.' Ex. B). Plaintiff, however, proceeded with this case.

In a report and recommendation issued on November 29, 2012 (Docket No. 49) ("the Recommendation"), this court, among other things, recommended dismissal of the plaintiff's claims on the basis that they were barred by the Settlement Agreement plaintiff and the CDOC executed in the prior lawsuit on March 23, 2012, finding as follows. The claims plaintiff raised here either were alleged or could have been alleged in the prior lawsuit, and pursuant to the terms of the Settlement Agreement reached, plaintiff agreed to dismiss such claims. Furthermore, right after this action was commenced, plaintiff himself expressly admitted

EXHIBIT D

that this lawsuit is "in reality one and the same" as the prior lawsuit when he moved to consolidate this case with the other. (Docket No. 7). This court agreed with the named defendants that pursuant to the Settlement Agreement, plaintiff expressly agreed to dismiss **[*3]** the claims asserted in this lawsuit because such claims had been brought at the time he signed the Settlement Agreement, were (by his own admission in Docket No. 7) related to the claims brought in the prior lawsuit, or concerned events that occurred during the period of time of the prior lawsuit's operative dates and the date of the Settlement Agreement. Plaintiff was represented by counsel during the negotiation and execution of the Settlement Agreement. Defendants noted that in exchange for plaintiff's waiver, the CDOC agreed to transfer plaintiff from his then-current facility (Sterling Correctional Facility) to Arrowhead Correctional Center or other facility that offers the CDOC's Drug & Alcohol Therapeutic Community and where plaintiff's enemies are not housed. Consequently, based upon these findings, this court concluded that the plaintiff's voluntary dismissal with prejudice of his prior lawsuit, based upon his Settlement Agreement, was a judgment on the merits, and thus the claims in this case were barred by the doctrine of res judicata. Plaintiff did not file any objections to the Recommendation. In an Order issued on December 20, 2012, Judge Daniel agreed that the plaintiff's **[*4]** claims should be dismissed for the reasons stated in both the Recommendation and his Order. (Docket No. 51 at 2). The Recommendation was thus affirmed and adopted, and the case was dismissed. Final Judgment entered the following day. (Docket No. 52).

Shortly thereafter, defendants filed the motion that is now before the court, Defendants' Motion for Attorney's Fees Pursuant to *42 U.S.C. § 1988(b)* (Docket No. 55).

Plaintiff filed a response (Docket No. 63) in which he asserts the following. He is pro se and indigent; there is no way he can pay any type of fee award. He was represented in the prior litigation by appointed counsel, Mr. Meyer, who has since passed away. Mr. Meyer was incompetent and informed him that plaintiff was free to resume this lawsuit after the disposition of the prior lawsuit, which was the one main reason he agree to settle the prior lawsuit. One of the drafts of the Settlement Agreement differs from the Settlement Agreement actually signed. That draft included specific language that plaintiff agreed to dismiss this case voluntarily. That language was not included in the Settlement Agreement. The Settlement Agreement was not binding, and the court did not make any **[*5]** determination as to whether it was "good or bad or fair or unfair." (Docket No. 63 at 7). Plaintiff was tricked and manipulated into believing the settlement was changed to where he could proceed with this case. He was taken advantage of because he has a mental illness. Since he was represented by counsel, it is only fair that his lawyer be held accountable. His claim against the John Doe defendants was dismissed as a conclusory claim, not because it was an unfounded claim, so the entire claim was not protected under the Settlement Agreement. (Docket No. 63 at 6).

The court has carefully reviewed these motions papers, has taken judicial notice of the court file for this case and the prior lawsuit, and has considered applicable Federal Rules of Civil Procedure and case law. The court now being fully informed makes the following findings, conclusions of law, and recommendation.

Defendants assert they are entitled to attorney fees pursuant to *42 U.S.C. § 1988(b)* because they are prevailing parties in a lawsuit that plaintiff continued to litigate without foundation. "*Section 1988(b)* **[*6]** codifies an exception to the 'American Rule' in which each party ordinarily must pay its own attorneys' fees." *Zinna v. Congrove, 680 F.3d 1236, 1239 (10th Cir. 2012)*. "Specifically, *§ 1988(b)* creates a fee-shifting regime in which prevailing civil rights litigants can recoup the litigation costs stemming from their successful claims. The statute provides that 'the court, in its

2013 U.S. Dist. LEXIS 131880, *6

discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'" *Id.* Attorney fees, however, should be assessed against a *pro se* plaintiff in a *§ 1983* action only where "a court finds that [the plaintiff's] claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe, 449 U.S. 5, 14-15, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980).* See *Hensley v. Eckerhart, 461 U.S. 424, 429 n.2, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* ("A prevailing defendant may recover an attorney's fee award only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant."); Houston v. Norton, 215 F.3d 1172, 1174-75 (10th Cir. 2000). "The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment **[*7]** of fees." *Hughes, 449 U.S. at 14.*

Here, this court agrees with the defendants that an award of fees is justified. Based upon the Settlement Agreement entered into in the prior lawsuit, plaintiff's continuation of this lawsuit was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. Plaintiff readily acknowledged this case was "one and the same" as the prior lawsuit, which he voluntarily dismissed pursuant to a Settlement Agreement, yet he continued to pursue this case despite two explicit written warnings from defense counsel that failure to dismiss this lawsuit voluntarily could result in an award of attorney fees and costs against him. Plaintiff, not his appointed counsel in the prior litigation, is responsible for the fee award. Plaintiff has provided only hearsay that his attorney advised him that he could continue with this action. The court takes judicial notice of an e-mail sent by plaintiff's counsel in the prior lawsuit to defense counsel regarding the draft language in the Settlement Agreement concerning this lawsuit that, "I am not counsel on 12-cv-000448 and have no authority to address it in any manner." (Civil **[*8]** Action No. 08-cv-00737-MSK-KLM, Docket No. 519-4 at 1). Defendants are entitled to an award of attorney fees.

When determining the amount of a fee award, the court should follow the three-step process set forth in *Ramos v. Lamm, 713 F.2d 546 (10th Cir. 1983),* overruled on other grounds by *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 725, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987);* *Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 2011 U.S. Dist. LEXIS 90420, 2011 WL 3568165, at \*2 (D. Colo. Aug. 15, 2011).* The first step in determining a fee award is to determine the number of hours reasonably spent by counsel for the party seeking the fees. *Malloy v. Monahan, 73 F.3d 1012, 1017 (10th Cir. 1996);* *Ramos, 713 F.2d at 553.* Factors considered in a reasonableness determination include: (1) whether the amount of time spent on a particular task appears reasonable in light of the complexity of the case, the strategies pursued, and the responses necessitated by an opponent's maneuvering; (2) whether the amount of time spent is reasonable in relation to counsel's experience; and (3) whether the billing entries are sufficiently detailed, showing how much time was allotted to a specific task. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 2011 U.S. Dist. LEXIS 90420, 2011 WL 3568165, at \*2* **[*9]** (citing *Rocky Mountain Christian Church v. Board of County Comm'rs of Boulder County, 2010 U.S. Dist. LEXIS 102081, 2010 WL 3703224, at \*2-3 (D. Colo. Sept. 13, 2010)).* "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley, 461 U.S. at 434.* Although the court is obligated to exclude hours not reasonably expended from the fee award, it need not "identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a 'request for attorney's fees should not result in a second major litigation.'" *Malloy, 73 F.3d at 1018* (quoting *Hensley, 461 U.S. at 437);* *Fox v. Vice, 131 S. Ct. 2205, 2216, 180 L. Ed. 2d 45 (2011)* ("[C]ourts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection. So trial courts may take into

Grant Sullivan

account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").

Once the court has determined the number of hours reasonably spent, it must then determine a reasonable hourly rate of compensation. *Ramos, 713 F.2d at 555*. **[*10]** "A reasonable rate is the prevailing market rate in the relevant community." *Malloy, 73 F.3d at 1018* (citing *Blum v. Stenson, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984))*. Defense counsel here, an Assistant Attorney General, should be assigned a billing rate equal to her counterparts in expertise in private practice. See *Ramos, 713 F.2d at 555* ("Salaried public interest firm lawyers should be assigned a billing rate equal to their counterparts in expertise in private practice."). The party seeking the award has the burden of persuading the court that the hours expended and the hourly rate are both reasonable. *Malloy, 73 F.3d at 1018*. Once that burden has been met, "the resulting product is presumed to be the reasonable fee contemplated by *§ 1988*." Id.

The third step consists of multiplying the reasonable hourly rate by the number of hours reasonably expended to determine the "lodestar" amount. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 2011 U.S. Dist. LEXIS 90420, 2011 WL 3568165, at *2* (citing *Hensley, 461 U.S. at 433*).

Here, defendants Milyard and Long seek attorney fees totaling $5,713.00. They have filed an affidavit of defense counsel, Assistant Attorney General Kathryn A. Starnella, which includes a timekeeping report **[*11]** for attorney and paralegal time that was spent on this lawsuit. (Docket No. 55-3 and 55-4). In addition, defendants have submitted the affidavits of the two paralegals who have worked on this case. (Docket No. 55-5 and 55-6).

The time spent on this matter is reportedly: attorney time (Ms. Starnella) 23.80 hours, and paralegal time (Darlene Hill) 3.30 hours and (Elle DiMuro) 0.90 hours. These hours are supported by the detailed timekeeping records submitted. Defendants seek $220 per hour for Ms. Starnella (totaling $5,236.00), $120 per hour for Ms. Hill (totaling $396.00), and $90 per hour for Ms. DiMuro (totaling $81.00). Plaintiff has not challenged the reasonableness of the hours expended or the rates sought.

The court has followed the three-step process set forth in *Ramos v. Lamm* in evaluating the defendants' motion for attorney fees. The court has reviewed the documentation submitted by defense counsel and finds that the number of hours claimed are reasonable. The timekeeping records are sufficiently detailed, showing how much time was allotted to the various tasks. The amount of time spent on the various itemized tasks appears reasonable in light of the complexity of the case, the **[*12]** strategies pursued, and the work necessitated by the defense of this lawsuit, including preparing a motion to dismiss, responding to plaintiff's motion for preliminary injunctive relief, and preparing the motion for attorney fees. The court finds no duplication of effort. In addition, the time expended was reasonable in relation to counsel's experience. Finally, upon review of the billing entries, the court finds that the defendants are entitled to recover fees for the itemized work of the paralegals.

With regard to the reasonableness of the rates, the court is familiar with the hourly rates charged by attorneys in this area, and defendants have provided authority to establish the reasonableness of the hourly rate sought. The court finds that given defense counsel's experience, skill, and specialization, the hourly rate sought is reasonable. This court notes that Judge Arguello has found that an hourly rate of $425 was reasonable. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 2011 U.S. Dist. LEXIS 90420, 2011 WL 3568165, at *9*. The hourly rate sought here is substantially lower. The court, however, finds that the hourly rate sought for paralegal time is slightly excessive and finds that an hourly rate of **[*13]** $75 would be a reasonable hourly rate of compensation in this area.

See *Shrader v. Beann, 2012 U.S. Dist. LEXIS 88084, 2012 WL 2411969, at * (D. Colo. June 26, 2012)* ($75 is a reasonable hourly rate of compensation in this area for legal assistant time), aff'd, *503 Fed. Appx. 650, 655 (10th Cir. Nov. 29, 2012)* (district court did not abuse its discretion in the amount of attorney fees awarded to defendant).

Multiplying the reasonable hourly rate by the number of hours reasonably expended, the court finds as follows. Defendants Milyard and Long should be awarded a total of **$5551.00** as reasonable attorney fees in this action. More specifically, the amount is broken down as follows: 23.80 hours of attorney time at a rate of $220.00 per hour for a total of $5236.00, and 4.2 hours of paralegal services at a rate of $75 per hour for a total of $315.00.

**WHEREFORE**, for the foregoing reasons, it is hereby

**RECOMMENDED** that the Defendants' Motion for Attorney's Fees Pursuant to *42 U.S.C. § 1988(b)* (Docket No. 55) be **granted**, and defendants Milyard and Long be awarded attorney fees in the amount of **$5551.00**.

**NOTICE: Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Fed. R. Civ. P. 72(b)(2)*, the parties have fourteen (14) days after service [\*14] of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, *Thomas v. Arn, 474 U.S. 140, 148-53, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*, and also waives appellate review of both factual and legal questions. *Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999)*; *Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996)*.**

Date: August 23, 2013

Denver, Colorado

/s/ Michael J. Watanabe

Michael J. Watanabe

United States Magistrate Judge

---

**End of Document**

Grant Sullivan

EXHIBIT D

 Caution
As of: October 27, 2016 11:27 AM EDT

## *Stender v. Gerardi*

United States District Court for the District of Colorado

September 30, 2008, Decided; September 30, 2008, Filed

Civil Action No. 07-cv-02503-EWN-MJW

**Reporter**

2008 U.S. Dist. LEXIS 83151; 2008 WL 4452117

STEVEN A. STENDER, and INFINITY CLARK STREET OPERATING, on behalf of themselves and all others similarly situated, Plaintiffs, v. ERNEST A. GERARDI, JR., RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P. KOGOD, JAMES H. POLK III, JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED G. NEELY, ARCHSTONE-SMITH OPERATING TRUST, ARCHSTONE-SMITH TRUST, LEHMAN BROTHERS HOLDINGS, INC., and TISHMAN SPEYER DEVELOPMENT CORPORATION, Defendants.

**Subsequent History:** Motion granted by, Motion granted by, in part, Motion denied by, in part, Stay granted by *Stender v. Cardwell, 2009 U.S. Dist. LEXIS 88949 (D. Colo., Sept. 28, 2009)*

**Prior History:** *Stender v. Cardwell, 2008 U.S. Dist. LEXIS 18573 (D. Colo., Feb. 27, 2008)*

## LexisNexis® Headnotes

Real Property Law > Trusts > Real Estate Investment Trusts

*HN1* A real estate investment trust (REIT) is an entity that owns and manages income-producing real estate such as apartments, offices, and industrial space. To qualify as a REIT, an entity must, inter alia: (1) pay at least ninety percent of its taxable income to its shareholders every year; (2) have at least 100 shareholders; (3) invest at least seventy-five percent of its assets in real estate; and (4) derive at least seventy-five percent of its income from rent or mortgage interest from properties in its portfolio. Amongst the most beneficial aspects of qualifying as a REIT are the tax consequences; a REIT may deduct the dividends paid to its shareholders from its corporate tax bill. As a consequence, REITs generally do not pay federal corporate income tax, and taxes are only paid by the individual investors for dividends received and capital gains.

Real Property Law > Trusts > Real Estate Investment Trusts

*HN2* A real estate investment trust is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN3* *Fed. R. Civ. P. 12(b)(6)* provides that a defendant may move to dismiss a claim for failure to state a claim upon which relief can be granted.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN4* The court's function on a *Fed. R. Civ. P. 12(b)(6)* motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

EXHIBIT D

sufficient to state a claim for which relief may be granted. Thus, all well-pleaded factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff.

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN5* *Fed. R. Civ. P. 8(a)(2)* requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.

Civil Procedure > Pleading & Practice > Motion Practice > General Overview

*HN6* In the context of motions, arguments not raised in an opening brief are deemed abandoned and waived. However, if a district court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials. If a district court does preclude a surreply, then the court can avoid error by not relying on new materials and arguments in the movant's reply brief. Finally, although courts generally do not review issues raised for the first time in a reply brief, they make an exception when the new issues argued in reply are offered in response to arguments advanced in a response brief.

Business & Corporate
Compliance > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN7* The Federal Arbitration Act provides in part that a written provision in any contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. *9 U.S.C.S. § 2*.

Business & Corporate
Compliance > ... > Arbitration > Federal Arbitration

Act > Stay Pending Arbitration

*HN8* The Federal Arbitration Act (FAA) provides that, upon being satisfied that an issue is referable to arbitration under a written arbitration agreement, the court shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. *9 U.S.C.S. § 3*. Although there appears to be a circuit split upon the issue, the United States Court of Appeals for the Tenth Circuit holds that upon a party's proper application for a stay under *§ 3* of the FAA, district courts must stay rather than dismiss an arbitrable case.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN9* If a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN10* The statement of a claim must give the defendant fair notice of what the claim is and the grounds upon which it rests.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN11* *Fed. R. Civ. P. 23(a)(2)* states that questions of law or fact common to the class are a prerequisite for maintenance of a class action.

Business & Corporate Law > ... > Management

Grant Sullivan

EXHIBIT D

Duties & Liabilities > Causes of Action > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > General Overview

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > General Overview

**HN12** *Md. Code Ann., Corp. & Ass'ns § 2-405.1(a)* (2008), establishes duties of good faith, care, and loyalty on the part of corporate directors. *Section 2-405.1(a)* of the Maryland corporate code establishes duties of good faith, care, and loyalty on the part of corporate directors. Nonetheless, *§ 2-405.1(g)* limits the means of enforcing the statutory duties created in this section by stating: Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation. *§ 2-405.1(g)*. Construing these provisions separately or together, at least three Maryland trial courts have held that actions for breaches of fiduciary duty can only be brought derivatively, not directly, or that such duties only run only to the corporation and not to shareholders.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

**HN13** Directors' fiduciary duties under *Md. Code Ann., Corp. & Ass'ns § 2-405.1(a)* run to the corporation, not to its shareholders.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Real Property Law > Trusts > Real Estate Investment Trusts

**HN14** Although Maryland statutory law is ambiguous regarding whether the fiduciary duties

applicable to corporate directors even apply to REIT trustees, it is unambiguous in stating that statutory limitations placed thereupon clearly do. Specifically, *Md. Code Ann., Corp. & Ass'ns § 8-601.1* of the Maryland corporate code, which addresses trustee liability under Maryland REIT law, states that *Md. Code Ann., Corp. & Ass'ns § 2-405.1(d) through (g)* of this article shall apply to real estate investment trusts. *§ 8-601.1*. Thus, while Maryland REIT law does not explicitly incorporate by reference the statutory duties applicable to corporate directors codified in *§ 2-405.1(a)*, it does explicitly incorporate the statutory limitations placed thereupon, namely the limitation that nothing in *§ 2-405.1* creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation. *Md. Code Ann., Corp. & Ass'ns § 2-405.1(g)*.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > General Overview

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

Real Property Law > Trusts > Real Estate Investment Trusts

**HN15** *Md. Code Ann., Corp. & Ass'ns § 2-405.1(g)* of the Maryland corporate code, incorporated by reference through *Md. Code Ann., Corp. & Ass'ns § 8-601.1* of Maryland real estate investment trust law, restricts claims for breach of fiduciary duties premised upon trustee mismanagement to derivative, rather than direct, actions.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

EXHIBIT D

**HN16** The existence of fiduciary duties running simultaneously to both a corporation and its shareholders is perfectly reconcilable with the Maryland General Assembly's determination that nothing in *Md. Code Ann., Corp. & Ass'ns § 2-405.1*, creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation. *§ 2-405.1(g)*.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

Business & Corporate Law > ... > Actions Against Corporations > Standing > General Overview

**HN17** In deciding whether a shareholder may bring a direct suit, the question Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is "distinct" from that suffered by the corporation.

Business & Corporate Law > ... > Corporate Governance > Directors & Officers > General Overview

Governments > Courts > Judicial Precedent

**HN18** With respect to corporate governance issues, Maryland courts often look to Delaware caselaw.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > General Overview

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

**HN19** Construing Delaware law, the Maryland Court of Appeals has stated that the test to distinguish between derivative and direct harm is whether the plaintiff suffered a special injury. More

specifically, the plaintiff in a direct action must allege either an injury which is separate and district from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Torts > Procedural Matters > Commencement & Prosecution > General Overview

**HN20** The United States Court of Appeals for the Tenth Circuit has consistently refused to allow tort claims to coexist with breach of contract claims when the two are grounded in the same facts.

Governments > Legislation > Statutory Remedies & Rights

Real Property Law > Trusts > Real Estate Investment Trusts

**HN21** *Md. Code Ann., Corp. & Ass'ns §§ 8-202(c)* and *8-501(g)* (2008) grant real estate investment trusts the power to define in their declarations of trust the voting power of various classes in relation to mergers.

Business & Corporate Law > Closely Held Corporations > General Overview

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Governments > Courts > Common Law

**HN22** Maryland common law recognizes that minority shareholders are entitled to protection against fraudulent or illegal action of the majority. Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) not to exercise their control to the disadvantage of minority stockholders.

Business & Corporate Law > ... > Directors &

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *83151

Officers > Scope of Authority > General Overview

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > General Overview

**HN23** Unless acting ultra vires, illegally, or in bad faith, the directors of a corporation of the prescribed class have a statutory right to approve a sale of all its assets as an entirety at a given price, and the stockholders owning two-thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

**HN24** Civil aider and abettor liability requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.

**Counsel: [*1]** For Steven A. Stender, Infinity Clark Street Operating, on behalf of themselves and all others similarly situated, Plaintiffs: Gerald L. Bader, Jr., LEAD ATTORNEY, Renee Beth Taylor, Bader & Associates, LLC, Denver, CO; Kenneth A. Wexler, LEAD ATTORNEY, Christopher James Stuart, Edward Anthony Wallace, Wexler Toriseva Wallace, LLP, Chicago, IL; Olimpio Lee Squitieri, LEAD ATTORNEY, Maria J. Ciccia, Squitieri & Fearon, LLP, New York, NY.

For Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H. Polk, III, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R. Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely, Defendants: B. Lawrence Theis, Bobbee J. Musgrave, Holme Roberts & Owen, LLP-Denver, Denver, CO; Frederick J. Baumann, Rothgerber Johnson & Lyons, LLP-Denver, Denver, CO.

For Archstone-Smith Operating Trust, Archstone-Smith Trust, Defendants: Ashish Dinesh Gandhi, Jonathan D. Polkes, Weil Gotshal & Manges, LLP-New York, New York, NY; Cindy Coles Oliver, Frederick J. Baumann, Rothgerber Johnson & Lyons, LLP-Denver, Denver, CO; David C. Bryan, David Gruenstein, George Thomas Conway, III, Wachtell, Lipton, Rosen **[*2]** & Katz, New York, NY; Ralph I. Miller, Weil Gotshal & Manges, LLP-DC, Washington, DC.

For Lehman Brothers Holdings, Inc., Tishman Speyer Development Corporation, Defendants: Frederick J. Baumann, Rothgerber Johnson & Lyons, LLP-Denver, Denver, CO; Katherine Allison White, Roger P. Thomasch, Ballard, Spahr, Andrews & Ingersoll, LLP-Denver, Denver, CO.

**Judges:** EDWARD W. NOTTINGHAM, Chief United States District Judge.

**Opinion by:** EDWARD W. NOTTINGHAM

## Opinion

### ORDER AND MEMORANDUM OF DECISION

This is a putative class action lawsuit sounding in contract and tort. Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege that Defendants Archstone Smith Operating Trust ("Archstone UPREIT") and Archstone Smith Trust ("Archstone REIT") (collectively the "Archstone Entities"), and their individual directors, officers, and/or trustees (collectively the "Individual Defendants"), breached various contractual provisions with and fiduciary duties owed to Plaintiffs by entering into a merger with Defendants Lehman Brothers Holdings, Inc. ("Lehman"), and Tishman Speyer Development Corporation ("Tishman") (collectively **[*3]** the "Lehman-Tishman Partnership"). Plaintiffs also allege that the Lehman-Tishman Partnership aided

Grant Sullivan

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *3

and abetted the Archstone Entities' and Individual Defendants' breaches of fiduciary duties owed to Plaintiffs.

This matter is before the court on: (1) "Defendants' Motion to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim," filed January 29, 2008; (2) "Plaintiffs' Motion to Strike Section I.B of Defendants' Reply Memorandum in Further Support of Defendants' Motion to Stay or Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim or, in the Alternative, to Grant Plaintiffs Leave to File a Sur-Reply to Section I.B," filed March 14, 2008; and (3) "Motion and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification," filed February 15, 2008. Jurisdiction is purportedly proper pursuant to satisfaction of the prerequisites for diversity jurisdiction under the Class Action Fairness Act, *28 U.S.C. § 1332(d)(2)*.

## FACTS

### 1. Factual Background

The following facts relevant to Defendants' motion to dismiss are taken from Plaintiffs' class action complaint and presumed true for the purposes of this motion.

### a. Real Estate Investment [*4] Trusts ("REITs") and Umbrella Partnership Real Estate Investment Trusts ("UPREITs")

**HN1** A REIT is an entity that owns and manages income-producing real estate such as apartments, offices, and industrial space. (Class Action Compl. P 44 [filed Nov. 30, 2007] [hereinafter "Compl."].) To qualify as a REIT, an entity must, *inter alia:* (1) pay at least ninety percent of its taxable income to its shareholders every year; (2) have at least 100 shareholders; (3) invest at least seventy-five percent of its assets in real estate; and (4) derive at least seventy-five percent of its income from rent or mortgage interest from properties in its portfolio. (*Id.*) Amongst the most beneficial aspects of qualifying as a REIT are the tax consequences; a

REIT may deduct the dividends paid to its shareholders from its corporate tax bill. (*Id.* P 45.) As a consequence, REITs generally do not pay federal corporate income tax, and taxes are only paid by the individual investors for dividends received and capital gains. (*Id.*)

REIT investors enjoy the advantages of limited liability and liquidity of their shares offered by the REIT's corporate structure, but do not incur the costs of double taxation. (*Id.* P 46.) Accordingly, [*5] *HN2* a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership. (*Id.*)

An UPREIT is typically created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in exchange for limited partnership interests in the UPREIT. (*Id.* P 47.) Simultaneously, a corporation, usually the REIT, contributes cash that it raises in a public offering in return for a general partnership interest in the UPREIT. (*Id.*) The resulting partnership is called an UPREIT, and the managing general partner of the UPREIT, responsible for its strategic direction and the management and administration of its properties, is usually a REIT. (*Id.* PP 47-48.)

By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contribute by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets. (*Id.* P 49.) Sponsors can also eliminate personal liabilities encumbering their contributed properties by having the UPREIT assume such liabilities. (*Id.*) In most UPREITs, the sponsors receive limited [*6] partnership interests that are easily convertible into common stock of the managing partner REIT. (*Id.* P 50.) Thus, limited partnership interests in UPREITs are easily sellable on the open market. (*Id.*)

Sponsors who contribute property to UPREITs, as opposed to REITs, also generally enjoy the benefits of deferred taxation. (*See id.* P 55.) Specifically,

                    EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *6

while transfers of appreciated property to REITs are generally taxable events, requiring the sponsors who contribute such property to recognize gains in the amount of the excess value of the stock received over the basis of the property contributed, this tax ramification does not apply to UPREITs, which are not corporations. (*Id.*) Instead, sponsors who contribute properties to UPREITs generally enjoy tax deferred treatment of their transactions. (*See id.*)

Realizing the tax benefits and liquidity advantages of UPREITs, many real estate investors in the late 1990s -- including partnerships in which Plaintiffs were investors -- began contributing their properties to various UPREITs in exchange for limited partnership interests. (*Id.* P 56.)

### b. Archstone REIT and Archstone UPREIT

Archstone REIT was organized under Maryland law and engaged primarily **[\*7]** in the acquisition, development, redevelopment, operation, and long-term ownership of apartment communities in the United States. (*Id.* P 31.) Archstone REIT's common shares publically traded on the New York Stock Exchange. (*Id.* P 52.) Archstone UPREIT was a limited partnership organized under Maryland law, and issued limited partnership interests known as A-1 Units. [1] (*Id.* P 32.) The above-captioned Individual Defendants were all simultaneously directors, officers, and/or trustees of both Archstone Entities. (*See id.* PP 12-28.)

Archstone REIT owned approximately eighty-nine

---

[1] As discussed below, Archstone UPREIT was governed by a Declaration of Trust defining the entity as a REIT, not a limited partnership, under Maryland law. (*See, e.g.,* Defs.'s Br., Ex. A-1 Part 1 at 6 [Decl. of Trust] [defining Archstone UPREIT as a "Maryland real estate investment trust . . . formed under Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland"].) Accordingly, despite Plaintiffs' contention that Archstone UPREIT was a limited partnership, I may disregard this contention because it constitutes an erroneous legal conclusion. *See, e.g., GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997)* **[\*8]** ("Mere legal conclusions and factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").

percent of Archstone UPREIT. (*See id.* PP 31, 52.) Archstone REIT was the sole managing general partner and sole trustee of Archstone UPREIT, and it was responsible for the strategic direction of the UPREIT, as well as the management and administration of its properties. (*Id.* P 52.) Archstone REIT's relation with Archstone UPREIT was governed by Archstone UPREIT's Declaration of Trust. (*Id.* P 31.) As of December 31, 2006, the Archstone Entities owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction. (*Id.* P 53.)

The limited partners in Archstone UPREIT received limited partnership interests -- the A-1 Units -- that were convertible into common stock of Archstone REIT. (*Id.* P 54.) The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment; rather than being restricted to illiquid equity holdings in Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash, or convert **[\*9]** them into easily sellable Archstone REIT common stock. (*See id.*) Moreover, by utilizing Archstone UPREIT, A-1 Unit holders were able to contribute their property to this entity, rather than to Archstone REIT, with resultant tax deferred treatment of their transactions. (*Id.* P 55.)

### c. Plaintiffs and All Others Similarly Situated

Plaintiff Stender is an individual and former owner of A-1 Units. (*Id.* P 10.) Plaintiff Infinity is a general partnership and also a former owner of A-1 Units. (*Id.* P 11.) Plaintiffs' contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT"), an UPREIT which merged with and into Archstone UPREIT in 2001, provided that, for a period of time following closings of their real estate contributions, Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable gain. (*Id.* P 57.) If such a gain were triggered, Smith UPREIT would indemnify Plaintiffs for any resulting tax liability. (*Id.*) Plaintiffs' contribution agreements also provided

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 48 of 101

Page 8 of 25
2008 U.S. Dist. LEXIS 83151, *9

that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc., REIT. (*Id.* P 58.) Plaintiffs' **[*10]** tax protection and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITs, including those with Archstone UPREIT. (*Id.* P 60.)

Following Smith UPREIT's merger into and with Archstone UPREIT in 2001, the tax protection and liquidity provision in Plaintiffs' contribution agreements were assumed by the Archstone Entities, and also contained in Archstone UPREIT's Declaration of Trust. (*Id.* P 59.) Archstone UPREIT agreed in its Declaration of Trust, for the benefit hundreds, if not thousands, of A-1 Unit holders with tax protection and liquidity provisions virtually identical to Plaintiffs', not to sell, exchange, or other dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of Archstone UPREIT. (*Id.* P 61.) Such restrictions were to be effective until January 1, 2022. (*Id.*) Moreover, each A-1 Unit issued pursuant to contribution agreements virtually identical to Plaintiffs' was subject to a unit redemption right at the option of the A-1 Unit holder requiring Archstone UPREIT to acquire the unit holder's A-1 Units for the market price of Archstone **[*11]** REIT common shares. (*Id.* P 62.) Archstone REIT could elect to assume and directly satisfy Archstone UPREIT's redemption obligation by paying the redeeming unit holder in Archstone REIT common shares, or their cash equivalent. (*Id.*) In addition, Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to contributed properties, and A-1 Unit holders were to receive quarterly dividend distributions from Archstone UPREIT. (*Id.* P 63.) If Archstone UPREIT sold any of the contributed properties, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, Archstone UPREIT would be liable for any loss of tax benefits to Plaintiffs' and other sponsors and could be liable for monetary damages for engaging

in such undertakings. (*Id.* P 64.)

### d. The Merger

On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities at a cash purchase price of $ 64.00 per Archstone REIT common share, and $ 64.00 per Archstone UPREIT common unit. (*Id.* P 65.) On May 2, 2007, the Lehman-Tishman Partnership submitted a similar **[*12]** indication of interest reciting the same price. (*Id.* P 65.) Defendant Lehman and Defendant Tishman are Delaware corporations that own and control River Holding LP, the entity with which Archstone REIT ultimately merged, and River Trust Acquisition (MD), LLC, the entity with which Archstone UPREIT ultimately merged (collectively the "Successor Entities"). (*Id.* PP 29-30.)

In the middle of May 2007, Archstone REIT's board of trustees became aware of concerns on the part of both bidders regarding the Archstone Entities' tax protection agreements with A-1 Unit holders pertaining to such unit holders' contributed property. (*See id.* PP 67-68.) On May 23, 2007, the Lehman-Tishman Partnership offered to acquire the Archstone Entities at $ 60.00 per Archstone REIT common share and Archstone UPREIT common unit, and indicated that its reduced offer price "'was primarily a result of information obtained in [its] confirmatory due diligence regarding, among other things, the magnitude and scope of [the Archstone Entities'] tax protection arrangements . . . .'" (*Id.* P 69 [quoting a subsequent Securities and Exchange Commission filing by Archstone UPREIT].) Following further proposals and counterproposals, **[*13]** Archstone REIT publically announced on May 29, 2007, that it had signed a definitive merger agreement to be acquired by the Lehman-Tishman Partnership. (*See id.* PP 70-72.)

Pursuant to the merger agreement, the Lehman-Tishman Partnership agreed to acquire all outstanding common shares of Archstone REIT at a price of $ 60.75 per share in cash. (*Id.* P 73.) The

agreement also provided that A-1 Unit holders were entitled to one newly issued Series O Unit for each existing A-1 Unit, or, alternatively, could elect to receive: (1) $ 60.75 per A-1 Unit in cash; or (2) a combination of the cash consideration and Series O Units. (*Id.* P 74.) The agreement provided that no additional quarterly dividend would be paid to the A-1 Unit holders prior to the completion of the merger. (*Id.* P 75.)

### e. Effects of the Merger Upon Plaintiffs and All Others Similarly Situated

The merger has had negative financial consequences for A-1 Unit holders who elected to receive the cash buyout price, and those who elected to convert their A-1 Units to Series O Units. (*Id.* P 81.) A-1 Unit holders like Plaintiff Stender who elected to take the cash buyout price have had to recognize capital gains in the amount they originally **[*14]** deferred when their properties were contributed to Archstone UPREIT. (*Id.* PP 10, 82.) Conversely, A-1 Unit holders like Plaintiff Infinity who elected to convert their units to Series O Units have lost their former liquidity because they now own equity in a private company that will likely be highly leveraged with debt. (*Id.* P 83.) Moreover, such Series O Unit holders may only redeem their units at a cash redemption value of $ 60.75 plus all accumulated and unpaid distributions, if any, after five years, and only then if the total number of redemption notices the Successor Entities receive in any twelve month period does not exceed one-third of the outstanding Series O Units. (*Id.* PP 84-85.)

The merger has also negatively affected the dividend distributions A-1 Unit holders previously enjoyed. (*See id.* P 87.) Specifically, all A-1 Unit holders lost a final quarterly dividend distribution that Archstone UPREIT would otherwise have paid during the pendency of the merger, but which was suspended by the merger agreement. (*See id.* PP 75, 87.) Moreover, A-1 Unit holders who elected to convert their units to Series O Units will likely not receive further dividend distributions. (*See id.* P

87.) **[*15]** Specifically, the six percent dividend on Series O Units provided under the merger agreement is discretionary and, "according to a source at the Archstone REIT, the [Successor Entities] ha[ve] no current plan to pay dividends and do not know when [they] will begin, if ever, paying them." (*Id.*)

Finally, the adverse consequences of the merger upon former A-1 Unit holders include: (1) elimination of anti-dilution measures that formerly protected A-1 Units; (2) less favorable terms to Series O Unit holders upon dissolution, liquidation, or winding up of the Successor Entities; (3) elimination of various limitations upon managerial discretion previously embodied in Archstone UPREIT's Declaration of Trust; and (4) the less frequent issuance of financial reports to Series O Unit holders. (*Id.* P 88.)

### 2. Procedural History

On November 30, 2007, Plaintiffs filed a class action complaint in this court stating three counts for relief. (*See* Compl.) Count one alleges breach of contract against the Archstone Entities premised upon the theory that, under contribution and partnership agreements with A-1 Unit holders, the Archstone Entities agreed: (1) not to enter into any transactions or dispose of any **[*16]** interest in property that such holders had contributed to Archstone UPREIT resulting in these sponsors realizing a taxable gain; and (2) to provide such unit holders with the ability to liquidate their units by receiving cash or Archstone REIT common shares. (*Id.* PP 103-10.) Plaintiffs allege that, by accepting the merger agreement, the Archstone Entities have breached such contracts by "subject[ing] Plaintiffs . . . to adverse tax consequences or completely strip[ping] them of their liquidity rights." (*Id.* P 107.)

Count two alleges breach of fiduciary duty against Archstone REIT and the Individual Defendants, and against the Lehman-Tishman Partnership for aiding and abetting thereof, premised upon the theory of majority oppression of the minority. (*Id.*

PP 111-19.) Specifically, this count alleges that, as majority owner of Archstone UPREIT common units, Archstone REIT owed a fiduciary duty to not act in bad faith or oppress the minority owners, and that it breached this duty by voting for the merger despite the impairment to the liquidity, dividend, and tax deferral benefits of A-1 Unit holders the merger caused. (*Id.*) In addition, count two purports to state the same breaches of fiduciary **[*17]** duty against Archstone REIT acting in its capacity as sole trustee of Archstone UPREIT. (*See id.* PP 113-14.)

Count three alleges breach of fiduciary duty against Archstone REIT and the Individual Defendants, and against the Lehman-Tishman Partnership for aiding and abetting thereof, premised upon the theory of self-dealing. (*Id.* PP 120-24.) Specifically, this count alleges that as both sole trustee and majority owner of Archstone UPREIT, Archstone REIT had fiduciary duties to: (1) act in good faith; (2) not act in reckless disregard of its duties as trustee; (3) not self-deal with Archstone UPREIT on terms more beneficial to itself than to the minority unit holders; (4) deal at arms-length with Archstone UPREIT; and (5) ensure that all dealings with Archstone UPREIT satisfied an "entire fairness" standard. (*Id.* P 121.) Plaintiffs allege Archstone REIT breached these duties by, *inter alia:* (1) refusing to let A-1 Unit holders vote on the merger; (2) refusing to appoint an independent committee to act on behalf of Archstone UPREIT; (3) refusing to require separate voting on the merger by A-1 and A-2 Unit holders; and (4) refusing to allow Archstone UPREIT to engage investment and legal **[*18]** advisors to advise on the fairness of the merger from the A-1 Unit holders' perspective. (*Id.* P 122.)

On January 29, 2008, Defendants moved to stay this action in favor of arbitration, or to dismiss for failure to state a claim. (Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss For Failure to State a Claim [filed Jan. 29, 2008] [hereinafter "Defs.' Br."].) Specifically, Defendants argued that: (1) count one should be stayed or

dismissed in favor of arbitration pursuant to an arbitration clause in Archstone UPREIT's Declaration of Trust; (2) counts two and three should be dismissed due to lack of standing, exculpation clauses in Archstone UPREIT's Declaration of Trust, Maryland's business judgment rule, and provisions in Archstone UPREIT's Declaration of Trust permitting the merger; and (3) if any count is not stayed or dismissed, the court should stay the entire action in light of the arbitrable issues. (*Id.*) On February 19, 2008, Plaintiffs responded. (Pls.' Mem. in Opp'n to Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss For Failure to State a Claim [filed Feb. 19, 2008] [hereinafter "Pls.' Resp."].) On March 10, 2008, Defendants replied. **[*19]** (Reply Mot. in Further Supp. of Defs.' Mot. to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim [filed Mar. 10, 2008] [hereinafter "Defs.' Reply"].)

On February 15, 2008, Plaintiffs moved to certify their putative class. (Mot. and Mem. of Law in Supp. of Pls.' Mot. for Class Certification [filed Feb. 16, 2008] [hereinafter "Pls.' Class Certification Br."].)

On March 14, 2008, Plaintiffs moved to strike a section of Defendants' reply on the grounds that this section raised new arguments not raised in Defendants' opening brief. (Pls.' Mot. to Strike Section I.B. of Defs.' Reply Mem. in Further Supp. of Defs.' Motion to Stay or Dismiss in Favor of Arbitration and to Dismiss For Failure to State a Claim or, in the Alternative, to Grant Pls. Leave to File a Sur-Reply to Section I.B. [filed Mar. 14, 2008] [hereinafter "Pls.' Strike Br."].) On March 19, 2008, Defendants responded. (Defs.' Opp'n to Pls.' Mot. to Strike Section I.B of Defs.' Reply Mem. or, in the Alternative, to Grant Pls. Leave to File a Surreply to Section I.B [filed Mar. 19, 2008] [hereinafter "Defs.' Strike Resp."].) On March 31, 2008, Plaintiffs replied. (Pls.' Reply in Further Supp. **[*20]** of Their Mot. to Strike Section I.B. of Defs.' Reply Br. or, in the Alternative, for Leave to File a Sur-Reply [filed Mar. 31, 2008] [hereinafter

2008 U.S. Dist. LEXIS 83151, *20

"Pls.' Strike Reply"].) These matters are fully briefed and ripe for review.

## ANALYSIS

### 1. Legal Standard

*HN3* *Federal Rule of Civil Procedure 12(b)(6)* provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)* (2008). *HN4* "The court's function on a *Rule 12(b)(6)* motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc., 336 F.3d 1194, 1201 (10th Cir. 2003)* (citations and quotation marks omitted). Thus, all well-pleaded factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).*

Prior to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*, dismissal of a complaint was appropriate only when it appeared the plaintiff could prove "no [*21] set of facts" in support of the claims that would entitle him to relief. *See, e.g., Coosewoon v. Meridian Oil Co., 25 F.3d 920, 924 (10th Cir. 1994)*. In *Bell Atlantic*, the Supreme Court articulated a new "plausibility" standard, under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." *127 S. Ct. at 1974*. *Bell Atlantic* did not, however, mark a sea change. As the Court explained in a case decided two weeks after *Bell Atlantic*, *HN5* "*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)*. "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

*Id.* (quoting *Bell Atlantic, 127 S. Ct. at 1964*); *see Alvarado, 493 F.3d at 1215 n.2* (stating that *Bell Atlantic* and *Erickson* suggest "courts should look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief"); *see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 (10th Cir. 2008)* (stating [*22] that courts must take as true "all plausible, non-conclusory, and non-speculative" facts alleged in a plaintiff's complaint).

### 2. Evaluation

Defendants argue that: (1) Plaintiffs' first count should be stayed or dismissed in favor of arbitration or should be dismissed for failure to state a claim; (2) Plaintiffs' second and third counts should be dismissed due to lack of standing, exculpation clauses in Archstone UPREIT's Declaration of Trust, Maryland's business judgment rule, and provisions in Archstone UPREIT's Declaration of Trust permitting the merger; and (3) if any count is not stayed or dismissed, the court should stay the entire action in light of the arbitrable issues. (Defs.' Br.; Defs.' Reply.) Plaintiffs deny that dismissal or referral to arbitration are appropriate, and moreover contend that Defendants' argument for dismissal of count one premised upon failure to state a claim must be stricken from Defendants' briefing, or in the alternative, that Plaintiffs should be granted leave to file a surreply on this issue. (Pls.' Resp.; Pls.' Strike Br.; Pls.' Strike Reply.) Plaintiffs also move to certify their putative class. (Pls.' Class Certification Br.)

I analyze Plaintiffs' [*23] motion to strike first, and then assess each of Defendants' arguments for stay or dismissal of each of Plaintiffs' claims. I analyze Plaintiffs' motion to certify their putative class only if I find that any of Plaintiffs' counts survive dismissal or should not be referred to arbitration or stayed.

### a. Motion to Strike

Plaintiffs move to strike section I.B of Defendants' reply brief in support of their motion to stay or to

2008 U.S. Dist. LEXIS 83151, *23

dismiss upon the theory that this section raises new arguments not originally contained in Defendants' opening brief. (Pls.' Strike Br.) Alternatively, Plaintiffs request leave to file a surreply on the issues raised in this section. (*Id.*) Defendants respond that this section raised no new arguments that were not contained in their opening brief, and that their expanded argumentation in this section responded to arguments in Plaintiffs' response. (Defs.' Strike Resp.) For the following reasons, I agree with Defendants, and deny Plaintiffs' request to file a surreply.

*HN6* Arguments not raised in an opening brief are deemed abandoned and waived. *See Minshall v. McGraw Hill Broad. Co., 323 F.3d 1273, 1288 (10th Cir. 2003)* (citation omitted). However, if a district court "relies [*24] on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials." *Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006)* (citations omitted). If a district court does preclude a surreply, then the court can avoid error by not relying on new materials and arguments in the movant's reply brief. *Id.* (citation omitted). Finally, although courts generally do not review issues raised for the first time in a reply brief, they make an exception when the new issues argued in reply are offered in response to arguments advanced in a response brief. *See Beaudry v. Corr. Corp. of Am., 331 F.3d 1164, 1166 n.3 (10th Cir. 2003)*; *see also Home Design Services, Inc., v. B&B Custom Homes, 509 F. Supp. 2d 968, 971 (D. Colo. 2007)* ("'[R]eply briefs reply to arguments made in the response brief -- they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.'" [citation omitted]).

In the instant case, I find that Defendants' arguments pertaining to Plaintiffs' failure to state a claim in count one were raised in its opening brief, and hence were not "new arguments" in [*25] their reply brief requiring that I grant Plaintiffs' request to file a surreply to avoid error. *Cf. Pippin, 440 F.3d at 1192*. In their opening brief, Defendants argued that:

> Plaintiffs complain about supposed "other" contract rights -- mentioning "liquidity," "dividends," "levels of borrowings," and "financial reports," -- but they nowhere cite, quote nor attach any provision of any agreement demonstrating any continuing right on the part of any plaintiff to any of the foregoing benefits following the merger. These conclusory assertions *fail to state any cognizable basis for relief,* and must be disregarded.

(Pl.'s Br. at 7 [emphasis added].) In support of this argument, Defendants cited, *inter alia, Connolly v. Mitsui O.S.K. Lines (America), Inc., No. 04-5127, 2007 U.S. Dist. LEXIS 86490, 2007 WL 4207836 (D.N.J. Nov. 21, 2007)*, and *Parrish v. NFL Players Association, 534 F. Supp. 2d 1081 (N.D. Cal. 2007)*, both of which stand for the proposition that claims for breaches of contract may be dismissed where the plaintiffs fail to allege which provisions of which contracts are allegedly breached. (*See Defs.' Br. at 8.*) In their response brief, Plaintiffs addressed the sufficiency of the statement of their breach of contract [*26] claim under the subject heading, "Plaintiffs' Allegations Regarding Breach of Contract State a Basis for Relief." (Pls.' Resp. at 17.) Plaintiffs therein acknowledged that "Defendants also argue that the Court should reject certain allegations in the Complaint because they . . . *'fail to state any cognizable basis for relief.'*" (Pls.' Resp. at 17 [emphasis added].) Plaintiffs nonetheless failed to address *Connolly* or *Parrish. (See id.* at 17-18.) I accordingly find that Defendants' arguments pertaining to Plaintiffs' failure to state a claim in count one were not "new arguments" in their reply brief, and that their invocation of *Connolly* or *Parrish* in this reply was not the invocation of "new materials" necessitating that I grant Plaintiffs' request to file a surreply. *Cf. Pippin, 440 F.3d at 1192*. Moreover, I find Plaintiffs' contention that Defendants' arguments pertaining to Plaintiffs' alleged failure to state a

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *26

claim were new to their reply because they were subsumed within a section of Defendants' opening brief discussing the arbitrability of count one to be borderline frivolous, and note that this contention is in any event insufficient to absolve Plaintiffs from their duty to **[*27]** timely respond to Defendants' arguments. (*See, e.g.,* Pls.' Strike Br. at 2 [incorrectly claiming that Defendants' motion to dismiss only argued that count one should be stayed or dismissed in favor of arbitration].)

In addition, I find that Defendants' invocation of new authority in its reply brief relating to Plaintiffs' alleged failure to state a claim does not constitute invocation of "new materials" because this authority properly responded to arguments in Plaintiffs' response. *Cf.* *Pippin, 440 F.3d at 1192*; *see also* *Beaudry, 331 F.3d at 1166 n.3*. Responding to Defendants' argument that count one should be referred to arbitration pursuant to an arbitration clause in Archstone UPREIT's Declaration of Trust, Plaintiffs argued in part that their breach of contract claim related to "the abrogation of the Declaration of Trust in its entirety" under the merger. (Pls.' Resp. at 6.) In reply, Defendants proffered authority showing that the termination provisions in the Archstone UPREIT's Declaration of Trust are lawful, and that lawful termination of a contract cannot constitute breach. (*See* Defs.' Reply at 8-9.) I find that such authority was properly proffered in response to Plaintiffs' **[*28]** arguments, and thus does not require granting Plaintiffs' request to file a surreply. *See* *Beaudry, 331 F.3d at 1166 n.3* (considering an issue first raised in a reply brief where the issue was offered in response to an argument in a response); *see also* *Home Design Services, 509 F. Supp. 2d at 971* ("'[R]eply briefs reply to arguments made in the response brief . . . .'" [citation omitted]). Moreover, as demonstrated below, because I do not rely upon Defendants' new authority to support my holdings pertaining to count one, and I find Plaintiffs' request for leave to file a surreply on this issue is particularly unavailing. *See* *Pippin, 440 F.3d at 1192* (noting that district court may avoid error by not relying on new materials in the movant's reply brief).

### *b. Stay or Dismissal of Count One in Favor of Arbitration, or Dismissal of Count One for Failure to State a Claim*

Defendants invoke a provision of Archstone UPREIT's Declaration of Trust to prove that Plaintiffs' breach of contract claim must be stayed or dismissed for arbitration under the Federal Arbitration Act ("FAA"), and also argue that this count should be dismissed for failure to state a claim. (Defs.' Br. at 3-5; Defs.' Reply **[*29]** at 2-9.) I address each issue in turn.

### *i. Stay or Dismissal of Count One in Favor of Arbitration*

**HN7** The FAA provides in relevant part that "a written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2 (2006)*. **HN8** The FAA further provides that, upon being satisfied that an issue is referable to arbitration under a written arbitration agreement, "the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id. § 3*. Although there appears to be a circuit split upon the issue, the Tenth Circuit holds that upon a party's proper application for a stay under section three of the FAA, district courts must stay rather than dismiss an arbitrable case. *See* *Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994)* (calling a district court's dismissal of an arbitrable case when the request to dismiss was made **[*30]** under section three a "procedural error").

In the instant case, Defendants invoke a provision of Archstone UPREIT's Declaration of Trust to prove that Plaintiffs' breach of contract claim must be dismissed or stayed in favor of arbitration. (*See*

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *30

Defs.' Br. at 3-8.) In response, Plaintiffs both deny that their dispute falls within the scope of this arbitration agreement, and hint that other contracts may be the source of their alleged breach of contract claim. (*See* Pls.' Resp. at 11-18.) At the outset, I note that at least to the extent that Archstone UPREIT's Declaration of Trust is the source of Plaintiffs' breach of contract claim, I may properly consider provisions in this Declaration in connection with Defendants' motion to dismiss without converting this motion into one for summary judgment. *GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)* (**HN9** "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.") Plaintiffs neither **[*31]** dispute the authenticity of Defendants' proffered Declaration of Trust, nor dispute that the terms contained therein apply to them. (*See* Pls.' Resp. at 11-18; Defs.' Br. at 5 n.2, Ex. A Part 1 at 21 [Decl. of Trust] ["This <u>Annex A</u> constitutes not only an integral part of the Declaration of Trust but also a separate agreement among all holders of Units . . . of the Trust, each of whom is identified on the books and records of the Trust. Each holder of Untis on the Effective Date . . . shall become a party to this agreement without further action required on the part of any such holder." (emphasis in original)].)

The arbitration clause of the Declaration of Trust provides that if any Unit holders fail to resolve their disputes with Archstone UPREIT through good faith negotiation:

> [T]he Trust and the [Unit holder] shall jointly retain a nationally recognized independent public accounting firm ("an Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of any of the covenants set forth [in] Section 2 . . . has occurred and, if so,

the amount of damages to which the [Unit holder] **[*32]** is entitled as a result thereof, determined as set forth in Section 4(a)). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of any of the covenants set forth in Section 2 . . . and the amount of damages payable to the [Unit holder] under Section 4(a) shall be final, conclusive, and binding on the Trust and the [Unit holder].

(Defs.' Br., Ex. A Part 4 at 21 [Decl. of Trust].) Section 2(a) provides in relevant part that:

> The Trust agrees for the benefit of each [Unit holder], for the term of the Protected Period, not to directly or indirectly sell, exchange, transfer, or otherwise dispose of any Protected Property or any interest therein . . . to the extent that such disposition would cause a [Unit holder] to recognize part or all of the gain that would have been recognized for federal income tax purposes upon a fully taxable disposition of one or more Protected Properties . . . . Without limiting the foregoing, the term "sale, exchange, transfer or disposition by the Trust shall be deemed to include, and the prohibition shall extend to, (i) any disposition by any Subsidiary of the Trust of any Protected Property or any interest therein **[*33]** . . . .

(*Id.,* Ex. A Part 4 at 14 [Decl. of Trust].) "Protected Properties" refers to properties contributed by Unit holders, and the "Protected Period" extends until January 1, 2022. (*See id.*) Finally, Section 2(c) further provides:

> Any merger or consolidation involving the Trust or any Subsidiary of the Trust, whether or not the Trust is the surviving entity in such merger or consolidation, that results in [a Unit holder] being required to recognize part or all of part of the gain that would have been recognized for federal income tax purposes upon a fully taxable disposition of one or more Protected Properties . . . shall be deemed to be a disposition of the Protected Properties for the

purposes of Section 2(a).

(*Id.,* Ex. A Part 4 at 16 [Decl. of Trust].)

I find that, at least to the extent count one alleges a breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, it must be stayed for arbitration under the above-cited language. Count one alleges that under "property contribution agreements and partnership agreements" between Plaintiffs and Archstone UPREIT, the Archstone Entities "agreed not to enter into any transactions or dispose of any interest in the **[*34]** property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain . . . ." (Compl. PP 104-05.) In addition, count one incorporates by reference every preceding paragraph of the complaint. (*Id.* P 103.) Discussing the tax deferral provisions provided in their contribution agreements with Smith UPREIT, Plaintiffs represent in earlier paragraphs of the complaint that such provisions were "assumed by . . . the declaration of trust governing the Archstone UPREIT and Archstone REIT." (*Id.* P 59.) Moreover, Plaintiffs represent that:

> [T]he Archstone UPREIT agreed in its Declaration of Trust, for the benefit of hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2002.

(*Id.* P 61.)

While the source of Plaintiffs' alleged contractual rights relating to tax deferral are thus unclear -- Plaintiffs **[*35]** appear to argue that the source is either their contribution agreements with Smith UPREIT, or the reiteration of the provisions in such agreements in Archstone UPREIT's Declaration of

Trust, or both -- I find that, at least to the extent that count one alleges breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, it must be stayed for arbitration. A claim for breach of contract relating to the tax deferral provisions of the Archstone UPREIT's Declaration of Trust premised upon the effects of the merger falls squarely within Section 2(a) of the Declaration of Trust because, under Section 2(c), a merger causing a Unit holder such as Plaintiff Stender to recognize a taxable gain that would otherwise have been deferred is deemed to be "a disposition of the Protected Properties" that triggers Section 2(a)'s indemnification provisions. (*See* Defs.' Br., Ex. A Part 4 at 14, 16 [Decl. of Trust].) Moreover, under the Declaration's arbitration clause, Archstone UPREIT and the unit holder must retain an accounting firm to arbitrate "whether a breach of any of the covenants set forth [in] Section 2 . . . has occurred." (*Id.,* Ex. A Part 4 at 21 [Decl. of Trust].) Accordingly, **[*36]** I find that, at least to the extent that it claims a breach of the tax deferral provisions of Archstone UPREIT's Declaration of Trust, count one must be stayed for arbitration. *See, e.g., Nat'l Am. Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288, 1290 (10th Cir. 2004)* (determining whether arbitration is required by "look[ing] to the scope of [the] agreement and then determin[ing] whether [a plaintiff's] claims fall within the scope").

In so holding, I note Plaintiffs' argument that their dispute is not arbitrable because it does not constitute a sale, exchange, transfer, or other disposition of their contributed property within the meaning of Section 2(a) ignores the clear language of Section 2(c), and suggests that Plaintiffs are either intentionally trying to mislead the court, or have failed to completely read the Declaration. (*Compare* Pls.' Resp. at 12-17 [claiming that "(t)he express language of Section 2 clearly shows that the subject matter of this provision relates only to a taxable gain that is recognized by a (unit holder) as a result of the Trust disposing of protected property"], *with* Defs.' Reply at 2-6 [quoting Section 2(c), which expands the purview of Section 2(a) into **[*37]** mergers].) Additionally, I find

2008 U.S. Dist. LEXIS 83151, *37

Plaintiffs' suggestion that arbitration may be inappropriate because Section 2 only applies to Plaintiffs and other putative class members who contributed their property to Smith UPREIT, as opposed to all putative class members, to be without merit as: (1) Plaintiffs have cited no law to this effect; (2) Defendants have cited persuasive law to the contrary; (3) Plaintiffs allege that their breach of contract claim relating to tax deferral provisions in the Declaration of Trust pertains to "hundreds, if not thousands of A-1 unit holders;" (4) and -- as discussed next -- Plaintiffs have failed to state a claim for breach of any contribution agreement, thus obviating my need to determine whether such claims are properly before me, or must instead be referred to arbitration. (*See* Pls.' Resp. at 2 n.2; Defs.' Reply at 3 n.3 [citing *Robey v. Shapiro, Marianos & Cejda, LLC, 434 F.3d 1208, 1213 (10th Cir. 2006)* (finding dismissal of class-action allegations prior to class certification proper where the class representative failed to state a claim on his own behalf)]; Compl. P 61.) Finally, I note that, despite Defendants' request to either dismiss or stay Plaintiffs'  **[*38]** breach of contract claim in favor of arbitration, they have only moved for relief under section three of the FAA, and I accordingly lack the authority to dismiss rather than stay count one. (*See* Defs.' Br. at 6); *cf. Armijo v. Prudential Ins. Co. of Am., 72 F.3d 793, 796-97 & n.3 (10th Cir. 1995)* (intimating that dismissal of claims under the FAA is appropriate where a party both invokes section four of the FAA and requests dismissal).

Based on the foregoing, I find that count one must be stayed for arbitration to the extent that it alleges breach of the tax deferral provisions in Archstone UPREIT's Declaration of Trust.

## ii. Dismissal of Count One for Failure to State a Claim

As indicated above, the source of Plaintiffs' alleged contractual rights relating to tax deferral are unclear; such rights could either allegedly arise from the putative class members' contribution

agreements with Smith UPREIT, Archstone UPREIT's Declaration of Trust, or class members' contribution agreements with other entities with which Archstone UPREIT previously merged. (*See* Compl. PP 56-64; 103-10.) More specifically, in addition to its allusions to breach of tax deferral covenants, count one refers to breach  **[*39]** of contractual provisions in unspecified "contribution agreements and partnership agreements" that allegedly "provide A-1 Unit holders . . . with the ability to liquidate their units by receiving cash or converting them to common shares in the publically traded Archstone REIT." (*Id.* P 105.) Moreover, in their response to Defendants' motion to dismiss, Plaintiffs argue that their breach of contract claim derives from the loss of liquidity and dividend rights for class members like Plaintiff Infinity that were allegedly "contractually guaranteed pursuant to [their] contribution and partnership agreements," and the recognition of taxable gain for class members like Plaintiff Stender who elected to cash out their A-1 Units. (Pls. Resp. at 14.) Plaintiffs nonetheless acknowledge that their complaint "did not specifically cite the contribution and partnership agreements that are referenced." (*Id.* at 18.)

I find that, to the extent not arbitrable, count one must be dismissed for failure to state a claim. The Supreme Court holds that **HN10** the statement of a claim must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson, 127 S. Ct. at 2200* (quoting  **[*40]** *Bell Atlantic, 127 S. Ct. at 1964*). In the instant case, because Plaintiffs fail to cite any contractual language from contribution and partnership agreements that were allegedly breached -- or even to specify whether these contribution and partnership agreements, as opposed to their reiteration in Archstone UPREIT's Declaration of Trust, form the basis of their alleged breach of contract claim as it relates to tax deferral rights -- I find that they have not given Defendants fair notice of what their claim is, and the grounds upon which it rests. *See, e.g., Connolly, 2007 U.S. Dist. LEXIS 86490, 2007 WL 4207826, at *10*

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *40

(dismissing breach of contract claim for failure to state a claim where a plaintiff "fails to allege or submit any contractual terms in her" complaint); *Parrish, 534 F. Supp. 2d at 1094* (dismissing complaint where, *inter alia,* "[c]opies of any agreements actually signed by plaintiffs, or recitations of terms contained therein, [were] conspicuously absent from the complaint"). In contrast to the arbitrable issue of whether Archstone UPREIT must indemnify Plaintiff Stender and others similarly situated for taxable gains they incurred by electing the cash consideration option during the merger, I **[*41]** find that Plaintiffs have not adequately alleged breach of contract relating to alleged liquidity or dividend rights because they have not adequately indicated which provisions of which contracts allegedly contain such rights. (*See* Compl. PP 56-64; 103-10.) Instead, throughout both the complaint and their briefing on all matters before me, Plaintiffs studiously avoid specifying the alleged contractual source of their dividend and liquidity rights, instead schizophrenically implying that these rights derive from unspecified "contribution and partnership agreements," the Archstone UPREIT's Declaration of Trust, some mysterious combination -- or abrogation -- of these two sources, or abstract legal principles. (*See, e.g.,* Compl. PP 104-06 [alleging that their liquidity and dividend rights arise from "contribution and partnership agreements" and "statutory and common law partnership principles"]; Pls.' Resp. at 2 [arguing that their "contract claim arises solely from Defendants' wholesale and wrongful abrogation of the Declaration of Trust through the Merger"], 14 [claiming that their liquidity and dividend rights arise from "contribution and partnership agreements"]; Pls.' Class Certification **[*42]** Br. at 4 [asserting that Archstone UPREIT's Declaration of Trust "preserved all of the tax and liquidity provisions of the original agreements applicable to all class members"].) Because I find that such ambiguity in Plaintiffs' complaint, only muddied by the "explanation" in their briefing, deprives Defendants of a fair opportunity to respond to

Plaintiffs' complaint after determining whether the allegedly breached covenants even exist, or are subject to arbitration or potential pre-litigation defenses, I find that this count must be dismissed for failure to state a claim. Alternatively, I note that, even if I had found that Plaintiffs state a claim for breach of contract, I would still have been unable to certify their putative class because the ambiguity in both their complaint and their class certification motion precludes me from meaningfully assessing whether they share common questions of law or fact with the putative class members in relation to this claim. *See* **HN11** *Fed. R. Civ. P. 23(a)(2)* (2008) (stating that "questions of law or fact common to the class" are a prerequisite for maintenance of a class action).

Based on the foregoing, I find count one must be dismissed for failure **[*43]** to state a claim to the extent that it alleges breach of any alleged contractual tax deferral, dividend, or liquidity rights derived from any source other than Archstone UPREIT's Declaration of Trust, or breach of any alleged dividend or liquidity provisions of the Declaration of Trust.

### c. Dismissal of Counts Two and Three for Lack of Standing, Exculpation Clauses in Archstone UPREIT's Declaration of Trust, Maryland's Business Judgment Rule, and Provisions in the Declaration of Trust Permitting the Merger

Counts two and three allege breaches of fiduciary duties by Archstone REIT acting through the Individual Defendants, and aided and abetted by the Lehman-Tishman Partnership, arising from Archstone REIT's majority ownership of Archstone UPREIT, and from its role as "sole trustee" of Archstone UPREIT. (Compl. PP 111-24.) Because fiduciary duties arising from managerial control of corporations differ from fiduciary duties owed from majority shareholders to minority shareholders, I address these two categories of fiduciary duties separately despite the unfortunate intermingling of allegations in Plaintiffs' complaint. (*See, e.g., id.* P 113 [alleging that "[a]s majority owner, the

EXHIBIT D

Archstone [*44] REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners"].) At the outset, I note that both parties apparently agree that Maryland law controls Plaintiffs' breach of fiduciary duty claims. (*See* Compl. PP 31-32 [representing that both Archstone REIT and Archstone UPREIT were "organized under Maryland law"]; Defs.' Br. at 8 & nn.3-4 [asserting that Maryland law controls Plaintiffs' claims under the internal affairs doctrine]; Pls.' Resp. at 18-34 [arguing that counts two and three assert breaches of fiduciary duties under Maryland law]); *Great W. Producers Co-Op v. Great W. United Corp., 200 Colo. 180, 613 P.2d 873, 875* & n.2, 878 & n.4 (Colo. 1980) (applying corporate law of a defendant's state of incorporation to assess "the responsibility of [its] board of directors").

### i. Archstone REIT's Fiduciary Duties as "Sole Trustee" of Archstone UPREIT

Although in largely conclusory fashion, both counts two and three allege breaches of fiduciary duty by Archstone REIT -- presumably acting through the Individual Defendants -- in its capacity of "sole trustee" of Archstone UPREIT. [*45] (*See* Compl. PP 111-24.) The allegedly offending acts, moreover, all relate to Archstone REIT's exercise of managerial control over Archstone UPREIT preceding and during the merger. [2](*See, e.g., id.* PP 114 [alleging breach of fiduciary duties based upon Archstone REIT's "negotiating, formulating and voting in favor of the Merger"], 122 [alleging

---

[2] I note in this regard that although Plaintiffs purport to represent that Archstone REIT had direct managerial control over Archstone UPREIT as "sole trustee" by virtue of its majority ownership, it appears from both Archstone UPREIT's Declaration of Trust and Maryland law controlling REITs that Archstone REIT only had indirect managerial control over this entity by virtue of electing its "sole trustee" — the equivalent of a corporate director — by voting its majority A-2 units. (See, e.g., Defs.' Br., Ex. A Part 1 at 11 [Decl. of Trust] [stating that "(o)nly Class A-2 Common Unitholders shall have the right to vote in the election of Trustees"]); *MD. CODE ANN., CORPS. & ASS'NS § 8–202(b)(1)(v)–(vi)* (2008) (providing for election of trustees by shareholders).

breach of fiduciary duties based upon Archstone REIT's refusal: (1) to allow A-1 Unit holders to vote on the merger; (2) to appoint an independent committee to act on behalf of Archstone UPREIT; (3) to allow A-1 Unit holders to vote separately as a class upon the merger; and (4) to allow Archstone UPREIT to engage investment and legal advisors to advise on the fairness of the merger from the A-1 Unit holders' perspective].) At the outset, I note that neither party addressed the issue of how fiduciary duties might allegedly flow from Archstone REIT -- or even the Individual Defendants in their capacities as directors, officers, and/or trustees of this entity -- to Plaintiffs, who are unit holders of a separate entity, Archstone UPREIT. Nonetheless, rather than unravel this mystery, I may assume without deciding that such fiduciary duties might [*46] flow from this entity to Plaintiffs because, for the reasons explained below, I find that claims for breach of fiduciary duty premised upon mismanagement of the merger are derivative claims that must be brought by, or on behalf of, Archstone REIT. Alternatively, I note that, despite Plaintiffs' exceedingly confused presentation of their own claims, their statement of counts two and three against the Individual Defendants might be construed as alleging claims against these defendants in their capacities as directors, officers, and/or trustees of Archstone UPREIT. (*See* Compl. at 26, 28, PP 12-28 [alleging the Individual Defendants were all simultaneously directors, officers, and/or trustees of both Archstone Entities].) To the extent that the complaint should properly be so read, the same result ultimately obtains because claims for breaches of fiduciary duty against even the Individual Defendants in their capacities as agents for Archstone UPREIT would be derivative claims for the same reasons explained below. Finally, I note that both parties agree that if Plaintiffs lack standing to assert counts two and three against Archstone REIT and the Individual Defendants directly, their claims [*47] against the Lehman-Tishman Partnership must also fail. (*See* Defs.' Br. at 10-11, Pls.' Resp. at 7 n.7); *see also, e.g., Feldman v. Cutaia, 956 A.2d 644, 2007 Del.*

2008 U.S. Dist. LEXIS 83151, *47

Ch. LEXIS 111, 2007 WL 5211892, at *12 (Del. Ch. 2007) (stating the "unsurprising proposition that an aiding and abetting claim premised upon a derivative cause of action is necessarily derivative itself").

In challenging Plaintiffs' statement of breach of fiduciary duty claims against Archstone [*48] REIT in its capacity as "sole trustee" of Archstone UPREIT, Defendants argue that counts two and three should be dismissed due to: (1) lack of standing; (2) exculpation clauses in Archstone UPREIT's Declaration of Trust; (3) Maryland's business judgment rule; and (4) provisions in Archstone UPREIT's Declaration of Trust permitting the merger. (Defs.' Br. at 9-17.) For the reasons demonstrated below, I need only reach Defendants' first argument.

Although counts two and three are vague about the alleged source of the fiduciary duties flowing from Archstone REIT to Plaintiffs, claiming only that such duties arise because Archstone REIT is "sole trustee . . . of Archstone UPREIT," Plaintiffs clarify in their briefing that such duties allegedly arise "by virtue of being trustees of a trust owned by Unit holders." (Pls.' Resp. at 23; see also note 1, supra.) While the missing subject or subjects of this phrase -- who or what are allegedly trustees of which trust? -- highlights the ambiguity in Plaintiffs' argument regarding the capacity in which Archstone REIT and the Individual Defendants allegedly owe fiduciary duties to Plaintiffs, this argument at least establishes that the alleged fiduciary [*49] duties flow from these defendants' exercise of managerial control as trustee(s) over Archstone UPREIT. [3] Reinforcing this conclusion,

Plaintiffs invoke as the apparent basis for their alleged fiduciary duty claims a provision of the Maryland corporate code reciting that directors of a corporation must comply with the duties of good faith, loyalty, and care in their performance of managerial functions. (See Pls.' Resp. at 23 & n.9 [citing MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(a) and case law construing this provision].) Because this provision is the only alleged source of fiduciary duties flowing from Archstone REIT in its capacity as "sole trustee" of Archstone UPREIT referenced in Plaintiffs' briefing, and because I am unaware of any other source of fiduciary duties applicable to Archstone REIT or the Individual Defendants beyond the duties owed by majority shareholders to minority shareholders discussed below, I analyze Plaintiffs' standing to bring counts two and three under Maryland law construing this provision.

HN12 Section 2-405.1(a) of the Maryland corporate code establishes duties of good faith, care, and loyalty on the part of corporate directors. See MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(a) (2008); see also, e.g., Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 133 (Md. 2000) (observing that [*51] directors' duties to act in good faith, in the best interest of the corporation, and with due care derive from section 2-405.1[a]). Nonetheless, section 2-405.1(g) limits the means of enforcing the statutory duties created in this section by stating: "Noting in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation." Id. § 2-405.1(g). Construing these provisions separately or together, at least three Maryland trial courts have held that actions for breaches of fiduciary duty can only be brought

---

[3] Plaintiffs' complete representation is as follows: "The complaint alleges, as required [a] fiduciary relationship arising out of contractual relation and by virtue [*50] of being trustees of a trust owned by Unit holders and by virtue of majority ownership . . . ." (Pls.' Resp. at 23.) I analyze below the sufficiency of Defendants' alleged breach of fiduciary duties arising from Archstone REIT's "majority ownership" of Archstone UPREIT. (See Analysis § 2[b][ii], infra.) Moreover, I note that the complaint contains no well-pled allegations suggesting "a fiduciary relationship arising out of

contractual relation[s]" between Plaintiffs and Archstone REIT or the Individual Defendants, and note that such a claim would, in any event, be non-cognizable under Tenth Circuit law. See, e.g., Foodbrands Supply Chain Services v. Terracon, Inc., No. Civ.A 02-2504-CM, 2003 U.S. Dist. LEXIS 25279, 2003 WL 23484633, at *6 (D. Kan. Dec. 8, 2003) ("[T]he Tenth Circuit [has] consistently refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts." [citations omitted]).

EXHIBIT D

2008 U.S. Dist. LEXIS 83151, *51

derivatively, not directly, or that such duties only run only to the corporation and not to shareholders. *See* In re Laureate, No. 24-C-07-000664, 2007 Md. Cir. Ct. LEXIS 11, *6 (Md. Cir. Ct. June 26, 2007) (slip op.) (calling the language of section 2-405.1[g] "clear and unambiguous" and holding that it bars a direct claim by shareholders for breach of fiduciary duties); *Carley v. Kopko*, No. 03-C-06-008836, at *4 (Md. Cir. Ct. Apr. 2, 2007) (slip op.) ("[P]ursuant to Maryland law, a claim for breach of fiduciary duty against a corporate officer or director may only be pursued as a derivative, not a direct, action." [citations omitted]); **[*52]** Patterson v. Patterson, 2006 Md. Cir. Ct. LEXIS 18, 2006 WL 990998, at *5 (Md. Cir. Ct. Jan. 31, 2006) (construing section 2-405.1[g], and stating that "[b]ecause it is Plaintiff . . . who has brought this suit on his own behalf, and he is not suing in the right of the Corporation for any injury done to the corporation, the Defendant directors have no duty to Plaintiff under this section"). Although in slightly ambiguous language, the Maryland Court of Appeals appears to hold that **HN13** directors' fiduciary duties under section § 2-405.1(a) run to the corporation, not to its shareholders. *See* Werbowsky, 766 A.2d at 133 (describing fiduciary duties under section § 2-405.1[a], and stating "[t]hat obligation runs, however, to the corporation and not, at least directly, to the shareholders").

I find that the language of section 2-405.1(g) is clear and unambiguous, and that it bars direct claims for breaches of fiduciary duty premised upon Archstone REIT's and the Individual Defendants' alleged acts of mismanagement as "sole trustee[s]" for Archstone UPREIT. *See* MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(g) (2008). **HN14** Although Maryland statutory law is ambiguous regarding whether the fiduciary duties applicable to corporate directors **[*53]** even apply to REIT trustees, it is unambiguous in stating that statutory limitations placed thereupon clearly do. Specifically, section 8-601.1 of the Maryland corporate code, which addresses trustee liability under Maryland REIT law, states that "[s]ections . . . 2-405.1(d) through (g) . . . of this article shall

apply to real estate investment trusts." *Id.* § 8-601.1. Thus, while Maryland REIT law does not explicitly incorporate by reference the statutory duties applicable to corporate directors codified in section 2-405.1(a), it does explicitly incorporate the statutory limitations placed thereupon, namely the limitation that "[n]othing in [section 2-405.1] creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation." *Id.* § 2-405.1(g). Accordingly, I find that **HN15** section 2-405.1(g) of the Maryland corporate code, incorporated by reference through section 8-601.1 of Maryland REIT law, restricts claims for breach of fiduciary duties premised upon trustee mismanagement to derivative, rather than direct, actions. *See id.* §§ 2-405.1(g), 8-601.1; *see also, e.g.,* In re Laureate, No. 24-C-07-000664, 2007 Md. Cir. Ct. LEXIS 11, at *6. Moreover, because **[*54]** Plaintiffs have failed to include any allegations that they either made a demand upon Archstone REIT's (or Archstone UPREIT's) board of trustees to redress their grievances before filing the instant action, or that such demand would have been futile, I find they have failed to satisfy both the pleading and substantive prerequisites for a derivative action brought in federal court under Maryland law. *See* Fed. R. Civ. P. 23.1(b)(3)(A)-(B) (2008) (requiring a complainant in a derivative action to "state *with particularity* . . . any effort made . . . to obtain the desired action from the directors or comparable authority . . . [or] the reasons for . . . not making the effort" [emphasis added]); Werbowsky, 766 A.2d at 133-35 (discussing the requirement of pleading demand or futility under Maryland substantive law).

In arguing against the conclusion above, Plaintiffs advance two arguments that merit discussion. (*See* Pls.' Resp. at 19-22 & n.8.) First, Plaintiffs proffer Maryland cases reciting that, the above-cited authority notwithstanding, corporate directors' fiduciary duties run to *both* the corporation *and* its shareholders. (*See, e.g., id.* at 20 [quoting, *e.g.,* Mona v. Mona Elec. Group, Inc., 176 Md. App. 672, 934 A.2d 450, 463 (Md. Ct. Spec. App. 2007)

[*55] ("The directors of a corporation stand in fiduciary relation to the corporation and to its stockholders.")].) I find such authority unavailing because, even assuming it is reconcilable with the Maryland Court of Appeals' recitation in *Werbowsky* that directors' fiduciary duties "run[] . . . to the corporation and not, at least directly, to the shareholders," the existence of duties running simultaneously to *both* the corporation *and* the shareholders proves nothing about the proper vehicle for redressing alleged breaches thereof. *See Werbowsky, 766 A.2d at 133*. Specifically, *HN16* the existence of fiduciary duties running simultaneously to both the corporation and its shareholders is perfectly reconcilable with the Maryland General Assembly's determination that "[n]othing in *[section 2-405.1]* creates a duty of any director of a corporation *enforceable* otherwise than by the corporation or in the right of the corporation." *Id. § 2-405.1(g)* (emphasis added). In other words, even assuming that corporate directors owe direct fiduciary duties to shareholders under Maryland law, such duties run alongside duties owed to the corporation, and the Maryland Assembly has unambiguously directed that all [*56] such duties may only be enforceable by, or on behalf of, the corporation. *See id.*

Second, Plaintiffs invoke Maryland common law discussing when shareholders' claims may be brought directly, rather than derivatively, and thereby suggest that their breach of fiduciary duty claims are appropriately brought directly. (*See* Pls.' Resp. at 22 n.8.) For the following reasons, I disagree. First, I find common law discussing when claims are appropriately brought directly versus derivatively irrelevant in light of the Maryland Assembly's unambiguous determination that claims for breach of fiduciary duties created by *section 2-405.1(a)* may only be brought derivatively. *See id.* Second, and alternatively, I find for the following reasons that, even assuming such law is relevant, or that some source other than *section 2-405.1(a)* creates fiduciary duties on the part of Archstone REIT and the Individual Defendants acting as "sole trustee" of Archstone UPREIT, counts two and

three are still derivative claims under Maryland common law, and thus fail for lack of allegations relating to demand or futility in Plaintiffs' complaint.

*HN17* "In deciding whether a shareholder may bring a direct suit, the question Maryland [*57] courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is 'distinct' from that suffered by the corporation." *Strougo v. Bassini, 282 F.3d 162, 170 (2d Cir. 2002)* (citing *Tafflin v. Levitt, 92 Md. App. 375, 608 A.2d 817, 820 [Md. 1992]*.) In addition, *HN18* "[w]ith respect to corporate governance issues, Maryland courts often look to Delaware caselaw." *Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc., No. Civ. RBD 05-841, 2005 U.S. Dist. LEXIS 26837, 2005 WL 2989343, at *3 & n.10 (D. Md. Nov. 3, 2005)* (citations omitted). *HN19* Construing Delaware law, the Maryland Court of Appeals has stated that "[t]he test to distinguish between derivative and direct harm is whether the plaintiff suffered a 'special injury.'" *Paskowitz v. Wohlstadter, 151 Md. App. 1, 822 A.2d 1272, 1277 (Md. 2003)* (citations omitted). More specifically, the plaintiff in a direct action "must allege either an injury which is separate and district from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." [*58] *Id.* (citations and internal quotation marks omitted).

I find that, to the questionable extent Maryland or Delaware common law is applicable at all, such law defines counts two and three as derivative claims. In both counts, the gravamen of Plaintiffs' complaint is that Archstone REIT's and the Individual Defendants' actions preceding and during the merger caused Plaintiffs to receive inadequate consideration for their A-1 Units. (*See, e.g.,* Compl. PP 3 [claiming that the $ 60.75 consideration price was inadequate in light of the

alleged tax deferral, liquidity, and dividend rights lost during the merger], 118 [alleging that Plaintiffs were "coerc[ed] . . . into converting their A-1 Units for cash with less than fair value"], 123 [alleging that Plaintiffs "have sustained loss and damage to the value of their A-1 Units"].) I find that such alleged injuries are not "'distinct' from that suffered by the corporation" because they derive from injury to the corporation itself -- *i.e.*, from diminution in value of Archstone UPREIT's equity. *Strougo, 282 F.3d at 170* (citation omitted). Similarly, under persuasive Delaware law, I find Plaintiffs' alleged injury is not direct because it is not "an [*59] injury which is separate and distinct from that suffered by other shareholders." *Paskowitz, 822 A.2d at 1277*. On the contrary, Plaintiffs' alleged injury is identical to the injuries allegedly sustained by all A-1 Unit holders, as ironically highlighted by Plaintiffs' outstanding motion to certify their class. (*See* Pls.' Class Certification Br. at 14-15 [arguing that Plaintiffs' alleged injuries are typical of the putative class members].)

Both counts two and three also allege injuries related to Plaintiffs': (1) inability to vote on the merger; (2) inability to vote as a class; and (3) Archstone REIT's refusal to appoint investment or legal advisors to consult on interests of A-1 Unit holders. (*See* Compl. PP 118, 122.) As such, these counts might state wrongs "involving a contractual right of a shareholder, such as the right to vote, or to assert majority control." *See Paskowitz, 822 A.2d at 1277*. In turn such counts, if properly pleaded, could state direct claims against Archstone REIT, at least under Delaware law. *See id.* Nonetheless, such claims would sound in contract, not tort, and are thus not properly included under counts two and three. *See, e.g., Terracon, 2003 U.S. Dist. LEXIS 25279, 2003 WL 23484633, at *6* [*60] (*HN20* "[T]he Tenth Circuit [has] consistently refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts." [citations omitted]). Even if I considered these claims separately as contract claims, I would still find they fail to state a claim for relief because, as with Plaintiffs' alleged breach of contract claim

relating to alleged tax deferral, liquidity, and dividend rights, Plaintiffs nowhere cite any contractual provisions conferring upon A-1 Unit holders the right to vote on the merger, the right to vote by class, or the right to have Archstone REIT appoint an independent committee or investment or legal advisors to consult on the merger. *See, e.g., Erickson, 127 S. Ct. at 2200*; *Connolly, 2007 U.S. Dist. LEXIS 86490, 2007 WL 4207826, at *10*; *Parrish, 534 F.Supp. 2d at 1094*. On the contrary, Archstone UPREIT's Declaration of Trust appears to affirmatively disclaim most, if not all, of these alleged "rights." For example, the Declaration recites that mergers need only be approved "by the Unitholders holding at least a majority of the then outstanding Units *(including any Units held by the Trustee)*," thus foreclosing the argument that Plaintiffs had a contractual [*61] right to vote by class on the merger. (*See* Pls.' Br., Ex. A Part 3 at 17 [Decl. of Trust] [emphasis added]); *see also HN21 MD. CODE ANN., CORPS. & ASS'NS §§ 8-202(c), 8-501(g)* (2008) (granting REITs the power to define in their declarations of trust the voting power of various classes in relation to mergers). Similarly, the Declaration recites in a section entitled, "No Obligation to Consider Separate Interests of Other Unitholders," that absent bad faith "the Trustee is under no obligation to consider the separate interests of the other Unitholders (including, without limitation, the tax consequences to the other Unitholders) in deciding whether to cause the Trust to take (or decline to take) any actions." (*Id.*, Ex. A Part 3 at 5 [Decl. of Trust].) As discussed below, I find there are no well-pled allegations of bad faith in Plaintiffs' complaint. (*See* Analysis § 2[b][ii], *infra.*) In short, to whatever extent counts two and three properly allege breaches of contract rather than breaches of fiduciary duty, I find they fail to state a claim, and would in any event likely be foreclosed by the affirmative disclaimers in the Declaration of Trust.

Based on the foregoing, I find Plaintiffs lack [*62] standing to bring counts two and three to the extent that these counts allege breaches of fiduciary duty by Archstone REIT acting in its capacity of

EXHIBIT D

"sole trustee" of Archstone UPREIT.

### ii. Archstone REIT's Fiduciary Duties as Majority Unit Holder of Archstone UPREIT

As indicated above, counts two and three also allege breaches of fiduciary duty by Archstone REIT arising from its majority ownership of Archstone UPREIT. (Compl. PP 111-24.) Nonetheless, despite the styling of Plaintiffs' second count as "BREACH OF FIDUCIARY DUTIES -- MAJORITY OPPRESSION OF THE MINORITY A-1 UNIT HOLDERS," (Compl. at 26), the only alleged act recited in either counts two or three committed by Archstone REIT in its capacity as majority shareholder -- as opposed to as "sole trustee" of Archstone UPREIT-- is "voting in favor of the [m]erger." (*Id.* P 114.) Although they do not dispute that Plaintiffs may have standing to bring majority oppression claims directly rather than derivatively, Defendants argue that Plaintiffs have failed to state a claim for majority oppression of the minority. (Defs.' Br. at 17-19; Defs.' Reply at 16-18); *see also Twenty Seven Trust v. Realty Growth Investors, 533 F. Supp. 1028, 1039 n.22 (D. Md. 1982)* [*63] (applying Maryland law, and noting that under persuasive authority, claims for majority oppression of the majority may be brought directly, not derivatively). For the following reasons, I agree with Defendants.

*HN22* "Maryland common law recognizes that minority shareholders are entitled to protection against fraudulent or illegal action of the majority." *Mona, 934 A.2d at 464*. "Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) not to exercise their control to the disadvantage of minority stockholders." *Id.* (citation and internal quotation marks omitted).

Despite this broad recitation of majority fiduciary duty principles, the Maryland Court of Appeals has directly addressed the duties majority shareholders owe to minority shareholders in a transaction remarkably similar to the one at bar. In *Homer v.*

*Crown, Cork & Seal Company,* the court addressed the duties owed by majority to minority shareholders where a dissenting minority shareholder filed a bill in equity seeking to enjoin a shareholder meeting called to authorize the sale of all of a corporation's assets. *155 Md. 66, 141 A. 425 (1928)*. The court stated:

> [T]he gravamen [*64] of the complaint is inadequacy of price. The fundamental difference between the majority and minority stockholders on this record is simply whether the value of the assets for the purpose of a sale in their entirety is the market value of the shares of the stock or their book value. It is not perceived how holding to either view is practicing a fraud. . . . Aside from the fraud to be imputed from the price to be paid, there has been found no well-pleaded allegations from which fraud affirmatively appears. . . .

> *HN23* Unless acting ultra vires, illegally, or in bad faith, the directors of a corporation of the prescribed class have a statutory right to approve a sale of all its assets as an entirety at a given price, and the stockholders owning two-thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action.

*Id. at 433-34*.

In the instant case, I find that Plaintiffs fail to state a claim for breach of fiduciary duty in counts two and three premised upon the theory of majority oppression [*65] of the minority because, as in *Homer,* the gravamen of their complaint is that Archstone REIT's actions in voting for the merger caused Plaintiffs to receive inadequate consideration for their A-1 Units. (*See, e.g.,* Compl. PP 3, 118, 123.) To be sure, counts two and three also allege injuries arising from Plaintiffs' alleged disenfranchisement, and Archstone REIT's refusal to appoint investment or legal advisors, but such

EXHIBIT D

allegations: (1) relate to Archstone REIT's actions in its managerial capacity as "sole trustee" of Archstone UPREIT; (2) properly sound in contract; and (3) fail to state a claim, as discussed above. (*See* Compl. P 118, 122); *see also* Analysis § 2[b][i], *supra.*) Accordingly, unless Archstone REIT was acting "ultra vires, illegally, or in bad faith" by voting for the merger, I find it had a property right to vote for the merger regardless of the "folly and consequence" of this vote, *i.e.,* any diminution in value of the A-1 Units. *Homer, 141 A. at 434*. Plaintiffs essentially concede that Archstone REIT had a right to vote for the merger absent evidence of bad faith, but string cite to six paragraphs of their complaint that purportedly demonstrate bad faith. (*See* Pls.' **[*66]** Resp. at 24, 28, 30 [citing paragraphs 3, 8, 12, 79, 112 and 114 of the complaint].) Plaintiffs proffer no argumentation that Archstone UPREIT acted ultra vires or illegally in voting for the merger. (*See id.*) Upon review of Plaintiffs' string-cited paragraphs, I find that: (1) two recite bare legal conclusions, (*see* Compl. PP 8, 114); (2) one irrelevantly recites that a single Individual Defendant is a director/trustee of both Archstone Entities, (*see id.* P 12); (3) one irrelevantly recites that Archstone REIT was 89% owner of Archstone UPREIT, (*see id.* P 112); and (4) two claim that the $ 60.75 merger consideration was inadequate in light of the tax deferral, liquidity, and dividend rights that were allegedly lost during the merger, (*see id.* PP 3, 79). Because none of these paragraphs discusses Archstone REIT's purportedly ulterior motive in voting for the merger -- instead merely discussing the *effects* of this merger upon Plaintiffs -- I find that none suggests that Archstone REIT voted for the merger in bad faith. *See, e.g., Homer, 141 A. at 433* (noting on similar facts that "[a]side from the fraud imputed from the price to be paid, there has been found no well-pleaded allegations **[*67]** from which fraud affirmatively appears"); *Cooperative Milk Serv. v. Hepner, 198 Md. 104, 81 A.2d 219, 224 (Md. 1951)* (stating that majority shareholders become fiduciaries when they "use their voting power for . . . for some ulterior purpose adverse to the interests

of the corporation"); *Patterson, 2006 Md. Cir. Ct. LEXIS 18, 2006 WL 990998, at *5* (granting motion to dismiss where complaint contained "no statement of fact as to what the ulterior motives are . . ." [emphasis in original]).

Based on the foregoing, I find that Plaintiffs have also failed to state claims in counts two and three for breaches of fiduciary duties allegedly arising from Archstone REIT's majority ownership of Archstone UPREIT. The statement of these claims against the Lehman-Tishman Partnership also fail for lack of an underlying tort. *See Alleco Inc. v. Harry & Jeanette Weinberg Found., 340 Md. 176, 665 A.2d 1038, 1050 (Md. 1995)* (**HN24** "[C]ivil aider and abettor liability . . . requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable.").

### 3. Conclusion

Based on the foregoing it is therefore ORDERED that:

1. PLAINTIFFS' motion to strike (# 54) is DENIED.

2. DEFENDANTS' motion (# 29) to dismiss or stay in favor of arbitration **[*68]** is GRANTED; the case is STAYED for arbitration to the extent that count one alleges breach of the tax deferral provisions in Archstone UPREIT's Declaration of Trust but is otherwise DISMISSED.

3. PLAINTIFFS' motion to certify class (# 39) is DENIED as MOOT.

4. Any final judgment entered at the conclusion of the case shall reflect a judgment in favor of Defendants and against Plaintiffs, dismissing Plaintiffs' second and third counts for relief with prejudice. Any final judgement shall also reflect a judgment in favor of Defendants and against Plaintiffs, dismissing Plaintiffs' first count for relief with prejudice to the extent that this count alleges breach of any alleged contractual tax deferral, dividend, or liquidity

2008 U.S. Dist. LEXIS 83151, *68

rights derived from any source other than Archstone UPREIT's Declaration of Trust, or breach of any alleged dividend or liquidity provisions of the Declaration of Trust.

5. The case shall be ADMINISTRATIVELY CLOSED pursuant to *D.C.COLO.L.Civ.R. 41.2*, subject to reopening for good cause.

Dated this 30th day of September, 2008.

BY THE COURT:

/s/ Edward W. Nottingham

EDWARD W. NOTTINGHAM

Chief United States District Judge

---

**End of Document**

Grant Sullivan

 Caution
As of: October 27, 2016 11:27 AM EDT

## *Lucas v. Kmart Corp.*

United States District Court for the District of Colorado

July 27, 2006, Decided ; July 27, 2006, Filed

Civil Action No. 99-cv-01923-JLK-CBS

**Reporter**

2006 U.S. Dist. LEXIS 51420; 18 Am. Disabilities Cas. (BNA) 695

CARRIE ANN LUCAS, DEBBIE LANE, JULIE REISKIN, EDWARD MUEGGE, ROBERT G. GEYER, STACY BERLOFF, JEAN RYAN, JAN CAMPBELL, on behalf of themselves and all others similarly situated, Plaintiffs, v. KMART CORPORATION, Defendant.

**Subsequent History:** Class certification granted by, Objection overruled by *Lucas v. Kmart Corp., 2006 U.S. Dist. LEXIS 51439 (D. Colo., July 27, 2006)*

**Prior History:** *Lucas v. Kmart Corp., 2006 U.S. Dist. LEXIS 21521 (D. Colo., Mar. 22, 2006)*

## LexisNexis® Headnotes

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN1* In determining the total amount of the common fund, it is proper to include agreed-upon fees and costs in addition to class damages.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN2* Under the Tenth Circuit's common fund doctrine, courts apply one of two methods of determining reasonable attorneys' fee awards: by a percentage of the fund approach; or by the lodestar

plus multiplier ("enhanced multiplier") approach, whereby the reasonable hours expended are multiplied by a reasonable hourly rate, adding a multiplier to account for risk. In the Tenth Circuit, there is a preference for the percentage of the fund method in common fund cases. The United States Court of Appeals for the Tenth Circuit has concluded that whichever method for fee calculation is employed, the district court must consider 12 Johnson factors.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN3* The lodestar is the product of the number of hours reasonably expended on a case and a reasonable hourly rate.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN4* Hourly rates must reflect the prevailing market rates in the relevant community. Because of the significant resources and skill required, as well the risks entailed, to litigate large-scale actions on behalf of a class, very few attorneys handle such cases. Thus the relevant community for purposes of determining a reasonable billing rate for class counsel likely consists of attorneys who litigate nationwide, complex class actions.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN5* In the context of reasonable attorneys' fees,

EXHIBIT D

2006 U.S. Dist. LEXIS 51420, *51420

the Johnson factors are (1) the time and labor required; (2) the novelty and difficulty of the question presented by the case; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN6** The customary attorneys' fee award is 30% of the fund under the percentage of the fund approach. Under the enhanced lodestar approach, courts typically award multipliers of two to three times the lodestar.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN7** In the context of reasonable attorneys' fees, the United States Court of Appeals for the Tenth Circuit has recognized that rarely are all of the Johnson factors applicable.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN8** State law controls both the award of and the reasonableness of attorneys' fees awarded where state law supplies the rule of decision. Where a plaintiff successfully obtains benefits for the class under both state and federal claims, fees may be awarded under state law. Thus if a plaintiff successfully obtains benefits for a class on a state

law claim, and state law permits recovery under the common fund or enhanced lodestar doctrines, then the plaintiff may seek a fee recovery based on these doctrines.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN9** Where a class action settlement results in a monetary fund for the class, courts applying California law blend two doctrines, the enhanced lodestar doctrine and the percentage-of-the-benefit doctrine. Under California law, the primary method for establishing the amount of "reasonable" attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented. When a class action settlement includes a common fund, a court should adjust the lodestar multiplier to ensure that the fee award, as a percentage of the overall common fund, is within the range of fees freely negotiated in the legal marketplace in comparable litigation.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN10** In the context of reasonable attorneys' fees, California has a relatively permissive attitude on the use of multipliers. Various factors may justify an award of a multiplier, including (1) the novelty and difficulty of the questions involved; (2) the skill displayed in presenting them; (3) the extent to which the nature of the litigation precluded other employment by the attorneys; and (4) the contingent nature of the fee award. A court may then use the percentage-of-the-benefit analysis to

EXHIBIT D

2006 U.S. Dist. LEXIS 51420, *51420

"cross-check" the propriety of a lodestar fee award.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN11* In the context of reasonable attorneys' fees, California courts place particular emphasis on contingency risk, which is one of the most common fee enhancers. A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN12* In the context of reasonable attorneys' fees under California law, the purpose of the cross-check is to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation. The simplest way for the law to duplicate the bargain that informed parties would reach is to look to fee award levels in actions brought by sophisticated private parties under the same or comparable statutes.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

*HN13* Under both California law and the law of the Tenth Circuit, reasonable costs may be awarded to successful plaintiffs in a class action. *Cal. Code Civ. Proc. § 1032(b)*. As with attorneys' fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred.

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

*HN14* Attorney's fees can be awarded for post-judgment monitoring and other efforts to ensure compliance with court orders in a civil rights case.

**Counsel:** **[*1]** For Carrie Ann Lucas, Debbie Lane, Julie Reiskin, for themselves and all others similarly situated, Plaintiffs: Amy Farr Robertson, Fox & Robertson, P.C., Denver, CO; Antonio Michael Lawson, Lawson Law Offices, Oakland, CA; Bill Lann Lee, Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, CA; Brian D. East, Advocacy, Inc.-Austin, Austin, TX; Denette Vaughn, Advocacy, Inc., Lubbock, TX; , Advocacy, Inc.-Lubbock, Lubbock, TX; Kevin William Williams, Colorado Cross-Disability Coalition, Denver, CO; L. Javier Cavazos, L. Javier Cavazos, Atty at Law, Harlington, TX; Mari Mayeda, Mari Mayeda, Attorney at Law, Berkeley, CA; Michael Wayne Breeskin, Arc of Denver, Inc., Denver, CO; Steven R. Greenberger, DePaul College of Law, Chicago, IL; Timothy Patrick Fox, Fox & Robertson, P.C., Denver, CO.

For Stacy Berloff, Jan Campbell, Robert Geyer, Edward Muegge, Jean Ryan, Plaintiffs: Amy Farr Robertson, Fox & Robertson, P.C., Denver, CO.

For Kmart Corporation, Defendant: David F. McDowell, Morrison & Foerster, LLP-Los Angeles CA, Los Angeles, CA; Robert A. Naeve, Morrison & Foerster, LLP-Irvine California, Irvine, CA; Steven M. Kaufmann, Morrison & Foerster, LLP-Colorado, **[*2]** Denver, CO.

Richard Quintana, Claimant, Pro se, Sterling, CO.

Marc Miller, Interested Party, Pro se, Bloomington, IL.

**Judges:** John L. Kane, SENIOR U.S. DISTRICT COURT JUDGE.

**Opinion by:** John L. Kane

# Opinion

### ORDER GRANTING CLASS COUNSEL'S UNOPPOSED PETITION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

2006 U.S. Dist. LEXIS 51420, *2

This matter is before the Court in connection with Class Counsel's Unopposed Petition for an Award of Attorneys' Fees and Costs ("Petition"). Class Counsel seek compensation for their work in securing a settlement on behalf of a Nationwide Class seeking relief under Title III of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12181 et seq.*, and a Damages Sub-Class seeking relief under the laws of seven states. Defendant Kmart Corporation ("Kmart") has agreed to pay the amount sought by Class Counsel, subject to Court approval. In addition, after an extensive, Court-approved program to notify the class of the terms of the settlement, including the amount of fees and costs sought by Class Counsel, there have been no objections to the requested award. For the reasons set forth below, this Court grants the Petition, and approves the fees and costs sought **[*3]** by Class Counsel.

## BACKGROUND

### I. The Litigation.

In 1999, Fox & Robertson entered into a contingency fee agreement to bring suit against Kmart based on alleged violations of Title III of the ADA. Although initially brought only on behalf of one plaintiff, the complaint was amended in 2000 to assert a nationwide class action.

The evidence submitted by Class Counsel demonstrates that they performed a significant amount of work in connection with Plaintiffs' motion for class certification. This included, for example: reviewing over 100,000 pages of documents, as well as a database with data from over 65,000 "mystery shopper" reports; taking or defending over 50 depositions of fact and expert witnesses; interviewing, and obtaining declarations from, approximately 80 putative class members; and writing, or responding to, more than 15 briefs on the class certification issue.

Plaintiffs filed their final class certification brief on January 4, 2002; two weeks later, Kmart filed a voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code, *11 U.S.C. §§ 101 et seq.*, in the Bankruptcy Court for the Northern District of Illinois. Plaintiffs **[*4]** moved to lift the bankruptcy stay, which was denied by the bankruptcy court. Plaintiffs unsuccessfully appealed the denial.

After Kmart emerged from bankruptcy on May 6, 2003, it argued that the class claims for injunctive relief had been discharged by its bankruptcy. This Court held that the injunctive claims had not been discharged, and that the case could proceed.

Between the summer of 2003 and the summer of 2005, the parties continued to litigate the case, submitting opposing briefs on discovery matters and recent relevant decisions in other cases. On July 13, 2005, this Court granted Plaintiffs' motion for class certification and certified a nationwide class of individuals who use wheelchairs or scooters and who shop at Kmart stores. Kmart immediately sought and obtained permission from the Tenth Circuit to appeal that decision under Fed. R. Civ. P. ("Rule") 23(f). Briefing of the appeal has been continued pending settlement negotiations.

During the course of this litigation, Kmart has been represented by two large, Denver-area law firms and three other large law firms based in other cities around the country; a sixth large, national **[*5]** firm represented Kmart during its bankruptcy.

### II. The Settlement.

In August 2005, the parties initiated settlement negotiations that resulted in the settlement agreement before this Court. The parties carefully structured the settlement negotiations. The parties reached agreement concerning a large part of the injunctive relief before turning to damages, and the negotiations concerning damages and injunctive relief were kept completely separate from one another. Further, the parties did not discuss attorneys' fees until there was substantial agreement on all parts of the injunctive and damages settlement.

The settlement agreement provides injunctive relief

EXHIBIT D

that is comprehensive and far-reaching, resulting in immediate improvements in Kmart's policies relating to accessibility, as well as surveys of each of Kmart's stores to identify, and remedy, architectural barriers. *See  Lucas v. Kmart Corp., 234 F.R.D. 688, 691-92 (D. Colo. 2006)*. In addition, the settlement creates a $ 13 million fund on behalf of a Damages Sub-Class, which Class Counsel believes is the largest monetary settlement ever of a public accommodations disability discrimination case.

The [*6] Damages Sub-Class fund provides compensation for the release of claims for statutory minimum damages under the laws of the seven Statutory Minimum Damages States.  *Lucas, 234 F.R.D. at 692*. The formula approved by this Court to allocate the damages fund among these states took into account two factors: the number of Kmart stores in the state, and the minimum amount of statutory damages recoverable in the state.  *Id. at 695*. Based on this formula, California receives over $ 12 million of the fund, in large part because California state law provides by far the largest amount of minimum statutory damages of any state.

In the settlement agreement, Kmart also agreed to pay, subject to Court approval, $ 3.25 million in attorneys' fees for work done prior to the final approval date, and costs incurred through that date in an amount not to exceed $ 125,000. In addition, Kmart agreed to pay Class Counsel's reasonable fees and costs relating to implementing and monitoring the Agreement after final approval.

### III. Class Counsel.

The majority of work on behalf of the class in this case was performed by the firm of Fox & Robertson. Class Counsel has submitted [*7] the following evidence concerning the firm.

Fox & Robertson is a small firm, consisting (for most of the litigation) of two attorneys, Tim Fox and Amy Robertson, and (for the period 2000 to 2002) of attorney Michael Breeskin as well.

Fox & Robertson has a strong emphasis in representing plaintiffs in disability rights cases, and has represented plaintiffs, or appeared in cases, in California, Colorado, Florida, Massachusetts and Virginia.

Mr. Fox graduated from Stanford Law School in 1991, and Ms. Robertson graduated from Yale Law School in 1988. Together they formed Fox & Robertson in 1996, and since then have litigated dozens of disability rights cases, including several large class actions -- according to Ms. Robertson, courts have appointed Fox & Robertson as class counsel in six disability rights class actions. Mr. Fox and Ms. Robertson have written and spoken extensively on issues relating to the rights of persons with disabilities.

Mr. Breeskin graduated from Georgetown University Law Center in 1975. He has had extensive experience in the field of disability rights, including working for disability rights organizations for nine years before joining Fox & Robertson. He, too, [*8] has written and spoken extensively on disability rights issues.

The evidence demonstrates that this litigation placed a heavy burden on Fox & Robertson. The vast majority of costs were fronted by Fox & Robertson. At several points during the litigation, Fox & Robertson was unable to take on new cases because of its commitment to the Kmart case. For example, in 2001, almost 50% of the total hours billed at Fox & Robertson were for work on this case.

Fox & Robertson's co-counsel practice in communities across the country. Many of these attorneys are known nationally for their skill in disability, civil rights and/or class action cases.

### ARGUMENT

Kmart has agreed to pay $ 13 million in damages, $ 3.25 million in fees, and $ 125,000 in costs, resulting in an overall monetary recovery of $ 16,375,000. Class Counsel seek an award of fees in

the amount of $ 3.25 million, which represents less than 20% of the total monetary recovery, [1] and a multiplier of 1.87 on Class Counsel's combined lodestar. For the reasons set forth below, this Court grants Class Counsel's Petition under the Tenth Circuit's common fund approach. In the alternative, the Court grants the Petition under California's [*9] enhanced lodestar approach.

## I. Recovery Of Fees Under Tenth Circuit Law.

### A. Legal Background.

Class Counsel seek recovery of their fees and costs [*10] under the common fund doctrine as applied in this Circuit. *HN2* Under this doctrine, courts apply one of two methods of determining reasonable attorneys' fee awards: by a percentage of the fund approach; or by the lodestar plus multiplier ("enhanced multiplier") approach, whereby the reasonable hours expended are multiplied by a reasonable hourly rate, adding a multiplier to account for risk. *Vaszlavik v. Storage Tech. Corp., 2000 U.S. Dist. LEXIS 21129, Civ. Action No. 95-B-2525, slip. op. at 2 (D. Colo. March 9, 2000)* (citing *Uselton v. Commercial Loveless Motor Freight, Inc., 9 F.3d 849, 853 (10th Cir. 1993)* & *Rosenbaum v. MacAllister, 64 F.3d 1439, 1445 (10th Cir. 1995))*. In the Tenth Circuit, there is "'a preference for the percentage of the fund method' in common fund cases." *Id.* (citations omitted). "The Tenth Circuit has concluded that whichever method for fee calculation is employed, the District Court must consider the 12 factors articulated in *Johnson*

---

[1] *HN1* In determining the total amount of the common fund, it is proper to include agreed-upon fees and costs in addition to class damages. *See, e.g.,* **Staton v. Boeing Co., 327 F.3d 938, 972 (9th Cir. 2003)** (holding that "the parties may negotiate and agree to the value of a common fund (*which will ordinarily include an amount representing an estimated hypothetical award of statutory fees*) and provide that, subsequently, class counsel will apply to the court for an award from the fund, using common fund fee principles." (Emphasis added.); *Johnston v. Comerica Mortgage Corp., 83 F.3d 241, 246 (8th Cir. 1996)* ("The award to the class and the agreement on attorney fees represent a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery.").

*v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974).*" *2000 U.S. Dist. LEXIS 21129, [WL] at 3* (citations omitted).

## B. Lodestar Computation.

*HN3* The lodestar is the product of the number of hours reasonably expended [*11] on a case and a reasonable hourly rate. *See, e.g., Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998)*. Class Counsel have submitted detailed billing records, along with the Declaration of Darold W. Killmer, an expert on attorneys' fees.

### 1. Reasonable Number of Hours.

Mr. Killmer reviewed fee records, along with Fox & Robertson's entire case file, including pleadings and documents. He found the fee records to be "very detailed, and [to] provide a clear basis for understanding the tasks performed and the time expended for those tasks . . . easily meet[ing] the standards typically required in this judicial district for compensability of time spent."

This litigation has spanned the course of seven years. During that time, Class Counsel have: interviewed scores of class members; taken or defended more than 50 depositions; reviewed, analyzed and organized over 100,000 pages of documents, in addition to a database with almost 70,000 mystery shopper reports; written or responded to over 15 briefs on the class certification issue alone; briefed the issue of whether, under *Rule 23(f)*, the Tenth Circuit should accept an interlocutory appeal of the [*12] class certification decision; attempted to have the bankruptcy stay lifted; and negotiated the settlement. [2]

---

[2] The fact that Plaintiffs were unsuccessful in opposing Kmart's *Rule 23(f)* appeal, or in lifting the stay, does not preclude Plaintiffs from recovering fees for work done on these tasks. *See Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* (Holding that when a plaintiff achieves excellent results, "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and

EXHIBIT D

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 72 of 101

Page 7 of 12
2006 U.S. Dist. LEXIS 51420, *12

To accomplish these tasks, Class Counsel and their staff **[*13]** billed approximately 6,500 hours, of which less than 5,000 hours were billed by attorneys. Fox & Robertson, in the exercise of billing judgment, has reviewed its fee statement and eliminated certain entries. Finally, Mr. Killmer has reviewed Class Counsel's records and, in his expert opinion, the number of hours billed by Class Counsel in this case is reasonable.

This Court finds that the number of hours billed by Class Counsel in this case is reasonable.

## 2. Reasonable Hourly Rates.

*HN4* Hourly rates must reflect the prevailing market rates in the relevant community. Because of the significant resources and skill required, as well the risks entailed, to litigate large-scale actions on behalf of a class, very few attorneys handle such cases. Thus the relevant community for purposes of determining a reasonable billing rate for Class Counsel likely consists of attorneys who litigate nationwide, complex class actions. *See, e.g., Casey v. City of Cabool, 12 F.3d 799, 805 (8th Cir. 1994)* ("'A national market or a market for a particular legal specialization may provide the appropriate market.'" (Quotation omitted.)). This rate would be significantly higher than the **[*14]** rate prevailing in Denver. Class Counsel have chosen to take a conservative approach and have applied rates applicable in the Denver legal community.

In analyzing reasonable hourly rates, Class Counsel have specifically addressed the rates of Fox & Robertson attorneys, who billed the majority of hours in this case, and have applied "blended" rates for all other attorneys, and for paralegals and other staff.

### a. Hourly rates for Fox & Robertson attorneys.

Class Counsel seek a rate of $ 330 per hour for work performed by Fox & Robertson attorneys on the Kmart case. Class Counsel have submitted the following evidence to establish that this is the prevailing rate in the Denver community:

!  The expert opinion of Mr. Killmer;

!  The hourly rates approved by Colorado federal and state courts in successful employment and civil rights actions over the last several years.

!  A survey conducted by the Colorado Bar Association in 2000 (the "CBA Survey"), reflecting that the top 5% of plaintiff's employment lawyers (a reasonable comparison to the type of work performed in this case) charged $ 325 per hour. In light of the fact that six years have passed since the CBA survey, **[*15]** the rate requested here -- $ 330 per hour -- is conservative.

### b. Hourly rates of other timekeepers.

The other attorneys who worked on the Kmart case on behalf of the class include attorneys known nationally for their skill in civil rights and class action cases who would command the highest rates in any jurisdiction in which they practiced, as well as less experienced attorneys. Class Counsel have applied a blended average rate of $ 275 per hour for all hours billed by non-Fox & Robertson attorneys, including partners and associates, which Mr. Killmer opines is a conservative approach.

Class Counsel have also applied a blended average rate of $ 110 per hour for work done by paralegals in this case, a rate that Mr. Killmer opines is reasonable for the Denver community. This rate is also supported by the CBA Survey, which found that six years ago, experienced paralegals charge between $ 75 and $ 120 per hour.

This Court finds that the rates applied by Class Counsel are reasonable. Based on these rates and the total hours billed, the total lodestar in this case is $ 1,734,947.50.

---

the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."). In any event, Class Counsel used the research conducted in connection with that unsuccessful motion and appeal in making their successful argument that this case was not discharged in bankruptcy.

## C. Application of the *Johnson* Factors.

**HN5** The *Johnson* factors are: (1) the time [**\*16**] and labor required; (2) the novelty and difficulty of the question presented by the case; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson, 488 F.2d at 717-19*, cited in *Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 3*.

### 1. Time and labor required.

This case involved a significant amount of time and labor. The case took seven years to litigate. During that time, Class Counsel and their staff billed more than 6,500 hours for work done on this case. This work included: interviewing, and obtaining declarations from, over 80 class members; taking or defending more than 50 depositions across the country; reviewing and organizing over 100,000 pages of documents; reviewing and analyzing a [**\*17**] database of over 65,000 mystery shopper reports; writing and responding to numerous briefs on the class certification issues, among others; and engaging in extensive settlement negotiations.

### 2. Novelty and Difficulty of the Questions Presented by the Case.

This case involved several novel and/or difficult issues, including:

! The appropriate standard in the Tenth Circuit for the grant of an interlocutory appeal under *Fed. R. Civ. P. 23(f)* of an order granting class certification;

! Whether the class claims for injunctive relief,

attorneys' fees and costs were discharged by Kmart's bankruptcy; and

! Whether merchandise on moveable displays must be on an accessible route at least 36 inches wide.

### 3. Skill Requisite to Perform the Legal Service Properly.

This case involved numerous novel and/or difficult legal and factual issues, many of which have not been fully resolved by the courts. Litigating such issues required a high degree of specialized skill in disability rights law and complex litigation. *See Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 3*. It also required a small firm and co-counsel to manage and present a large [**\*18**] quantity of documents and information.

The result in this case is outstanding. The injunctive relief obtained by the class includes policy changes as well as surveys of every Kmart store that will result in the removal of architectural barriers. To the best of Class Counsel's knowledge, the damages recovery for the Damages Sub-Class is larger than in any previous case of this kind.

### 4. Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case.

Large-scale class actions such as this case -- involving dozens of depositions, over 100,000 pages of documents, a large database, numerous briefs, and a bankruptcy proceeding -- necessarily require a great deal of work, and a concomitant inability to take on other cases. That is particularly true here because most of the work was done by Fox & Robertson, a small firm with only two attorneys at present.

### 5. The Customary Fee.

The requested fee is reasonable under either the percentage of the fund or enhanced lodestar approach. Class Counsel seek less than 20% of the fund, which is over $ 1.6 million less than **HN6** the

customary fee award of 30% of the fund under the percentage of the fund approach. *See Vaszlavik [\*19] , 2000 U.S. Dist. LEXIS 21129, slip op. at 7; see also* 4 Robert Newberg, *Newberg on Class Actions* § 14:6 at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."). Under the enhanced lodestar approach, courts typically award multipliers of 2 to 3 times the lodestar, whereas Class Counsel here seek only a multiplier of 1.87. *See Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 5*.

**6. Whether the Fee Is Fixed or Contingent.**

Class Counsel pursued this case based on a contingent fee agreement, and thus they would have recovered nothing if they had not prevailed. "Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee." *Vaszlavik,2000 U.S. Dist. LEXIS 21129, slip op. at 6*.

**7. Any Time Limitations Imposed by the Client or the Circumstances.**

The size, magnitude and procedural posture of this case imposed significant time limitations on Class Counsel in this case, particularly Fox & Robertson. The time limitations were particularly significant given the prospect of a substantial delay resulting from the *Rule 23(f)* interlocutory appeal, lengthy trial and subsequent appeals.

**[\*20] 8. The Amount Involved and the Results Obtained.** Class Counsel recovered $ 13 million on behalf of the subclass. Class Counsel believe that this is the largest recovery in a class action against a public accommodation for disability discrimination. Given the significant risk that the plaintiffs would recover nothing for their efforts, this result more than justifies the requested fee. *See Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 6*.

**9. The Experience, Reputation and Ability of the**

Attorneys.

The Class Counsel in this case include attorneys with national reputations for their work on disability rights cases, and skill in litigating civil rights and class action cases. Together the result achieved by Class Counsel is exceptional.

**10. The Undesirability of the Case.**

Given the risk of no recovery and the unsettled legal issues described above, this was not a desirable case to take. *See Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 7*.

**11. The Nature and Length of the Professional Relationship with the Client.**

This factor is irrelevant in this case. [3]

**[\*21] 12. Awards in Similar Cases.**

As set forth above, the amount of fees requested by Class Counsel is substantially less than is typically awarded under either the enhanced lodestar or percentage of the fund approach.

This Court finds that the fees requested by Class Counsel are reasonable under Tenth Circuit precedent both because the *Johnson* factors support the request, and because the requested fees are significantly less than the amount of fees typically awarded in common fund cases.

**II. Recovery Of Fees Under California Law.**

In the alternative, the Court grants the Petition under California law.

---

[3] *HN7* The Tenth Circuit has recognized that "rarely are all of the *Johnson* factors applicable." *Brown v. Phillips Petroleum Co., 838 F.2d 451, 456 (10th Cir. 1988)*. Fox & Robertson, which is one of the few firms in the country that represents plaintiffs in disability rights actions, has represented the named plaintiffs in other cases. This fact does not impact the fees analysis. *See, e.g., Ruiz v. Estelle, 553 F. Supp. 567, 594 (S.D. Tex. 1982)* (Finding, in discussing this factor, that "[t]he meaning of this criterion and its effect on the calculation of a 'reasonable' fee has always been unclear. Courts applying to *Johnson* factors typically state simply that this particular standard is irrelevant or immaterial.")

2006 U.S. Dist. LEXIS 51420, *21

## A. Applicability of California Law.

*HN8* State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision. *See, e.g.*, *Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002)* (holding that "[b]ecause Washington law governed the claim, it also governs the award of fees."); *Mathis v. Exxon Corp., 302 F.3d 448, 461 (5th Cir. 2002)*; *Pub. Serv. Co. of Colo. v. Continental Cas. Co., 26 F.3d 1508, 1520 (10th Cir. 1994)*. Where, as here, a plaintiff successfully **[\*22]** obtains benefits for the class under both state and federal claims, fees may be awarded under state law. *See, e.g.*, *Mangold v. Cal. Pub. Utils. Comm'n, 67 F.3d 1470, 1478-79 (9th Cir. 1995)*. Thus if a plaintiff successfully obtains benefits for a class on a state law claim, and state law permits recovery under the common fund or enhanced lodestar doctrines, then the plaintiff may seek a fee recovery based on these doctrines. *See, e.g.*, *Mangold, 67 F.3d at 1478-79* (affirming an award of a fee multiplier based on state law); *Vizcaino, 290 F.3d at 1047-48* (holding that where a state law claim resulted in a settlement fund, the lower court correctly applied the common fund doctrine based on state law.).

In this case, Plaintiffs were successful, obtaining benefits for the class on both their federal claim, and their claims under California state law, resulting in a California settlement fund of over $ 12 million. Thus the requested fee may be approved based on California law.

## B. California Attorneys' Fee Law.

*HN9* Where, as here, a class action settlement results in a monetary fund for the class, courts applying California law **[\*23]** blend two doctrines, the enhanced lodestar doctrine and the percentage-of-the-benefit doctrine.

Under California law,

> [T]he primary method for establishing the amount of "reasonable" attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.

*Lealao v. Beneficial California, Inc., 82 Cal. App. 4th 19, 97 Cal. Rptr. 2d 797, 803 (Cal. Ct. App. 2000)*. When a class action settlement includes a common fund, a court should adjust the lodestar multiplier to ensure that the fee award, as a percentage of the overall common fund, is within the range of fees freely negotiated in the legal marketplace in comparable litigation. *Id. at 821*.

## C. Multiplier.

Class Counsel's request of a multiplier of 1.87 is well supported by California **[\*24]** law.

*HN10* California has a "relatively permissive attitude on the use of multipliers." *Lealao, 97 Cal. Rptr. 2d at 815*. Various factors may justify an award of a multiplier, including: (1) the novelty and difficulty of the questions involved; (2) the skill displayed in presenting them; (3) the extent to which the nature of the litigation precluded other employment by the attorneys; and (4) the contingent nature of the fee award. *Ketchum v. Moses, 24 Cal. 4th 1122, 104 Cal. Rptr. 2d 377, 384, 17 P.3d 735 (Cal. 2001)* (citation omitted). A court may then use the percentage-of-the-benefit analysis to "cross-check" the propriety of a lodestar fee award. *Lealao, 97 Cal. Rptr. 2d at 817* & n.12.

The four factors identified in *Ketchum* mirror several of the *Johnson* factors discussed above, and will not be repeated here, with the exception of the contingency risk factor. *HN11* California courts place particular emphasis on contingency risk, which is "[o]ne of the most common fee

EXHIBIT D

2006 U.S. Dist. LEXIS 51420, *24

enhancers." *Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 21 Cal. Rptr. 3d 331, 352, 101 P.3d 140 (Cal. 2004)*. "'A lawyer who both bears the risk of not being paid and provides legal services is not receiving [*25] the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.'" *Ketchum, 104 Cal. Rptr. 2d at 384* (quotation omitted).

The case at bar involved significant risk to Class Counsel. First, as set forth above, this case involved novel issues that, if decided against the class, could have significantly reduced the likelihood that Class Counsel would be paid for their work on this case.

The risk to Class Counsel was particularly acute in this case because the Defendant filed for bankruptcy in the middle of the case. This factor alone justifies a larger multiplier than Class Counsel have requested. *See In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 104 (D.N.J. 2001)* (Awarding multiplier of 2.81, in part because class counsel faced a heightened risk of nonpayment of fees due to the defendant's bankruptcy.).

The *Ketchum* factors demonstrate that the 1.87 multiplier requested by Class Counsel is reasonable. Indeed, it is less than multipliers typically awarded in California and elsewhere. *See In re Calif. Indirect Purchaser X-Ray Film Antitrust Litig.*, 1998 WL 1031494 [*26] * 10 (Cal. Sup. Ct. 1998) ("Cases from California and other jurisdictions reflect that multipliers of two or more are commonplace in class actions."); [4] *see also*

*Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 5* (noting that under common fund theory, courts "regularly award multipliers of two to three times the lodestar or more to compensate for risk and to reflect the quality of the work performed.").

 [*27] The reasonableness of the requested fee is further demonstrated by a cross-check with the percentage-of-the-benefit approach. *HN12* The purpose of this cross-check is "to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation." *Lealao, 97 Cal. Rptr. 2d at 821*. "'The simplest way for the law to duplicate the bargain that informed parties would reach . . . is to look to fee award levels in actions brought by sophisticated private parties under the same or comparable statutes.'" *Id. at 819-20* (quotation omitted).

As set forth above, "class action fee awards are typically 30% of the fund created by the settlement." *Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 3*; *see also* 4 Robert Newberg, *Newberg on Class Actions* § 14:6 at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."). This cross check demonstrates that Class Counsel's fee request -- which represents less than 20% of the common fund -- is reasonable.

## III. Reasonable Costs.

*HN13* Under both California [*28] law and the law of this Circuit, reasonable costs may be awarded to successful plaintiffs in a class action. *See Cal. Code Civ. P. § 1032(b)*; *Vaszlavik, 2000 U.S. Dist. LEXIS 21129, slip op. at 7* ("As with attorneys' fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred."). Plaintiffs are also entitled to an award of costs because they successfully obtained benefits

---

[4] Citing *ABS Pipe Cases II*, J.C.C.P. No. 3126 (Contra Costa Sup. Ct.) (Orders Signed June 24, 1998) (awarding lodestar and multiplier of 2.2 in eight class action settlements together worth approximately $ 70,000,000); *Wilson v. Bank of America Nat'l Trust & Sav. Ass'n.*, No. 643872 (Cal. Sup. Ct. Aug. 16, 1982) (multiplier of 10 times the hourly rate awarded); *Glendora Community Redevelopment Agency v. Demeter, 155 Cal. App. 3d 465, 465, 202 Cal. Rptr. 389 (Cal. Ct. App. 1984)* (affirming a 12-times multiplier of counsel's hourly rate and expressly rejecting the argument that the requested fee was exorbitant or unconscionable); *In re Trilogy Sec. Litig.*, C-84-20617(A) (N.D. Cal.1986) (multiplier of 4.37); *Underwood v.*

*Pierce*, 79-1318-HP (3.5 multiplier; $ 60 million settlement) (C.D. Cal. 1983).

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 77 of 101

Page 12 of 12
2006 U.S. Dist. LEXIS 51420, *28

for the class on their claims under the ADA. *42 U.S.C. § 12205*.

Class Counsel have submitted detailed records of their costs to date, which total $ 123,312.56. In addition, they anticipate that additional costs relating to the Final Approval Hearing will result in total costs in excess of $ 125,000.

This Court finds that the costs incurred by Class Counsel to date are reasonable, and approves an award of $ 123,312.56 for costs incurred through July 21, 2006. The Court also approves an award of reasonable costs incurred after that date and prior to the date of final approval, not to exceed $ 125,000.

## IV. Fees And Costs For Implementing And Monitoring The Settlement Agreement.

Kmart has agreed to pay Class **[*29]** Counsel's reasonable fees and costs relating to implementing and monitoring the Agreement after final approval. Payment of such fees and costs is appropriate. *See Diaz v. Romer, 961 F.2d 1508, 1511 (10th Cir. 1992)* (Holding that **HN14** "attorney's fees can be

awarded for post-judgment monitoring and other efforts to ensure compliance with court orders in a civil rights case."). The Court hereby approves the payment of Class Counsel's reasonable fees and costs relating to implementing and monitoring the Agreement after final approval.

## CONCLUSION

For the reasons set forth above, this Court grants the Petition, and approves: (1) an award of attorneys' fees through the date on which final approval is granted of $ 3.25 million; (2) an award of costs incurred through July 21, 2006 of $ 123,312.56, plus additional reasonable costs incurred after that date and prior to the date of final approval, with total costs not to exceed $ 125,000; and (3) an award of reasonable fees and costs relating to implementing and monitoring the Agreement after final approval.

Dated: July 27, 2006

**John L. Kane**

SENIOR U.S. DISTRICT COURT JUDGE

---

**End of Document**

 Positive
As of: October 27, 2016 11:27 AM EDT

## *Ryals v. City of Englewood*

United States District Court for the District of Colorado

June 6, 2014, Decided; June 6, 2014, Filed

Civil Action No. 12-cv-02178-RBJ

**Reporter**

2014 U.S. Dist. LEXIS 77304; 2014 WL 2566288

STEPHEN BRETT RYALS, Plaintiff, v. CITY OF ENGLEWOOD, Defendant.

**Prior History:** *Ryals v. City of Englewood, 962 F. Supp. 2d 1236, 2013 U.S. Dist. LEXIS 118728 (D. Colo., 2013)*

**Counsel:** **[*1]** For Stephen Brett Ryals, an individual, Plaintiff: Daniel David Williams, LEAD ATTORNEY, Boulder, CO; Jennifer Lee Sullivan, LEAD ATTORNEY, Hetal Janak Doshi, Shelby Lynne Myers, Faegre Baker Daniels LLP-Denver, Denver, CO; Mark Silverstein, Sara R. Neel, LEAD ATTORNEYS, American Civil Liberties Union-Denver, Denver, CO.

For City of Englewood, Defendant: Monica N. Kovaci, LEAD ATTORNEY, Gillian Marie Fahlsing, Thomas Sullivan Rice, Senter Goldfarb & Rice, LLC, Denver, CO.

**Judges:** R. Brooke Jackson, United States District Judge.

**Opinion by:** R. Brooke Jackson

## Opinion

### Order on Attorney's Fees and Costs

Plaintiff moves for an award of attorney's fees and certain costs not previously assessed. The parties have submitted several affidavits in support of their respective positions and have not requested an evidentiary hearing or oral argument. For the reasons set forth herein, the Court awards attorney's fees in the amount of $429,999.50 and additional costs in the amount of $16,618.13.

### BACKGROUND

The Court's findings and conclusions on the merits are set forth in detail in its order of August 21, 2013. Briefly, in 2001 the plaintiff, Stephen Ryals, was convicted of a sex offense. He served two years in prison and was ultimately **[*2]** discharged from parole in October 2004. Thereafter his only continuing obligation has been to register in his place of residence as a sex offender. He will be eligible to petition to discontinue his registration obligation in October 2014.

In 2012 Mr. Ryals and his wife purchased a house in Englewood, Colorado. In anticipation of his move into the new house he deregistered as a sex offender in Denver, where he had been living, and contacted the Englewood Police Department about registering there. However, he was informed that he could not live in Englewood because of his sex offense, and when he nevertheless registered in Englewood, he was cited for violating an Englewood ordinance governing sex-offender residency restrictions.

The ordinance, modeled after a similar ordinance in neighboring Greenwood Village, was enacted hurriedly in 2006 after the City Council learned that the Parole Board planned to place a "sexually violent predator" near a day care center in Englewood. It prohibits all felony and some misdemeanor sex offenders from living within 2000

EXHIBIT D

2014 U.S. Dist. LEXIS 77304, *2

feet of any school, park or playground or within 1000 feet of any licensed day care center, recreation center, public swimming pool, [*3] school bus stop, walk-to-school route, or recreational trail. The ordinance placed 99% of the City, and as a practical matter the entire City, off limits for Mr. Ryals (who was not a "sexually violent predator").

Because the ordinance prohibited him from living in his new home, Mr. Ryals filed a lawsuit against the City in state court seeking a judgment declaring that the ordinance was legally invalid and enjoining its enforcement against him. He based his case on several alternative legal theories: (1) that the ordinance was preempted by state law; (2) a § 1983 claim that the ordinance violated the United States Constitution as a prohibited ex post facto law; (3) a similar ex post facto violation of the Colorado constitution; (4) a § 1983 claim that the ordinance violated Mr. Ryals' right to substantive due process under the United States Constitution; and (5) a similar substantive due process violation under the Colorado Constitution.

The City removed the case to federal court, asserting federal question jurisdiction pursuant to *28 U.S.C. § 1331* as to claims based upon the United States Constitution and supplemental jurisdiction under *28 U.S.C. § 1367* as to the state law claims. The [*4] case was tried to the Court from July 22-25, 2013. The Court concluded that the regulation of sex offender residency in Colorado is a matter of mixed state and local concern; that the operational effect of the ordinance impermissibly conflicts with the state's interest in the uniform treatment, management, rehabilitation, and reintegration of sex offenders; and, therefore, that in its present form the ordinance is preempted by state law. Findings of Fact, Conclusions of Law and Order of Judgment [ECF No. 56] at 11-23. Because the Court entered judgment in the plaintiff's favor on the preemption claim, it did not reach the federal constitutional claims.

Plaintiff now seeks an award of attorney's fees in the amount of $475,403.50 and costs (in addition to $11,764.21 taxed by the Clerk's Office) of $16,618.13. The defendant responds that the plaintiff is not entitled to any award of attorney's fees, but if there is an award, then it should be substantially less than the amount requested.[1]

**FINDINGS AND CONCLUSIONS**

**I. <u>ENTITLEMENT TO AN AWARD OF FEES</u>.**

Courts may award the prevailing party (other than the United States) reasonable attorney's fees in a successful *§ 1983* action to enforce a constitutional right. *42 U.S.C. § 1988(b)*. Mr. Ryals was the prevailing party. While he did bring two *§ 1983* claims, the Court decided the case on state preemption grounds and therefore did not reach or decide the constitutional issues. Nevertheless, a district court may award fees even though it declined to enter judgment on a substantial constitutional claim where the plaintiff prevailed on a pendent state law claim that arose out of a common nucleus of operative fact. *Plott v. Griffiths, 938 F.2d 164, 167-68 (10th Cir. 1991)* (citing *Maher v. Gagne, 448 U.S. 122, 133 n.15, 100 S. Ct. 2570, 65 L. Ed. 2d 653 (1980))*.

"A federal claim is insubstantial only if it is 'obviously without merit or is wholly frivolous,' or 'is clearly foreclosed by prior decisions of the Supreme Court.'" *Id. at 167* (citing 138 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE § 3564, at 68-70 (2d ed. 1984)). The test for "substantiality" is the same as the test for determining [*6] whether the district court has pendent (supplemental) jurisdiction over the state law claim. *Id. at 168*.

Here the answer to the substantiality question, as well as the "common nucleus" question, was

---

[1] The parties disagree as to whether the Court should defer ruling on fees and costs until after the Tenth Circuit has addressed defendant's appeal on the merits. Recognizing that the work involved in preparing [*5] this order could be for naught, I prefer to address the issue now.

EXHIBIT D

2014 U.S. Dist. LEXIS 77304, *5

essentially provided by the defendant when it removed this case to this Court. The Verified Notice of Removal [ECF No. 1] noted that the case as filed in the state court asserted violations of substantive due process under the *Fourteenth Amendment* and the ex post facto ban of Article 1, Section 10 of the United States Constitution. Accordingly, it rested on federal question jurisdiction under *28 U.S.C. § 1331*. *Id.* at 3. As for the state law claims including the claim of preemption under state law, the defendant stated: "These claims are so related to the federal claims asserted by Plaintiff that they form part of the same case or controversy under Article III of the United States Constitution. Thus, this Court has supplemental jurisdiction under *28 U.S.C. § 1367* over the state claims asserted." *Id.* (tracking the language of *§ 1367(a)*).

In any event, the Court finds that the constitutional questions were substantial, and that they did arise from a common nucleus of fact. The core of the case **[*7]** was the allegation that the City's ordinance unlawfully precluded Mr. Ryals, as a sex offender still under the state's registration requirement, from living in his own home or virtually anywhere in the City of Englewood. The state preemption claim and the two federal constitutional claims were simply alternative legal theories on which to challenge the same ordinance.

I also agree with the plaintiff that *Fross v. County of Allegheny, 848 F. Supp. 2d 547 (W.D. Pa. 2012)* is similar and persuasive. There, sex offenders challenged a county ordinance that prevented them from living within 2500 feet of any child care facility, community center, public park, recreation facility, or school. Plaintiffs asserted violations of various federal constitutional rights pursuant to *§ 1983*; a violation of the Fair Housing Act; preemption by state law; and a violation of the local zoning code. The court decided the case in plaintiffs' favor on state law preemption grounds, over which it had supplemental jurisdiction pursuant to *28 U.S.C. § 1367(a)*. Exercising judicial restraint, it did not decide the constitutional

questions, but it found that the constitutional claims were substantial: "Where a fee generating **[*8]** claim is sufficiently meritorious to confer jurisdiction on the district court, and in turn to support the exercise of the court's jurisdiction over related state law claims, the substantiality test has been met." *Id. at 552*. It also found that there was a "common nucleus of operative fact" because (1) the "facts related to the passage, operation, enforcement, and effect of the Allegheny County Ordinance were common to both the section 1983 claim and the state law claim that was ultimately decided;" and (2) both the state preemption and constitutional theories "shared a determination that the County Ordinance imposed restrictions and punishments on offenders who were otherwise eligible for release under state law." *Id. at 553*. The same factors exist in the present case.

## II.   REASONABLE   AMOUNT   OF ATTORNEY'S FEES.

### A. Lodestar Presumption.

"To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a 'reasonable' fee." *Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998)*. The "lodestar" is the product of reasonable **hours** times reasonable **[*9]** hourly **rates**. *Id.* If the applicant "has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by *§ 1988*." *Blum v. Stenson, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*.

Plaintiff's proposed lodestar is summarized in the following chart:

🔳*Go to table1*

Motion [ECF No. 72] at 7.

### B. Evidence Submitted by the Parties.

Grant Sullivan

2014 U.S. Dist. LEXIS 77304, *9

## 1. **Plaintiff's evidence**.

Plaintiff begins with the declaration of Daniel D. Williams, plaintiff's lead counsel. Among other things Mr. Williams states that his law firm, Faegre Baker Daniels LLP, conducts annual market surveys of hourly rates to be "comparable and competitive." [ECF No. 72-1 at ¶7]. **[*10]** He applied Faegre's 2013 rate schedule to all time recorded by the Faegre personnel. He then reviewed Faegre's itemized billing records and wrote off 409.7 of the 1643.4 hours recorded by the six Faegre lawyers and one paralegal included in the chart. Together with write offs of some of the time recorded by plaintiff's co-counsel from the American Civil Liberties Union, plaintiff has written off 555.9 of the 1922 recorded hours listed in the chart, a reduction of approximately 29%. Mr. Williams also wrote off time recorded by several others whose names are not listed in the chart.[2] All told, plaintiff wrote off approximately 34% of the recorded time (717.4 of 2,083.5 hours). *See id.* at ¶ 9.

The two ACLU lawyers, Mark Silverstein and Sara Rich, each prepared a declaration discussing their experience litigating civil rights issues. [ECF Nos. 72-5 and 72-6]. Mr. Silverstein, the Legal Director of the ACLU of Colorado, explains that he arrived at his rate of **[*11]** $450 an hour for his time "after consultation with a number of attorneys who practice in the Denver area and who are familiar with the market rates of attorneys of similar skill, experience, and reputation." He set the hourly rate for Ms. Rich's time ($350) based on her experience (nine years doing plaintiffs' civil rights litigation). [ECF No. 72-5 at ¶ 10].

In further support plaintiff presents the declaration of Lino Lipinsky de Orlov, a partner in the Denver office of McKenna Long & Aldridge LLP. Mr. Lipinsky, as he is commonly known in this community, is a reputable lawyer who specializes in complex civil litigation. He is familiar with his firm's rates as a member of the firm's Board of Directors. He also accessed confidential market rate studies prepared for his law firm in 2012 and 2013 and a 2013 ALM report on billing rates and practices. Based on that information, and on his discussions with attorneys at other firms, clients, and prospective clients, and on fee applications he has prepared, he states that he is familiar with the prevailing market rates in the Denver metropolitan area in 2013. He has examined the experience and other credentials of Mr. Williams, Mr. Silverstein **[*12]** and Ms. Rich. His opinion is that the rates charged in this case "fall well within the range charged by firms in cases such as [this case] and are reasonable for the Denver metropolitan legal market." [ECF No. 72-7 at 10]. He did not review the hours recorded on a line by line basis, but he is satisfied from the review conducted by Mr. Williams that the number of hours being billed is reasonable. *Id.* at 11. Overall, his opinion is that the fees billed were reasonable. *Id.* at 12.

Finally, the plaintiff presented the declaration of David A. Lane. [ECF No. 72-8]. Mr. Lane is an experienced plaintiffs' civil rights attorney who enjoys a reputation in this community as an able and hard-nosed advocate on behalf of his (often unpopular) clients. In his opinion the rates charged by the ACLU lawyers were "eminently reasonable," indeed low in Mr. Silverstein's case. [ECF No. 72-8 at ¶¶ 14-16]. He did not express an opinion about the number of hours billed by the ACLU lawyers or about the billings of the Faegre lawyers.

## 2. **Defendant's evidence**.

In opposition the City submits three affidavits: (1) Thomas Rice, lead defense counsel; (2) Cathy Havener Greer, an experienced attorney specializing in **[*13]** the defense of civil rights and employment litigation; and (3) Lisa Mancini Saunders, a Florida attorney with an insurance defense background who presently is the Director

---

[2] I identified two associates, one summer associate, two "researchers," two paralegals, one "paraprofessional," and one staff employee as having recorded time to the account that was entirely written off. [ECF Nos. 72-2 through 72-4].

EXHIBIT D

of Legal Operations for a national legal bill review company.

Mr. Rice is an experienced and able defense attorney who frequently appears in this Court on behalf of the City and County of Denver and other municipal clients. He states that the work his firm did for the City in this case was billed at $200 per hour for himself; $185 per hour for partner Gillian Fahlsing; $165 per hour for associate Monica Kovaci; and $85 per hour for paralegal Sheileen O'Hayre. Affidavit [ECF No. 78-1] at ¶ 4. He states that these rates are what his firm charges for any municipality that is a member of the Colorado Intergovernmental Risk Sharing Agency (a self-insurance risk pool). *Id*. at ¶ 5. He adds that, to his knowledge, these rates are consistent with rates charged by other attorneys and firms in the Denver legal community who handle civil rights litigation on an hourly basis. *Id*. at ¶ 6. He is critical of the number of attorneys and others on the plaintiff's team and singles out the number of hours counsel billed for plaintiff's **[*14]** response to defendant's summary judgment motion as "more than twice as much time as should have been reasonably incurred to complete briefing on these issues." *Id*. at ¶ 9. He does not, however, indicate the number of hours or the total amount of fees billed by his firm on the summary judgment issues or on this case as a whole.

Ms. Greer is a well-regarded defense attorney who has practiced with two reputable firms, Hall & Evans and Wells, Anderson & Rice. She has particular expertise in § 1983 litigation from a defense perspective. *See id*. at ¶ 5-6. Like Mr. Lipinsky on the plaintiff's side, she has served as an attorney's fee expert in other cases. In her opinion, the rates charged by the plaintiff here are "more consistent with those of practitioners of sophisticated commercial litigation than of private practice attorneys engaged in civil rights litigation of comparable experience to the attorneys for Plaintiff." *Id*. at ¶ 13. In reaching that opinion she has considered, in addition to her own experience, recent attorney's fee decisions of Judges Arguello,

Brimmer and Martinez of this district as well as a 2008 Colorado Economics of Law Practice Survey which found that the average **[*15]** rate charged by lawyers who practiced in "Downtown Denver" that year was $268 per hour. Ms. Greer's opinion is that rates in the range of $275 to $300 per hour for partner-level attorneys, $230 an hour for associate attorneys, and $120 an hour for paralegals would be reasonable for the plaintiff's attorneys in this case. *Id*. at ¶ 19. She expresses no opinion on the number of hours billed.

Ms. Saunders has no opinion on hourly rates, but she has gone through the billing records on a line by line basis and has identified time entries that she believes should be reduced after applying several audit categories used by her company to audit legal bills. [ECF No. 78-3 at ECF pages 9-34]. Two categories--duplicative time for review of documents by multiple timekeepers and communication among timekeepers--account for most of her recommended write-downs. Because she did not attempt to adjust the hourly rates, the hours that she would eliminate account for $71,258 of the total of $475,403.50 billed ($61,088 Faegre, $1,350 Silverstein, $8,820 Rich).

## C. **Analysis**.

The "lodestar" creates a rebuttable presumption of reasonableness. In determining whether the presumption has been rebutted the Court must **[*16]** exercise discretion. However, that discretion is narrow and must be exercised so as not to undermine the principles that gave rise to the Civil Rights Attorney's Fees Awards Act. *Robinson, 160 F.3d at 1278, 1280*.

### 1. **Hours**.

To begin, I recognize that without the "brake" of having to bill a client, it is easy to record many hours. But only those hours that were reasonably expended may be billed to one's adversary. *Ramos v. Lamm, 713 F.2d 546, 553 (10th Cir. 1983)*. Here, on the plaintiff's side, 18 different individuals recorded time. The billing documents contain

numerous examples of between seven and 12-hour days recorded to this account. Both Mr. Rice and Ms. Saunders have commented on what they believe to have been approximately 345 hours recorded just to the plaintiff's response to the City's summary judgment. My own review added up to a little less, 332.7 hours, but either way it seems excessive at first blush.

But one must remember that the City very vigorously defended the ordinance and this case. Defendant's summary judgment motion, for example, was 53 pages long and was supported by 14 exhibits (152 pages). I characterized the motion as "excessive" in a minute order granting plaintiff [*17] an extension of time to respond to it. [ECF No. 38]. A Tenth Circuit panel, affirming for the most part a fee award to plaintiffs' counsel in a civil rights case, cited the trial judge's finding that "in a typical civil rights case, where virtually all the evidence and witnesses were in the hands of the defendants and plaintiffs had the burden of proof, it could be expected that plaintiffs' lawyers must spend more time than defendants." *Sussman v. Patterson, 108 F.3d 1206, 1209 (10th Cir. 1997)* (as paraphrased by the circuit). That is substantially true of this case as well.

In *Sussman* the court also noted the trial court's findings that plaintiff's counsel had submitted meticulous, contemporaneous time records; that plaintiff's counsel had deleted approximately eight to ten percent of their time; that counsel by affidavit represented that the remaining hours were reasonable and necessary; and that the defendants had not submitted evidence challenging the reasonableness of the hours charged. *Id.* The comments concerning the plaintiff's evidence are equally true here. Plaintiff's counsel maintained and submitted detailed contemporaneous time records. Mr. Williams conducted a line by line [*18] review of all of the time recorded and wrote off approximately 29% of the time recorded by the nine timekeepers for whom time is being "billed" and all of the time recorded by nine other individuals. The remaining hours, in his judgment,

were necessarily and reasonably incurred.

Unlike the *Sussman* case, the City here did submit evidence challenging the hours charged, i.e., Ms. Saunders' report. I have gone over her analysis line by line and find that I disagree with the majority of her recommendations for further reduction of the number of hours billed. My overall impression is that Mr. Williams did an excellent job of culling out arguably inefficient time, and that what remains is generally reasonable for a case of this size and complexity. Although the remaining time does include some time for meetings or conferences among members of the "team," and reviews of certain documents by multiple individuals, that is not necessarily an indication of inefficiency.

Nevertheless, I have identified certain time entries as to which I agree with Ms. Saunders' judgment in whole or part. In doing so I do not mean to indicate that the work was poorly done. I am satisfied from these lawyers' credentials [*19] and from the fact that Mr. Williams and Mr. Silverstein included them in the team that they do good work. I find only that a small amount of the billed time, in addition to that which Mr. Williams already wrote off, can fairly be viewed as questionable enough to eliminate it from a final accounting of the hours that can be reasonably included in a bill to be paid by the defendant. By timekeeper, I find that the following additional hours should be excluded:

Olsen: reduce by an additional 5.6 hours.

Sullivan: reduce by an additional 9.3 hours.

Doshi: reduce by an additional 16.5 hours.

Myers: reduce by an additional 15.1 hours.

Rich: reduce by an additional 14.2 hours.

Accordingly, the Court finds that the following hours were necessarily and reasonably "billed" on this case through the end of the billing records submitted to date:

Williams: 237.1 hours

EXHIBIT D

2014 U.S. Dist. LEXIS 77304, *19

Sullivan: 288.7 hours

Doshi: 275.5 hours

Myers: 118.7 hours

Olsen: 141.2 hours

LaTarte: 27.0 hours

Coil: 99.0 hours

Silverstein: 6.8 hours

Rich: 111.4 hours

## 2. Hourly rates.

Reasonable hourly rates in *§ 1988* cases are governed by "the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit [*20] counsel." *Blum, 465 U.S. at 895*. A lawyer's regular rate is relevant but not conclusive. *Ramos, 713 F.2d at 555*. But Faegre's rates are said (by them and by Mr. Lipinsky) to be within the range of rates charged by large commercial law firms in the Denver metropolitan market in 2013.[3] Defendant agrees. [*See* ECF No. 78 at 14]. The rates for the ACLU lawyers were set by Mr. Silverstein after conferring with lawyers of similar experience in the community and are said (by Mr. Lane) to be "eminently reasonable" for such work.

Mr. Lipinsky has a commercial litigation practice, but according to his affidavit he has litigated cases involving constitutional issues including civil rights. [ECF No. 72-7 at 7-8]. Similarly Mr. Williams primarily has a commercial litigation practice, but he has participated [*21] in civil rights cases including another recent case with the ACLU. [ECF No. 72-1 at 3]. Nevertheless, it is fair to say

that neither Mr. Lipinsky nor the Faegre lawyers consider themselves specialists in plaintiffs' civil rights work. But that largely misses the point. "The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation." *Ramos, 713 F.2d at 555*. No one has suggested that the legal work required in this case was of a different level of complexity or difficulty to that of commercial litigation. The team included two experienced plaintiffs' civil rights specialists who presumably provided guidance as needed. Significantly, Mr. Williams recognized certain inefficiencies and wrote off a significant portion of the recorded time. On those facts this Court is not inclined to depart from their regular rate structure without good reason. I do find good reason as to some of the rates and will discuss that below.

The Court takes no issue with Mr. Lane's opinion concerning the rates charged by the ACLU lawyers. "Salaried public interest firm lawyers should be assigned a billing rate equal to their counterparts in expertise in private practice." [*22] *Id*.

Ms. Greer, similarly to the City's lawyers in this case, primarily specializes in what might broadly be called "insurance defense" litigation. She is recognized in the community and by this Court as a very fine lawyer. However, I am not persuaded by her opinions regarding the prevailing market rates applicable to the plaintiff's lawyers in this case. For one thing, the market survey she cites is dated. Also, Ms. Greer's suggested rates ($275-300 for partner-level work, $230 for associates, and $120 for paralegals) do not distinguish among different levels of experience within those categories, particularly "associates." Most importantly, her suggested rates, like the rates Mr. Rice bills to municipal clients who belong to a common risk pool, come from the perspective of lawyers handling defendants' civil rights work. But it does not follow that they should be applied here. "Plaintiffs' and defendants' civil rights work . . . are markedly dissimilar." *Malloy v. Monahan, 73 F.3d 1012, 1018 (10th Cir. 1996)*. The court explained:

---

[3] The hourly rates used for this purpose, whether or not they are the lawyers' regular rates, "should reflect rates in effect at the time the fee is being established by the court, rather than those in effect at the time the services were performed." *Ramos, 713 F.2d at 555*. The Court has received no indication that the rates charged by Faegre or the prevailing rates in the community have increased in 2014.

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 85 of 101

Page 8 of 12
2014 U.S. Dist. LEXIS 77304, *22

Attorneys in defendants' civil rights cases are typically paid regardless of their success in a case and receive payment on a shorter billing cycle. Moreover, [*23] defendants' attorneys are sometimes guaranteed a certain amount of work from insurance pools. As the district court pointed out, "defendants' attempt to impose the insurance pool rate on attorneys who perform plaintiff's civil rights work ignores these benefits — benefits which attorneys who perform plaintiff's civil rights work do not enjoy."

*73 F.3d at 1019*.

In fact, the rates Ms. Green suggests might be low even for insurance defense work. For example, in *Nero v. American Family Mut. Ins. Co., No. 11CV2717-PAB-MTW, 2013 U.S. Dist. LEXIS 135669, 2013 WL 5323191 (D. Colo. Sept. 23, 2013)*, Judge Brimmer considered a fee application filed on behalf of the defendant insurance company after plaintiff's case (a putative class action asserting coverage and bad faith issues) was dismissed under *Rule 12(b)(6)*. Coincidentally the defendant's lawyers were from Faegre Baker Daniels. The court approved Faegre's normal billing rates, i.e., $615-$630 for a senior partner with 35 years' experience; $395-$420 for Mr. Williams (the same Mr. Williams who headed up the present case for the plaintiff but based on his 2011-2012 regular rate); $370 for an associate with eight years' experience; $310 for an associate with five years' [*24] experience; and $240 for an associate with three years' experience. *2013 U.S. Dist. LEXIS 135669, [WL] at *8-9*.[4]

In *Brokers' Choice of America, Inc. v. NBC Universal, No. 09CV717-CMA-BNB, 2011 U.S. Dist. LEXIS 90420, 2011 WL 3568165 (D. Colo. Aug. 15, 2011)*, the defendant prevailed and requested fees under *§ 1988* and *C.R.S. § 13-17-201*. The court (Judge Arguello) approved the

requested rates of $425 for partners, $320 for an associate with six years of experience when work on the case began, $285 for an associate with two and one half years of experience when work on the case began, and $50 for a legal assistants. *2011 U.S. Dist. LEXIS 90420, [WL] at *8*.

The City calls my attention to various other cases decided by judges in this district. I do not find them to be contrary to the plaintiff's position here. In *Lucas v. Kmart Corp., No. 99CV1923-JLK-CBS, 2006 U.S. Dist. LEXIS 51420, 2006 WL 2729260 (D. Colo. July 27, 2006)*, Judge Kane approved awards of $330 per hour and $275 per hour for plaintiffs' lawyers who secured a settlement of a nationwide class action under the Americans with Disabilities Act. The plaintiffs' application for an award at those levels was based on what their lawyers believed [*25] (and the court agreed) were rates prevailing in Denver at that time. Those rates were equal to or higher than the rates viewed as reasonable by Ms. Greer and Mr. Rice today, some eight years later.

An even older case is *Milham v. Perez, No. 03CV00702, 2005 U.S. Dist. LEXIS 44618, 2005 WL 1925770 (D. Colo. Aug. 11, 2005)*. The City points out that Judge Krieger approved $80 per hour for paralegal time in that civil rights case (which is what the plaintiff requested). Not mentioned, however, is the court's finding that rates of $300 per hour for partners, $210 an hour for senior associates, and $150 per hour for other associates (as requested by the plaintiff) reflected prevailing rates in the Denver civil rights legal community at that time. The lawyers' work in that case was performed in the years 2003 through 2005. *2005 U.S. Dist. LEXIS 44618, [WL] at *6*.

Back to more recent times, in *Trujillo v. Campbell, No. 12CV228, 09CV3011-CMA-KLM, 2012 U.S. Dist. LEXIS 70154, 2010 WL 1835245 (D. Colo. May 21, 2012)*, Magistrate Judge Mix found that $125 per hour was reasonable for paralegal time. That is significantly lower than the rate Faegre has billed the principal paralegal who participated in

---

[4] I obtained the experience levels of the lawyers from the court file of which I take judicial notice.

the present case. But the City does not mention that while Magistrate Judge Mix awarded [*26] attorney's fees for only part of the plaintiff lawyer's time, she found the rate of $400 per hour (as against defendant's proposed $180-$200) to be reasonable. The award arose from a discovery dispute.

The City also cites *Nuanes v. NCC Business Services, Inc., No. 12CV0228-WJM-MJW, 2012 U.S. Dist. LEXIS 161123, 2012 WL 5464598 (D. Colo. Nov. 9, 2012)*. In that case Judge Martinez rejected a proposed rate of $300 per hour and instead found that $250 was reasonable for the work performed. *2012 U.S. Dist. LEXIS 161123, [WL] at *1-2*. But that was not for civil rights or analogous work. It was an application for a statutory fee award under the Fair Debt Collection Practices Act. I too have used $250 an hour for that type of work, as have others of my colleagues. Those cases, arising from a complaint that a collector has employed an abusive collection practice, are numerous, simple, routine and usually settled early for small amounts that often are less than the fee application. They are in no way comparable to the work performed in the present case.

Ms. Greer cites another decision of Judge Martinez, *James v. Fenske, No. 10CV2591-WJM-CBS, 2013 U.S. Dist. LEXIS 24545, 2013 WL 656821 (D. Colo. Feb. 22, 2013)*. This was a multi-plaintiff collective action under the FLSA. The court [*27] indicated that, while it required more time and effort than a single plaintiff case, the wage and hour issues were not complex. *2013 U.S. Dist. LEXIS 24545, [WL] at *2*. The prevailing plaintiff requested an attorney fee award based on hourly rates of $300-$350 for the two more senior lawyers, $280 for associates, and $120-$130 for paralegals. After reviewing competing affidavits (that were not further discussed in the order) the court found that "the hourly rates charged by Plaintiffs' counsel are somewhat high given each attorney's experience level and the customary rates in the Denver legal market for employment lawyers." *2013 U.S. Dist.*

*LEXIS 24545, [WL] at *2*. The court awarded fees at the rates of $275-$300 for the two more senior lawyers, $230 for associates, and $125 for paralegals. Those rates are in line with the rates Ms. Greer recommends. However, in my judgment, the case, though somewhat more difficult than a typical Fair Debt Collection Practices Act case, still is not comparable to the present case.

These cases essentially tell a story that we already knew. Rates are increasing. The market varies according to the type of case, the complexity of the case, and the experience level of the lawyers. Courts consider the reasonableness [*28] of a lawyer's hourly rates on a case by case basis. But none of the cases compels the conclusion that the prevailing market rates in this community for the type of plaintiffs' civil rights work involved here are significantly different than those which Mr. Ryals' lawyers are using.

This is not to say that I am not at all troubled by the rates charged in this case. I practiced law at a time when rates were substantially less. I fear that the legal profession's ever escalating rates have contributed to what has been called "the vanishing jury trial" and are putting high caliber legal representation out of reach for all but the rich and those who, like Mr. Ryals, are fortunate enough to find lawyers willing to represent them on a contingency basis or in the hope of a fee award by a court. Be that as it may, however, the present task is simply to determine whether the rates used by plaintiff's counsel are consistent with the prevailing market rates in the community. With four exceptions, I find that they are.

The first exception applies to the rate applied to the time of associate attorney Tommy Olsen. I am not in any way suggesting that he isn't a fine young lawyer. He graduated cum laude [*29] from the Georgetown University Law Center in 2011. Among other things he worked as a legal assistant at the U.S. Department of the Interior while in law school. He wouldn't have been hired by Faegre Baker Daniels if he weren't well qualified. But

EXHIBIT D

2014 U.S. Dist. LEXIS 77304, *29

when he started working on this case (on July 9, 2012) he had been out of law school for one year. His work on the case concluded (on March 1, 2013) before he was two years out of law school. The billing records reflect that he was doing legal research, preparing drafts of pleadings, and doing other work of a kind that one would expect a beginning lawyer to do. All of his time is billed at $275 an hour. I remember that when I was fresh out of law school my time was billed at $25 an hour, and I was sure that I wasn't worth it. That makes me an old fogie, I suppose, but I cannot find that it is reasonable to expect the City to pay $275 an hour for his time on this case.

Although not quite as clear, I also have trouble with $275 an hour for associate Shelby Myers. She, too, appears to be a well-qualified young associate who graduated from the University of California, Berkeley School of Law in 2011 after serving as a Faegre summer associate in **[\*30]** 2010. But she was not yet two years out of law school when she begin work on this case (on March 3, 2013) and barely two years out when her work on the case concluded (last time entry June 3, 2013).

I further find that a small adjustment of the hourly rate of associate Hetal Doshi is appropriate to put her experience level (seven years) more in line with the rates billed for Ms. Sullivan ("Counsel" and one of the two primary trial lawyers with 14 years of experience) and Sara Rich (an ACLU staff attorney with eight years of experience in civil rights cases). Experience measured by years of practice is not the only indicator of value. The quality of one's work and its contribution to the result obtained obviously must be considered. *Ramos, 713 F.2d at 555*. I can find, and do find, that the quality of the work performed on behalf of Mr. Ryals by the team of lawyers from Faegre and the ACLU was excellent. But with respect to the junior lawyers, whose work mostly was performed behind the scenes, experience level is primarily what I have. On that basis I find that an adjustment of Ms. Doshi's rate is reasonable.

Finally, the time of paralegal Jill Coil was billed at $200 per hour. She is **[\*31]** an experienced paralegal who joined Faegre in 2007. I have no doubt that her work was good, and that she contributed important value to the team effort. But that billing rate is significantly higher than the paralegal and legal assistant rates requested and approved in other cases in this district, and I have no good basis (other than that is what Faegre charges) to find that it was the prevailing rate for experienced paralegal work in the Denver metropolitan market in 2013.

Taking as a rough gauge Judge Brimmer's finding in *Nero* that $240 an hour was a reasonable rate for associates with three years of experience, I find that reasonable rates to charge the City for the time of Mr. Olsen and Ms. Myers are $210 and $225 respectively. I will adjust Ms. Doshi's rate downward by $10 to $340 per hour. I find that a reasonable rate to charge the City for Ms. Coil's time in this case is $125 per hour.

### 3. Conclusion regarding Attorney's Fees.

Putting my findings regarding hours and rates together, I find and conclude that the following attorney's fees (including paralegal fees) were necessarily incurred, reasonable in amount, and consistent with the prevailing rates for similar services in the **[\*32]** Denver metropolitan legal market in 2013:

⊞ *Go to table2*

## III. COSTS.

Plaintiff submitted a bill of costs totaling $32,855.50. [ECF No. 63]. Costs were taxed by the Clerk's Office in the amount of $11,764.21. Plaintiff now seeks an additional award of costs for Westlaw research ($15,391.66) and travel expenses associated with depositions of two out of state expert witnesses, one called by each side at trial ($1,226.57), for a total of $16,618.13. Defendant has not objected. Mr. Williams represents that Westlaw charges are typically billed to Faegre's clients, and that reliance on Westlaw was necessary

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 88 of 101

Page 11 of 12
2014 U.S. Dist. LEXIS 77304, *32

and efficient in this case. [ECF No. 72-1 at ¶ 22]. Absent any indication to the contrary, I find that this cost may reasonably be awarded. *See Case v. Unified School Dist. No. 233, 157 F.3d 1243, 1258 (10th Cir. 1998)*. Mr. Williams also represents that [*33] the travel costs were necessarily incurred (and that plaintiff does not seek payment for travel time for the depositions). [ECF No. 72-1 at ¶ 22]. I find that this too is a reasonably charged cost.

## ORDER

Plaintiff's Petition for Attorney Fees and Expenses is GRANTED. The Court awards attorney's fees in the amount of $429,999.50 and additional costs in the amount of $16,618.13. An Amended Final Judgment will be entered accordingly.

DATED this 6th day of June, 2014.

BY THE COURT:

/s/ R. Brooke Jackson

R. Brooke Jackson

United States District Judge

Grant Sullivan

EXHIBIT D

2014 U.S. Dist. LEXIS 77304, *33

**Table1** (*Return to related document text*)

| Time Keeper | Title | Graduation Year | Hours Expended | Hours Billed | Hourly Rate | Total |
|---|---|---|---|---|---|---|
| **FaegreBD** | | | | | | |
| Williams | Partner | 2000 | 267.4 | 237.1 | $435.00 | $103,138.50 |
| Sullivan | Counsel | 1999 | 342.1 | 298 | $395.00 | $117,710.00 |
| Doshi | Associate | 2006 | 419.2 | 292 | $350.00 | $102,200.00 |
| Myers | Associate | 2011 | 223.9 | 133.8 | $275.00 | $36,795.00 |
| Olsen | Associate | 2011 | 175.5 | 146.8 | $275.00 | $40,370.00 |
| LaTarte | Associate | 2008 | 29.2 | 27 | $310.00 | $8,370.00 |
| Coil | Paralegal | N/A | 186.1 | 99 | $200.00 | $19,800.00 |
| **ACLU Att'ys** | | | | | | |
| Silverstein | Legal Director | 1989 | 8.5 | 6.8 | $450.00 | $3,060.00 |
| Rich | Staff Attorney | 2005 | 270.1 | 125.6 | $350.00 | $43,960.00 |
| | | | **1922** | **1366.1** | | **$475,403.50** |

**Table1** (*Return to related document text*)

---

**Table2** (*Return to related document text*)

| | | |
|---|---|---|
| Williams: | 237.1 hours @ $435= | $103,138.50 |
| Sullivan: | 288.7 hours @ $395= | $114,036.50 |
| Doshi: | 275.5 hours @ $340= | $93,670.00 |
| Myers: | 118.7 hours @ $225= | $26,707.50 |
| Olsen: | 141.2 hours @ $210= | $29,652.00 |
| LaTarte: | 27.0 hours @ $310= | $8,370.00 |
| Coil: | 99.0 hours @ $125= | $12,375.00 |
| Silverstein: | 6.8 hours @ $450= | $3,060.00 |
| Rich: | 111.4 hours @ $350 ...= | $38,990.00 |
| **TOTAL:** | **1305. 4 hours** | **$429,999.50** |

**Table2** (*Return to related document text*)

---

**End of Document**

Grant Sullivan                                                    EXHIBIT D

 Caution
As of: October 27, 2016 11:27 AM EDT

# *Nero v. Am. Family Mut. Ins. Co.*

United States District Court for the District of Colorado

September 23, 2013, Decided; September 23, 2013, Filed

Civil Action No. 11-cv-02717-PAB-MJW

**Reporter**

2013 U.S. Dist. LEXIS 135669

JAMES L. NERO, individually and on behalf of a class of others similarly situated, Plaintiffs, v. AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant.

**Prior History:** *Nero v. Am. Family Mut. Ins. Co., 2012 U.S. Dist. LEXIS 27541 (D. Colo., Mar. 2, 2012)*

**Counsel:** **[*1]** For James L. Nero, individually and on behalf of a class of others similarly situated, Plaintiff: Matthew Wesley Hall, LEAD ATTORNEY, Marc Robert Levy, Levy Wheeler & Waters, P.C., Greenwood Village, CO; Glen Joseph Dunn, Jr., Glen J. Dunn & Associates Ltd., Chicago, IL; Jeffrey Grant Brown, Jeffrey Grant Brown, P.C., Chicago, IL.

For American Family Mutual Insurance Company, Defendant: Christopher John Lange Diedrich, Jeffrey S. Roberts, Jennifer Lee Sullivan, Michael S. McCarthy, Faegre Baker Daniels LLP-Denver, Denver, CO; Daniel David Williams, Faegre Baker Daniels LLP-Boulder, Boulder, CO.

**Judges:** PHILIP A. BRIMMER, United States District Judge.

**Opinion by:** PHILIP A. BRIMMER

# Opinion

### ORDER

This matter is before the Court on the Motion for Attorneys' Fees Pursuant to *C.R.S. § 13-17-201* [Docket No. 91] filed by defendant American Family Mutual Insurance Company. The Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332*.

### I. BACKGROUND

On February 15, 2011, plaintiff James L. Nero filed this putative class action against defendant in the District Court for the Northern District of Illinois. *See* Docket No. 2. In his original complaint, plaintiff brought claims on behalf of the class against defendant for **[*2]** breach of contract, fraudulent concealment, negligent misrepresentation, bad faith breach of contract, and violations of the Colorado Consumer Protection Act ("CCPA"), *Colo. Rev. Stat. § 6-1-101 et seq.* Docket No. 2 at 6-10. The class claims were based on defendant's alleged failure to provide Personal Injury Protection ("PIP") benefits for insurance policies sold in Colorado as required by the Colorado Auto Accident Reparations Act ("CAARA"), *Colo. Rev. Stat. § 10-4-701 et seq.* (repealed by Laws 1997, H.B. 97-1209, § 8, eff. July 1, 2003). *Id.* at 2-5. Plaintiff sought to represent a putative class consisting of:

> All persons who paid premiums to American Family Mutual Insurance Company or American Standard Insurance Company of Wisconsin for UM/UIM coverage covering a vehicle during the period from September 16, 1999 to the present, and who were denied coverage for claims arising out of or related to personal injury protection or extended personal

EXHIBIT D

2013 U.S. Dist. LEXIS 135669, *2

injury protection coverage, or expenses that may be reimbursed under personal injury protection or extended personal injury protection coverage, excluding defendants and their employees, officers, directors, and agents.

*Id*. at 4. On October **[*3]** 19, 2011, the District Court for the Northern District of Illinois transferred the case to this Court pursuant to *28 U.S.C. § 1404(a)*. *See* Docket No. 1. On January 3, 2012, plaintiff filed a Corrected Second Amended Complaint [Docket No. 19], raising identical putative class action claims against defendant.[1] Docket No. 19 at 16-24. In the Corrected Second Amended Complaint, plaintiff also raised individual claims against defendant for breach of contract, bad faith delay or denial of insurance benefits in violation of *Colo. Rev. Stat. § 10-3-1115*, common law bad faith breach of insurance contract, and violations of the CCPA. *Id*. at 24-29. On January 17, 2012, defendant moved to dismiss plaintiff's complaint. Docket No. 20. On September 28, 2012, the Court granted defendant's motion and dismissed plaintiff's individual claims for failure to state claims pursuant to *Fed. R. Civ. P. 12(b)(6)*. *See* Docket No. 88. Because plaintiff could not sustain his own claims, the Court also dismissed the claims plaintiff brought on behalf of the putative class. Docket No. 88 at 6.

In the present motion, defendant seeks an award of $52,258.00 in attorneys' fees pursuant to *Colo. Rev. Stat. § 13-17-201*, which awards attorneys' fees to a

---

[1] In the second corrected amended complaint, the putative class consisted of:

All persons who presented claims to American **[*4]** Family Mutual Insurance Company for basic PIP coverage and/or enhanced PIP coverage, covering a vehicle during the period from January 1, 2001 through July 1, 2003, and whose benefits were not paid within 45 days of presenting "Reasonable proof of the fact" and "amount of the expenses incurred" for covered lost wage, medical and/or rehabilitative benefits and where American Family Mutual Insurance Company did not timely provide the requisite forms and/or notice pursuant to Colorado Department of Insurance regulation 5-2-8.

Docket No. 19 at 10.

defendant who secures pretrial dismissal of all tort claims through a motion brought under *Colo. R. Civ. P. 12(b)*. Docket No. 91 at 7. Defendant states that it incurred $52,258.00 in attorneys' fees for the work performed by its attorneys to secure the dismissal of plaintiff's tort claims. Plaintiff opposes defendant's motion, arguing that the Court should not grant defendant an award of attorneys' fees for two reasons: first, Colorado substantive law does not apply in this case; and, second, **[*5]** even if Colorado law applies, defendant is not entitled to attorneys' fees because plaintiff's claims are based on defendant's breach of contract, and not due to the commission of a tort. Docket No. 98 at 3-5. In the alternative, plaintiff requests that, should defendant receive an award of attorneys' fees, the Court reduce defendant's award because the requested amount is unreasonable. *Id*. at 10-14.

## II. ANALYSIS

### A. Choice of Law

Plaintiff asserts that the issues in this case are governed by the law of Illinois, Docket No. 98 at 3, and that, because defendant cannot recover attorneys' fees under Illinois law, the Court should deny defendant's motion. *Id*. In response, defendant asserts that the substantive law of Colorado applies to the facts of this case because Colorado is the state with the most significant contacts. Docket No. 99 at 2-3.

Generally, a federal court sitting in diversity applies the forum state's choice of law principles. *Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir. 1996)*. However, where a case is transferred from one forum to another under *28 U.S.C. § 1404(a)*, the transferee court must follow the choice of law rules of the state in which **[*6]** the transferor court sits. *Yoder v. Honeywell, Inc., 104 F.3d 1215, 1219 (10th Cir. 1997)*. Because the case was transferred to this district from the Northern District of Illinois, the Court must apply the choice of law rules of the State of Illinois.

Grant Sullivan

EXHIBIT D

2013 U.S. Dist. LEXIS 135669, *6

Under Illinois law, a choice of law analysis is required only when it will affect the outcome of the case. *Townsend v. Sears, Roebuck & Co., 227 Ill. 2d 147, 879 N.E. 2d 893, 898, 316 Ill. Dec. 505 (Ill. 2007).* In the present case, the parties agree that a conflict exists between Illinois and Colorado law with regard to the request for attorneys' fees. Docket No. 98 at 5; Docket No. 99 at 1-4. Specifically, the parties agree that Illinois does not have a statute which provides defendant with attorneys' fees based on the dismissal of plaintiff's tort claims. Because the parties agree that there is a conflict, the Court finds that a resolution of the choice of law issue here will have an impact on the outcome of the attorneys' fees request.[2]

In their briefs, both parties cite cases discussing Illinois choice of law rules governing the interpretation of insurance contracts that do not have choice of law provisions. *See Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co., 166 Ill. 2d 520, 655 N.E. 2d 842, 845, 211 Ill. Dec. 459 (Ill. 1995); Jupiter Aluminum Corp. v. Home Ins. Co., 225 F.3d 868, 872 (7th Cir. 2000)* (applying Illinois law); *Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust, 309 Ill. App. 3d 730, 723 N.E. 2d 687, 694, 243 Ill. Dec. 384 (Ill. App. Ct. 1999); CitiMortgage, Inc. v. Absolute Title Servs., Inc., 2012 U.S. Dist. LEXIS 46391, 2012 WL 1108249, at *4 n.5 (N.D. Ill. April 2, 2012)* [*8] (applying Illinois law). According to these cases, when an insurance contract lacks a choice of law provision,

construction of an insurance contract will be "governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." *Lapham-Hickey, 655 N.E. 2d at 845.* However, because *Colo. Rev. Stat. § 13-17-201* awards attorneys' fees only in connection with the dismissal of tort claims, the Court finds that the *Lapham* test does not govern the choice of law issue here. Because plaintiff's class claims alleging fraudulent concealment, negligent misrepresentation, and bad faith, as well as plaintiff's individual claims for statutory bad faith breach of insurance contract, common law bad faith, and violations of the CCPA, are all tort claims, the Court must next determine which law applies to tort claims that do not "arise under the provisions" of the insurance contract. *Barron v. Kane & Roach, Inc., 79 Ill. App. 3d 44, 398 N.E. 2d 244, 246, 34 Ill. Dec. 569 (Ill. App. Ct. 1979); Travis v. Harris Corp., 565 F.2d 443, 446 (7th Cir. 1977)* [*9] (applying Indiana law) ("though the contract may be interpreted under Ohio law, . . . the questions of traditional tort law are to be determined in accord with the laws of Indiana, the situs of the injury and domicile of [plaintiff]").

Neither the Illinois Supreme Court nor the Seventh Circuit — interpreting Illinois law — has addressed the question of which law applies to tort claims arising out of an insurance contract without a choice of law provision. *See Cunningham Charter Corp. v. Learjet, Inc., 870 F. Supp. 2d 571, 575 (S.D. Ill. 2012).* The Seventh Circuit has noted, relying on decisions from other circuits, that district courts sitting in diversity should not apply contractual choice of law clauses to tort claims unless it is clear that the parties intended that the contractual choice of law clause apply to tort claims. *See Kuehn v. Childrens Hosp., Los Angeles, 119 F.3d 1296, 1302 (7th Cir. 1997)* (applying Wisconsin law) ("One can, it is true, find cases that say that contractual choice of law provisions

---

[2] The Court notes that there may be other conflicts with plaintiff's claims, such as the fact that Illinois law may not provide a cause of action in tort for a bad faith breach of insurance contract. *See Cramer v. Ins. Exch. Agency, 174 Ill. 2d 513, 675 N.E. 2d 897, 904, 221 Ill. Dec. 473 (Ill. 1996)* [*7] (noting that an insurer's conduct may give rise to both a breach of contract action and a separate independent tort action, but mere "allegations of bad faith or unreasonable and vexatious conduct, without more, however, do not constitute such a tort"). In addition, the CCPA requires that a defendant's deceptive practice "significantly impact[ ] the public," *see Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 147 (Colo. 2003)*, while the Illinois Consumer Fraud and Deceptive Business Practices Act, *815 Ill. Comp. Stat. 505/2*, does not. *See Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 675 N.E.2d 584, 593-94, 221 Ill. Dec. 389 (Ill. 1996).*

govern only contractual disputes and not torts . . . But what the cases actually hold is that such a provision will not be construed to govern tort as well as contract disputes **[*10]** unless it is clear that this is what the parties intended") (citation omitted); *CERAbio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 987 (7th Cir. 2005)* (applying Wisconsin law). In addition, numerous Illinois federal district courts, without citing to a decision from the Illinois Supreme Court or the Seventh Circuit interpreting Illinois law, have held that a contract's choice of law provision will apply to tort claims if: (1) the choice of law provision indicates that the parties intended Illinois law to govern non-contract claims; and/or (2) the plaintiff's tort claims are "dependent" upon the contract. *See Medline Indus. Inc. v. Maersk Medical Ltd., 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002)*; *Cunningham Charter Corp., 870 F. Supp. 2d at 576* (listing cases). These cases find that a tort claim is dependent upon a contract if: (1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without the contract. *Amakua Dev. LLC v. Warner, 411 F. Supp. 2d 941, 955 (N.D. Ill. 2006)*.

Because the insurance contract here does not have a choice **[*11]** of law provision, there is no indication that the parties intended a specific law to apply to any contract or tort claims arising from the contract. *See Kuehn, 119 F.3d at 1302*. Accordingly, because there is no contractual choice of law provision and this motions pertains only to plaintiff's tort claims, the Court finds that Illinois tort choice of law rules apply to this motion. *Diamond State Ins. Co. v. Chester-Jensen Co., Inc., 243 Ill. App. 3d 471, 611 N.E. 2d 1083, 1093, 183 Ill. Dec. 435 (Ill. App. 1993)* (noting that, in the absence of contractual choice of law provision, the general choice of law rules of Illinois should control); *see, e.g., Tradesmen Int'l, Inc. v. Black, 2011 U.S. Dist. LEXIS 128578, 2011 WL 5330589, at *4 (C.D. Ill. Nov. 7, 2011)* (applying Illinois law and finding that tort claims were not governed by the contract's choice of law provision because the

provision did not mention tort claims).

In tort cases, Illinois uses the "most significant relationship" test articulated in the *Restatement (Second) of the Conflict of Laws §§ 6, 145* (1971) (the "Restatement").[3] *See Townsend, 879 N.E. 2d at 900*. The cornerstone of the most significant relationship test is to "apply the law of the state that, with regard to the particular issue, **[*12]** has the most significant relationship with the parties and the dispute." *Burlington N. & Santa Fe Ry. Co. v. ABC-NACO, 389 Ill. App. 3d 691, 906 N.E. 2d 83, 91, 329 Ill. Dec. 238 (Ill. App. Ct. 2009)* (citation omitted). The Second Restatement "contemplates a two-step process in which the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule, and (2) tests this choice against the principles of *§ 6* in light of relevant contacts identified by general provisions like *§ 145* (torts)." *Townsend, 879 N.E. 2d at 903* (citation omitted). Under Illinois law, for personal injury actions, "the law of the place of injury controls unless another state has a more significant relationship with the occurrence and with the parties with respect to the particular issue." *Id.* (citation omitted); *Restatement (Second) of Conflict of Laws § 146* (1971). As such, "*Section 146* is the starting point for any choice-of-law analysis in personal injury claims." *Townsend, 879 N.E. 2d at 903*.

The **[*13]** Court finds, however, that *§ 146* does not apply here because none of plaintiff's tort claims are personal injury torts. Specifically, plaintiff's claims for bad faith, fraudulent concealment, negligent misrepresentation, and unfair claims practices are not claims of "physical harm or mental disturbance, such as fright and shock, resulting from physical harm or from threatened physical harm or other injury to oneself or to another." *Restatement (Second) of Conflicts of Law*

---

[3] Colorado courts also apply the "most significant relationship" test articulated in the *Restatement (Second) of the Conflict of Laws §§ 6, 145* (1971). *See AE, Inc. v. Goodyear Tire & Rubber Co., 168 P.3d 507, 508 (Colo. 2007)*.

Case No. 1:16-cv-01237-JLK   Document 54-1   filed 10/27/16   USDC Colorado   pg 94 of 101

Page 5 of 12
2013 U.S. Dist. LEXIS 135669, *13

§ 146 cmt. b. *See, e.g.,* *Simmons v. Campion, 2013 IL App (3d) 120562, 991 N.E. 2d 924, at 932, 372 Ill. Dec. 434 (Ill. App. Ct. 2013)* (describing elements of fraudulent concealment); *Doe v. Dilling, 228 Ill. 2d 324, 888 N.E. 2d 24, 36, 320 Ill. Dec. 807 (2008)* (noting that negligent misrepresentation is purely an economic tort). Because plaintiff's torts are economic torts, the Court finds that the choice of law analysis must begin with *§ 145* and *§ 6 of the Restatement. See Burlington, 906 N.E. 2d at 92* (applying *§ 147* to a tort case because the plaintiff did not suffer personal injuries but there were injuries to "tangible things").

*Section 145 (2)* lists general principles applicable to all torts and provides that courts should take into account the following contacts to determine the applicable [*14] law:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Restatement (Second) § 145(2)*; *Esser v. McIntyre, 169 Ill. 2d 292, 661 N.E. 2d 1138, 1141, 214 Ill. Dec. 693 (Ill. 1996).* Generally, in a tort case, the two most important contacts are the place where the injury occurred and the place where the conduct causing the injury occurred. *Fed. Ins. Co. v. J.K. Mfg. Co., 933 F. Supp. 2d 1065, 2013 U.S. Dist. LEXIS 45007, 2013 WL 1248635, at *8 (N.D. Ill. March 28, 2013)* (applying Illinois law). Furthermore, Illinois law requires that courts analyze the § 145 contacts in light of the principles listed in *§ 6 of the Restatement:*

(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, [*15] and (g) ease in the determination and application of the law to be applied.

*Restatement (Second) of Conflict of Law § 6*; *Burlington, 906 N.E. 2d at 91-92*

With regard to the first § 145 contact, although Illinois is the place of the personal injury from which plaintiff's contract claims against defendant arise, the injury for which plaintiff seeks relief through his tort claims is the alleged mishandling of his insurance claim. *See* Docket No. 19 at 24-28. Thus, the relevant location of plaintiff's injury is where plaintiff was domiciled at the time his claims was denied, and not where the car accident occurred. Based on the evidence submitted by the parties, plaintiff lived in Illinois for ten years prior to 2000, Docket No. 99-2 at 5 (Nero Dep. 11:5-25), moved to Colorado from 2000 until September 2003, Docket No. 99-2 at 4-5 (Nero Dep. 10:22-11:7), and then moved to Wisconsin, where he currently resides. Docket No. 98-1 at 4 (Nero Dep. 9:17-10:5). Although there is some evidence suggesting that plaintiff spent time in Illinois between October 2002 and September 2003, there is no indication that he filed his insurance claim with defendant while residing in Illinois. Accordingly, the [*16] most relevant location of plaintiff's injury (i.e., the place he was domiciled when defendant denied his insurance claim) is likely Wisconsin, which favors neither Colorado nor Illinois law. However, the Court finds that consideration of plaintiff's class action tort claims tips this factor in favor of applying Colorado law because a large portion of the class were likely domiciled in Colorado during the relevant period. *See* Docket No. 19 at 5, ¶ 15 (noting that CAARA applied only to policies issued "in the State of Colorado"). Moreover, the conduct giving rise to the class claims — fraudulent concealment and

2013 U.S. Dist. LEXIS 135669, *16

negligent misrepresentation — is conduct typically associated with contract formation, which likely occurred in Colorado for the majority of the class.[4] *Id.* Thus, the first contact weighs in favor of applying Colorado law.

With regard to the second § 145 contact, plaintiff does not deny that he purchased his insurance policy from one of defendant's Colorado agents, Docket No. 19-2 at 5, and that his insurance claim was handled by Colorado agents. It is also likely that the conduct causing the injury to the class occurred in Colorado based either on the mismanagement of insurance claims or misrepresentations made by defendant's Colorado agents. Moreover, although plaintiff argues that he discovered that defendant's PIP decisions were made at defendant's headquarters in Wisconsin, Docket No. 98 at 5, this fact does not support the application of Illinois law. Accordingly, the second § 145 contact also weighs in favor of applying Colorado law.

As to the third § 145 contact, it is undisputed that plaintiff is currently domiciled in Wisconsin and defendant is incorporated in Wisconsin. However, the majority of the class members are likely domiciled in Colorado. Thus, the third contact also weighs in favor of applying Colorado law. Finally, the parties' relationship is centered in Colorado. Plaintiff applied for, negotiated, and entered into [*18] the insurance contract in Colorado, plaintiff's insurance agent, Daniel B. Richmond, was located in Colorado, and defendant's Colorado agents handled plaintiff's insurance claim. Docket No. 19-2 at 5. These facts are likely similar for the rest of the class. Accordingly, the fourth contact also favors applying Colorado law. Therefore, all four of the contacts listed in § 145(2) suggest that

Colorado has the most significant relationship to plaintiff's tort claims.

As noted above, the § 145 contacts inform the § 6 analysis. With regard to the first § 6 principle, at its core, plaintiff's tort claims alleged that defendant made fraudulent or negligent misrepresentations, negligently handled insurance claims, and employed deceptive trade practices in connection with the sale of insurance policies in Colorado to a putative class of predominantly Colorado consumers. Given these facts, the needs of the interstate and international systems are undisputably best satisfied by applying Colorado law. Second, because the injury at issue here is not plaintiff's accident, but rather defendant's alleged mishandling of plaintiff's insurance claim and those of the class, which occurred in Colorado, [*19] the Court finds that Colorado's interests are great. Third, Colorado has a significant interest in resolving tort claims and unfair practices claims, which occurred in Colorado with a company licensed to do business in Colorado and arising out of contracts executed in Colorado. Fourth, having negotiated and executed the insurance contract in Colorado, the parties may have justifiably expected that Colorado law would govern disputes relating to extra-contractual factors, such as misrepresentation or concealment. Fifth, although Illinois law is arguably more favorable to plaintiff in that plaintiff would not have to provide for defendant's attorneys' fees, both bodies of law impose duties and provide protections for parties to an insurance contract. Sixth, applying Colorado law to extra-contractual issues arising out of a contract executed in Colorado enhances certainty, predictability, and uniformity of result for contracting parties in Colorado. Seventh, it is self-evident that while use of Illinois law may not be difficult, the use of Colorado law here also does not present any difficulty.

Accordingly, the Court finds that, had plaintiff's tort claims been litigated on the merits, [*20] the rights and liabilities of the parties would have been determined by Colorado law because Colorado has

---

[4] In his complaint, plaintiff alleges that defendant "concealed material" facts when it sold insurance policies to class members in order to induce the class members into purchasing its insurance policies. Docket No. 19 at 17-19, ¶¶ 60-61, 71-74. In addition, plaintiff claims that defendant negligently failed to communicate information about PIP coverage to class [*17] members by using standard insurance forms. *Id.* at 20-21, ¶¶ 78-83.

the most significant relationship to the dispute between the parties. *Burlington, 906 N.E. 2d at 93*. Because Colorado law applies to plaintiff's tort claims, the Court will now consider whether defendant is entitled to an award of attorneys' fees pursuant to *Colo. Rev. Stat. § 13-17-201*.

## B. *Colo. Rev. Stat. § 13-17-201*

Plaintiff claims that *Colo. Rev. Stat. § 13-17-201* does not apply here because his claims are based primarily on defendant's breach of contract, and not defendant's tortious acts. Docket No. 98 at 6. In addition, plaintiff argues that *§ 13-17-201* does not apply because his claims are not based on a death or injury to a person. *Id.*

*Section 13-17-201* provides that a defendant may have all of "his reasonable attorney fees in defending" an action when "all actions brought as a result of . . . injury to person . . . where any such action is dismissed on motion of the defendant . . . under *rule 12(b)* of the Colorado rules of civil procedure." Colo. Rev. Civ. *§ 13-17-201*. The Colorado General Assembly enacted *§ 13-17-201* to "discourage unnecessary litigation of tort claims," [*21] and it applies not only to tort actions involving death or injury to person or property, but also to tort actions involving mere economic injury. *Houdek v. Mobil Oil Corp., 879 P.2d 417, 424 (Colo. App. 1994)*. The Tenth Circuit has held that, when exercising diversity jurisdiction, federal courts should apply *§ 13-17-201* when Colorado state law tort claims are dismissed under *Fed. R. Civ. P. 12(b)* because federal courts "must apply the substantive law of the forum state" and attorney fee statutes are considered substantive for diversity purposes. *See, e.g., Jones v. Denver Post Corp., 203 F.3d 748, 757 (10th Cir. 2000)*.

Under *§ 13-17-201*, when an action is brought that contains a mix of tort and contract claims, courts may award attorneys' fees "if the action is primarily a tort action." *U.S. Fax Law Center, Inc. v. Henry Schein, Inc., 205 P.3d 512, 517-18 (Colo. App. 2009)*. In addition, when *§ 13-17-201* applies, an

award of attorneys' fees thereunder is mandatory. *Crandall v. City & Cnty. of Denver, 238 P.3d 659, 663-64 (Colo. 2010)*. To determine whether *§ 13-17-201* applies, district courts focus on the manner in which the plaintiff's claims are pled. *Dubray v. Intertribal Bison Co-op., 192 P.3d 604, 607 (Colo. App. 2008)*.

In [*22] this case, with regard to the class claims, plaintiff brought one breach of contract claim and four tort claims against defendant. Docket No. 19 at 16-24. As to his individual claims, plaintiff asserted one breach of contract claim, two statutory tort claims, and one common law tort claim. *Id. at 24-29*. Moreover, plaintiff added those tort claims to obtain relief beyond what was available solely under a breach of contract theory. *Id. at 29*, ¶ C; *see Dubray, 192 P.3d at 607*. The Court finds that *§ 13-17-201* applies to the facts of this case because plaintiff's claims are predominantly based in tort. *Crow v. Penrose-St. Francis Healthcare Sys., 262 P.3d 991, 997 (Colo. App. 2011)* (upholding an award of attorneys' fees pursuant to *Colo. Rev. Stat. § 13-17-201* where plaintiff brought four contract claims and four tort claims, because district court found the case was primarily based in tort); *Dubray, 192 P.3d at 606* (upholding award of attorneys' fees under *Colo. Rev. Stat. § 13-17-201* where plaintiff brought two contract claims and eight tort claims all arising out of his employment contract). In addition, the Court finds that *§ 13-17-201* applies in this case because the statute has been [*23] applied to claims arising out of torts based on purely economic injury. *See Houdek, 879 P.2d at 424* ("[the court is] not persuaded that the statute is limited in applicability to a 'species' of tort claims and is inapplicable to a tort claim which alleges only economic injury").

To the extent plaintiff argues that requiring him to pay an award of attorneys' fees for claims brought on behalf of a class is unfair, the Court has no discretion to deny attorneys' fees in this case because, once it has been shown that *§ 13-17-201* applies, the award of attorneys' fees is mandatory. *See Crandall, 238 P.3d at 663* (upholding

attorneys' fees award to the City and County of Denver against plaintiffs seeking to represent a class); *Infant Swimming Research, Inc. v. Faegre & Benson, LLP, 335 F. App'x 707, 715 (10th Cir. 2009)*. Moreover, the Court cannot apportion the attorneys' fees between plaintiff's class claims and his non-class claims because defendant would have incurred the same fees in any event since the entire action was dismissed for the same reason — plaintiff's failure to plead his own causes of action. *Dubray, 192 P.3d at 607*. Accordingly, because the Court finds that defendant is entitled **[*24]** to attorneys' fees pursuant to *§ 13-17-201*, the Court will now address plaintiff's objections to the reasonableness of defendant's requested fees.

## C. Attorneys' Fees Award

Defendant seeks an award of $52,258.00 in attorneys' fees for the work its attorneys performed in this case. Docket No. 91 at 5. Defendant states that it seeks only those attorneys' fees incurred for work related to reviewing plaintiff's original complaint, Docket No. 2, amended complaint, Docket No. 3, and the corrected second amended complaint, Docket No. 19, as well as fees incurred for work related to drafting motions to dismiss each complaint. Docket No. 91 at 5-6. In addition, defendant seeks attorneys' fees incurred in responding to plaintiff's motion to "overrule" a footnote in defendant's motion to dismiss concerning the statute of limitations. Docket No. 27.

To determine the reasonableness of a fee request, a court must begin by calculating the "lodestar amount," which represents the number of hours reasonably expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)*; *Balkind v. Telluride Mountain Title Co., 8 P.3d 581, 587-88 (Colo. App. 2000)*. The lodestar amount may **[*25]** be adjusted based upon several factors, including the amount in controversy, the length of time required to represent the client effectively, the complexity of the case, the value of

the legal services to the client, awards in similar cases, and the degree of success achieved. *See Tallitsch v. Child Support Servs., Inc., 926 P.2d 143, 147 (Colo. App. 1996)*. A party seeking an award of attorney's fees must establish the reasonableness of each dollar and each hour for which the party seeks an award. *Jane L. v. Bangerter, 61 F.3d 1505, 1510 (10th Cir. 1995)*.

## 1. Hourly Rate

Defendant requests attorneys' fees based on the compensation of its attorneys at an hourly rate of $395.00-$420.00 for Daniel D. Williams, $615.00-$630.00 for Michael S. McCarthy, $370.00 for Jeffrey S. Roberts, $310.00 for Christopher J.L. Diedrich, and $240.00 for Gordon M. Hadfield. Docket No. 91-1 at 1-2. Defendant claims that these hourly rates are reasonable for attorneys of similar skill and experience in the relevant community. *Id.* at 2, ¶ 3. In addition, defendant states that these are the "standard hourly billing rates" it charges for its attorneys. *Id.* at 1, ¶ 2. Plaintiff argues that defendant's requested **[*26]** hours are unreasonable, but does not present specific objections to the requested rates. Docket No. 98 at 10.

A "reasonable rate" is defined as the prevailing market rate in the relevant community for an attorney of similar experience. *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1078 (10th Cir. 2002)*. The party requesting fees bears "the burden of showing that the requested rates are in line with those prevailing in the community." *Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1203 (10th Cir. 1998)*. In order to satisfy its burden, plaintiff must produce "satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson, 465 U.S. 886, 895 n. 11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)*.

Defendant argues that the rates its attorneys charge

are reasonable because they are the attorneys' normal billing rates. Docket No. 99 at 6. The fact that defendant's attorneys regularly charge the aforementioned rates is relevant to the reasonableness of the rates, but not dispositive. *See Lucero v. City of Trinidad, 815 F.2d 1384, 1385 (10th Cir. 1987)* [*27] (prevailing rates at the firm seeking fees are "relevant but not conclusive in determining a reasonable rate"). Defendant has not submitted evidence that the rate charged by Mr. McCarthy is consistent with the rates charged by other attorneys with similar experience in the Denver area. *See Jane, 61 F.3d at 1510* (noting that "the fee rates of the local area should be applied"); *Farmers Co-op Co. v. Senske & Son Transfer Co., 572 F.3d 492, 500 (8th Cir. 2009)* (noting that "[t]he 'relevant community' for determining hourly rates is the place where the case was tried," and not the place from which it was transferred). Accordingly, because defendant has not provided any evidence in support of Mr. McCarthy's proposed rate, the Court will adjust Mr. McCarthy's rate based on its own familiarity of the range of prevailing rates in the Denver market. *See generally Guides, Ltd. v. Yarmouth Group Property Mgmt., Inc., 295 F.3d 1065, 1079 (10th Cir. 2002)* ("where a district court does not have before it adequate evidence of prevailing market rates, the court may use other relevant factors, including its own knowledge, to establish the rate"). Although Mr. McCarthy has over 35 years of experience [*28] litigating complex commercial litigation, the Court finds that a reasonable rate for a lead attorney in a case such as this, which requires knowledge of commercial litigation and class action claims, is $500.00. *See, e.g., MemoryTen, Inc. v. LV Admin. Servs., Inc., No. 12-cv-00993-WJM-BNB, 2013 U.S. Dist. LEXIS 37801, 2013 WL 1154492, at *3 (D. Colo. March 19, 2013)* (finding that $465-$495 is a reasonable hourly rate for an attorney with over 25 years of experience in complex commercial litigation, business torts, and securities fraud); *Jankovic v. Exelis, Inc., No. 12-cv-01430-WJM-KMT, 2013 U.S. Dist. LEXIS 54971, 2013 WL 1675936, at *4 (D. Colo. April 17, 2013)* (finding

that $430.00 was a reasonable rate for an attorney with more than 35 years of experience in employment and labor law); *Nova Leasing, LLC v. Sun River Energy, Inc., No. 11-cv-00689-CMA-BNB, 2013 U.S. Dist. LEXIS 44496, 2013 WL 1302265, at *3 (D. Colo. March 28, 2013)* (noting that $450.00 is a reasonable hourly rate for an attorney with over 23 years of experience in business litigation and securities fraud cases); *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA) Inc., ___ F. Supp. 2d ___, No. 08-cv-02750-MSK-KMT, 2013 U.S. Dist. LEXIS 102721, 2013 WL 3810861, at *15 (D. Colo. July 22, 2013)* (finding that $450 is a reasonable [*29] hourly rate for a lead attorney). The Court finds that the fees requested by defendant's remaining attorneys are consistent with rates charged by other similarly situated attorneys in the Denver area. *Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1259 (10th Cir. 2005)*.

## 2. Number of Hours

In support of its attorneys' fees motion, defendant attached a copy of itemized billing records from Faegre Baker Daniels, LLP ("Faegre Baker"). Docket No. 91-1. Defendant also submitted the declaration of Daniel D. Williams, an attorney for Faegre Baker, who acted as co-lead attorney in this case, in which Mr. Williams provides an analysis of Faegre Baker's billing entries. *Id.* Mr. Williams states that the five attorneys assigned to this case worked a total of 123.1 hours between 2011 and March 2, 2012. *Id.* at 2, ¶ 5. Mr. Williams also states that, from the total it billed defendant, Faegre Baker voluntarily omitted fees charged in connection with certain discovery matters, the successful motion to transfer the case to this District, and a fully briefed motion for summary judgment. *Id.* at ¶ 6.

Plaintiff raises five arguments in his response. First, plaintiff argues that Faegre Baker's use of block billing [*30] precludes the Court from determining how much time defendant's attorneys actually spent on a specific task. Docket No. 98 at 10-11. Second,

2013 U.S. Dist. LEXIS 135669, *30

plaintiff objects to defendant's billing entries for the period between February 23, 2011 and June 27, 2011, arguing that defendant voluntarily waived reimbursement for these fees since they reflect billing entries before the case was transferred to this District. *Id*. at 11-12. Third, plaintiff argues that certain billing entries reflect attorney time spent on the issues of *res judicata* and claim preclusion, which plaintiff contends defendant did not raise in its motion to dismiss. *Id*. at 12. Fourth, plaintiff asserts that defendant should not receive an award of attorneys' fees for work performed before November 21, 2011 because defendant's attorneys did not perform work on the successful motion to dismiss before that date. *Id*. at 13. Finally, plaintiff argues that some of defendant's billing entries are duplicative because Faegre Baker used different attorneys to draft and review the same motion. *Id*. at 13-14.

To determine the reasonableness of the hours expended, a court considers several factors. First, it considers whether the fees pertain **[*31]** to tasks that would ordinally be billed to a client. *See Ramos v. Lamm, 713 F.2d 546, 554 (10th Cir. 1983)*, overruled on other grounds by *Penn. v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711, 717 n. 4, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987)*. Plaintiff must also demonstrate that its counsel used "billing judgment" in winnowing down the hours actually spent to those reasonably expended. *Praseuth, 406 F.3d at 1257*; *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan., 157 F.3d 1243, 1250 (10th Cir. 1998)*. "In determining what is a reasonable time in which to perform a given task," an attorney submitting billing entries should consider the following factors: (1) the complexity of the case; (2) the number of reasonable strategies pursued; (3) the responses necessitated by the maneuvering of the other side; and (4) "the potential duplication of services" caused by the presence of multiple attorneys when one would suffice. *Ramos, 713 F.2d at 554*.

With regard to plaintiff's first objection, block

billing consists of attorneys recording large blocks of time for tasks without separating the tasks into individual blocks or elaborating on the amount of time each task took. *Payan v. Nash Finch Co., 310 P.3d 212, 2012 Colo. App. LEXIS 1311, 2012 WL 3517836, at *4 (Colo. App. Aug. 16, 2012)*. **[*32]** Colorado law does not require counsel to use a particular type of billing format, nor does it prohibit block billing. *Crow, 262 P.3d at 1000*. However, a trial court retains discretion to reduce the hours billed based on block billing if the court is unable to determine whether the amount of time spent on various tasks was reasonable. *Id.; Flying J Inc. v. Comdata Network, Inc., 322 F. App'x 610, 617 (10th Cir. 2009)*. The Court finds that defendant's use of block billing was reasonable in this case and does not impede the Court's ability to review defendant's billing entries. For example, plaintiff specifically objects to Mr. Hadfield's billing entry recording 4.6 hours of time for several tasks including, but not limited to, researching the statute of limitations issue, Colorado's no-fault act, and analyzing the accrual dates for plaintiff's claims. *See* Docket No. 91-1 at 6. The Court finds that, for this particular entry, Mr. Hadfield's billing entry reasonably represents time spent on the aforementioned tasks. *Jane, 61 F.3d at 1510*. In addition, the Court also rejects plaintiff's remaining objections to the billing entries identified in Docket No. 98-2, because the Court finds that **[*33]** the Faegre Baker's use of so-called block billing was generally reasonable.

With regard to defendant's billing entries between February 23, 2011 and June 27, 2011, a review of the challenged entries shows that this attorney time was spent preparing motions to dismiss plaintiff's Amended Complaint, Docket No. 3, and not the motion to transfer the case to this District. *See* Docket No. 91-1 at 4-6. Thus, although these time entries reflect work defendant's attorneys performed before the case was transferred, the actual time entries are compensable because they relate to work defendant's attorneys performed to secure dismissal of this case. *Jane, 61 F.3d at 1510*.

Case No. 1:16-cv-01237-JLK Document 54-1 filed 10/27/16 USDC Colorado pg 100 of 101

Page 11 of 12
2013 U.S. Dist. LEXIS 135669, *33

Next, plaintiff claims that defendant should not receive an award of fees for time spent researching the *res judicata* issue and the claim preclusion issue because defendant did not use this defense in its motion to dismiss. Docket No. 98 at 12. A review of defendant's motion to dismiss shows that defendant raised the claim preclusion issue in its motion to dismiss. *See* Docket No. 20 at 2-3. Thus, the Court will overrule plaintiff's objection to defendant's billing entries on this basis. *Jane, 61 F.3d at 1510*.

As to plaintiff's objection [*34] that defendant should not receive an award for work performed to draft a motion to dismiss the amended complaint, Docket No. 3, the Court is not persuaded. Although plaintiff made substantial changes between his amended complaint and his corrected second amended complaint, Docket No. 19, such as including his individual claims against defendant, the core issues presented in both complaints remained essentially the same. Thus, the work defendant's attorneys performed while drafting a motion to dismiss the amended complaint was useful in drafting the motion to dismiss the corrected second amended complaint. Accordingly, the Court finds that defendant is entitled to recover attorneys' fees for time spent on all of its motions to dismiss. *Jane, 61 F.3d at 1510*.

Finally, plaintiff argues that some of defendant's billing entries are duplicative. Docket No. 98 at 13-14; Docket Nos. 98-3, 98-4. Specifically, plaintiff contends that defendant's use of three different attorneys to review the same motion to dismiss is unreasonable. *See, e.g.*, Docket No. 91-1 at 12-13. The Court agrees that some of defendant's billing entries are duplicative. *Ramos, 713 F.2d at 554*. Accordingly, the Court will [*35] reduce defendant's attorney hours by 1.8 hours for a total number of hours of 121.30 hours.

### 3. Lodestar Amount

Based on the foregoing, the lodestar figure for defendant's fee request is $48,563.50.[5] The Court finds that this fee award is reasonable given the issues presented in this case. *Blum, 465 U.S. at 893-94*.

### III. CONCLUSION

Accordingly, it is

**ORDERED** that Defendant's Motion for Attorneys' Fees Pursuant to *C.R.S. § 13-17-201* [Docket No. 91] is **GRANTED** in part and **DENIED** in part as indicated in this Order. Plaintiff James L. Nero shall pay attorneys' fees in the amount of $48,563.50 to defendant American Family Mutual Insurance Company.

DATED September 23, 2013.

BY THE COURT:

/s/ Philip A. Brimmer

PHILIP A. BRIMMER

United States District Judge

---

[5] This total includes Mr. McCarthy's reduced hourly rate of is $500.00. and the deduction of 1.8 hours of duplicative billing entries.

Grant Sullivan

EXHIBIT D

2013 U.S. Dist. LEXIS 135669, *35

**End of Document**

EXHIBIT D